**Misc. No. _____**

# United States Court of Appeals
# for the Federal Circuit

IN RE REDLINE DETECTION, LLC,

*Petitioner.*

*Petition for Writ of Mandamus to the United States Patent and Trademark Office, Patent Trial and Appeal Board in Case No. IPR2013-00106, In re U.S. Patent No. 6,526,808*

## PETITION FOR WRIT OF MANDAMUS

MATTHEW A. NEWBOLES
Reg. No. 36,224
STETINA BRUNDA GARRED & BRUCKER
75 Enterprise, Suite 250
Aliso Viejo, CA 92656
(949) 855-1246

*Attorney for Petitioner*
*Redline Detection, LLC*

# CERTIFICATE OF INTEREST

Counsel for the petitioner, Redline Detection, LLC, certifies the following (use "None" if applicable; use extra sheets if necessary):

1.    The full name of every party or amicus represented by me is:

      Redline Detection, LLC

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

      Redline Detection, LLC

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

      None

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

      Matthew A. Newboles; Lowell Anderson; Stetina Brunda Garred & Brucker, 75 Enterprise, Suite 250, Aliso Viejo, CA 92656; (949) 855-1246; litigate@stetinalaw.com

October 17, 2013          /s/ Matthew A. Newboles
                                  Matthew A. Newboles
                                  Counsel for Petitioner

# TABLE OF CONTENTS

*Page*

CERTIFICATE OF INTEREST ................................................................ i

TABLE OF AUTHORITIES .......................................................... iv

I.  RELIEF REQUESTED ........................................................ 1

II.  ISSUES PRESENTED ........................................................ 2

III.  STATEMENT OF FACTS................................................... 3

IV.  ARGUMENT.................................................................... 8

A.  Standard of Review and the Jurisdiction of the Federal
Circuit Over Patent Office Matters ........................................... 8

B.  This Issue Presents a Clear Abuse of Discretion or
Usurpation of Judicial Power ................................................. 10

1.  The Legislative History of 37 C.F.R. § 42.123(a) –
(c) and The PTO's Interpretations Reinforces that
Timeliness and Relevance Are the Only
Requirements for a Submission Under § 42.123(a),
As the Factors Relied on by the Board Were
Rejected......................................................................... 11

2.  The Board Has Improperly Required Redline to
Meet New, Unheard of Legal Requirements That
Contradict the Plain Language of § 42.123(a) and
the PTO's Responses to Comments 91-93 .................... 14

3.  Redline Established that the Supplemental
Information Is Relevant and in Compliance with §
42.123(a) ....................................................................... 17

4.  The PTAB's Own Finding That the Exhibits Are
Relevant to the Two "Grounds" on Which IPR
Was Instituted Confirms Relevance to the
"Claims" under § 42.123(a), Rather Than
Establishing Inadmissibility.......................................... 19

     5.     The Board's Denial of Redline's Motion Under §
42.123(a) Contradicts the Board's Own Decisions ....... 21

   C.    This Issue is Particularly Novel and Affects Other Inter
Partes Cases.............................................................................. 22

   D.    This Issue Is Particularly Injurious Because of the
Compressed IPR Timeframe and Because the Expunged
Exhibits Are Relied on in the Orders, But Are Not Part of
the FRAP 30 Appendix for Later Appellate Review ............... 23

V.    CONCLUSION .................................................................................. 27

APPENDIX

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*In re Calmar, Inc.*,
    854 F.2d 461 (Fed. Cir. 1988) ............................................................. 8

*In re Princo Corp.*,
    478 F.3d 1345 (Fed. Cir. 2007) .......................................................... 8

*Mohawk Indus., Inc. v. Carpenter,*
    558 U.S. 100 (2009) ........................................................................... 9

## Statutes, Rules and Regulations

28 U.S.C. § 1295(a)(4)(A) ....................................................................... 9

28 U.S.C. § 1651 .................................................................................... 1

28 U.S.C. § 1651(a) ................................................................................ 8

35 U.S.C. § 316(a)(1)............................................................................ 23

35 U.S.C. § 316(b) ............................................................................ 6, 14

37 C.F.R. § 1.181 .................................................................................... 9

37 C.F.R. § 42.1(b) ................................................................................. 6

37 C.F.R. § 42.3(a) ................................................................................. 9

37 C.F.R. § 42.14 .................................................................................. 23

37 C.F.R. § 42.20 ............................................................................... 7, 9

37 C.F.R. § 42.71 .................................................................................... 2

37 C.F.R. § 42.71(b) ............................................................................... 9

37 C.F.R. § 42.71(d) .......................................................................... 6, 9

37 C.F.R. § 42.108(b) ........................................................................... 13

37 C.F.R. § 42.123 .......................................................................... 11, 14

37 C.F.R. § 42.123(a) ..................................................................... *passim*

37 C.F.R. § 42.123(A)(2)................................................................. 20, 25

37 C.F.R. § 42.123(b) ..................................................................... 12, 22

37 C.F.R. § 42.123(c) ...................................................................... 12, 20, 22

37 C.F.R. § 42.223(a) ............................................................. 2, 10, 21, 22

Fed. R. App. P. 21(a) ........................................................................ 1

Fed. R. App. P. 30.................................................................... 24, 26

Office Patent Trial Practice Guide, 77 Fed. Reg. 48756, 48761
    (Aug. 14, 2012).................................................................... 23

# I.    **RELIEF REQUESTED**

Redline Detection, LLC ("Redline"), the Petitioner in IPR2013-00106, *Redline Detection, LLC v. Star Envirotech, Inc.*, currently pending before the Patent Trial and Appeal Board ("PTAB" or "Board"), seeks a writ of mandamus from this Court pursuant to the provisions of 28 U.S.C. § 1651 and Rule 21(a) of the Federal Rules of Appellate Procedure directing the PTAB to vacate its August 5, 2013 Order and September 11, 2013 Decision on Petitioner's Request for Rehearing, which deny Redline's Motion to Submit Supplemental Information under 37 C.F.R. § 42.123(a).  Redline's Motion sought to enter proposed Exhibits 1039-1042 into the record.  Such Exhibits were directed to expert testimony as to why the claims at issue in the proceeding are invalid in view of the references the Board relied upon to institute trial.

Not only did the PTAB deny Redline's Motion on grounds that contradict the plain language of 37 C.F.R. § 42.123(a) and the published comments of the USPTO during the notice and comment rule making process resulting in the promulgation of § 42.123(a), the PTAB further expressly expunged such Exhibits from the record.  Such ruling completely removes the Exhibits from the proceedings and purportedly precludes Redline's use or reference to such Exhibits and their contents in case of

appeal.  Such ruling further directly conflicts with other rulings made by the PTAB under § 42.123(a), as well as identically-worded § 42.223(a) applicable to Post Grant Review proceedings, by imposing new, unheard of legal requirements not contemplated by the laws or rules, and of which it would have been impossible for Redline to know or be aware of.

Redline thus seeks to correct the PTAB's refusal to grant Redline's Motion and to make its proposed Exhibits of record.  In this regard, Redline complied in all respects with § 42.123(a) by timely seeking to submit and provide supplemental information that was relevant to the claims at issue. As Redline has exhausted its alternatives to mandamus by seeking a request for rehearing under 37 C.F.R. § 42.71 and further seeking clarification and confirmation from the Board that Redline has exhausted all administrative remedies, mandamus review is Redline's only recourse.

## II.    ISSUES PRESENTED

Did the PTAB, in *Inter Partes* Review 2013-00106, abuse its discretion in denying Redline's Motion to Submit Supplemental Information seeking to enter Exhibits 1039-1042 into the record under §42.123(a), where Redline timely submitted its Motion and proposed Exhibits within thirty (30) days after trial had been instituted and made a showing of how such Exhibits were relevant to the claims for which trial had been instituted?

Did the PTAB further abuse its discretion in imposing additional legal criteria beyond the plain language of 37 C.F.R. § 42.123(a) and the published comments of the USPTO during the notice and comment rulemaking process that Redline was obligated to meet in order for Redline's Motion to Submit Supplemental Information under § 42.123(a) to be granted?

## III.    <u>STATEMENT OF FACTS</u>

Redline is seeking to invalidate Claims 9 and 10 of United States Patent No. 6,526,808 in the matter entitled *Redline Detection, LLC v. Star Envirotech, Inc.*, IPR2013-00106, in the United States Patent and Trademark Office before the PTAB.  Redline filed its petition for *Inter Partes* Review ("IPR") on January 7, 2013.  A1-A66.  The patent owner, Star Envirotech Inc., ("Star" or "Patent Owner"), filed its preliminary response on April 10, 2013.  A67-A112.  The Board authorized the institution of an IPR on July 1, 2013. A113-A156.

On July 30, 2013, Redline filed a motion to submit supplemental information under 37 C.F.R. §42.123(a) (the "Motion").  A279-A282. Section 42.123(a) reads:

*Motion to Submit Supplemental Information.* Once a trial has been instituted, a party may file a motion to submit supplemental information in accordance with the following requirements:

(1)     A request for the authorization to file a motion to submit supplemental information is made within one month of the date the trial is instituted.

(2)     The supplemental information must be relevant to a claim for which the trial has been instituted.

37 C.F.R. § 42.123(a).    Accompanying Redline's Motion were proposed Exhibits 1039-1042, which consisted of an expert's declaration (Exhibit 1039, attached here as A316-A376), the expert's resume (Exhibit 1040, attached here as A377-A389), and two patents (Exhibits 1041, attached here as A390-A399, and 1042, attached here as A400-A404)[1].

At the initial telephonic scheduling conference held August 1, 2013 (A157-A197), the Patent Owner objected to the Motion and requested expungement of the Exhibits. A166-A173.    In an Order dated August 5,

---

[1] Ironically, despite the Patent Owner's objections, as of yesterday afternoon (October 16, 2013) the Patent Owner filed the two patents at issue, U.S. Patent No. 3,250,723 issued to Fortney and U.S. Patent No. 3,432,439 issued to Dickman, as its own Exhibits 2039 and 2040, respectively. Petitioner submits that the Patent Owner cannot now object to these references as being part of the record, and much less that such references are somehow not relevant to the IPR.

2013 (the "Order") (A198-A205), the Board expunged the Exhibits and denied Redline's Motion for the following reasons:

(1)   It is impermissible to wait until after the IPR is granted to present evidence bolstering the petitioner's position for the grounds on which the IPR was instituted. A199-A200.

(2)   The success of a motion brought under 37 C.F.R. §42.123(a) depends on the Board's discretionary determination that granting the motion is consistent with the Board's statutory mandate.  A201.

(3)   Whether or not the information sought to be submitted was available to the petitioner and could have been filed with the petition for IPR is a factor that the Board may consider in whether to grant or deny the motion under 37 C.F.R. § 42.123(a). *Id.*

(4)   Admitting supplemental information that was available to the petitioner at the time of the filing of the petition for IPR would turn the IPR into a prohibited two-stage process, citing *ZTE Corp. v. ContentGuard Holdings, Inc.*, IPR2013-00139.  A201-A202.

(5)   The supplemental information improperly addresses issues raised in the order instituting the IPR.  A202.

(6)   Petitioner must wait until its Reply to the Patent Owner's Response for any submissions.  *Id.*

Redline subsequently filed with the Board a Request for Rehearing pursuant to 37 C.F.R. § 42.71(d). A206-A224. Petitioner contended that the Board's Order was contrary to both the plain language of 37 C.F.R. § 42.123(a), as well as the published comments of the USPTO during the notice and comment rulemaking process resulting in the promulgation of § 42.123(a). A230-A231 (Comments 91-93).

Petitioner's Request for Rehearing was denied by the Board (the "Rehearing Order") on September 11, 2013. A232-A244. The Board's Rehearing Order stated that:

(1)    The criteria of §42.123(a) are not the "sole test" for submitting supplemental information. The Board may refuse to admit supplemental information if, in their discretion, admission would be contrary to the Board's statutory duties under 35 U.S.C. § 316(b) and 37 C.F.R. §42.1(b) for a just, speedy and inexpensive resolution. A233-A235.

(2)    The supplemental evidence was objectionable as raising new references, arguments, and claim charts which were addressed to the "grounds" of unpatentability as opposed to a "claim" for which the trial was instituted. A236.

(3)    Petitioner had not explained why proposed Exhibits 1041 and 1042 were relevant to the claims for which the trial was instituted. *Id.*

(4)     The proposed Exhibits contained arguments responsive to the Board's decision to institute the IPR. A238-A239.

(5)     Exclusion of only the unacceptable portions of the exhibits was not efficient. A240.

In seeking to ensure that it has exhausted its administrative remedies, Petitioner requested guidance from the PTAB, resulting in a telephonic conference held Sept. 23, 2013.  A245-A268.  During that conference call, the Board stated its belief to Redline that "you've exhausted your administrative remedies for getting it into the record."  A255.  When the PTAB was asked if any further steps could be taken the Board said, "I'm comfortable saying we can't give advisory opinions, and what you've done so far is what's been contemplated by the rules and about as far as I'm willing to go here."  A262.

In response to questions on whether the Board would entertain further motions or stipulations regarding the § 42.123(a) Motion and expunged Exhibits 1039-1042, the Board's authorization of which is required under 37 C.F.R. § 42.20, the Board expressed its unwillingness to authorize further motions.  Specifically, the Board was asked if it would enter a stipulation to make the expunged exhibits part of the record on appeal if filed under seal to address the Patent Owner's prejudice concerns.  A262-A263.  The Board stated:  "I think that we've actually ruled on this issue of whether we're going

to have these exhibits in the record and the answer has been no. We've ruled on it twice. So I'm not sure we want to entertain previous [sic] exhibits back in the record a third time." A263.

Following that conference call, the undersigned called the PTAB contact for Docketing and Before-Decision Matters and asked if there were any further administrative appeals left to pursue. The contact said none were available but that Petitioner should check the rules. All known reviews authorized by the regulations have been pursued and the Board has stated it is unwilling to authorize the filing of further proceedings on Redline's Motion and proposed Exhibits 1039-1042. Thus, Redline's administrative remedies have been exhausted.

## IV.    <u>ARGUMENT</u>

### A.    Standard of Review and the Jurisdiction of the Federal Circuit Over Patent Office Matters

A writ of mandamus under 28 U.S.C. § 1651(a) requires a showing that the right to issuance of the writ is 'clear and indisputable' and that "it lacks adequate alternative means to obtain the relief sought" *In re Princo Corp.*, 478 F.3d 1345, 1353 (Fed. Cir. 2007) (citations omitted). The remedy of mandamus also is available in extraordinary situations to correct a clear abuse of discretion or usurpation of judicial power. *In re Calmar, Inc.*, 854 F.2d 461, 464 (Fed. Cir. 1988). Particularly injurious or novel

8

issues can also be reviewed through mandamus.  *See Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 118 (2009).

This Court has exclusive jurisdiction over appeals from Patent Office proceedings.  28 U.S.C. § 1295(a)(4)(A).  In the Patent Office, the PTAB has exclusive jurisdiction over *Inter Parte* Reviews.  37 C.F.R. §42.3(a) ("The Board may exercise exclusive jurisdiction within the Office over every involved application and patent during the proceeding, as the Board may order.").  Except for its final decision on an IPR, a Board's decision is interlocutory.  § 42.71(b).  While the regulations authorize a single request for rehearing, no further review is available.  37 C.F.R. § 42.71(d).  Other than as expressly specified, any further paper regarding the motion under § 42.123(a) and expunged Exhibits 1039-1042 must be authorized by the Board.  37 C.F.R. § 42.20.[2]  In this case, Redline has exhausted all administrative remedies available before the PTAB, as discussed above. Seeking mandamus from this Court is therefore appropriate.

---

[2] Applying these rules, the PTAB has previously deemed a petition under 37 C.F.R. §1.181 to the Director as unauthorized by the rules and filed without permission.   A269-A271 (*CBS Interactive, Inc. v. Helferich Patent Licensing, LLC*, IPR2013-00033, Paper 18).

**B.    This Issue Presents a Clear Abuse of Discretion or Usurpation of Judicial Power**

The plain language of 37 C.F.R. §42.123(a), taken in view of the published comments of the USPTO Director during the notice and comment rulemaking process resulting in the promulgation of § 42.123(a), clearly establishes a comprehensive scheme that leaves no room for the Board to implement its own discretionary requirements that go beyond those stated in the plain language of § 42.123(a).  The Board's interpretation constitutes a clear error of statutory construction and a refusal to follow the rules as interpreted by the USPTO in its published comments 91-93 (A230-A231) discussed more fully below.  Such error is applicable to numerous pending IPRs relying on the PTO's published comments on the standards for submitting supplemental information under §42.123(a).  As such, a ruling by this Court will clarify the matter not only for the IPR at hand, but for countless IPRs going forward under these new and untested rules.[3]

---

[3] As discussed more fully herein, the issues presented not only affect IPRs and the submission of supplemental information under 42.123(a), but also Post Grant Reviews and the submission of supplemental information under identically-worded § 42.223(a).

1. **The Legislative History of 37 C.F.R. § 42.123(a) – (c) and The PTO's Interpretations Reinforces that Timeliness and Relevance Are the Only Requirements for a Submission Under § 42.123(a), As the Factors Relied on by the Board Were Rejected**

The regulatory history of the originally proposed § 42.123 makes clear that previously known evidence can be submitted under the presently issued § 42.123(a) as long as the evidence is "relevant" to an IPR "claim." Furthermore, the submission of previously known information within one month of institution of the IPR does not prejudice the patent owner or warrant exclusion.   In this regard, the *sole test* under §42.123(a) for admitting evidence is relevance to an IPR claim, and in view of the very recent legislative history of this rule, such a conclusion is indisputable.

Specifically, the regulations prescribing the submission of supplemental information complying with the requirements of §42.123(a) were proposed, published and discussed in notice and comment rulemaking. (A272-A274).   The discussion of then-proposed § 42.123 noted that the institution of an IPR was based on the petition and any response, so that the supplemental information must be submitted *after* inter partes review was instituted.   A273.   The initially-proposed supplemental information rule placed no limits on the information content of the proposed submission other than the information be "relevant to a ground on which trial was instituted"

and imposed no requirement that such information was not available at the time of the filing of the petition. A274.

The resulting final rule issued in relevant part as §42.123(a), and actually *broadened* the scope of supplemental information by requiring only that the supplemental information be relevant to a "claim," rather than relevant to the specific "ground" for which trial was instituted. A227, 37 C.F.R. § 42.123(a).[4]

In explaining the differences between the proposed and final regulations, the Patent Office noted that supplemental information submitted within one month under § 42.123(a) needs to be "relevant" to an IPR claim. Concerns regarding later submitted information or information not "relevant" to an IPR claim were addressed by the patent office in newly added §§ 42.123 (b) and (c), which are not at issue in this petition for writ, stating that such information must further meet the much higher "interests of justice" requirement plus a showing that it "reasonably could not have been obtained earlier." A228-A229.

---

[4] New §42.123(b) and (c) were also added, with section (b) addressing the submission of supplemental information more than one month after trial was instituted and section (c) addressing the submission of information not relevant to a claim for which trial was instituted.

In Comment 91 published with the issuance of the revised regulations, the Patent Office stated that the submission of evidence complies with § 42.123(a) if it is relevant to an IPR claim, while setting higher standards for later submitted evidence or evidence that was not "relevant" to an IPR claim. The PTO expressly states in Comment 91 that the patent owner would have sufficient time to respond to a timely filed supplemental submission under §42.123(a), and would not be prejudiced. A230. In short, the PTO said the test for submitting supplemental information within thirty (30) days under §42.123(a) is relevance to an IPR claim and the Patentee has enough time to respond to the submission without suffering prejudice.

In Comment 92, which addressed requests to limit supplemental information to rebuttal evidence, credibility evidence, or to require good cause, the PTO stated that the rules did not adopt the good cause standard, noting that "Petitioners are encouraged to set forth their best grounds of unpatentability and supporting evidence in their petitions, lest the petitioner risk a determination by the Board not to institute the review or deny the asserted grounds of unpatentability (§42.108(b))." A230-A231. The comment addresses the concern that a petitioner might 'hold back' information by not submitting it with the petition, noting that the risk that

the IPR will not be instituted is an adequate deterrent, and that later, supplemental submission of information under § 42.123(a) is not affected.

Comment 93 addressed the submission of new evidence to ensure "all pertinent issues" were resolved, even new grounds of unpatentability. The PTO response found that the § 42.123 standards were sufficient to address timeliness and relevance of the supplemental information, and reaffirmed the "relevant to a claim for which the trial has been instituted" standard of 42.123(a), stating that even new grounds could be raised if they were in the interests of justice. A231.

The Patent Office issued these regulations under its rulemaking authority, after notice and comment, as set forth in the Administrative Procedures Act ("APA"). A226. These regulations comply with and implement the statutory considerations of economy, integrity, efficient administration and timely completeness of *inter partes* reviews. 35 U.S.C. § 316(b). They must be followed by not only the parties to proceedings before the PTAB, but the PTAB as well.

**2. The Board Has Improperly Required Redline to Meet New, Unheard of Legal Requirements That Contradict the Plain Language of § 42.123(a) and the PTO's Responses to Comments 91-93**

The PTAB's denial of Redline's Motion to Submit Supplemental Information, which is the subject of this petition for writ of mandamus, is

based on standards entirely different from the published requirements of 37 C.F.R. § 42.123(a) as interpreted by the PTO. Specifically, Redline's Motion under § 42.123(a) was denied based upon the Board's view that Petitioner could have submitted expert opinion testimony (Exhibit 1039) and the Fortney and Dickman references (Exhibits 1041 & 1042) at the time of the filing of the petition for inter partes review, and that the burden was somehow on Petitioner to establish sufficient basis for submitting such exhibits at what the Board viewed as a late date in the proceeding. A201-A202. In this regard, the Order and Rehearing Order impose completely new, never-before-announced requirements, namely, that the supplemental information must not be previously known, and that the information must not be new -- even if it is relevant to an IPR claim. The Order also found that relevance to the specific "grounds" on which IPR was instituted precluded admission, and specifically precluded waiting until after the IPR was instituted to submit previously known evidence. *Id.*; A235-A240. *ZTE Corp. v. ContentGuard Holdings, Inc*. IPR2013-00139, Paper 27 (A275-A278), was cited as support.[5]

---

[5] The Board further relied on *ZTE Corp* at A277, for the requirement that "the filing of a Petition for *Inter Partes* Review should not be turned into a two-stage process, first to get the Board to narrow the issues, and second to complete the petition based on the issues left in the case." A201.

Such ruling disregards the PTO construction of § 42.123(a) in Response to Comments 91-93.  A230-A231.  There is likewise no authority for the Board to impose requirements found in subsections (b) and (c) onto Redline, namely, that such evidence could not have been obtained earlier, when those requirements were *intentionally omitted* from the final implementation of § 42.123(a). *Id.*

The Board's Order notes that the "newly submitted declaration responds to the Board's claim interpretation and other points made in the decision" in concluding that Redline did not establish sufficient basis for submitting Exhibits 1039-1042.  A202.  The Rehearing Order found that the expert's declaration "contains arguments and responses to the Board's decision to institute the inter partes review," (A238-A239) and that the expert's declaration "includes new arguments and responses to the Board's decision to institute."  A239.  These rationale are contrary to the PTO's responses to Comments 91-92 regarding § 42.123(a).

The Rehearing Order also cited "the new references and new arguments, as well as the new claim charts, presented in Dr. St. Denis's declaration."  A236.  But § 42.123(a) and Comments 91-93 show that all information need not be presented with the original petition and that new

information may be presented as supplemental information under § 42.123(a), *without any showing of good cause*.  A230-A231.

The Rehearing Order found the expunged patents of Exhibits 1041 and 1042 discussed in ¶36 of the expert's declaration addressed the "grounds" on which the IPR was based, before concluding "neither exhibit meets the requirements of 37 C.F.R. § 42.123(a)," at least as construed by the Board.  A237.  As the basis of the PTAB's Order denying the motion for supplemental information and expunging Exhibits 1039-1042 are contrary to the requirements of § 42.123(a) and the PTO Comments 91-93 interpreting that rule, a writ of mandamus reversing the denial of the motion and entering the exhibits is proper and requested.

### 3.  Redline Established that the Supplemental Information Is Relevant and in Compliance with § 42.123(a)

In addition to being timely, Redline's Motion under § 42.123(a) established the relevance of  Exhibits 1039-1042 to the two claims on which trial was instituted, showing Redline is entitled to entry of the supplemental information under § 42.123(a).

The PTAB identified Redline's initial Motion under § 42.123(a), the listing of that Motion on Redline's proposed motions list, the scheduling conference call and the Request for Rehearing on Redline's Motion as providing four opportunities to present arguments for admission, each of

which was considered by the Board.  A242.  Each opportunity was viewed by the Board as addressing the relevance of the supplemental information. *Id*.  Under the plain language of § 42.123(a), and the Board's finding of relevance to the specific grounds of the IPR, the Motion and proposed motions list should suffice to establish relevance to a claim.

The expert's qualification were not disputed as he was involved in testing related to the patented systems for generating smoke in inert gas to test for leaks in automotive evaporative emissions (EVAP) systems including their fuel tanks.  A280; A284.

The expert's declaration (Exhibit 1039) was said to explain several aspects of the references on which the IPR was instituted, and to help in establish reasons for combining the invalidating references and reasons for invalidating the two claims on which IPR was granted, based on the invalidating references on which the IPR was granted.  A280; A284-A285 (declaration directed to IPR claims and invalidity on the IPR grounds).  The declaration also included claim charts directed to the two invalidity grounds on which the IPR was granted and how one skilled in the art would deem the claims obvious in light to the references on which IPR was granted.  *Id*.

The expert's resume (Exhibit 1040) established his expert qualifications and is relevant for that reason.  A279-A280.  Exhibits 1041

and 1042 were two patents cited in the Gilliam patent on which the IPR was granted and were discussed in the expert declaration regarding uses of smoke machines and the types of smoke generators used in the invalidating Gilliam patent. A281.

As Redline's Motion explains the relevance of the proposed Exhibits to the claims for which the trial has been instituted, the requirements of § 42.123(a) are believed to be met. The Board's findings of relevance to the specific grounds on which the IPR was granted confirm the relevancy. The Board's conclusion that the proposed Exhibits are now not relevant to a claim is clearly in error, and reversal is proper.

**4. The PTAB's Own Finding That the Exhibits Are Relevant to the Two "Grounds" on Which IPR Was Instituted Confirms Relevance to the "Claims" under § 42.123(a), Rather Than Establishing Inadmissibility**

IPR claims 9 and 10 were found more likely than not to be invalid on two separate grounds, identified as ground 1 and ground 2 of the IPR instituting Order of July 1, 2013. A142-A143. Ground 1 is obviousness based on patents to Gilliam and Stoyle. Ground 2 is obviousness based on patents to Gilliam and Pauley, and a 1999 Website printout. *Id*.

The Board's Rehearing Order characterized the expert's declaration and its cited exhibits as "directed, at least in part, if not primarily, to the *grounds* for unpatentability on which trial was instituted . . ." A239.

19

Likewise, the expunged patents of Exhibits 1041 and 1042 and ¶36 of the expert's declaration addressed the "grounds" on which the IPR was based, which led to the conclusion that "neither exhibit meets the requirements of 37 C.F.R. §42.123(A)(2)." A237.

Redline maintains that information relevant to the specific grounds of invalidity is also relevant -- and actually *must* be relevant -- to the claim being invalidated. Relevance to the claim is broader than relevance to the specific ground of claim invalidity. Moreover, the Board's findings confirm relevance to the claims of the IPR under § 42.123(a).[6]

Thus, the Board's findings that the supplemental information is relevant to a specific ground on which trial was instituted confirm relevance

---

[6] That relevance to a claim is broader than relevance to the specific ground of rejection is confirmed by the changes to §42.123(a), which was originally proposed to allow submission of supplemental information *relevant to a ground* for which the trial has been instituted. A274 (emphasis added). As issued, the scope of potential supplemental information was *broadened* by requiring the supplemental information be relevant to a "claim for which trial has been instituted," rather than relevant to the specific "ground" for which trial was instituted. §42.123(a). The accompanying PTO comments note that if the information is not relevant to an IPR claim, then the relevance must be explained as required by the newly added §42.123(c). A230 (Comment 91).

to a claim under §42.123(a) rather than showing the information fails to comply with that regulation.[7]

### 5. The Board's Denial of Redline's Motion Under § 42.123(a) Contradicts the Board's Own Decisions

In addition to disregarding the criteria under § 42.123(a) and the PTO's Responses to Comments 91-93, despite Redline's timely submission of its Motion and Exhibits 1039-1042 and the relevance of those Exhibits, the Board's ruling contradicts other rulings made by the Board under § 42.123(a). Specifically, in *Gnosis S.P.A. v. Merck & CIE*, IPR2013-00117, Paper 21 (A289-A295), the Board readily admitted supplemental information submitted in a manner identical to Redline's submission, with a cursory motion and without the Board imposing any of the new criteria applied by the Order, the Rehearing Order, and *ZTE*.

The PTAB further admitted supplemental information in *Interthinx, Inc. v. Corelogic Solutions, LLC*, CBM 2012-00007, Paper 28/29 (A296-A298), where the petitioner was allowed to submit supplemental information under identically-worded § 42.223(a) by merely noting that, "having filed its request within one month of the institution of the trial, Rule § 42.223(a) permits Petitioner to file supplemental information that is shown to be relevant to a claim for which the trial has been instituted." A297. Petitioner

---

[7] To the extent there is any question, the proposed Exhibits are being made available for review in this mandamus proceeding at A316-A404.

had no obligation to meet any of the new criteria that were imposed on Redline.

Such a clear abuse of discretion or usurpation of judicial power favors mandamus relief. Without such relief, Redline has no idea what standard applies in submitting evidence under § 42.123(a).

### C. This Issue is Particularly Novel and Affects Other Inter Partes Cases

The submission of supplemental information under § 42.123(a) has not yet been construed by this Court. An identically worded regulation applies to Post Grant Reviews (37 C.F.R. § 42.223(a)). The plain meaning of the regulation allows supplemental information to be submitted if it is relevant to an IPR claim and submitted within one month of the IPR's institution. It does *not* consider prior availability of the information, as required by §§ 42.123(b) and (c).

The Board, however, in the Order, the Rehearing Order, and in *ZTE*, has imposed these additional criteria on submissions under § 42.123(a). Because of the compressed timeframe of the IPR procedure, it is in the interests of clarity and judicial economy to rapidly address this issue to achieve uniformity before the Board in its interpretation of § 42.123(a). Thus, the novelty of this issue favors mandamus relief.

### D. This Issue Is Particularly Injurious Because of the Compressed IPR Timeframe and Because the Expunged Exhibits Are Relied on in the Orders, But Are Not Part of the FRAP 30 Appendix for Later Appellate Review

The Patent Owner alleged in its Preliminary Response that because there is no expert declaration, there is insufficient evidence to establish invalidity.   A79-A92. The excluded and expunged Exhibits 1039-1042, however, include an expert's declaration and refute that basis for attacking the institution the IPR.   If on appeal, the evidence of invalidity is found insufficient to invalidate the patent, and the expert's declaration is found to be improperly excluded, then it is highly unclear what procedure would enable IPR completion within the statutory timelines, or whether the timelines would still even apply.[8]   Thus, the particularly injurious nature of

---

[8] That Exhibits 1039-1042 have been expunged from the record while their content is characterized in dispositive orders creates a further issue that runs contrary to the policy to make all documents filed in IPR proceedings available to the public.  *See, e.g.,* 35 USC 316(a)(1):"… the file of any proceeding under this chapter shall be made available to the public…"; 37 CFR 42.14: Public Availability "…The record of a proceeding, including documents and things, shall be made available to the public, except as otherwise ordered."  *See also*, A299-A305: "There is a strong public policy in favor of making information filed in an inter partes review proceeding open to the public, especially because the proceeding determines the patentability of claims in an issued patent and, therefore, affects the rights of the public. Under 35 U.S.C. § 316(a)(1), the default rule is that all papers filed in an inter partes review are open and available for access by the public….Similarly, 37 C.F.R. § 42.14 provides: The record of a proceeding, including documents and things, shall be made available to the public, except as otherwise ordered…."; A306-A315; Office Patent Trial Practice Guide, 77 Fed. Reg. 48756, 48761 (Aug. 14, 2012). "[t]here is an expectation that information will be made public where the existence of the information . . . is identified in a final written decision following a trial."

the issue, in that Redline lacks alternative means to obtain the relief sought, favors mandamus relief.

Additionally, most of the Patent Owner's arguments for denying Redline's Motion under § 42.123(a) and significant portions of the Board's Order and Rehearing Order denying the motion under § 42.123(a) refer to various unidentified parts of the proposed Exhibits 1039-1042, with the characterizations of the Exhibits favoring the decision of the Board or of Star.  Because the arguments to deny the Motion and the resulting Orders rely on exhibits now expunged from the record, there is purportedly no way to evaluate the merits of the Order and Rehearing Order in a later appeal because the Exhibits are not part of the record on appeal under F.R.A.P. 30.

The Patent Owner's opposition to the supplemental information discussed the content of the expunged Exhibits 1039-1042 as a basis for denying the Motion for supplemental submission under § 42.123(a), characterizing the exhibits as "extremely prejudicial," (A167), as presenting "brand new arguments," "new claim charts" such that "about 70 percent of the claim chart information is brand new." (A168).  The proposed Exhibits were said to address claim terms that were not argued in the petition for *inter partes* review, to contain a "whole new section on a person of ordinary skill in the art" and what was "understood at the time of the alleged invention."

*A169*  The expert declaration was also said to characterize references that were not part of the petition but cited by Star.  *Id*.  All of these allegedly contributed to Star's prejudice.  A170 ("prejudice is extreme").

None of the Patent Owner's arguments denied that the Exhibits were relevant to the two claims on which trial was instituted.

The Board's Order summarized both parties' characterization of the Exhibits and arguments.  A199-A200.  In concluding that Redline did not establish sufficient basis for submitting Exhibits 1039-1042, the Order notes that the "newly submitted declaration responds to the Board's claim interpretation and other points made in the decision."  A202.  The Rehearing Order cited the discussion of the Exhibits, including "the new references and new arguments, as well as the new claim charts, presented in [the expert's] declaration."  A236.  The expunged patents of Exhibits 1041 and 1042 are discussed regarding declaration ¶ 36 and the "grounds" on which the IPR was based, before concluding that "neither exhibit meets the requirements of 37 C.F.R. § 42.123(A)(2)," at least as construed by the Board.  A237.  The characterized content of the excluded papers thus form part of the Board's Order.

The Rehearing Order found that the expert's declaration "contains arguments and responses to the Board's decision to institute the inter partes

review." A238-A239. The Rehearing Order further found the declaration "is directed, at least in part, if not primarily, to the *grounds* for unpatentability on which trial was instituted and includes new arguments and responses to the Board's decision to institute." A239. The Patent Owner offered to stipulate to make the proposed Exhibits part of the appendix on appeal. A258-A259. The parties' stipulation to alter F.R.A.P. 30, however, is not believed to be binding on the Federal Circuit. The Patent Owner told the Board that the proposed Exhibits were part of the record on appeal, just like a motion *in limine* that excludes certain exhibits. A259. But motions *in limine* and exhibits have docket numbers and are part of the appendix on appeal under F.R.A.P. 30. In contrast, the proposed Exhibits 1039-1040 at issue have only a docket listing -- their contents are *not part of the record*. A254.[9]

The Board's Order and Rehearing Order relied on the content of the expert's declaration (i.e., Exhibit 1039), but the declaration is expunged and thus not part of the record on appeal. Thus, purportedly no effective appeal can be taken regarding the Motion to submit Exhibits 1039-1042 or the

---

[9] As discussed in footnote 1, *supra*, the Patent Owner has now made Exhibits 1041-1042 of record as the Patent Owner's Exhibits 2039 and 2040 – there is no issue those will now form part of the Rule 30 appendix on appeal.

decision to expunge those Exhibits.  Because of these conditions, Redline

lacks adequate alternative means to obtain meaningful review on appeal,

making this issue particularly injurious, and thus mandamus relief is

appropriate.

## V.    CONCLUSION

The requirements of § 42.123(a) and the PTO Comments 91-93

interpreting that rule show Redline's Motion for supplemental information

should have been granted.  Redline's Motion and expunged exhibits meet

the requirements of § 42.123(a), and the PTAB's findings that the exhibits

are relevant to the specific grounds on which claims were rejected confirms

those requirements are met.  A writ of mandamus ordering the grant of the

Petitioner's Motion to Supplement, and directing the Board to enter Exhibits

1039 to 1042 into the record, is thereby respectfully requested.

Respectfully submitted,

STETINA BRUNDA GARRED & BRUCKER

Dated: October 17, 2013         /Matthew A. Newboles/
                                Matthew A. Newboles, Reg. No. 36,224
                                Attorney for Petitioner
                                Redline Detection, LLC

                                STETINA BRUNDA
                                GARRED & BRUCKER
                                75 Enterprise, Suite 250
                                Aliso Viejo, CA 92656
                                (949) 855-1246

27

# APPENDIX

# **TABLE OF CONTENTS**

Petition for *Inter Partes* Review of U.S. Patent No. 6,526,808
Under 35 U.S.C. §311-319 and 37 C.F.R. §42.100 *et seq.*
(PTAB PAPER 1) .............................................................. A1-A66

Star Envirotech, Inc.'s Preliminary Response
(PTAB PAPER 13) ......................................................... A67-A112

PTAB Institution Order of July 1, 2013 (PTAB PAPER 17)........ A113-A156

Star Notice of Filing Transcript of August 1, 2013 Conference
Call (PTAB PAPER 23) ................................................. A157-A197

PTAB Order Conduct of the Proceeding (PTAB PAPER 24) ...... A198-A205

Petitioner's Request for Rehearing Pursuant to 37 C.F.R.
§42.71(d) (PTAB PAPER 29) ....................................... A206-A224

Petitioner's Exhibit 1046 ............................................. A225-A231

PTAB Order on Petitioner's Request for Rehearing
(PTAB PAPER 36) ...................................................... A232-A244

Petitioner's Notice of Filing Transcript of September 23, 2013
Conference Call (PTAB PAPER 38)............................... A245-A268

*CBS Interactive, Inc. v. Helferich Patent Licensing, LLC*, Case
IPR2013-00033 Order Expunging Papers (PTAB PAPER 18) .... A269-A271

Petitioner's Exhibit 1045 ............................................. A272-A274

*ZTE Corporation v. Contentguard Holdings, Inc.*, Case
IPR2013-00139 Decision Conduct of The Proceeding
(PTAB PAPER 27) ...................................................... A275-A278

Petitioner's Motion for Supplemental Disclosure of New
Exhibits 1037-1042 per 35 U.S.C. §361(3) and 37 C.F.R.
§123(a) (PTAB PAPER 19)........................................... A279-A282

Petitioner's Proposed Motions Prior to Initial Conference
(PTAB PAPER 21) ...................................................... A283-A288

*Gnosis S.P.A. v. Merck & Cie*, Case IPR2013-00117 Order
Conduct of the Proceeding (PTAB PAPER 21) ........................... A289-A295

*Interthinx, Inc. v. Corelogic Solutions LLC*, Case CBM2012-
00007 Order Granting Petitioner's Motion To Submit
Supplemental Information Under 37 C.F.R. §42.223 (PTAB
PAPER 28/29)............................................................................ A296-A298

*Amkor Technology v. Tessera, Inc.*, Case IPR2013-00242
Decision Joint Motion to Seal (PTAB PAPER 31) ..................... A299-A305

*St. Jude Medical v. Volcano Corporation*, Case IPR2013-00258
Decision Revised Motion to Seal (PTAB PAPER 28) ................. A306-A315

Petitioner's Expunged Exhibit 1039 .......................................... A316-A376

Petitioner's Expunged Exhibit 1040 .......................................... A377-A389

Petitioner's Expunged Exhibit 1041 .......................................... A390-A399

Petitioner's Expunged Exhibit 1042 .......................................... A400-A404

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

## BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

In re U.S. Patent No. 6,526,808

Filed:           July 7, 1999

Issued:          March 4, 2003

Inventors:       Kenneth Alan Pieroni
                 Jim Eli Saffie

Assignee:        Star Envirotech, Inc.

Title:           SMOKE AND CLEAN AIR GENERATING MACHINE FOR
                 DETECTING PRESENCE AND LOCATION OF LEAKS
                 IN FLUID SYSTEM

_____

Mail Stop PATENT BOARD, PTAB
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

**PETITION FOR _INTER PARTES_ REVIEW OF U.S. PATENT NO. 6,526,808 UNDER 35 U.S.C. § 311-319 AND 37 C.F.R. § 42.100 ET SEQ.**

**A1**

*Inter Partes* Review of U.S. Patent No. 6,526,808

# **TABLE OF CONTENTS**

**Page(s)**

I.     MANDATORY NOTICES PER 37 C.F.R. § 42.8(A) ..... 1

    A.     Real Party-In-Interest: ..... 1

    B.     Related Matters ..... 1

    C.     Lead and Back-Up Counsel ..... 2

    D.     Service Information ..... 2

    E.     Power of Attorney ..... 2

II.    PAYMENT OF FEES ..... 2

III.   REQUIREMENTS FOR *INTER PARTES* REVIEW ..... 3

    A.     Grounds for Standing Under 37 C.F.R. § 42.104(a) ..... 3

    B.     Identification of Challenge Under 37 C.F.R. § 42.104 ..... 3

         1.     Claims for which *inter partes* review is requested ..... 3

         2.     The specific art and statutory ground(s) of the challenge ..... 3

         3.     How the challenged claims are to be construed ..... 7

         4.     Supporting evidence relied upon to support the challenge ..... 8

IV.   SUMMARY OF THE '808 PATENT ..... 8

    A.     Description Of The '808 Patent ..... 8

    B.     Summary Of The Prosecution History ..... 10

    C.     Summary Of *Ex Parte* Reexamination ..... 12

         1.     Reexamination Control No. 90/009,683 ..... 12

         2.     Reexamination Control No. 90/011,916 ..... 13

    D.     Construction of Claims 9-10 and Clarification of "Claim Terms Flammable Fluid" and "Locating" ..... 15

         1.     Clarification of "Flammable Fluid" ..... 16

*Inter Partes* Review of U.S. Patent No. 6,526,808

# TABLE OF CONTENTS (continued)

|  |  |  |  |
|---|---|---|---|
| | 2. | Clarification of "Locating" | 18 |
| V. | DESCRIPTION OF THE PRIOR ART | | 19 |
| | A. | Prior Art Smoke Machines for Vehicle Leak Testing | 21 |
| | | (1) The *Gilliam* Patent (Ex. 1005) | 21 |
| | | (2) The 1995 VACUTEC Reference (Ex. 1006) | 23 |
| | B. | Prior Art Using Inert Gas to Make Smoke And Motivation For Use In Leak Testing | 24 |
| | | (1) The 1969 AE Article (Ex. 1007) | 25 |
| | | (2) The GB '867 Patent (Ex. 1008) | 25 |
| | | (3) The IFJ Article (Ex. 1009) | 26 |
| | | (4) GB '266 Patent (Ex. 1010) | 27 |
| | | (5) The 1998 ESTA Reference (Ex. 1011) | 28 |
| | | (7) The 1999 Website (Ex. 1013) | 30 |
| VI. | THERE IS A REASONABLE LIKELIHOOD THAT CLAIMS 9 AND 10 OF THE '808 PATENT ARE UNPATENTABLE | | 30 |
| VII. | DETAILED EXPLANATION | | 34 |
| | A. | Claim Charts Showing Claims 9 and 10 of the '808 Patent Are Obvious On Grounds (1) Gilliam + AE, or (2) Gilliam + GB '867, or (3) Gilliam + IFJ + Swiatosz, or (4) Gilliam + IFJ + 1999 Website, or (5) Gilliam + GB '266 + 1999 Website, or (6) Gilliam + ESTA + 1999 Website | 34 |
| | B. | Claim Charts Showing Claims 9 and 10 of the '808 Patent Are Obvious On Grounds (7) Gilliam/Vacutec + AE, or (8) Gilliam/ Vacutec + GB '867 + AE, or (9) Gilliam/Vacutec + IFJ + Swiatosz, or (10) Gilliam/Vacutec + GB '266 + 1999 Website, or (11) Gilliam/Vacutec + IFJ + 1999 Website, or (12) Gilliam/Vacutec + ESTA + 1999 Website | 45 |

**A3**

*Inter Partes* Review of U.S. Patent No. 6,526,808

# **TABLE OF CONTENTS (continued)**

VIII.   CONCLUSION                                                                58

**A4**

*Inter Partes* Review of U.S. Patent No. 6,526,808

## EXHIBIT LIST

1001  United States Patent No. 6,526,808 to *Pieroni et al*. (the '808 Patent)

1002  Prosecution History of United States Patent Application Serial No. 09/348,320, which matured into the '808 Patent

1003  Prosecution History of *Ex Parte* Reexamination Control No. 90/009,683

1004  Prosecution History of *Ex Parte* Reexamination Control No. 90/011,916

1005  United States Patent No. 5,107,698 to *Gilliam* (the *Gilliam* Patent)

1006  The 1995 VACUTEC Smoke Machine Operation Manual and Maintenance Instructions (the VACUTEC Reference)

1007  The 1969 Article entitled "Research and Testing" from Aircraft Engineering and Aerospace Technology, Vol. 41, issue 1, pp. 44-44 (the AE Article)

1008 Great Britain Patent No. 1,240,867 filed Aug. 28, 1968 and published July 28, 1971 (the GB '867 Patent)

1009  The 1996 Article entitled "High Temperature Smoke Training – the Way Forward" published in the Industrial Fire Journal, December – January 1996 (the IFJ Article)

1010 Great Britain Patent No. 640,266  filed June 4, 1947 and published July 19, 1950 (the GB '266 Patent)

1011 The 1998 Entertainment Services & Technology Association's Introduction to Modern Atmospheric Effects (the ESTA Reference)

1012  United States Patent No. 4,303,397 to *Swiatosz* (the *Swiatosz* Patent)

1013  Webpages published at least as early as January 28, 1999 from the website www.smokemachines.com (the 1999 Website)

1014  United States Patent No. 5,922,944 to *Pieroni et al.*(the '944 Patent)

1015  Material Data Safety Sheet for Citigo PAO 46 Oil

## **EXHIBIT LIST:** (continued)

1016  Definitions Published 1997 re: the Occupational Safety and Health Administration (OSHA) Definition for Flammable Liquid; Department of Transportation Definition of Flammable Liquid and the Environmental Protection Agency's definition of "ignitable" fluids.

1017 Federal Register Published 1999 re: OSHA's definition for Flammable Liquid

*Inter Partes* Review of U.S. Patent No. 6,526,808

Petitioner, Redline Detection, LLC ("Redline") requests *inter partes* review of Claims 9 and 10 of U.S. Patent 6,526,808 ("the '808 Patent" – Ex. Ex. 1001) pursuant to 35 U.S.C. §§ 311-319 and 37 C.F.R. § 42.100 et seq.

## I.    MANDATORY NOTICES PER 37 C.F.R. § 42.8(a)

### A.    Real Party-In-Interest:

Per 37 C.F.R. § 42.8(b)(1), Petitioner certifies that Redline is the real party-in-interest.

### B.    Related Matters

Per 37 C.F.R. § 42.8(b)(2), the '808 patent is the only patent involved in a lawsuit titled *Star EnviroTech, Inc. v. Redline Detection, LLC et al.*, SACV12-1861-DOC (C.D. Cal.), filed on October 25, 2012, less than one year ago. A Scheduling Conference is set for February 25, 2013.  A motion under FRCP 12(b)(6) and 12(f) is set for hearing on January 28, 2013.

Redline seeks to use the *inter partes* review as an alternative to time consuming and costly patent litigation as provided by the Leahy-Smith America Invents Act (AIA). This review first became available for the '808 patent on Sept. 16, 2012.  As the current proceeding must be concluded within 12 months by statute, the issues of patentability for the '808 patent may be quickly resolved, especially insofar as discovery has not yet commenced in the above-referenced litigation. Moreover, the *inter partes*

1

proceedings will be exclusively presided over by technically trained Administrative Patent Judges of the PTAB. Redline is looking forward to a timely and cost effective resolution to the patent validity.

## C.    Lead and Back-Up Counsel

Per 37 C.F.R. § 42.8(b)(3), Petitioner's designation of counsel is:

| **Lead Counsel** | **Back-Up Counsel** |
|---|---|
| Matthew A. Newboles | Lowell Anderson |
| Registration No. 36,224 | Registration No.: 30,990 |
| STETINA BRUNDA | STETINA BRUNDA |
| GARRED & BRUCKER | GARRED & BRUCKER |
| 75 Enterprise, Suite 250 | 75 Enterprise, Suite 250 |
| Aliso Viejo, CA 92656 | Aliso Viejo, CA 92656 |
| Phone: (949)855-1246 | Phone: (949) 855-1246 |
| Facsimile: (949)855-6371 | Facsimile: (949) 855-6371 |
| mnewboles@stetinalaw.com | landerson@stetinalaw.com |

## D.    Service Information

Per 37 C.F.R. § 42.8(b)(4), service information is provided above.

## E.    Power of Attorney

A power of attorney is filed in accordance with 37 C.F.R. § 42.10(b).

## II.    PAYMENT OF FEES

*Inter partes* review is requested for two claims, specifically Claims 9 and 10 of the '808 patent, and is accompanied by a payment of $27,200 for up to 20 claims. *See* 37 C.F.R. § 42.15 & 35 U.S.C. § 312(a)(1). The undersigned further authorizes payment for any additional fees that might be due in connection with this Petition to be charged to Deposit Account No.

2

**A8**

19-4330.

## III.   REQUIREMENTS FOR *INTER PARTES* REVIEW

As set forth below, each requirement of 37 C.F.R. § 42.104 for *inter partes* review of the '808 patent is satisfied.

### A.   Grounds for Standing Under 37 C.F.R. § 42.104(a)

Per 37 C.F.R. § 42.104(a), Petitioner certifies that the '808 patent is now available for *inter partes* review and that the Petitioner is not barred or estopped per 35 U.S.C. § 315(e) as the '808 patent is not subject to a prior estoppel-based proceeding of the AIA and that the complaint identified in Section I.B was served within the last 12 months.

### B.   Identification of Challenge Under 37 C.F.R. § 42.104

Per 37 C.F.R. § 42.104(b), the relief requested is that the Patent Trial and Appeal Board ("PTAB") invalidate Claims 9 and 10 of the '808 patent.

#### 1.  Claims for which *inter partes* review is requested

Per 37 C.F.R. § 42.104(b)(1), Petitioner requests *inter partes* review of Claims 9 and 10 of the '808 patent.

#### 2.  The specific art and statutory ground(s) of the challenge

Per 37 C.F.R. § 42.104(b)(2), *inter partes* review of the '808 Patent is requested in view of the following references, each of which is prior art to the '808 Patent under 35 U.S.C. § 102(a), (b), and/or (e).  While several

*Inter Partes* Review of U.S. Patent No. 6,526,808

references describe the same products, the references are listed separately:

United States Patent No. 5,107,698 to *Gilliam*, filed April 5, 1991 and issued April 28, 1992 (the *Gilliam* Patent), which is a 102(a) reference, Exhibit 1005.

The 1995 VACUTEC Smoke Machine Operation Manual and Maintenance Instructions (the VACUTEC Reference), which is a 102(a) reference, Exhibit 1006.

The 1969 article, "Research and Testing" from Aircraft Engineering and Aerospace Technology, Vol. 41, issue 1, pp. 44-44, published in 1969 (the AE Article), which is a 102(a) reference, Exhibit 1007.

Great Britain Patent No. 1,240,867, filed Aug. 28, 1968 and published July 28, 1971 (the GB '867 Patent), which is a 102(a) reference, Exhibit 1008.

The article entitled "High Temperature Smoke Training – the Way Forward," published in the Industrial Fire Journal, December – January 1996 at p. 56 (the IFJ Article), which is a 102(a) reference, Exhibit 1009.

Great Britain Patent No. 640,266, filed June 4, 1947 and published July 19, 1950 (the GB '266 Patent), which is a 102(a) reference, Exhibit 1010.

The Entertainment Services & Technology Association's Introduction

4

to Modern Atmospheric Effects, published in 1998 (the ESTA Reference), which is a 102(a) reference, Exhibit 1011.

United States Patent No. 4,303,397 to *Swiatosz*, filed August 8, 1980 and issued December 1, 1981 (the *Swiatosz* Patent), which is a 102(a) reference, Exhibit 1012.

Webpages published at least as early as January 28, 1999 from the website www.smokemachines.com, obtained from archive.org (the 1999 Website), which is a 102(b) reference, Exhibit 1013.

Petitioner requests *inter partes* review of Claims 9 and 10 of the '808 Patent on the grounds set forth below and request that Claims 9 and 10 be found unpatentable. The first cited reference shows the basic structure and process while the remaining references provide inert gas to generate smoke, with the second bases of rejections 7-12 using overlapping references that disclose the same products to further ensure completeness of disclosures:

**Ground 1.**   The *Gilliam* Patent (Ex. 1005) in view of the AE Article (Ex. 1007) render Claims 9 and 10 obvious under 35 U.S.C. § 103.

**Ground 2.**   The *Gilliam* Patent (Ex. 1005) in view of the GB '867 Patent (Ex. 1008) render Claims 9 and 10 obvious under 35 U.S.C. § 103.

**Ground 3.**   The *Gilliam* Patent (Ex. 1005) in view of the IFJ Article (Ex. 1009) and further in view of the *Swiatosz* Patent (Ex. 1012) render

Claims 9 and 10 obvious under 35 U.S.C. § 103.

**Ground 4.** The *Gilliam* Patent (Ex. 1005) in view of the IFJ Article (Ex. 1009) and further in view of the 1999 Website (Ex. 1013) render Claims 9 and 10 obvious under 35 U.S.C. § 103.

**Ground 5.** The *Gilliam* Patent (Ex. 1005) in view of the GB '266 Patent (Ex. 1010) and further in view of the 1999 Website (Ex. 1013) render Claims 9 and 10 obvious under 35 U.S.C. § 103.

**Ground 6.** The *Gilliam* Patent (Ex. 1005) in view of the ESTA Article (Ex. 1011) and further in view of the 1999 Website (Ex. 1013) render Claims 9 and 10 obvious under 35 U.S.C. § 103.

**Ground 7.** The *Gilliam/Vacutec* References (Exs. 1005 & 1006) in view of the AE Article (Ex. 1007) render Claims 9 and 10 obvious under 35 U.S.C. § 103.

**Ground 8.** The *Gilliam/Vacutec* References (Exs. 1005 & 1006) in view of the GB '867 Patent (Ex. 1008) and AE Article (Ex. 1007) render Claims 9 and 10 obvious under 35 U.S.C. § 103.

**Ground 9.** The *Gilliam/Vacutec* References (Exs. 1005 & 1006) in view of the IFJ Article (Ex. 1009) and further in view of the *Swiatosz* Patent (Ex. 1012) render Claims 9 and 10 obvious under 35 U.S.C. § 103.

**Ground 10.** The *Gilliam/Vacutec* References (Exs. 1005 & 1006) in

view of the GB '266 Patent (Ex. 1010) and further in view of the 1999 Website (Ex. 1013) render Claims 9 and 10 obvious under 35 U.S.C. § 103.

**Ground 11.** The *Gilliam/Vacutec* References (Exs. 1005 & 1006) in view of the IFJ Article (Ex. 1009) and further in view of the 1999 Website (Ex. 1013) render Claims 9 and 10 obvious under 35 U.S.C. § 103.

**Ground 12.** The *Gilliam/Vacutec* References (Exs. 1005 & 1006) in view of the ESTA Article (Ex. 1011) and further in view of the 1999 Website (Ex. 1013) render Claims 9 and 10 obvious under 35 U.S.C. § 103.

### 3.  How the challenged claims are to be construed

Per 37 C.F.R. § 42.104(b)(3), Petitioner provides an explanation of how the claims that are the subject of the present Petition for *inter partes* review are to be construed.  A claim subject to *inter partes* review receives the "broadest reasonable construction in light of the specification of the patent in which it appears." 42 C.F.R. § 42.100(b).  Except for the claim terms "flammable fluid" and "locating" as explained in Section IV.C below, Petitioner submits that for purposes of this *inter partes* review only, the claim terms should take on their ordinary and customary meaning that the terms would have to one of ordinary skill in the art.

None of the challenged claims contains a "means" limitation under §112 ¶6.  Also, but for the claim terms "flammable fluid" and "locating,"

none of the claims recite a "coined" or defined phrase (lexicography).

### 4. Supporting evidence relied upon to support the challenge

Per 37 C.F.R. § 42.104(b)(5), the exhibit numbers of the supporting evidence relied upon herein and the relevance of that evidence, including identifying specific portions of the evidence that support the challenges, are provided in Section VII, below, in the form of explanatory text and claim charts. An Appendix of Exhibits identifying the exhibits is also attached.

## IV.   SUMMARY OF THE '808 PATENT

### A.   Description Of The '808 Patent

The '808 Patent discloses a method and apparatus to determine if a closed fluid system, such as the evaporative system or exhaust system of a motor vehicle, is leaking. Claims 9-10, for which *inter partes* review is sought, require leak testing in a volatile, potentially explosive environment, specifically a vehicle fuel tank. Ex. 1001, Reexamined Claim 9 at Col. 2: 21-26. The '808 Patent describes generating smoke with the aid of a carrier gas, which can be either air or, "because of their non-flammable and inert characteristics," an inert gas such as nitrogen or carbon dioxide. Ex. 1001, Col. 6: 54-60. The '808 Patent says that smoke carried by an inert gas would be relatively safe for testing the evaporative system of a motor vehicle which lies in a volatile environment of potentially explosive hydrocarbon vapors.

*Id*. Claims 9-10 at issue require using a non-combustible (i.e., inert) gas instead of air for leak testing the fuel tank.



The disclosed smoke generating apparatus has a chamber **6** containing an oil supply **8**. An air inlet tube **10** projects inwardly from the bottom of the chamber **6** and extends above the oil supply **8**. The chamber further includes a heating element **14** as well as a fluid baffle **18** having a smoke outlet orifice **20** that extends across the chamber and above the heating element **14**.  Air from air compressor **25** (below) can fill the smoke chamber **6** and help carry the smoke for leak testing.

The '808 Patent teaches the use of inert, non-flammable gas, namely, carbon dioxide or nitrogen, from a tank or bottle **60** (below). Per the '808 Patent, "smoke carried by nitrogen gas would be relatively safe for testing the evaporative system of a motor vehicle which lies in a generally volatile environment of potentially explosive hydrocarbon vapors." Ex. 1001, Col. 6: 54-60.

Moreover, producing smoke with nitrogen gas rather than air would enable a variety of high pressure systems to be tested at high



**A15**

operating temperature but without the inherent risk of an explosion.  Ex. 1001, Col. 6: 63-67.

## B.    Summary Of The Prosecution History

The application for the '808 Patent (Ser. No. 09/348,320), was filed on July 7, 1999 and issued on March 4, 2003. As there is no priority claim to any earlier application, the effective filing date of the patent is July 7, 1999.

The primary reference utilized during the original prosecution[1], the Patent Owner's '944 *Pieroni* Patent, was distinguished because its smoke generating device "employed air as the gas for blowing oil towards the heating element. As will be understood by those skilled in the art, air contains oxygen and is highly combustible in a volatile environment" whereas the claimed nitrogen gas was inert and did not support combustion. Ex. 1002, July 20, 2001 Amend. at pg. 5. The *Brayman* reference was distinguished as using nitrogen only as a trace gas, as the prior art did not teach the "improbable use of non-combustible nitrogen gas (i.e., a gas that does not burn) to blow fluid (e.g., oil) against a heating element at which the

---

[1] The references relied upon during the original prosecution were *Pieroni et al*. (*i.e*., U.S. 5,922,944, Ex. 1014), the primary reference, in further view of *Gouge* (*i.e.,* U.S. 5,859,363) and *Brayman et al*. (*i.e.,* U.S. 4,754,638). Later in prosecution, the combination of *Pieroni et al*. in view of *Chu et al*. (*i.e.,* U.S. 5,849,596) was relied upon.

fluid is vaporized into smoke in the manner recited by the applicants ...." *Id.*

at pg. 6.

The Patent Owner also argued that inert, nitrogen gas did not support

combustion and would not be expected to generate smoke:

> It is pointed out that nitrogen gas is inert, contains no oxygen
> and, therefore, is noncombustible. One of ordinary skill in the
> art would **not** be inclined to use a gas that will not burn to
> promote an ignition process to vaporize oil into smoke.
> Contrary to what would be expected by using a non-
> combustible gas, the Applicants' use of nitrogen gas to blow the
> flammable fluid against the heating element permits smoke to
> be generated within a sealed chamber at higher pressures and
> temperatures and without the risk of an explosion. [Ex. 1002,
> 2/4/2002 Amend. Aft. Final at 5].

The *Chu* Patent was distinguished as using nitrogen gas to blow

smoke away from a smoke generating chamber only *after* the smoke had

first been generated. Ex. 1002, 8/22/2002 Amend. at 5. Patent Owner's

counsel further went on to emphasize in such amendment that:

> Accordingly, one wishing to make smoke would be expected to
> use a combustible gas containing air that is adapted to ignite
> rather than a mixture containing inert, non-combustible
> nitrogen gas like that claimed by the Applicants. In this same
> regard, one wishing to create smoke through an ignition process
> would be unlikely to use carbon dioxide (as is also taught by
> the Applicants) since compressed carbon dioxide is regularly
> used (e.g., in fire extinguishers) to suppress combustion. *Id.*

Ultimately, it was the use of a non-combustible gas to create an inert

environment within a smoke producing chamber that was identified as the

*Inter Partes* Review of U.S. Patent No. 6,526,808

Reasons for Allowance:

> [T]he express use of a non-combustible gas creating an inert environment within a smoke producing chamber and a non-combustible gas preventing ignition and thereby avoiding the possibility of an explosion at the volatile, potentially explosive environment at which the smoke will be used is not taught by the prior art. [Ex. 1002, Final Office Action 9/25/2002 at pg. 5].

The same reasons for allowance applied to issued Claim 9. *Id*. ("Claim 28 [issued Claim 9] is considered patentably distinct for substantially the same reasons given for Claim 25 discussed above.").

## C.    Summary Of *Ex Parte* Reexamination

### 1.  Reexamination Control No. 90/009,683

Claim 9 of the '808 Patent was the subject of *Ex Parte* Reexamination No. 90/009,683, at a time when *inter partes* proceedings did not apply to the '808 patent per MPEP §2611. During reexamination, original Claim 9 was rejected and revised and dependent Claim 10 was added. [2] Allowance of narrowed Claim 9 was based on the same use of inert gas in a smoke producing chamber as in the original examination, and on the use of an inert

---

[2] Reexamination references previously asserted to reject Claim 9 included GB 1,039,729 to *Popkin* (§102 rejections); the '944 *Pieroni* Patent in view of GB 1,039,729 to *Popkin* (§103 rejections); and the '944 Patent to *Pieroni* in view of EPA Publication IM 240 & EVAP Technical Guidance (§103 rejections). Reexamination references asserted to reject added Claim 10 included the '944 Patent to *Pieroni* in view of the GB '729 to *Popkin*, and further in view of U.S. 5,107,698 to *Gilliam* (§103 rejections), and the '944 Patent to *Pieroni* in view of EPA reference, EPO 240 (§103 rejections).

gas to carry the smoke downstream for the single purpose of leak testing vehicle fuel tanks.  The Reexamination Reasons for Allowance stated:

> Claims 9 and 10 are allowable in that none of the art teaches the method for generating smoke for use at a volatile, potentially explosive environment, where an inert environment is created in the smoke producing chamber to 1) prevent explosion in the chamber and 2) carrying the smoke downstream to a potential volatile system undergoing test for leaks to create an inert environment in the system undergoing test to prevent ignition during testing thereof, where the system undergoing test is the evaporative system of a motor vehicle including the fuel tank. [Ex. 1003, 5/26/2011 Notice of Intent to Issue Reexam Certificate in Reexamination 90/009,683, p. 2]

Thus, allowance was based on the alleged failure of the prior art to teach the use of inert gas-based smoke for leak detecting.

### 2.  Reexamination Control No. 90/011,916

Claims 9 and 10 were also the subject of second *Ex Parte* Reexamination No. 90/011,916. Claims 9 and 10 were initially rejected under 35 U.S.C. § 103(a) as unpatentable over the *Gilliam* Patent in view of RE 38,686 to *Loblick* and further rejected as unpatentable over Patent 3,683,675 to *Burton et al.* in view of RE 38,626 to *Loblick*.

Such claims were ultimately deemed patentable, however, because the prior art allegedly did not disclose or suggest an inert gas used within a combustion chamber as recited in Claim 9. Ex. 1004, 4/6/2012 Notice of Intent to Issue Reexam Certificate in Reexamination No. 90/011,916, at 2.

*Inter Partes* Review of U.S. Patent No. 6,526,808

Specifically, the Patent Owner argued that the primary reference to *Gilliam* disclosed a smoke machine that produced smoke by combustion -- as opposed to vaporization -- and hence required oxygen.  Ex. 1004, 2/6/2012 Amend. at 10-11.  Based on that premise, Patent Owner then construed the secondary reference (RE 38,626 to *Loblick* ) as supposedly teaching an improved, more "complete combustion" of oil with oxygen than was taught by the *Gilliam* Patent.  Ex. 1004 2/6/2012 Amend. at 9-10.

As the *Gilliam* Patent is a primary reference in this *inter partes* review, Petitioner submits that the *Gilliam* Patent was grossly mischaracterized in the previous *ex parte* reexamination as Gilliam never mentions "combustion" but does "vaporize" a "non-flammable" fluid using a heating element controlled so as not to exceed 250°F.  Ex. 1005, Col. 4: 38-46 (vaporize) Col. 6: 34-36; Cl. 9, Col. 9: 1-2, Cl. 17 (vaporizing); Col. 7: 14-25 (temp.).  Since the preferred fluid is "Bray Oil Company Fireproof Hydraulic Fluid C-635 having a flash point of 425°F" (Col. 6: 1-2) ***the non-flammable fluid is vaporized 175 degrees below the fluid's flash point; as such, ignition and combustion cannot occur***.

Despite the secondary reference's (*Loblick*) description and drawings showing an inert gas as the only gas connected to both the fuel and smoke generating chamber (see element 26 at



14

right), inventor's declarations and arguments recharacterized *Loblick* as using inert gas only **after** the oxygen-combusted smoke was produced in the combustion chamber. This construction is not disclosed in *Loblick* and allowed expert testimony that contradicts the disclosure of a prior art patent.

Nevertheless, the Reasons for Allowance found that *Loblick* mixed air/oxygen with the smoke generating fluid first, and then used inert gas only after or downstream of the combustion chamber 14. Ex. 1004, 4/6/2012 NIRC at 2-3. Thus, the lack of a reference using inert gas to vaporize a flammable fluid was again a basis for allowance. As such, *Loblick* cannot be "cumulative" of the current references relied upon by Petitioner herein which use inert gas in a smoke generating chamber.

Further, the '944 *Pieroni* Patent was removed as a basis for rejection by revising the inventorship so it was not a prior publication by another under §102(b). Finally, the Reasons for Allowance cited declarations for the "non-obvious concept of producing smoke in an inert gas environment" and that there was a long felt need for a non-combustible smoke producing chamber to detect leaks in a combustible atmosphere. *Id.* at 3.

## D. Construction of Claims 9-10 and Clarification of "Claim Terms Flammable Fluid" and "Locating"

Claims subject to *inter partes* review are intended to be construed per

47 C.F.R. § 42.100(b) and receive the "broadest reasonable construction in light of the specification of the patent which it appears."  Generally, the claim terms take on the ordinary and customary meaning that the terms would have to one of ordinary skill in the art.

### 1.  Clarification of "Flammable Fluid"

One claim term not using its ordinary meaning is "flammable fluid". Specifically, independent Claim 9 requires vaporizing a "flammable fluid".

First, the term "fluid" is not expressly defined in the '808 patent so its ordinary meaning is broad enough to include liquid glycerins, glycols and oils along with other fluids.  Second, while the use of a "flammable" fluid might normally imply something that readily ignites at a low temperature, that is not the case in the '808 Patent.  The "oil" described in the '808 patent as the vaporized "fluid" has a large range of flash points or ignition temperatures depending on the type of oil.  More importantly though, the '808 patent incorporates patent application Serial No. 09/020,841 by reference. Ex. 1001, Col. 3: 18-21.  That application issued as the '944 *Pieroni* Patent, attached as Ex. 1014, and prefers using a Citigo PAO 46 oil to generate smoke.  Ex. 1014 Col. 2: 50-52. The flash point of PAO 46 is 468ºF (242ºC).  Ex. 1015.  One would normally expect the '808 claims to encompass the preferred smoke generating fluid with its 468ºF flash point.

16

**A22**

The term "flammable" is never used in the '808 specification. Rather, that term was added to issued Claims 1 and 6 in a Feb. 4, 2001 amendment, and was presented in Claim 25 (issued Claim 9) when that claim was added in an Aug. 22, 2001 amendment during original prosecution. The explanatory remarks show "flammable" encompasses the preferred PAO 46 oil. When adding "flammable," the Patent Owner said that the prior art '944 *Pieroni* Patent "used to blow a *flammable fluid* against a heating element." Ex. 1002, 10/25/2001 Amend. At p.4 (emphasis added)).

Since the preferred smoke generating fluid in the '944 Patent is PAO 46 with a flash point of 468°F (242°C) and since that fluid was said to be "flammable," the claim term "flammable fluid" should include any fluid with a flash point of at least 468°F or lower. This definition is broader than the normal definition of "flammable," which at the time the '808 Patent was filed referred to a liquid having a flash point of 141°F (60°C) or less. *Cf.* Ex. 1016, p. 5 (OSHA defined flammable liquid as having a flash point of 100°F (38°C) or less, DOT defined it as a flash point of 141°F (61°C) or less and the EPA defined "ignitable" fluids as having a flash point of 140°F (60°C) or less). *Accord* Ex. 1017, p. 13909 (OSHA defines a flammable liquid as having a flash point below 100°F, with flash points at or above 100°F being called "combustible").

17

**A23**

The flash point for glycol is 210ºF (99ºC) and glycerin's flash point is 320ºF (160ºC), each of which is much less than the 468ºF (242ºC) flash point of the preferred smoke generating fluid in the '808 patent and thus a "flammable fluid." Several references use these fluids.

Significantly, the smoke generating hydraulic fluid of the *Gilliam* Patent has a flash point of 425º F (218º C). Ex. 1005, Col. 6: 1-2. *Gilliam's* hydraulic fluid is thus also a "flammable fluid" within the meaning of the '808 patent claims, despite the fact the *Gilliam* Patent expressly calls that fluid "fireproof." Ex. 1005, Col. 5: 67 to Col. 6: 2.

## 2.  Clarification of "Locating"

The claim term "*locating* a heating element within a closed smoke producing chamber" can refer to the step of forming, placing or positioning the heating element in the chamber or it could refer to identifying the location of the heating element in the chamber. Simply identifying the location of a part in the chamber makes no sense in the context of Claim 9. Because Claim 9 is a method claim, however, the step of putting or placing a heating element within the chamber makes sense and should be used.

Claim 1 also uses "locating" a second time to mean forming, placing or positioning as it defines the step of "*locating* a heating element within said closed smoke producing chamber *so as to extend in spaced alignment*

*with said supply of fluid*." Ex. 1001, Col. 8: 30-32 (emphasis added). Likewise, Claim 4 defines the step of "locating" a pressure discharge accumulator between a smoke outlet and the atmosphere. Ex. 1001, Col. 8: 64-65. Since claim terms should be construed to have the same meaning in other claims, Claim 1 affirms that "locating" a heating element in Claim 9 refers to forming, placing or positioning a heating element.

Using "locating" to refer to the placement or positioning of something is also used in the '808 specification. The '808 patent describes "[l]ocating the pressure check valve 40 after the smoke producing apparatus 1, rather than prior to the air inlet tube 10 of chamber 6" to avoid early release of pressure. Ex. 1001, Col. 5: 16-23. Likewise the patent describes "[l]ocating the combination of pressure discharge accumulator 38 and pressure check valve 40 upstream from the smoke generating apparatus 1" to collect oil condensed from the smoke. Ex. 1001, Col. 5: 28-34. The term "located" was also used to refer to placing check valve 44 ahead of or upstream of flow meter 32. Ex. 1001, Col. 6: 9-12. These uses are consistent with the use of the "locating" step in method Claim 9 to refer to forming, placing, or positioning something in the chamber, rather than merely identifying the position or location of something in the chamber.

## V.    DESCRIPTION OF THE PRIOR ART

19

*Inter Partes* Review of U.S. Patent No. 6,526,808

As discussed more fully below, the VACUTEC Reference is the commercial embodiment of the *Gilliam* Patent and they disclose all of the elements of Claims 9 and 10 of the '808 Patent, except they use air instead of inert gas to generate smoke and carry that smoke to the systems being tested.[3]  Ex. 1006 at 2 (Vacutec is "a diagnostic tool … *described in* U.S. Patent No. 5,107,698" to *Gilliam*).  Petitioner submits five (5) prior art references - the  AE Article; the GB '867 Patent; the GB '266 Patent; the IFJ Article; and the ESTA Reference - that each teach the use of an inert gas to generate smoke  as broadly defined in Claim 9 of the '808 Patent.  Further, the *Swiatosz* Patent and the 1999 Website provide additional motivation to combine or modify such references for use in vehicle leak testing and overcome any supposed deficiencies of the cited prior art relied upon during original prosecution and *ex parte* reexamination of the '808 Patent.

Below is a brief summary of the prior art cited in Section III.B.2.  The full claim chart in Section VII below shows the specific application of those references against the claims under 35 U.S.C. § 103 as summarized above, including the identification of where each element is found in the prior art.

_____

[3] Indeed, this was the express finding by the USPTO with respect to the *Gilliam* Patent in previous Reexamination No. 90/011,916.  Ex. 1004, 12/7/2011 Non-Final Rejection at 3-4.

### A. Prior Art Smoke Machines for Vehicle Leak Testing

### (1) The *Gilliam* Patent (Ex. 1005)

The *Gilliam* Patent was previously relied upon to reject Claims 9 and 10 in Reexamination No. 90/011,916 in combination with *Loblick* (to show inert gas). The *Gilliam* Patent discloses a smoke generator for detecting leaks in an internal combustion engine used in automobiles and trucks "and <u>any</u> closed vacuum system" (Column 1: 10), involving, *inter alia*, carburation or fuel injection systems, which were previously acknowledged by the USPTO as volatile, potentially explosive environments.  Ex. 1004, 12/7/2011 Non-Final Rejection at 3-4.

The *Gilliam* Patent discloses a smoke-generating assembly **35**, which includes pump **15**, switch **10** and ceramic heating element **11** located in chamber **20**.  A  smoke-producing fluid is poured into the chamber **20** through filler port **6**, preferably covering one half of heating element **11**.

In use, heating element **11** causes the smoke-generating fluid to vaporize by coming into contact therewith.  Bellows pump **15** pumps air into

the chamber **20** and mixes the air with the oil and causes the oil to circulate about heating element **11** (i.e., air pump **15** forces air to bubble up through the smoke producing liquid), ultimately producing smoke that passes through conduit **22** and into the vacuum system connected thereto for leak testing purposes.[4]

To test a system for leaks, the smoke so generated within the chamber passes through conduit **22** to the intake manifold of a vacuum system in the internal combustion engine to be tested. By observing smoke exiting from any of the plurality of hoses, flanges, gaskets, etc. in the vacuum system, any and all leaks therein may be located.

In the second reexamination, the Patent Owner expressly recognized that the *Gilliam* Patent discloses a smoke machine for use in testing vehicle systems for leaks and further, acknowledged that well-prior to July 7, 1999 smoke machines were much more efficient in detecting leaks than merely pressure testing. Ex. 1003, 2/6/2012 Oath at 2.

The *Gilliam* Patent also expressly acknowledged the potential risk of explosion -- the problem allegedly solved by Claims 9 and 10 of the '808

---

[4] Importantly, the *Gilliam* Patent says that its smoke generating aspect is known in the prior art and smoke generators from other machines can be used in Gilliam, including generators for firefighter training as taught in Patent No. 4,303,397 to *Swiatosz*, discussed *infra*. Ex. 1005 at Col. 5: 61-5.

Patent. However, the *Gilliam* Patent does not disclose any use of an inert gas in connection with its smoke generator disclosed therein. Thus, but for the use of an inert gas, the *Gilliam* Patent discloses the claimed invention.

### (2)    The 1995 VACUTEC Reference (Ex. 1006)

The 1995 VACUTEC Reference is an operation manual for a vacuum leak finder sold under the trademark "VACUTEC." VACUTEC teaches the use of the smoke machine of the *Gilliam* Patent for detecting leaks in automotive evaporative systems. Ex. 1006, pg. 9. Specifically, the Vacutec is "a diagnostic tool … *described in* U.S. Patent No. 5,107,698" to *Gilliam*. Ex. 1005 at 2; *Accord*, Ex. 1005 at 5 (VACUTEC "*covered by* … 5,107,698"). The *Gilliam* Patent is thus used to supply any details of construction not found in the VACUTEC reference.

VACUTEC shows the use of the Vacutec smoke machine in fluid communication with an evaporative canister and a vehicle fuel tank and describes how the smoke machine is used to detect leaks in such dangerous,



**A29**

potentially explosive systems.  One figure is illustrated below:

VACUTEC further expressly teaches the use of the *Gilliam* Patent smoke machine to test for leaks in evaporative systems and fuel tanks and states, "to find the leak in this system, fill the line and [fuel] tank with smoke by turning on the smoke generating section of the VACUTEC and observe where the smoke leaves the system."  Thus, but for the use of an inert gas the VACUTEC Reference discloses the claimed invention.

### B. Prior Art Using Inert Gas to Make Smoke And Motivation For Use In Leak Testing

Using inert gas to make smoke is provided by several of the following references that vaporize a mixture of inert gas and oil to make smoke for various purposes, including leak testing. For those references not mentioning leak testing, the 1999 Website teaches the interchangeable use of smoke machines for each of the various references as well as leak testing of "vehicles," with *Gilliam* or VACUTEC suggesting the specific leak testing of vehicle fuel tanks.   The *Gilliam* Patent's use of *Swiatosz's* smoke

generator teaches that smoke machines for firefighter training (like Swiatosz) can be used for leak detection.  Other motivations exist.

### (1)  The 1969 AE Article (Ex. 1007)

The AE Article discloses two models of smoke generators produced by Concept Engineering, Ltd. that were "patent applied for" and "new" in 1969 when it also filed the GB '867 patent (Ex. 1008).  Such models operated "on the proven system" of a medicinal grade oil propelled by inert carbon dioxide that is heated electrically to produce a white smoke. Ex. 1007 at 1.  The white smoke produced by the generators is "non-flammable." Ex. 1007 Col. 1. The disclosed smoke machines have cylinders for the carbon dioxide gas, stop valves and pressure reducing regulators. *Id.* Importantly, the 1969 AE Article discloses using the smoke generators in the aircraft industry for leak testing closed systems such as luggage hold leak testing and fuselage testing for leaks. *Id.*

### (2)   The GB '867 Patent (Ex. 1008)

The GB '867 Patent (Ex. 1008) was filed in 1968 and is the "patent applied for" in the 1969 AE Article on Concept Engineering's "new" smoke machines.  GB '867 forces a mixture of carbon dioxide and oil into an



**A31**

annular gap between a heated plug 11 and a larger bore 2 to generate smoke, with the smoke going directly into "ducts or pressurized vessels" (pg. 3: 5-7) for "testing ventilation systems and theatrical effects." Pg. 1: 11-17. The stated uses suggest its combination with Vacutec/Gilliam, the safety advantages of the inert smoke suggest its combination, and the cautions about explosions in Vacutec/Gilliam suggest its combination.

### (3)    The IFJ Article (Ex. 1009)



The IFJ Article discloses the use of a ViCount smoke system, produced by Concept Engineering, referenced above in connection with the 1969 AE

*Concept's ViCount smoke system. Circle No. 133.*

Article, that produces **a "non-flammable" smoke using, refined white oil**. Ex. 1009, pg. 1. The oil is "entrained in a stream of inert propellant gas prior to the heating of the oil to a vapor state, which consequently produces a dense, oil-based smoke (more accurately described as a fog or aerosol), formed and **still entrained in inert gas**." (emphasis added). The IFJ Article's ViCount smoke machine creates smoke for, among other uses, firefighter training.[5]

---

[5]  The *Gilliam* Patent says smoke-generating methods for firefighter training (Patent No. 4,303,397 to *Swiatosz*) can be used in its leak detection. Ex. 1005 at Col. 5: 61-65. The 1999 Website also teaches the use of smoke machines for both firefighting training as in IFJ and *Swiatosz*, and for leak

(continued . . .)

### (4)    GB '266 Patent (Ex. 1010)

The GB '266 Patent was published in 1950 and discloses a method for making smoke using oil that is identical to the method of Claim 9, even teaching that nitrogen or carbon dioxide "greatly reduces any tendency to ignition" or "reduces to a minimum any tendency to ignition" of the flammable fluid.  GB '266 states:

> According to this invention therefore, glycerin, or a hydrocarbon oil is sprayed in atomised form by means of a jet of carbon dioxide or nitrogen under pressure onto a surface sufficiently heated as to cause an immediate vaporization of the liquid ... *The use of the carbon dioxide or nitrogen gas under pressure* as a medium of atomizing and propelling the fog forming liquid *is advantageous* not merely because of its cooling effects upon the mixture but also *because its presence greatly reduces any tendency to ignition of the vapour should the liquid medium be one of an inflammable nature.* [Ex. 1010, Pg. 1: 25-44 (emphasis added).  *Accord* Pg. 2: 38-47 & 108-115.].

GB '266 further shows an inert gas in the adjacent figure to blow oil onto "a surface sufficiently heated so as to cause an immediate vaporization of the liquid." Ex. 1010 pg. 2: 28-34; 96-103. Gas from



testing of vehicles as in the *Gilliam*/VACUTEC references.  The "non-flammable" smoke of the IFJ Reference also suggests its use with the *Gilliam*/VACUTEC smoke machines for safety reasons.

nozzle "c" hits oil from oil spray nozzle "b3" to hit cylindrical walls "d" heated by heating coil "e".

GB '266 further expressly recognizes and appreciates that the smoke generated by the disclosed system "is relatively proof against fire or explosion" by virtue of the use of carbon dioxide or nitrogen gas. Ex. 1010 Pg. 3: 65-77; *Accord*, Pg. 2: 108-116 ("The use of either of the said gases [carbon dioxide or nitrogen] under pressure as a medium for atomizing and propelling the fog forming liquid is advantageous … because its presence greatly *reduces to a minimum* any tendency to ignition of the vapour should the liquid medium be one of an inflammable nature."); Pg. 1: 110-115.

The GB '266 Patent further discloses that the fog generated per such teachings may be usefully employed in theatrical work and in the making of cinematic pictures, and used in "other applications." Ex. 1010, Pg. 1: 9-17. To the extent "other applications" does not include leak testing, the 1999 Website, discussed *infra*, teaches the use of smoke machines for both leak testing of vehicles and theatrical effects and movies.

### (5)    The 1998 ESTA Reference (Ex. 1011)

The 1998 ESTA Reference describes well-known industry standards for creating artificial mist, smoke and fog for use in creating special effects. Ex. 1011, pg. 3-4.  ESTA discloses the exact, allegedly novel method for

producing smoke as in Claim 9. Specifically, the ESTA Reference makes a heated-fog using a gas-propelled fluid such as glycerin or mineral oil. Ex. 1011, pp. 5 & 6. The fuels are propelled by carbon dioxide or nitrogen from a pressurized bottle and heated to create smoke.[6] Ex. 1011, pg. 6.

### (6)    The *Swiatosz* Patent (Ex. 1012)

The *Swiatosz* Patent 4,303,397 is cited in the *Gilliam* Patent as one way to make smoke for *Gilliam's* leak testing of "any and all" closed systems in a motor vehicle. Ex. 1012, Col. 5: 64-65 (reference); Col. 3: 48-52 (virtually any closed system); Col. 3: 3-6 & 45-47 (any and all leaks); Col. 8: 23-26 (same); Claims 1 & 17 ("vacuum leaks in a vehicle"). *Swiatosz* uses oil or glycol (Col. 2: 14-15) to generate smoke for firefighter training. Ex. 1012, Col. 1: 7-8 ("in particular, this invention relates to a training device for simulating the smoke of a fire."). The *Swiatosz* Patent vaporizes mineral oil using a heater limited to 420ºF. Ex. 1012, Col. 4: 37-41 & 59-60.

Accordingly, it was well-known in the art per the teachings of the *Gilliam* Patent to use smoke generated for use in firefighter training,

---

[6] The 1999 Website teaches the use of smoke machines for both theatrical and movie applications as in ESTA, and for leak testing of vehicles as in the *Gilliam* Patent/VACUTEC.

especially the non-combustible firefighter training smoke of the IFJ reference, for further use in automotive leak detection applications, including leak detection in potentially explosive environments.

### (7)    The 1999 Website (Ex. 1013)

According to archive.org, the first pages archived from the website http://www.smokemachines.com were published December 12, 1998.[7]  As of January 28, 1999, the www.smokemachines.com website published the various applications of smoke generators, including leak testing of "vehicles." Also expressly referenced was the use of the smoke generators for firefighter training, and a variety of special effects and lighting in all types of theaters, TV studios and the like. Ex. 1013, pg. 2.

Accordingly, it was well-known prior to the filing of the '808 Patent that smoke machines could be interchangeably used for leak testing in vehicles as well as for theatrical purposes and training fire-fighters.  The 1999 Website thus provides a suggestion to use the smoke machines identified herein in these various applications.

## VI.    THERE IS A REASONABLE LIKELIHOOD THAT CLAIMS 9

---

[7] It is understood that Corona Integrated Technologies, Inc., the owner and operator of the website www.smokemachines.com, is the North American distributor for Concept Engineering, Ltd., discussed above in connection with the 1969 AE and IFJ references.

### AND 10 OF THE '808 PATENT ARE UNPATENTABLE

In the original prosecution and reexamination, it was established and even admitted by the Patent Owner that using smoke machines to check leaks in fuel tanks and EVAP systems were well-known as of the 1980's. *See, e.g.*, Ex. 1003, 2/6/2012 Supplemental Decl. of J. Saffie, pp. 5-7, 10. The VACUTEC Reference expressly teaches the use of smoke machines to leak test numerous motor vehicle systems, including potentially explosive environments including vehicle fuel tanks.   These same teachings were further set forth in the *Gilliam* Patent which the Patent Owner expressly acknowledged in previous Reexamination No. 90/011,916.

While the use of smoke machines for testing vehicle systems for leaks was known and in use several years before July 7, 1999, the Patent Owner argued that the prior art did not disclose generating smoke by heating a flammable fluid with an inert gas and then using that smoke to test for leaks in a hazardous, potentially explosive motor fuel tank. Claims 9 and 10 were repeatedly allowed on that basis. The prior art discussed above and applied below disprove the basis for allowance and at a minimum, show there is a reasonable likelihood Claims 9 and 10 are unpatentable.

Contrary to the arguments asserted in the original prosecution and in reexamination, however, the prior art references identified herein and

31

applied in the Detailed Explanation below teach the exact claimed method for generating smoke that supposedly was unknown in the art. Specifically, the 1969 AE Article, the GB '867 Patent, and the IFJ Article expressly disclose the use of smoke machines produced by Concept Engineering, Ltd. whereby medicinal or food grade oil is propelled by an inert gas, namely carbon dioxide gas that is heated to produce a non-flammable while smoke. AE and GB '867 further teach the use of such smoke produced in leak testing in the aircraft industry, ventilation and other closed pressure vessels.

Moreover, the GB '266 Patent published in 1950 expressly teaches spraying a mixture of non-combustible nitrogen gas and oil onto a heated surface to generate smoke. The IFJ Article, directed to making smoke for firefighter training as relied upon by the *Gilliam* Patent, likewise expressly teaches a method of making smoke using refined white oil that is entrained in a stream of inert propellant gas and heated to form a dense, oil-based smoke that remains "entrained in inert gas." Similarly, the 1998 ESTA Reference teaches that it was a well-known industry standard to make smoke using mineral oil that is mixed with a non-flammable gas, either carbon dioxide or nitrogen and propelled into a heat exchanger.

Moreover, pages from the 1999 Website, www.smokemachines.com operated by an affiliate of Concept Engineering, Ltd., the manufacturer

referenced in the 1969 Aircraft Engineering Article, expressly teach the use of smoke machines for a wide variety of uses, including entertainment and leak testing of vehicles.  Accordingly, one skilled in the art would have readily used smoke machines for theatrical work and firefighter training in vehicle leak detection.  Indeed, the *Gilliam* Patent expressly taught the use of smoke generators used for firefighter training - the *Swiatosz* Patent - for use in detecting leaks and automotive systems.  Those skilled in the art would have turned to references such as the 1969 AE Article and the 1998 IFJ article that produced smoke using an oil and inert gas precisely as claimed by Claims 9 and 10 and as previously considered the novel aspect of the claims.  This aspect of the claims, however, is not novel, and was not novel as of July 1999.

One skilled in the art need only use any of the aforementioned teachings for generating a non-flammable smoke in an inert environment with admittedly known smoke machines that had been used for automobile leak detection to derive the claimed invention.

As reflected by the attached discussion and claim charts, the aforementioned new prior art invalidates Claims 9 and 10, and at a minimum raises a reasonable likelihood that Claims 9 and 10 are unpatentable.

*Inter Partes* Review of U.S. Patent No. 6,526,808

## VII.  DETAILED EXPLANATION

Per 37 C.F.R. § 42.104(b)(4), the following   claim charts specify where each element of Claims 9-10 is found in the prior art. All emphasis is added unless otherwise indicated.

### A. Claim Charts Showing Claims 9 and 10 of the '808 Patent Are Obvious On Grounds (1) Gilliam + AE, or (2) Gilliam + GB '867, or (3) Gilliam + IFJ + Swiatosz, or (4) Gilliam + IFJ + 1999 Website, or (5) Gilliam + GB '266 + 1999 Website, or (6) Gilliam + ESTA + 1999 Website

| '808       Patent Claims | Gilliam (Ex. 1005), AE   (Ex. 1007), GB '867 (Ex. 1008), IFJ (Ex. 1009), Swiatosz   (Ex. 1012), 1999 Website (Ex. 1013), GB '266 (Ex. 1010), and ESTA (Ex. 1011) |
|---|---|
| **Amended   Claim 9:** A method for generating   smoke for   use   at   a volatile, potentially explosive environment,   said method comprising   the steps of: | **Grounds 1-6:** Gilliam's smoke machine checks "any and all leaks" in vehicles, including fuel injection and emission control systems. Col. 1: 24-26; Col. 3: 3-6 & 45-47.   Gilliam cautions against explosions.   Col. 7: 56-57.<br>**Ground 1:** AE uses smoke generators to detect leaks in the aircraft industry.  Middle Col. Last ¶.<br>**Ground 2:** GB '867 generates smoke using $CO_2$ and oil for "testing ventilation systems or for theatrical effects"   (Pg. 1:11-17; pg. 2:60-62) with "connecting means"   for injecting smoke "directly into ducts or pressurized vessels." Pg. 3: 4-7.<br>**Ground 3:**   Gilliam also uses smoke machines for firefighting for its leak testing applications.  Col. 5:64-65 (Swiatosz 4,303,397 fire training).    IFJ is for firefighter training using oil vaporized in inert gas to create a non-flammable smoke.  Pg. 1. IFJ's smoke generator, especially as the non-flammable gas also cures Gilliam's caution on explosions.<br>**Ground   4:**     Gilliam   uses   smoke   machines   for |

34

**A40**

*Inter Partes* Review of U.S. Patent No. 6,526,808

| | |
|---|---|
| | firefighting in Gilliam's leak testing. Col. 5:61-65 (Swiatosz 4,303,397 smoke for fire training). IFJ is for "High Temperature Smoke Training" for firefighters. The 1999 Website uses smoke machines for leak testing of "vehicles" and for training fire fighters, thus teaching the interchangeability of smoke machines for such uses. Pg. 2, end<br><br>**Ground 5:** GB '266 generates fog using inert gas to minimize potential ignition, for use in theatrical work, movies, and "other applications." Pg. 1: 11-14 (uses). Pg. 1: 26-44 (no ignition), pg. 2: 38-47 & 108-116 (no ignition). The 1999 Website uses smoke machines for leak testing of "vehicles," for theatrical work and movies, thus teaching the interchangeability of smoke machines for such uses. Pg. 2, end.<br><br>**Ground 6:** ESTA makes fog using oil vaporized in inert gas for special effects theaters and movies. Pg. 5-6. The 1999 Website uses smoke machines for leak testing of "vehicles" and for theatrical work and movies, thus teaching the interchangeability of smoke machines for leak testing. Pg. 2, end. |
| locating a heating element within a closed smoke producing chamber, said smoke producing chamber having a gas inlet and a smoke outlet; . . . | **Grounds 1-6:** Gilliam has air inlet 7 to smoke producing chamber 20 containing heating element 11 and outlet conduit 22. Fig. 3; Cl. 1 & 17 (chamber means, heating means, conduit means).<br><br>**Ground 1:** AE's uses "a medicinal grade oil propelled by carbon dioxide gas, heated electrically" which requires an inlet outlet to the chamber and heater, or renders them obvious. Left Col., 3rd ¶.<br><br>**Ground 2:** GB '867 has a cylindrical bore 2 within which is placed a heated plug 11 so the gas and oil are heated in the gap between the plug and the bore. Fig. 3, pg. 2:24-32 & 94-98 & 115-118; Cl. 6. It also has gas and oil inlet 14 and smoke outlet 10.<br><br>**Grounds 3 & 4:** IFJ describes a "heat exchanger vaporization chamber" (Rt. Col., ¶2) and has an inert, bottled gas input and smoke output (photo).<br><br>**Ground 5:** GB '266 has the walls of the closed |

*Inter Partes* Review of U.S. Patent No. 6,526,808

| | |
|---|---|
| | chamber vaporize the smoke liquid. Gas from inlet nozzle C forces oil from nozzle b³ onto cylindrical walls d heated by heater e and discharge tube f. Pg. 1:45-53; pg. 2: 96-108 & 116 to pg. 2:9.<br><br>**Ground 6:** ESTA discloses a heat exchanger into which oil mixed with a non-flammable gas is propelled, heated to vapor, and forced out of the front of the machine. Pg. 6. |
| delivering a flammable fluid to said heating element within the closed smoke producing chamber; | **Grounds 1-6:** Gilliam's oil is heated in chamber 20 to make smoke. Cl. 1 & 17 (fluid vaporized).<br><br>**Ground 1:** AE uses "a medicinal grade oil propelled by carbon dioxide gas, *heated* electrically." Col 1, 3ʳᵈ ¶.<br><br>**Ground 2:** GB '867 forces oil through inlet 14 to the heated plug 13 and the gap between the plug and bore 2. Pg. 2: 101-105; Figs 1 & 3.<br><br>**Ground 3:** IFJ says "oil is entrained in a stream of inert propellant gas prior to the heating of the oil to vapour state." Col. 1, last ¶.<br><br>**Ground 4:** The 1999 Website offers heated chambers to produce smoke (pg. 2 under Fire Fighter Training) and uses oil-based smoke that does not layer at 360ºF. Website at 3.<br><br>**Ground 5:** GB '266 says "a hydrocarbon oil is sprayed in atomized form by means of a jet of carbon dioxide or nitrogen under pressure on to a surface sufficiently heated as to cause an immediate vaporization of the liquid." Pg. 2: 29-34. *Accord* Pg. 2: 96-103. Oil sprays out atomizing nozzle b³. The 1999 Website produces smoke using oil that does not layer at 360ºF. Website at 3.<br><br>**Ground 6:** 1999 Website as in Ground 4 of this limitation. ESTA uses glycol & mineral oil. Pg. 5 & 6. |
| energizing said heating element for vaporizing into smoke within the | **Grounds 1-6:** Gilliam's switch 1 activates heating element 11. Col. 6: 3-7. The fluid is "vaporized." Gilliam Cl. 1, Col. 8: 64 to Col. 9: 2. *Accord*, Cl. 17, Col 10: 36-39; Col. 3: 65 to Col. 4: 1; Col. 4: 41 |

36

**A42**

| | |
|---|---|
| closed smoke producing chamber the flammable fluid that is delivered thereto; [and] | (vaporizing said smoke-generating fluid into smoke"); Col. 6: 34-36.<br><br>**Ground 1:** AE: "a medicinal grade oil propelled by carbon dioxide gas, *heated electrically from 230V or 115V supplies, a.c. or d.c.*" Left Col., 3rd ¶. The $CO_2$ prevents combustion so the oil vaporizes and produces "non-flammable" smoke. Col. 1, ¶3-4.<br><br>**Ground 2:** GB '867 uses a temperature controlled, electrical heating element for plug 11 so the oil-$CO_2$ mixture is vaporized to make smoke. Pg. 2:24-32 & 60-63 & 94-107.<br><br>**Ground 3:** IFJ: "oil is entrained in a stream of inert propellant gas prior to the heating of the oil to vapour state" to generate smoke. Col. 1, last ¶.<br><br>**Ground 4:** IFJ as in Ground 3 of this limitation. The 1999 Website produces smoke using oil that does not layer at 360°F. Website at 3.<br><br>**Ground 5:** GB '266, "a hydrocarbon oil is sprayed in atomized form by means of a jet of carbon dioxide or nitrogen under pressure on to a surface sufficiently heated as to cause an immediate vaporization of the liquid." GB '266: Pg. 2: 29-34. The 1999 Website produces smoke using oil that does not layer at 360°F (pg. 3) and uses the smoke for theater and movies like GB '266 as well as leak testing vehicles as in Gilliam. Website pg.2.<br><br>**Ground 6:** ESTA describes a method for making heated fog using inert gas mixed with oil propelled into a heat exchanger to vaporize the smoke fluid. Pg. 5-6. The mineral oil "is mixed with a non-flammable gas, either carbon dioxide ($CO_2$) or nitrogen ($N_2$), from a pressurized gas bottle. The mixture is propelled into a heat exchanger." Pg. 6. The 1999 Website uses oil to make smoke that doesn't layer at 360°F (pg. 3) and uses the smoke for ESTA's special effects and for leak testing vehicles. Pg. 2. |
| …blowing a supply of non- | **Grounds 1-6:** Gilliam blows air in inlet 7 using air pump 15, with the air also circulating smoke fluid in |

| combustible gas under pressure into the closed smoke producing chamber by way of said gas inlet thereof | the chamber 20.  Col. 6: 57-63 |
| --- | --- |
| | **Ground 1:** AE: "operate[s] on the proven system of a medicinal grade oil *propelled by carbon dioxide gas*." 1st Col. ¶3; 1st Col. ¶ 4 ("The units are portable and include cylinders for the carbon dioxide gas ..." and bottled gas is pressurized and would "blow" into a chamber to "propel" the smoke as described.). The smoke is also "passed into vessels pressurized up to 80 lb./sq.in." (1st Col. Last ¶). |
| | **Ground 2:** GB '867 says the "oil/gas mixture is *forced* into the space" between the plug 11 and bore 2 through inlet 14.  Pg. 2: 99-108. |
| | **Ground 3:** IFJ entrains oil "in a stream of inert gas propellant prior to the heating of the oil to the vapor state" and the resulting smoke is "still entrained in inert gas." Col. 1, last ¶. The bottom photo shows bottles of the inert gas, pressurized to blow the smoke generating fluid.  Gilliam cites Swiatosz (smoke generators for firefighter training) for use in smoke for leak testing (Col. 5:61-65), suggesting IFJ's smoke generator for leak testing vehicles. |
| | **Ground 4:** IFJ as in Ground 3 of this limitation. 1999 Website teaches using smoke machines for fire training and leak testing vehicles, suggesting, IFJ inert gas smoke generator for fire training be used for leak testing "vehicles" as in Gilliam.  Website at 2. |
| | **Ground 5:** GB '266 Pg. 1: 26 – 29, 47-49; pg. 2: 30-33, 38-42 & 108-110 ("the use of the carbon dioxide or nitrogen gas under pressure as a medium for atomizing and propelling the fog forming liquid is advantageous").  The 1999 Website teaches using smoke machines for theater and movies and for leak testing vehicles, suggesting the GB '266 inert gas smoke generator for leak testing "vehicles" as in Gilliam.  Website at 2. |
| | **Ground 6:** ESTA makes heated fog using oil mixed with inert gas from a pressurized bottle that "propels" the mixture to the heater and beyond. Pg. 6.  The 1999 Website teaches smoke machines used for both |

*Inter Partes* Review of U.S. Patent No. 6,526,808

| | |
|---|---|
| | entertainment as in ESTA, and vehicle leak testing as in Gilliam. Pg. 2. It is obvious to use ESTA's inert gas smoke generation in Gilliam's vehicle testing as the 1999 Website shows smoke machines can be used for both applications. The safety advantages of ESTA's inert gas also make obvious its use in vehicle testing. |
| For (1) creating an inert environment within said chamber so as to prevent ignition and thereby avoid the possibility of an explosion when said flammable fluid is vaporized into smoke by said heating element and | **Ground 1:** AE: The smoke is made using inert, carbon dioxide gas and is said to be "non-flammable." Col. 1, ¶3. Gilliam and AE are both for leak testing, suggesting the use of AE's inert gas smoke in Gilliam's vehicle testing. Gilliam's warnings against sparks and combustion in the engine (Col. 7: 56-57) further motivate using AE's inert gas generated smoke. **Ground 2:** GB '867 forces only oil, $CO_2$ and optionally water into the small gap/chamber between the plug 11 and bore 2 so the environment is inert. Pg. 2, 99-108; Claims 9-10. AE confirms oil and $CO_2$ are used to making the "non-flammable," inert smoke in the Concept Engineering smoke machine. Col. 1, ¶ 3-4. **Ground 3:** IFJ's oil is "entrained in a stream of inert propellant gas prior to the heating of the oil to vapour state . . . [and] still entrained in inert gas" when vaporized." Col. 1, last ¶. The vaporized smoke entrained in inert gas thus avoids explosion when the fuel is vaporized into smoke. Safety concerns also render this limitation obvious for Gilliam's use. Gilliam's warnings against sparks and combustion in the engine (Col. 7: 56-57) further motivate using IFJ's "non-flammable" smoke. At Col. 5: 64-65, Gilliam cites Swiatosz 4,403,397 and its smoke generator for fire training as usable in Gilliam's leak testing of motor vehicles. IFJ provides a smoke generator that can "simulate shipboard fire scenarios." Col. 1, 2nd ¶. That suggests using IFJ's fire training smoke generator in Gilliam's smoke generator. **Ground 4:** Gilliam & IFJ as in Ground 3 of this limitation. The 1999 Website teaches smoke machines usable in fire training and leak testing, further |

*Inter Partes* Review of U.S. Patent No. 6,526,808

| | |
|---|---|
| | motivating the use of IFJ's inert-gas generated smoke in making smoke for Gilliam.<br><br>**Ground 5:**  Gilliam as in Ground 2 of this limitation. GB '266 states: "The use of the carbon dioxide or nitrogen gas under pressure as a medium for atomizing an propelling the fog forming liquid is advantageous not merely because of its cooling effects but because *its presence reduces to a minimum any tendency to ignition of the vapour* should the liquid employed be of an inflammable nature."   GB '266 pg. 1: 36-44. *Accord* Pg. 2: 38-47 (same) & pg. 2: 108-116 (same). The non-ignition teachings of GB '266 suggest the use of GB '266 in Gilliam.  Gilliam's warnings against sparks and combustion in the engine (Col. 7: 56-57) also suggest using GB '266's ignition suppressing smoke.  The 1999 Website teaches smoke machines usable in theater and movies and in leak testing of vehicles, further motivating the use of GB '266 inert smoke to make smoke for Gilliam.<br><br>**Ground 6:**  ESTA uses inert $N_2$ or $CO_2$ or other non-flammable gas with oil in a heat exchanger to generate fog or smoke.  Pg. 4-5.  This is known to create an inert environment and prevent ignition and explosion, as recognized by the '808 patent.   The 1999 Website teaches smoke machines usable in theater and movies and in leak testing of vehicles, further motivating the use of ESTA's inert gas generated smoke to make smoke for Gilliam.   Motivation also arises from the safety issues resolved by inert smoke as discussed in Ground 4 of this limitation. |
| (2)  for carrying the smoke to the volatile potentially explosive environment by way of the smoke outlet of the closed    smoke | **Grounds 1-6:**  Gilliam detects leaks in closed systems involving carburation, fuel injection and emission control (Col. 1: 24-26) and provides "means for determining the location of *any and all leaks* in an internal combustion engine."   Col. 3: 3-6 & 45-47. Gilliam cautions against sparks causing an explosion. Col. 7: 56-57.<br>**Ground 1:** AE teaches "non-flammable" smoke for |

40

**A46**

*Inter Partes* Review of U.S. Patent No. 6,526,808

| producing chamber, said volatile potentially explosive environment being a closed system undergoing testing for leaks; and | leak testing closed luggage holds and fuselages. 1st Col., 3rd ¶; 2nd Col., 2nd full ¶. AE and Gilliam are both for leak testing. AE's non-flammable smoke resolves Gilliam's safety concern. Col. 7: 56-57.<br><br>**Ground 2:** GB '867 says the smoke is injected "directly into ducts or *pressure vessels*" (Pg. 3: 4-6) and for "testing ventilation systems." Pg. 1:14-17. Those are closed, potentially explosive systems.<br><br>**Ground 3:** IFJ teaches "non-flammable" smoke for fire training and safety (Col. 1) and Gilliam teaches one to look to smoke generators used in fire simulation (Col. 5: 61-65 via Swiatosz 4,303,397). IFJ's teachings on smoke generation are suggested for use in Gilliam's smoke machine for vehicles. Gilliam's safety concerns on sparks also motivate this use. Col. 7: 56-57.<br><br>**Ground 4:** IFJ as in Ground 3 of this limitation. The 1999 Website teaches smoke machines usable in fire training and in leak testing of vehicles, further motivating the use of IFG's smoke generator for fire training to make smoke for Gilliam. IFJ's "non-flammable" smoke further suggests this combination given the 1999 Website suggestion to combine, as does Gilliam's spark concerns (Col. 7:56-57).<br><br>**Ground 5:** GB '266 discloses making smoke for theatrical works and "*in other applications*." Pg. 1: 10-14. GB '266 further teaches using carbon dioxide and nitrogen gas which "*reduces to a minimum any tendency to ignition of the vapour.*" GB '266 pg. 1: 36-44; Pg. 2: 38-47, pg. 2: 108-116. GB '266 also uses the inert gases to "propel" the vaporized smoke fluid. Pg. 1: 30-32. *Accord* Pg. 1: 53-54; Pg. 3: 72-77; pg. 2: 34-36; pg. 2: 104; Pg. 3: 72. The 1999 Website teaches interchangeable use of the smoke machines in entertainment, theaters and movies as in GB '266, and also use in leak testing a "broad range of systems," including "vehicles" Pg. 2. That suggests using GB '266 in Gilliam. GB '266's ignition suppression also suggests its use in Gilliam.<br><br>**Ground 6:** ESTA uses nitrogen or carbon dioxide to |

41

**A47**

*Inter Partes* Review of U.S. Patent No. 6,526,808

| | |
|---|---|
| | generate fog for theatrical and movie uses. Pg. 5-6. The 1999 Website teaches smoke machines for theatrical and movie uses and for leak testing vehicles, making the use of ESTA's fog generators obvious for Gilliam's closed fuel tank system. |
| …connecting the smoke outlet of said closed smoke producing chamber to the closed system undergoing testing. | **Grounds 1-6:** Gilliam's smoke chamber outlet conduit 22 is connected to the system being leak tested. Abstract (smoke "sealably communicated through conduit means to the intake manifold of a vacuum system"); Col. 8: 18-21 ("interconnected with conduit 22"); Cl. 1 & 17 (conduit means). <br><br> **Ground 1:** AE says "*smoke may be hosed or ducted* and, when an injector is fitted, passed into vessels pressurized up to 80 lb./sq. in." AE, Col. 1, last ¶. <br><br> **Ground 2:** GB '867 has "pipes and junctions for attaching it to fluid delivery or receiving means such as smoke generating or dispersal means," (Pg. 2:49-52) and has "connecting means" on the outlet. Pg. 3: 6-8. <br><br> **Grounds 4-6:** The 1999 Website uses smoke machines for leak testing of vehicles (Pg. 2, end) and that requires the claimed connection to the parts being leak tested, or make such a connection obvious. <br><br> **Ground 5:** GB '266 and the 1999 Website each require the claimed connections to get smoke where it is needed for theatrical effects and movies. |
| said supply of non-combustible gas for creating an inert environment within the closed system to which the smoke is carried, said inert environment with the closed system preventing ignition within the | **Grounds 1-6:** Gilliam cautions against combustion, recognizing a need for safety improvement. Gilliam Col. 7: 56-57. The cited references provide that improvement. <br><br> **Ground 1:** AE: The smoke is made using inert, carbon dioxide gas and is said to be "non-flammable." Col. 1, ¶3. <br><br> **Ground 2:** GB '867 uses oil and $CO_2$ and may further use water so the smoke is inert and would create an inert environment in the ventilation system, duct or pressure vessel tested. Pg. 1:11-17; pg. 3:5-6; Cl. 9-10. Those are closed systems. AE also says the smoke from |

42

**A48**

| closed system during the testing thereof; | this $CO_2$ and oil is "non-flammable." Col. 1, ¶ 3-4. **Ground 3:** IFJ's oil is "entrained in a stream of inert propellant gas prior to the heating of the oil to vapour state . . . [and] still entrained in inert gas" when vaporized. Col. 1, last ¶. Vaporized smoke entrained in inert gas avoids explosions. The motivation to combine is discussed above in Grounds 1 and 2, including safety issues. **Ground 4:** IFJ as discussed in Ground 3 of this limitation. The 1999 Website provides further motivation to combine. **Ground 5:** GB '266 Pg. 1: 36-44 (minimizes and greatly reduces any tendency for ignition); pg. 2: 38-47 (same text); Pg. 2: 109-116 (reduces ignition to a minimum). The 1999 Website provides further motivation to combine. **Ground 6:** ESTA teaches the use of non-flammable nitrogen or carbon dioxide gas to make smoke. Pg. 7. These are known to create an inert environment. The 1999 Website provides further motivation to combine. |
|---|---|
| wherein the closed system to be tested for leaks at the volatile, potentially explosive environment is the evaporative system of a motor vehicle including a fuel tank, further comprising delivering smoke from the smoke outlet of said smoke producing chamber to the fuel tank. | **Grounds 1-6:** Gilliam's closed evaporative system includes the fuel tank and Gilliam tests for leaks in "virtually any closed vacuum system in the automobile and the like." Col. 3: 48-52. *Accord* Col. 3: 3-6; Col. 8: 23-26; Claims 1 and 17. **Ground 1:** AE: Gilliam teaches a leak test use for AE's old leak testing device in similar leak testing applications, thus motivating the use of AE's $CO_2$ in Gilliam's applications, or the use of $CO_2$ in Gilliam's device. AE's "non-flammable" smoke (Col. 1, ¶4) for leak testing (Col. 2, ¶4) suggests use in leak testing where the non-flammability would be useful, as in leak testing "any and all" of Gilliam's vehicle systems – including the fuel tank or others where a "spark" should be avoided (Gilliam Col. 7: 56-57). AE's "non-flammable" smoke removes the need for Gilliam's spark arrestor 3 to guard against use of the smoke in explosive environments of a motor vehicle thus |

*Inter Partes* Review of U.S. Patent No. 6,526,808

| | |
|---|---|
| | motivating one skilled in the art to use AE's non-flammable smoke to leak test Gilliam's fuel tank in order to reduce the risk of ignition and explosion. **Ground 2:** GB '867 uses smoke for leak testing ventilation (pg. 1: 15-17), ducts and pressure vessels (pg. 3: 5-6) which encompass or overlap with Gilliam's closed vehicle systems and fuel tank, providing a motivation to combine. The use of inert gas provides safety advantages, and Gilliam's spark arrestor shows a need for ignition suppression–as by GB '867's inert gas. **Grounds 3-6:** IFJ, GB '266, and ESTA all produce "non-flammable" smoke using a heated mixture of inert gas with oil that would reduce the risk of ignition and explosion used to leak test the fuel tank per Gilliam and eliminate the need for Gilliam's spark arrestor. **Grounds 4-6:** The 1999 Website teaches the interchangeable use of the smoke machines for firefighter training (IFJ), theatrical effects and movies (GB '266 and ESTA), and also use in leak testing a "broad range of systems, including "vehicles." Pg. 2. That motivates the combination with Gilliam's fuel tank testing. |

| <u>'808 Patent Claims</u> | <u>Gilliam (Ex. 1005), AE (Ex. 1007), GB '867 (Ex. 1008), IFJ (Ex. 1009), Swiatosz (Ex. 1012), 1999 Website (Ex. 1013), GB '266 (Ex. 1010), and ESTA (Ex. 1011)</u> |
|---|---|
| **Claim 10:** The method of generating smoke recited by Claim 9, comprising | As in Claim 9. |
| the additional step of regulating the pressure at which the smoke is carried by said | **Grounds 1-6:** Gilliam Col. 5: 35-49 ("The flow of smoke-generating fluid is controlled by pressure adjustment knob 4 and drain 14. . . . Of course, knob 4 could be marked or calibrated to indicate specific pressure levels which would be useful for applying |

44

**A50**

*Inter Partes* Review of U.S. Patent No. 6,526,808

| | |
|---|---|
| non-combustible gas from said closed smoke producing chamber to the closed system undergoing testing | prescribed pressures to particular automotive systems."); Cl. 3 (flow regulating means).<br><br>**Ground 1:**  AE injects smoke at up to 80 psi and can continually adjust the smoke output:  "The rate of emission of smoke is continuously variable from zero to full rate."  AE, Col. 1, last ¶ to Col. 2.<br><br>**Ground 2:**   GB '867 regulates the temperature, making heating easy to control.  Pg. 2:40-48 & 115-119 (easy to control).  There is a "very low pressure drop" to the tested part.  Pg. 3: 7-13. Controlling the temperature of vaporization controls the pressure and volume and velocity of smoke carried with low pressure drop to the part tested.<br><br>**Grounds 3-4:** IFJ shows a bottle of inert gas with a pressure regulator thus teaching or rendering obvious the introduction of variable pressure gas to generate and propel the resulting non-flammable smoke.<br><br>**Ground 5:** GB '266 uses a valve to start and stop the flow of smoke. Pg. 2: 77-82.  Turning smoke on and off regulates the pressure at which smoke is supplied and carried by the gas that "propels" the smoke.  Pg. 1: 30-32 ("the vapour so created being . . . *propelled* along ....").  *Accord* Pg. 1: 53-54; Pg. 3: 72-77 ("the vapour so created is propelled along"); pg. 2: 34-36; pg. 2: 104; Pg. 3: 72 (same).<br><br>**Ground 6:**  ESTA says the fog volume is adjusted by "opening or closing the regulator valve on the pressurized non-flammable gas bottle."  Pg. 7.  The volume determines the speed gas is propelled through the fixed diameter connecting hose. |

**B. Claim Charts Showing Claims 9 and 10 of the '808 Patent Are Obvious On Grounds (7) Gilliam/Vacutec + AE, or (8) Gilliam/ Vacutec + GB '867 + AE, or (9) Gilliam/Vacutec + IFJ + Swiatosz, or (10) Gilliam/Vacutec + GB '266 + 1999 Website, or (11) Gilliam/Vacutec + IFJ + 1999 Website, or (12) Gilliam/Vacutec + ESTA + 1999 Website**

Inter Partes Review of U.S. Patent No. 6,526,808

| '808 Patent Claims | Gilliam/Vacutec (Exs. 1005 & 1006), AE (Ex. 1007), GB '867 (Ex. 1008), IFJ (Ex. 1009), Swiatosz (Ex. 1012), GB '266 (Ex. 1010), 1999 Website (Ex. 1013), and ESTA (Ex. 1011) |
|---|---|
| **Claim 9:** A method for generating smoke for use at a volatile, potentially explosive environment, said method comprising the steps of: | **Grounds 7-12:** **Vacutec** is "a diagnostic tool … *described in* U.S. Patent No. 5,107,698" to Gilliam. Ex. 1005 at 2. *Accord*, Ex. 1005 at 5 Vacutec "*covered by* … 5,107,698"). Vacutec tests for leaks in vehicle fuel tanks. Ex. 1005 at pg. 6B ("To find a leak in this system, fill the line and tank with smoke . . . and observe where the smoke leaves the system. (example: fuel filler cap may be leaking)." <br><br>**Ground 7:** AE uses smoke generators to detect leaks in the aircraft industry. Col. 2, last ¶. <br><br>**Ground 8:** AE uses smoke generators to detect leaks in the aircraft industry. Col. 2, Last ¶. GB '867 uses $CO_2$ and oil for smoke to leak test ventilation systems and other pressure vessels. Pg. 1:11-17, pg. 3:6-7. <br><br>**Ground 9:** Gilliam also uses smoke machines for firefighting for its leak testing applications. Col. 5:64-65 (Swiatosz 4,303,397 fire training). IFJ is for firefighter training using oil vaporized in inert gas to create a non-flammable smoke. Pg. 1. IFJ's smoke generator, especially as the non-flammable gas also cures explosion risk. Gilliam Col. 7: 56-57; Vacutec Pg. 6B <br><br>**Ground 10:** GB '266 generates fog using inert gas to minimize potential ignition, for use in theatrical work, movies, and "other applications." Pg. 1: 11-14 (uses). Pg. 1: 26-44 (no ignition), pg. 2, 38:47 & 108-116 (no ignition). The 1999 Website uses smoke machines for leak testing of "vehicles," for theatrical work and movies, thus teaching the interchangeability of smoke machines for such uses. Pg. 2, end. <br><br>**Ground 11:** Gilliam uses smoke machines for firefighting in Gilliam's leak testing. Col. 5:61-65 (Swiatosz 4,303,397 smoke for fire training). IFJ is for "High Temperature Smoke Training" for firefighters. |

**A52**

*Inter Partes* Review of U.S. Patent No. 6,526,808

|  | The 1999 Website uses smoke machines for leak testing of "vehicles" and for training fire fighters, thus teaching the interchangeability of smoke machines for such uses. Pg. 2, end<br><br>**Ground 12:** ESTA makes fog using oil vaporized in inert gas for special effects theaters and movies. Pg. 5-6. The 1999 Website uses smoke machines for leak testing of "vehicles" and for theatrical work and movies, thus teaching the interchangeability of smoke machines for leak testing. Pg. 2, end. |
|---|---|
| locating a heating element within a closed smoke producing chamber, said smoke producing chamber having a gas inlet and a smoke outlet; . . . | **Grounds 7-12:** Gilliam has air inlet 7 to smoke producing chamber 20 containing heating element 11 and outlet conduit 22. Fig. 3; Cl. 1 & 17 (chamber means, heating means, conduit means). Vacutec produces smoke for leak testing. Ex. 1006 at 6-6C.<br><br>**Ground 7:** AE uses "oil propelled by carbon dioxide gas, heated electrically" which requires an inlet outlet to the smoke chamber and heater, or renders them obvious. Col. 1, ¶3.<br><br>**Ground 8:** AE's oil and $CO_2$ gas are "heated electrically" which requires an inlet outlet to the chamber and heater, or renders them obvious. Col. 1, ¶3. GB '867 has a cylindrical bore 2 containing heated plug 11 so the $CO_2$ and oil are heated in the gap between the plug and the bore. Fig. 1, pg. 2:24-32 & 94-98 & 115-118; Cl. 6.<br><br>**Grounds 9 & 11:** IFJ describes a "heat exchanger vaporization chamber" (Rt. Col., ¶2) and has an inert, bottled gas input and smoke output (photo).<br><br>**Ground 10:** GB '266 has the walls of the closed chamber vaporize the smoke liquid. Gas from inlet nozzle C forces oil from nozzle b$^3$ onto cylindrical walls d heated by heater e and discharge tube f. Pg. 1:45-53; pg. 2: 96-108 & 116 to pg. 2:9.<br><br>**Ground 12:** ESTA discloses a heat exchanger into which oil mixed with a non-flammable gas is propelled, heated to vapor, and forced out of the front of the machine. Pg. 6. |

*Inter Partes* Review of U.S. Patent No. 6,526,808

| | |
|---|---|
| delivering a flammable fluid to said heating element within the closed smoke producing chamber; | **Grounds 7-12:** Gilliam's oil is heated in chamber 20 to make smoke. Cl. 1 & 17 (fluid vaporized). Vacutec uses oil and generates smoke. Ex. 1006 at 6-14. **Grounds 7 & 8:** AE uses "medicinal grade oil propelled by carbon dioxide gas, *heated* electrically." Col 1, ¶3. **Ground 8:** GB '867 has an oil and inert gas mixture enter inlet 14 to hit heated plug 13. Pg. 2: 101-105; Figs 1 & 3. **Grounds 9 & 11:** IFJ says "oil is entrained in a stream of inert propellant gas prior to the heating of the oil to vapour state." Col. 1, last ¶. **Grounds 10-12:** The 1999 Website offers heated chambers to produce smoke (pg. 2 under Fire Fighter Training) and uses oil-based smoke that does not layer at 360ºF. Website at 3. **Ground 10:** GB '266 says "a hydrocarbon oil is sprayed in atomized form by means of a jet of carbon dioxide or nitrogen under pressure on to a surface sufficiently heated as to cause an immediate vaporization of the liquid." Pg. 2: 29-34. *Accord* Pg. 2: 96-103. Oil sprays out atomizing nozzle b$^3$. **Ground 12**: ESTA uses glycol & mineral oil. Pg. 5 & 6. |
| energizing said heating element for vaporizing into smoke within the closed smoke producing chamber the flammable fluid that is delivered thereto; [and] | **Grounds 7-12:** Gilliam's switch 1 activates heating element 11. Col. 6: 3-7. The fluid is "vaporized." Gilliam Cl. 1, Col. 8: 64 to Col. 9: 2. *Accord*, Cl. 17, Col 10: 36-39; Col. 3: 65 to Col. 4: 1; Col. 4: 41 ("vaporizing said smoke-generating fluid into smoke"); Col. 6: 34-36. Vacutec uses a remote control Ex. 1006 at 6. **Ground 7:** AE uses "oil propelled by carbon dioxide gas, *heated* electrically" to generate "non-flammable" smoke. Col 1, ¶3-4. The oil and $CO_2$ gas are "heated electrically from 230V or 115V supplies, a.c. or d.c." Col. 1, ¶3. The $CO_2$ prevents combustion so the oil vaporizes and produces "non-flammable" smoke. Col. 1, ¶3-4. |

| | |
|---|---|
| | **Ground 8:** AE: As in Ground 7 of this limitation. GB '867 uses a temperature controlled, electrical heating element for plug 11 so the oil-$CO_2$ mixture is vaporized to make smoke or mist. Pg. 2:24-32 & 60-63 & 94-107.<br><br>**Ground 9:** IFJ: "oil is entrained in a stream of inert propellant gas prior to the heating of the oil to vapour state" to generate smoke. Col. 1, last ¶.<br><br>**Ground 10:** GB '266, "a hydrocarbon oil is sprayed in atomized form by means of a jet of carbon dioxide or nitrogen under pressure on to a surface sufficiently heated as to cause an immediate vaporization of the liquid." GB '266: Pg. 2: 29-34. The 1999 Website produces smoke using oil that does not layer at 360ºF (pg. 3) and uses the smoke for theater and movies like GB '266 as well as leak testing vehicles as in Gilliam. Website pg.2.<br><br>**Ground 11:** IFJ as in Ground 9 of this limitation. The 1999 Website produces smoke using oil that does not layer at 360ºF. Website at 3.<br><br>**Ground 12:** ESTA describes a method for making heated fog using inert gas mixed with oil propelled into a heat exchanger to vaporize the smoke fluid. Pg. 5-6. The mineral oil "is mixed with a non-flammable gas, either carbon dioxide ($CO_2$) or nitrogen ($N_2$), from a pressurized gas bottle. The mixture is propelled into a heat exchanger." Pg. 6. The 1999 Website uses oil to make smoke that doesn't layer at 360ºF (pg. 3) and uses the smoke for ESTA's special effects and for leak testing vehicles. Pg. 2. |
| …blowing a supply of non-combustible gas under pressure into the closed smoke producing chamber by way of said gas inlet | **Grounds 7-12:** Gilliam blows air in inlet 7 using air pump 15, with the air also circulating smoke fluid in the chamber 20. Col. 6: 57-63. Vacutec blows smoke for leak testing. 6-6D.<br><br>**Ground 7:** AE: uses oil "*propelled by carbon dioxide gas.*" Col. 1, ¶3-4 (units also "include cylinders for the carbon dioxide gas" to propel gas). The smoke is also "passed into vessels pressurized up to 80 lb./sq.in." |

49

**A55**

| | |
|---|---|
| thereof | Col. 1, last ¶.  Both Gilliam and AE are for leak testing of potentially explosive environments.  AE Col. 2, ¶4; Gilliam Col. 3: 3-6 & 45-47 (test any and all systems). **Ground 8:** AE: uses oil "*propelled by carbon dioxide gas*." Col. 1, ¶3-4 (units also "include cylinders for the carbon dioxide gas" to propel gas). The smoke is also "passed into vessels pressurized up to 80 lb./sq.in." (1st Col. Last ¶).  GB '867 says the "oil/gas mixture is *forced* into the space" between the plug 11 and bore 2 through inlet 14.  Pg. 2: 99-108.  As discussed in this limitation, AE also blows $CO_2$ gas.  Col. 1, ¶3-4. **Ground 9:**  IFJ entrains oil "in a stream of inert gas propellant prior to the heating of the oil to the vapor state" and the resulting smoke is "still entrained in inert gas." Col. 1, last ¶. The bottom photo shows bottles of the inert gas, pressurized to blow the smoke generating fluid.  Gilliam cites Swiatosz (smoke generators for firefighter training) for use in smoke for leak testing (Col. 5:61-65), suggesting IFJ's smoke generator for leak testing vehicles. **Ground 10:**  GB '266 Pg. 1: 26 – 29, 47-49; pg. 2: 30-33, 38-42 & 108-110 ("the use of the carbon dioxide or nitrogen gas under pressure as a medium for atomizing and propelling the fog forming liquid is advantageous").  The 1999 Website teaches using smoke machines for theater and movies and for leak testing vehicles, suggesting the GB '266 inert gas smoke generator for leak testing "vehicles" as in Gilliam.  Website at 2. **Ground 11:**  IFJ as in Ground 9 of this limitation. 1999 Website teaches using smoke machines for fire training and leak testing vehicles, suggesting, IFJ inert gas smoke generator for fire training be used for leak testing "vehicles" as in Gilliam.  Website at 2. **Ground 12:**  ESTA makes heated fog using oil mixed with inert gas from a pressurized bottle that "propels" the mixture to the heater and beyond.  Pg. 6. The 1999 Website teaches smoke machines used for both entertainment as in ESTA, and vehicle leak testing as |

50

**A56**

*Inter Partes* Review of U.S. Patent No. 6,526,808

| | |
|---|---|
| | in Gilliam. Pg. 2. It is obvious to use ESTA's inert gas smoke generation in Gilliam's vehicle testing as the 1999 Website shows smoke machines can be used for both applications.  The safety advantages of ESTA's inert gas also make obvious its use in vehicle testing. |
| for (1) creating an inert environment within said chamber so as to prevent ignition and thereby avoid the possibility of an explosion when said flammable fluid is vaporized into smoke by said heating element and | **Ground 7:**  AE confirms that the smoke made using inert, carbon dioxide gas is "non-flammable."  Col. 1, ¶3.  Vacutec/Gilliam and AE are for leak testing, suggesting the use of AE's inert gas smoke in vehicle testing.  Gilliam's warnings against sparks and combustion in the engine (Col. 7: 56-57) further motivate using AE's inert gas generated smoke, as do Vacutec's "Danger" cautions.  Page 6B. <br> **Ground 8:**  GB '867 forces only oil, $CO_2$ and optionally water into the small gap/chamber between the plug 11 and bore 2 so the environment is inert.  Pg. 2, 99-108; Claims 9-10.  AE confirms that the smoke made using inert, carbon dioxide gas is "non-flammable."  Col. 1, ¶3.  Vacutec/Gilliam and AE are for leak testing, suggesting the use of AE's inert gas smoke in vehicle testing.  Gilliam's warnings against sparks and combustion in the engine (Col. 7: 56-57) further motivate using AE's inert gas generated smoke, as do Vacutec's "Danger" cautions.  Page 6B. <br> **Ground 9:**  IFJ's oil is "entrained in a stream of inert propellant gas prior to the heating of the oil to vapour state . . . [and] still entrained in inert gas" when vaporized."  Col. 1, last ¶.  The vaporized smoke entrained in inert gas thus avoids explosion when the fuel is vaporized into smoke. Safety concerns also render this limitation obvious for Gilliam's use.  Gilliam's warnings against sparks and combustion in the engine (Col. 7: 56-57) further motivate using IFJ's "non-flammable" smoke.  At Col. 5: 64-65 Gilliam cites Swiatosz 4,403,397 and its smoke generator for fire training as usable in Vacutec/Gilliam's leak testing of fuel tanks. IFJ provides a smoke generator that can "simulate shipboard fire scenarios."  Col. 1, 2nd ¶. |

| | That suggests using IFJ's fire training smoke generator in the Vacutec/Gilliam smoke generator. |
|---|---|
| | **Ground 10:**    Gilliam as in Ground 8 of this limitation. GB '266 states: "The use of the carbon dioxide or nitrogen gas under pressure as a medium for atomizing an propelling the fog forming liquid is advantageous not merely because of its cooling effects but because *its presence reduces to a minimum any tendency to ignition of the vapour* should the liquid employed be of an inflammable nature."    GB '266 pg. 1: 36-44. *Accord* Pg. 2: 38-47 (same) & pg. 2: 108-116 (same). The non-ignition teachings of GB '266 suggest the use of GB '266 in Gilliam.    Gilliam's cautions against sparks and combustion in the engine (Col. 7: 56-57) also suggest using GB '266's ignition suppressing smoke, as do Vacutec's "Danger" cautions.    Page 6B. The 1999 Website teaches smoke machines usable in theater and movies and in leak testing of vehicles, further motivating the use of GB '266 inert smoke to make smoke for Vacutec/Gilliam. |
| | **Ground 11:**    Gilliam & IFJ as in Ground 9 of this limitation.    The 1999 Website teaches smoke machines usable in fire training and leak testing, further motivating the use of IFJ's inert-gas generated smoke in making smoke for Gilliam. |
| | **Ground 12:**    ESTA uses inert $N_2$ or $CO_2$ or other non-flammable gas with oil in a heat exchanger to generate fog or smoke.    Pg. 4-5.    This is known to create an inert environment and prevent ignition and explosion, as recognized by the '808 patent.    The 1999 Website teaches smoke machines usable in theater and movies and in leak testing of vehicles, further motivating the use of ESTA's inert gas generated smoke to make smoke for Vacutec/Gilliam.    Motivation also arises from the safety issues resolved by inert smoke as discussed above in this limitation. |
| (2)    for carrying the    smoke    to the | **Grounds 7-12:**  Vacutec shows connecting lines to the fuel tank on pages 6A, 6B & 6D, and says to "Connect |

52

**A58**

| | |
|---|---|
| volatile potentially explosive environment by way of the smoke outlet of the closed smoke producing chamber, said volatile potentially explosive environment being a closed system undergoing testing for leaks; and | outlet hose to system." Pg. 6. *Accord* Pg. 6A (hoses, adaptors). Gilliam detects leaks in carburation, fuel injection and emission control (Col. 1: 24-26) and provides "means for determining the location of *any and all leaks* in an internal combustion engine." Col. 3: 3-6 & 45-47. Gilliam cautions against sparks causing an explosion (Col. 7: 56-57) and Vacutec's "Danger" cautions provide motivation. Page 6B. |

**Ground 7:** AE teaches "non-flammable" smoke for leak testing closed luggage holds and potentially volatile fuselages. Col. 1, ¶3 & Col. 2, last ¶. AE and Vacutec/Gilliam are both for leak testing. AE's non-flammable smoke resolves Vacutec/Gilliam safety concerns (Ex. 1005 at Col. 7: 56-57 & Ex. 1006 at 6B) and separately suggests use in Vacutecc/Gilliam.

**Ground 8:** GB '867 says the resulting oil/CO2 is "particularly suitable for injecting . . . directly into ducts or *pressure vessels*" (Pg. 3: 4-6) and for "testing ventilation systems or theatrical effects" like explosions. Pg. 1:14-17. AE confirms the smoke is used for explosive environments. Col. 2, ¶4 (e.g., fuselage testing for leaks). The overlapping uses of Vacutec/Gilliam and GB '867 and/or AE suggest using GB '867 in Vacutec/Gilliam's fuel tanks and systems.

**Ground 9:** IFJ teaches "non-flammable" smoke for fire training and safety (Col. 1) and Vacutec/Gilliam teaches one to look to smoke generators used in fire simulation (Col. 5: 61-65 via Swiatosz 4,303,397). IFJ's teachings on smoke generation are suggested for use in Vacutec/Gilliam's vehicle testing smoke machine for fuel tanks. Gilliam's safety concerns on sparks also motivate this use (Col. 7: 56-57), as do Vacutec's "Danger" cautions. Page 6B.

**Ground 10:** GB '266 discloses making smoke for theatrical works and "*in other applications*." Pg. 1: 10-14. GB '266 further teaches using carbon dioxide and nitrogen gas which "*reduces to a minimum any tendency to ignition of the vapour.*" GB '266 pg. 1: 36-44; Pg. 2: 38-47, pg. 2: 108-116. GB '266 also

*Inter Partes* Review of U.S. Patent No. 6,526,808

| | |
|---|---|
| | uses the inert gases to "propel" the vaporized smoke fluid. Pg. 1: 30-32. *Accord* Pg. 1: 53-54; Pg. 3: 72-77; pg. 2: 34-36; pg. 2: 104; Pg. 3: 72. The 1999 Website teaches interchangeable use of the smoke machines in entertainment, theaters and movies as in GB '266, and also use in leak testing a "broad range of systems," including "vehicles" Pg. 2 That suggests the use of GB '266 in Vacutec/Gilliam. GB '266's ignition suppression further suggests or independently suggests its use in Vacutec/Gilliam. *See* Ex. 1006 at 6B. |
| | **Ground 11:** IFJ as in Ground 9 of this limitation. The 1999 Website teaches smoke machines usable in fire training and leak testing of vehicles, further motivating the use of IFG's smoke generator for fire training to make smoke for Vacutec/Gilliam. IFJ's "non-flammable" smoke further suggests this combination given the 1999 Website suggestion to combine, as does Gilliam's spark concerns (Col. 7:56-57), as do Vacutec's "Danger" cautions. Page 6B. |
| | **Ground 12:** ESTA uses nitrogen or carbon dioxide to generate fog for theatrical and movie uses. Pg. 5-6. The 1999 Website teaches smoke machines for theatrical and movie uses and for leak testing vehicles, making the use of ESTA's fog generators obvious for Vacutec/Gilliam's closed fuel tank system. |
| …connecting the smoke outlet of said closed smoke producing chamber to the closed system undergoing testing. | **Grounds 7-12:** Vacutec shows connecting lines to the fuel tank on pages 6A, 6B & 6D. Accord Pg. 6 ("Connect outlet hose to system."); Pg. 6A (hook up EVAP "using the supplied hoses and adaptors."). Gilliam Col. 8: 18-21 ("interconnected with conduit 22"); Cl. 1 & 17 (conduit means). |
| | **Ground 7:** AE says "*smoke may be hosed or ducted* and, where an injector is fitted, passed into vessels pressurized up to 80 lb./sq. in." AE, Col. 1, last ¶. |
| | **Ground 8:** GB '867 has "pipes and junctions for attaching it to fluid delivery or receiving means such as smoke generating or dispersal means." Pg. 2:49-52. The smoke outlet can have "connecting means." Pg. 3: |

*Inter Partes* Review of U.S. Patent No. 6,526,808

|  |  |
|---|---|
|  | 6-8.  AE also says "*smoke may be hosed or ducted* and, where an injector is fitted, passed into vessels pressurized up to 80 lb./sq. in." AE, Col. 1, last ¶.<br><br>**Ground 10:** GB '266 and the 1999 Website each require the claimed connections to get smoke where it is needed for theatrical effects and movies.<br><br>**Grounds 10-12:** The 1999 Website uses smoke machines for leak testing of vehicles (Pg. 2, end) and that requires the claimed connection to the parts being leak tested, or make such a connection obvious. |
| said supply of non-combustible gas for creating an inert environment within the closed system to which the smoke is carried, said inert environment with the closed system preventing ignition within the closed system during the testing thereof; | **Grounds 7-12:** Vacutec/Gilliam caution against combustion, recognizing a need for safety improvement. Ex. 1006 at 6B; Ex. 1005 at Col. 7: 56-57. The cited references provide that improvement.<br><br>**Ground 7:** AE generates "non-flammable" smoke and $CO_2$ does not support combustion. AE: Col. 1, ¶3 ("The smoke produced by these generators is … non-flammable …."); Col. 1, 3rd ¶ (carbon dioxide -smoke).<br><br>**Ground 8:** GB '867 uses oil and $CO_2$ and may further use water so the smoke is inert and creates an inert environment in the closed ventilation system, duct or pressure vessel tested. Pg. 1:11-17; pg. 3:5-6; Cl. 9-10. AE also says the smoke from this $CO_2$ and oil smoke is "non-flammable." Col. 1, ¶ 3-4.<br><br>**Ground 9:** IFJ's oil is "entrained in a stream of inert propellant gas prior to the heating of the oil to vapour state . . . [and] still entrained in inert gas" when vaporized. Col. 1, last ¶. Vaporized smoke entrained in inert gas avoids explosions. The motivation to combine is discussed above, including safety issues.<br><br>**Ground 10:** GB '266 Pg. 1: 36-44 (minimizes and greatly reduces any tendency for ignition); pg. 2: 38-47 (same text); Pg. 2: 109-116 (reduces ignition to a minimum). The 1999 Website provides further motivation to combine.<br><br>**Ground 11:** IFJ as discussed in Ground 9 of this limitation. The 1999 Website provides further motivation to combine. |

| | |
|---|---|
| | **Ground 12:** ESTA teaches the use of non-flammable nitrogen or carbon dioxide gas to make smoke. Pg. 7. These are known to create an inert environment. The Website provides further motivation to combine. |
| wherein the closed system to be tested for leaks at the volatile, potentially explosive environment is the evaporative system of a motor vehicle including a fuel tank, further comprising delivering smoke from the smoke outlet of said smoke producing chamber to the fuel tank. | **Grounds 7-12:** Vacutec/Gilliam test potentially explosive systems, including fuel tanks recognize a need for safety improvement. Vacutec Pg. 6B (danger, warning), Gilliam Col. 7: 50-64 (spark avoidance), Col. 3: 3-6 & 48 (test any system); Claims 1 and 17; Vacutec Ex. 1006 at 6B (Danger, Warning). |
| | **Ground 7:** The overlapping leak testing uses of AE, Gilliam, Vacutec and GB '867 suggest interchangeability. AE's "non-flammable" smoke (Col. 1, ¶4) for leak testing (Col. 2, ¶4) suggests use in leak testing where the non-flammability is useful as in leak testing "any and all" of Gilliam's vehicle systems – including the fuel tank or others where a "spark" should be avoided (Gilliam Col. 7: 56-57). |
| | **Ground 8:** GB '867 uses smoke for leak testing ventilation (pg. 1: 15-17), ducts and pressure vessels (pg. 3:5-6) which encompass or overlap with Gilliam's closed vehicle systems and fuel tank, providing a motivation to combine. AE's "non-flammable" smoke (Col. 1, ¶4) for leak testing (Col. 2, ¶4) suggests use in leak testing where the non-flammability is useful as in leak testing "any and all" of Gilliam's vehicle systems – including the fuel tank or others where a "spark" should be avoided (Gilliam Col. 7: 56-57). AE's "non-flammable" smoke removes the need for Gilliam's spark arrestor 3 to further motivate using AE's non-flammable smoke to leak test Vacutec's fuel tank in order to reduce the risk of ignition and explosion. |
| | **Grounds 9-12:** IFJ, GB '266 and ESTA all produce "non-flammable" smoke using a heated mixture of inert gas with oil that would reduce the risk of ignition and explosion used to leak test the fuel tank per Gilliam and eliminate the need for Gilliam's spark arrestor. IFJ and the 1999 Website as in the discussion above. |

| | |
|---|---|
| | **Grounds 10-12:** The 1999 Website teaches the interchangeable use of the smoke machines firefighter training (IFJ), theatrical effects and movies (GB '266 and ESTA), and also use in leak testing a "broad range of systems, including "vehicles" Pg. 2. That motivates the combination with Gilliam's fuel tank testing. |

| '808 Patent Claims | Gilliam/Vacutec (Exs. 1005 & 1006), AE (Ex. 1007), GB '867 (Ex. 1008), IFJ (Ex. 1009), Swiatosz (Ex. 1012), GB '266 (Ex. 1010), 1999 Website (Ex. 1013), and ESTA (Ex. 1011) |
|---|---|
| **Claim 10:** The method of generating smoke recited by Claim 9, comprising | As in Claim 9. |
| the additional step of regulating the pressure at which the smoke is carried by said non-combustible gas from said closed smoke producing chamber to the closed system undergoing testing | **Grounds 7-12:** Vacutec uses a "flow meter attachment" for testing (Pg. 13-fuel evaporative test) and regulates pressure to .5psi (pg. 6B & 6C) which requires a pressure regulator. Gilliam Col. 5: 35-49 & Cl. 3 (flow regulating means). **Ground 7:** AE, Col. 1, last ¶ to Col. 2 ("The rate of emission of smoke is continuously variable from zero to full rate."). **Ground 8:** GB '867 regulates the temperature, making heating easy to control. Pg. 2:40-48 & 115-119 (easy to control). There is a very low pressure drop" to the tested part is low. Pg. 3: 7-13. Controlling the temperature controls the pressure and volume and velocity of smoke produced and carried with low pressure drop to the part tested. AE, Col. 1, last ¶ to Col. 2 ("The rate of emission of smoke is continuously variable from zero to full rate.") **Grounds 9 & 11:** IFJ shows a bottle of inert gas with a pressure regulator thus teaching or rendering obvious the introduction of variable pressure gas to generate and propel the resulting non-flammable smoke. |

57

**A63**

| | |
|---|---|
| | **Ground 10:** GB '266 uses a valve to start and stop the flow of smoke. Pg. 2: 77-82.  Turning smoke on and off regulates the pressure at which smoke is supplied and carried by the gas that "propels" the smoke.  Pg. 1: 30-32 ("the vapour so created being . . . *propelled* along ....").  *Accord* Pg. 1: 53-54; Pg. 3: 72-77 ("the vapour so created is propelled along"); pg. 2: 34-36; pg. 2: 104; Pg. 3: 72 (same).<br><br>**Ground 12:**  ESTA says the fog volume is adjusted by "opening or closing the regulator valve on the pressurized non-flammable gas bottle."  Pg. 7.  The volume determines the speed gas is propelled through the fixed diameter connecting hose. |

## VIII. CONCLUSION

The prior art references identified in this Petition contain pertinent technological teachings, either explicitly or inherently disclosed, that were not previously considered in the manner presented herein or applied during original examination of the '808 patent, or during previous reexaminations. At least by virtue of disclosing the limitations that served as the basis for the allowance of the claims at issue, the references relied upon herein should be considered important in determining patentability. In sum, these references provide new, non-cumulative technological teachings not previously considered and relied upon on the record, and they establish a reasonable likelihood of success as to Petitioner's assertions that Claims 9 and 10 of the '808 patent are not patent eligible, per the grounds presented in this Petition.

*Inter Partes* Review of U.S. Patent No. 6,526,808

Accordingly, Petitioner respectfully requests institution of *inter partes*
review for Claims 9 and 10 of the '808 patent for each of the grounds
presented herein.

Respectfully submitted,

STETINA BRUNDA GARRED & BRUCKER

Dated: <u>January 7, 2013</u>          /Matthew A. Newboles/
                                    Matthew A. Newboles, Reg. No. 36,224
                                    Attorney for Petitioner
                                    Redline Detection, LLC

STETINA BRUNDA
GARRED & BRUCKER
75 Enterprise, Suite 250
Aliso Viejo, CA 92656
(949) 855-1246

*Inter Partes* Review of U.S. Patent No. 6,526,808

## CERTIFICATE OF SERVICE

Pursuant to 37 C.F.R. §§ 42.8(e) and 42.105(b), the undersigned certifies that on January 7, 2013, a complete and entire copy of this Petition for *Inter Partes* Review and all supporting exhibits were provided via Express Mail, costs prepaid, to the Patent Owner by serving the correspondence address of record as follows:

Edward Schlatter
Knobbe Martens
2040 Main Street, 14th Floor
Irvine, California 92614

and with a courtesy copy via Express Mail to:

Todd M. Malynn
Feldman Gale, P.A.
880 West First Street, Suite 315
Los Angeles, CA 90012

By:/Matthew A. Newboles/
Matthew A. Newboles
Reg. No. 36,224

T:\Client Documents\REDLN\025X\Petition.Inter.Partes.Review.Final.docx

Filed:  April 10, 2013

Filed on behalf of:
    Patent Owner STAR EnviroTech, Inc.
By:   Edward A. Schlatter, Reg. No. 32,297
     Edward.Schlatter@knobbe.com
     Brenton R. Babcock, Reg. No. 39,592
     Brent.Babcock@knobbe.com
     KNOBBE, MARTENS, OLSON & BEAR, LLP
     2040 Main Street, 14th Floor
     Irvine, CA 92614
     Tel:  (949) 760-0404
     Fax:  (949) 760-9502

## UNITED STATES PATENT AND TRADEMARK OFFICE
_____

## BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

REDLINE DETECTION, LLC
Petitioner

v.

STAR ENVIROTECH, INC.
Patent Owner

_____

Case IPR2013-00106
Patent 6,526,808

_____

## STAR ENVIROTECH, INC.'S PRELIMINARY RESPONSE

# TABLE OF CONTENTS

**Page No.**

I. INTRODUCTION & SUMMARY OF ARGUMENT ...................................1

II. THE PETITION SHOULD BE DENIED .......................................2

    A.   Assignor Estoppel Bars The Petitioner From Pursuing An
*Inter Partes* Review Of The '808 Patent...............................2

    B.   Petitioner's Conclusory Attorney Arguments Fail To
Satisfy The Evidentiary Requirements For Instituting An
*Inter Partes* Review Of The '808 Patent And Fail To
Show A Reasonable Likelihood Of Proving
Unpatentability Of Any Claims...........................................6

        1.   There Is No Assessment Of The Level Of Ordinary
Skill In The Art Or The Previously Submitted
Evidence Of Secondary Considerations ....................................8

        2.   There Is No Reasonable Basis For Finding That A
Person Of Ordinary Skill Would Consider
Combining The Gilliam Patent's Engine Leak
Testing Equipment With The Theatrical Smoke
Machines Described In The Petitioner's Secondary
References ................................................................11

        3.   There Is No Evidence A Person Of Ordinary Skill
Would Have Had A Reasonable Expectation Of
Successfully Combining The Gilliam Patent's
Engine Leak Testing Equipment With The
Theatrical Smoke Machine Art Of Petitioner's
Secondary References ...................................................18

        4.   The Alleged Prior Art Fails To Show Material
Claim Limitations And There Is No Reasonable
Showing That A Person Of Ordinary Skill Would
Fill In The Gaps .......................................................19

A68

# TABLE OF CONTENTS
## (*cont'd*)

**Page No.**

C.  Petitioner Relies On The Same Or Substantially The
Same Prior Art And Arguments Presented During The
Initial Prosecution And In Its Two Previous
Reexaminations Of The '808 Patent, Further
Undermining The Likelihood Of Proving Unpatentability.................25

  1.  The Gilliam Patent Was Previously Presented To,
  And Considered By, The USPTO.............................................25

  2.  The Vacutec Reference And Pauley Patent Are
  Substantially The Same As The Previously
  Considered Gilliam Patent And Other References ..................27

  3.  The Remaining Secondary References Are
  Substantially The Same As The Previously
  Considered Popkin Patent.........................................................31

D.  A Denial Of The Petition Is Consistent With The AIA's
Policy Of Ensuring The Integrity Of The Patent System
And The Efficient Administration Of The USPTO ...........................35

III.  CONCLUSION.............................................................................................38

# TABLE OF AUTHORITIES

**Page No(s).**

*Abbott Labs. v. Cordis Corp.*,
No. 2012-1244, 2013 WL 136627
(Fed. Cir. Mar. 20, 2013) .................................................................5

*Amgen Inc. v. Hoffman-La Roche Ltd.*,
580 F.3d 1340 (Fed. Cir. 2009) ...........................................18, 24

*Catalina Lighting, Inc. v. Lamps Plus, Inc.*,
295 F.3d 1277 (Fed. Cir. 2002) ...................................................9

*Custom Accessories, Inc. v. Jeffrey-Allan Indust., Inc.*,
807 F.2d 955 (Fed. Cir. 1986) .................................................8, 9

*In re De Blauwe*,
736 F.2d 699 (Fed. Cir. 1984) ..........................................7, 17, 24

*Gemtron Corp. v. Saint-Gobain Corp.*,
572 F.3d 1371 (Fed. Cir. 2009) ...................................................7

*Graham v. John Deere Co.*,
383 U.S. 1 (1966)..........................................................7, 8, 10, 24

*In re Huang*,
100 F.3d 135 (Fed. Cir. 1996) ..........................................7, 17, 24

*Intel Corp. v. U.S. Int'l Trade Comm'n*,
946 F.2d 821 (Fed. Cir. 1991) ............................................2, 3, 4

*KSR Int'l Co. v. Teleflex, Inc.*,
550 U.S. 398 (2007)..........................................................10, 11

*Laitram Corp. v. Cambridge Wire Cloth Co.*,
919 F.2d 1579 (Fed. Cir. 1990) ...................................................7

*Litton Indust. Prods. v. Solid State Sys. Corp.*,
755 F.2d 158 (Fed. Cir. 1985) ...................................................9

*Mentor Graphics Corp. v. Quickturn Design Sys.*,
150 F.3d 1374 (Fed. Cir. 1998) ...................................................2

# TABLE OF AUTHORITIES
## (*cont'd*)

**Page No(s).**

*Ortho-McNeil Pharm., Inc. v. Mylan Labs. Inc.*,
 520 F.3d 1358 (Fed. Cir. 2008) .............................................................10, 11

*Phillips v. AWH Corp.*,
 415 F.3d 1303 (Fed. Cir. 2005) ....................................................................37

*Rolls-Royce, PLC v. United Techs. Corp.*,
 603 F.3d 1325 (Fed. Cir. 2010) ....................................................................11

*Ruiz v. A.B. Chance Co.*,
 234 F.3d 654 (Fed. Cir. 2000) .........................................................................8

*Shamrock Tech., Inc. v. Med. Sterilization, Inc.*,
 903 F.2d 789 (Fed. Cir. 1990) ...............................................................2, 3, 4

*Synopsis, Inc. v. Mentor Graphics Corp.*,
 No. IPR2012-00041 (P.T.A.B. Feb. 22, 2013) ...............................................7

*Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*,
 492 F.3d 1350 (Fed. Cir. 2007) ....................................................................11

*Vitronics Corp. v. Conceptronic, Inc.*,
 36 F. Supp. 2d 440 (D.N.H. 1997) .................................................................5

*Wyers v. Master Lock Co.*,
 616 F.3d 1231 (Fed. Cir. 2010) ....................................................................12

## OTHER AUTHORITIES

35 U.S.C. § 103 ..................................................................................................1

35 U.S.C. § 302 ..................................................................................................5

35 U.S.C. § 303 ..................................................................................................5

35 U.S.C. § 305 ..................................................................................................5

35 U.S.C. § 307 ..................................................................................................5

## TABLE OF AUTHORITIES
### *(cont'd)*

**Page No(s).**

35 U.S.C. § 312 ..............................................................6, 9, 24

35 U.S.C. § 313 ............................................................................1

35 U.S.C. § 314 ...................................................................passim

35 U.S.C. § 315 ..........................................................................35

35 U.S.C. § 316 .....................................................................5, 35

35 U.S.C. § 325 ...................................................................25, 35

37 C.F.R. § 42.22 ...........................................................6, 9, 24

37 C.F.R. § 42.63 .........................................................................3

37 C.F.R. § 42.101 ...................................................................2, 4

37 C.F.R. § 42.104 .......................................................................6, 24

37 C.F.R. § 42.107 ......................................................................1

77 Fed. Reg. 48680, 48702 (Aug. 14, 2012) ...........................7

157 Cong. Rec. S1375 (daily ed. Mar. 8, 2011) ......................5

## LIST OF PATENT HOLDER'S EXHIBITS

## RELIED UPON FOR THIS RESPONSE

| Exhibit No. | Description |
|---|---|
| 2001 | Pages From Redline Detection, LLC's Official Website |
| 2002 | U.S. Patent No. RE38,686 to Loblick ("the Loblick Patent") |
| 2003 | GB Patent No. 1,039,729 to Popkin ("the Popkin Patent") |
| 2004 | Order (1) Granting Defendants' Motion To Stay; (2) Striking Defendants' Motion To Dismiss; and (3) Vacating The April 15, 2013 Hearing And Scheduling Conference, *Star Envirotech, Inc. v. Redline Detection, LLC; Kenneth A. Pieroni*, No. SACV 12-01861 JGB (MLGx) (C.D. Cal. Apr. 3, 2013) (Doc. No. 31) |

IPR2013-00106
Redline Detection, LLC v. STAR EnviroTech, Inc.

Pursuant to 35 U.S.C. § 313 and 37 C.F.R. § 42.107, Patent Owner STAR EnviroTech, Inc. ("STAR") hereby submits its Preliminary Response to Redline Detection, LLC's Corrected Petition for Inter Partes Review of U.S. Patent 6,526,808 ("the '808 patent").

## I. INTRODUCTION & SUMMARY OF ARGUMENT

The Petition for *inter partes* review of the '808 patent should be denied. First, Petitioner is barred from challenging the patentability of the '808 patent's claims by the doctrine of assignor estoppel. The co-inventor of the '808 patent, Kenneth Alan Pieroni, is the founder and original owner of Petitioner Redline Detection, LLC ("Redline"), and Mr. Pieroni maintains an ongoing collaborative relationship with Redline, currently serving as Redline's R&D Director. Equity bars Mr. Pieroni from now arguing that his invention is not patentable.

Second, the Petition falls far short of meeting the requisite standard of demonstrating a reasonable likelihood that at least one of the challenged claims is unpatentable. Importantly, all of the proposed grounds of unpatentability rely on 35 U.S.C. § 103, yet Petitioner fails to provide any *evidence* to support the attorneys' obviousness arguments. Indeed, Petitioner provides no expert testimony of any kind, and fails to provide even one iota of *evidence* from the perspective of a person of ordinary skill in the art. Petitioner apparently hopes to meet the heightened *inter partes* review standard by submitting mere attorney argument; but it is well settled that attorney argument cannot substitute for evidence upon which the Board can rely.

Third, the arguments and prior art submitted by Petitioner are substantially

IPR2013-00106
Redline Detection, LLC v. STAR EnviroTech, Inc.

the same as those previously considered — and rejected — by the USPTO, not only during the original prosecution of the '808 patent, but also during *two* subsequent and back-to-back *ex parte* reexaminations initiated by Petitioner. In fact, Petitioner's primary arguments and prior art are identical to those in its previous unsuccessful challenges. This *inter partes* review petition is therefore Petitioner's third bite at the proverbial apple. Petitioner's regurgitation of the same unsuccessful arguments, apparently hoping this time for a different outcome with a different decision maker, falls far short of meeting the heightened *inter partes* review standard.

## II.  THE PETITION SHOULD BE DENIED

### A.    Assignor Estoppel Bars The Petitioner From Pursuing An *Inter Partes* Review Of The '808 Patent

The Petitioner is barred from challenging the validity of the '808 patent under the doctrine of assignor estoppel. The Petition should therefore be denied under 37 C.F.R. § 42.101(c).

The doctrine of assignor estoppel bars those who assign a patent from later arguing that the assigned patent is invalid. *Mentor Graphics Corp. v. Quickturn Design Sys.*, 150 F.3d 1374, 1377 (Fed. Cir. 1998). This doctrine is based on notions of fairness — one who reaps a benefit by selling something should not be permitted an additional benefit by later claiming what they sold was worthless. *Id*.

These notions of fairness extend the estoppel to those who are in privity with the assignor. *Intel Corp. v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 838–839 (Fed. Cir. 1991); *Shamrock Tech., Inc. v. Med. Sterilization, Inc.*, 903 F.2d 789, 793–794

(Fed. Cir. 1990). In assessing whether a party is in privity with an assignor, the Federal Circuit looks to the relationship between the party and the assignor, as well as whether the company has availed itself of the assignor's knowledge in conducting the alleged infringing activities. *Id.*

Petitioner is in privity for purposes of assignor estoppel with one of the '808 patent's inventors. The co-inventor/assignor is Kenneth Alan Pieroni, who signed a declaration, swearing under oath that the '808 patent was patentable. Ex. 1002 at 60–62 ('808 Patent PH, Declaration and Power of Attorney at 1–3).[1] After assigning his rights in the '808 patent (*id.* at 70–71 (Declaration Claiming Small Entity Status at 1–2)), Mr. Pieroni formed the Petitioner (Redline) and began competing with the patent owner (STAR). Ex. 2001 at 1, 3 ("After designing and selling smoke machines . . . Ken retired from [STAR]. . . . Two years after the expiration of his non-compete, Ken Pieroni founded Redline Detection, LLC. His goal was to design a smoke machine . . . ."). Mr. Pieroni was an owner and employee of Petitioner during the development of the alleged infringing product and the alleged infringing activity. *Id.* ("Ken Pieroni founded Redline Detection,

---

[1]    Because Petitioner failed to consecutively number each page of its exhibits as required by 37 C.F.R. § 42.63(d)(2)(i), STAR refers to the PDF page numbers of the prosecution history exhibits, and then appends in parentheses a short description of the pinpoint cited document within the prosecution history, as well as that document's internal page number. A similar practice is followed throughout this Preliminary Response.

LLC. . . .  He was most successful because after a year in development the high performance Smoke Pro Total Tech was released . . . .").  Moreover, Mr. Pieroni currently serves as Petitioner's R&D Director.  *Id.* ("Ken [Pieroni] continues as Redline's Research & Development Director . . . .").

Because (1) Mr. Pieroni had an ownership interest in Petitioner, (2) Petitioner availed itself of Mr. Pieroni's knowledge to conduct the alleged infringement, and (3) Mr. Pieroni currently serves as Redline's Research & Development Director, Petitioner is in privity with Mr. Pieroni and is also subject to assignor estoppel.  *See Intel,* 946 F.2d at 838–839; *Shamrock,* 903 F.2d at 793–794.  Petitioner is therefore estopped from challenging the patentability of the '808 patent claims, and the Petition should therefore be denied on that basis alone under 37 C.F.R. § 42.101(c).

Indeed, applying assignor estoppel is particularly equitable here.  As revealed on Redline's current website, Petitioner publicly touts Mr. Pieroni's patent portfolio (which includes the '808 patent), and even lauds the non-combustible gas feature covered by his patents:

> No one has more experience, knowledge, or *patents* regarding smoke machines [than Ken Pieroni].

> * * *

> Ken [Pieroni] continued to develop smoke technology for locating leaks for several more years during which time he filed *and received 6 U.S. patents for his work.*  One patent in Pieroni's name is for the use of nitrogen so as to alleviate dieseling in the smoke chamber which

> has plagued glow plug machines and is still used in the old technology
> today.

Ex. 2001 at 3 (emphases added).  While Petitioner proudly proclaims Mr. Pieroni's inventions to the public, Petitioner does an about face with the Board, decrying the inventions of the '808 patent as merely obvious and unpatentable.  Petitioner's duplicity further supports the application of equitable estoppel here.

STAR notes that an isolated, nonbinding district court decision shielding *ex parte* reexamination requests from the effects of assignor estoppel does not undermine the analysis and conclusion set forth above.  *See Vitronics Corp. v. Conceptronic, Inc.*, 36 F. Supp. 2d 440, 442 (D.N.H. 1997) (granting a stay pending the result of an *ex parte* reexamination even though assignor estoppel barred the requester/alleged infringer from challenging patentability in court).  In *ex parte* reexaminations, the requester has no burden of proving unpatentability and has no involvement other than the initial request.  *See* 35 U.S.C. §§ 302–303, 305, 307.  In *inter partes* review, on the other hand, the Petitioner bears the burden of proving unpatentability and thus plays an adversarial role throughout the proceeding.  35 U.S.C. § 316(e); *see* 157 Cong. Rec. S1375 (daily ed. Mar. 8, 2011) (statement of Sen. Kyl) ("One important structural change made by the present bill is that inter partes reexamination is converted into an adjudicative proceeding in which the petitioner, rather than the Office, bears the burden of showing unpatentability."); *see also Abbott Labs. v. Cordis Corp.*, No. 2012-1244, 2013 WL 136627 at *7 (Fed. Cir. Mar. 20, 2013) (noting that the purpose of *inter partes* reviews is to convert *inter partes* reexamination into an adjudicative

IPR2013-00106
Redline Detection, LLC v. STAR EnviroTech, Inc.

proceeding involving litigation tools such as subpoenas, depositions, and other discovery).   There is no material difference between the Petitioner's proposed challenges to Claims 9 and 10 here and how Petitioner would pursue the same arguments in district court.   Since assignor estoppel bars Petitioner from challenging the validity of Claim 9 and 10 in district court, it also bars Petitioner's *inter partes* review petition.

**B.    Petitioner's Conclusory Attorney Arguments Fail To Satisfy The Evidentiary Requirements For Instituting An *Inter Partes* Review Of The '808 Patent And Fail To Show A Reasonable Likelihood Of Proving Unpatentability Of Any Claims**

Petitioner's obligation to show a likelihood of success is intertwined with its duty to meet the evidentiary burdens outlined in 35 U.S.C. § 312(a)(3) and 37 C.F.R. §§ 42.22(a)(2), 42.104(b)(4), and 42.104(b)(5).   A failure to provide evidence or a detailed explanation to support an unpatentability challenge undermines the likelihood of succeeding on the challenge.   The Board recently applied these principles in rejecting another materially deficient petition:

> Petitioner's conclusory statements, without more detail, fail to satisfy any of [35 U.S.C. § 312(a)(3) or 37 C.F.R. §§ 42.22(a), 42.104(b)(4), and 42.104(b)(5)] and are irreparably lacking in detail.   Petitioner does not clearly provide analysis to support the assertion of obviousness over [the cited prior art].   The petition does not clearly point out the differences between the claimed invention and [the cited prior art].   Nor does Petitioner explain why a person of ordinary skill in the art would have found the claimed subject matter obvious in spite of those differences. . . .   Because Petitioner has failed to demonstrate a reasonable likelihood that it would prevail on such ground of unpatentability, we decline to institute an *inter partes*

IPR2013-00106

Redline Detection, LLC v. STAR EnviroTech, Inc.

review on [that basis].

Decision - Institution of *Inter Partes* Review (Paper 16) at 14–15, *Synopsis, Inc. v. Mentor Graphics Corp.*, No. IPR2012-00041 (P.T.A.B. Feb. 22, 2013).

Here, the Petition is similarly deficient. As an initial matter, Petitioner fails to even address two of the four critical *Graham* factors, which the Supreme Court has established as requirements for a proper obviousness assessment. These missing factors are (1) the level of ordinary skill in the art, and (2) objective indicia (a.k.a., "secondary considerations") of nonobviousness.

Petitioner's assessment of the prior art, moreover, relies solely on unsupported attorney argument. The Federal Circuit has repeatedly held that attorney argument is not evidence. *See, e.g., Gemtron Corp. v. Saint-Gobain Corp.*, 572 F.3d 1371, 1380 (Fed. Cir. 2009) (rejecting unsworn attorney argument regarding the accused manufacturing process as not evidence) (*citing Laitram Corp. v. Cambridge Wire Cloth Co.*, 919 F.2d 1579, 1583 (Fed. Cir. 1990)). Indeed, in outlining the new rules and regulations governing *inter partes* reviews, the USPTO has emphasized that "arguments of counsel cannot take the place of factually supported objective evidence." 77 Fed. Reg. 48680, 48702 (Aug. 14, 2012), Changes to Implement *Inter Partes* Review Proceedings, Post-Grant Review Proceedings, and Transitional Program for Covered Business Method Patents (citing *In re Huang*, 100 F.3d 135, 139–40 (Fed. Cir. 1996) and *In re De Blauwe*, 736 F.2d 699, 705 (Fed. Cir. 1984)).

A proper assessment of Petitioner's prior art shows that even assuming a person of skill in the art could and would make the proposed combinations (a

IPR2013-00106
Redline Detection, LLC v. STAR EnviroTech, Inc.

conclusion that is not supported by the Petition), the prior art still fails to show material claim limitations. Not surprisingly, Petitioner offers no testimony from the perspective of a person of ordinary skill in the art to support Petitioner's challenge to the patentability of Claims 9 and 10. For that reason alone, the Petition should be denied for failing to show a reasonable likelihood of succeeding on any of Petitioner's challenges to Claims 9 and 10.

### 1. There Is No Assessment Of The Level Of Ordinary Skill In The Art Or The Previously Submitted Evidence Of Secondary Considerations

A finding of obviousness cannot be made without assessing the level of ordinary skill in the relevant art. *Custom Accessories, Inc. v. Jeffrey-Allan Indust., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986) (citing *Graham v. John Deere Co.*, 383 U.S. 1 (1966)); *see Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 662 (Fed. Cir. 2000). Indeed the "critical question" in assessing obviousness is whether the claimed invention would have been obvious at the time of invention *to a person of ordinary skill in the art*. *Custom*, 807 F.2d at 962. As part of the fundamental *Graham* analysis, assessing the level of ordinary skill in the art is critical to protecting against hindsight, particularly where the invention is less technologically complex. *Ruiz*, 234 F.3d at 663-64.

Petitioner offers no testimony of any kind and altogether fails to identify any evidence of the level of ordinary skill in the relevant art. Indeed, Petitioner entirely fails to offer even a conclusory statement identifying the level of skill allegedly possessed by the person to whom the challenged claims would have supposedly been obvious. *See* Petition at 57-58. Because the level of skill in the

IPR2013-00106
Redline Detection, LLC v. STAR EnviroTech, Inc.

art is an integral consideration in assessing obviousness, the Petition is fatally deficient. More specifically, the Petition fails to meet the requirements of 35 U.S.C. § 312(a)(3) and 37 C.F.R. § 42.22(a) because the Petition fails to identify with any particularity evidence supporting this integral part of its obviousness challenge. Without this critical information, Petitioner cannot show a reasonable likelihood of proving unpatentability, as required by 35 U.S.C. § 314(a). *See Custom*, 807 F.2d at 962.

In some situations, the level of skill in the art might be gleaned from the prior art itself. *See, e.g.*, *Litton Indust. Prods. v. Solid State Sys. Corp.*, 755 F.2d 158, 163–164 (Fed. Cir. 1985). But any such attempted gleaning would be inappropriate with respect to the technology of the '808 patent, and in any event could not salvage the materially deficient Petition here. That is, even assuming the level of skill in the art relevant to the '808 patent claims could be gleaned from Petitioner's references, the laws and rules governing *inter partes* review demands from Petitioner more than simply providing the Board with a stack of references. Rather, the Petitioner is required to affirmatively identify with particularity the evidence that supports each ground for challenging the claims and provide a full and detailed explanation of the evidence and reasons for the relief it seeks. 35 U.S.C. § 312(a)(3); 37 C.F.R. § 42.22(a). Petitioner's failure to do so here justifies denial under 35 U.S.C. § 314(a).

Turning to secondary considerations, these objective indicia are independent evidence of validity and can "often be the most probative and cogent evidence of nonobviousness." *Catalina Lighting, Inc. v. Lamps Plus, Inc.*, 295 F.3d 1277,

-9-
**A82**

1288 (Fed. Cir. 2002) (internal citation omitted); *see also Ortho-McNeil Pharm., Inc. v. Mylan Labs. Inc.*, 520 F.3d 1358, 1365 (Fed. Cir. 2008). Indeed, the Supreme Court recently reaffirmed the importance of these objective considerations and their role in the fundamental *Graham* analysis. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).

During the second reexamination of the '808 patent, patent owner STAR submitted to the USPTO sworn statements from five experts in the field establishing several secondary considerations supporting the patentability of the '808 patent. These considerations included commercial success, expert skepticism, long-felt-but-unmet need, and laudatory statements. Ex. 1004 at 41–51, 55–100 ('808 Patent Second Reexamination PH, February 6, 2012 Amendment at 13–23, Declarations of Frederick G. Smith, Richard L. Banyard, Jim E. Saffie, Rick Escalambre, and Larry M. Gouge).

The testimony confirmed, for example, that generating smoke in an inert environment within a closed smoke-producing chamber was surprising and nonobvious to those of skill in the art at the time of the invention. *Id*. at 41–42. The evidence also showed that despite the decades-long use of smoke machines for leak testing non-volatile systems, General Motors did not approve the use of a smoke machine for leak testing volatile vehicle fuel tank systems until STAR introduced its commercial embodiment for practicing the inventions claimed in the '808 patent. *Id*. at 44–47. Indeed, STAR's commercial embodiments are now *mandated* by General Motors, Ford, and other automobile manufacturers for use in their thousands of authorized dealerships. *Id*. at 47–50.

IPR2013-00106
Redline Detection, LLC v. STAR EnviroTech, Inc.

The Central Reexamination Unit ("CRU") considered STAR's testimony on these secondary considerations and found it to be "compelling evidence" of nonobviousness.  *Id.* at 8 ('808 Patent Second Reexamination PH, Notice of Intent to issue *Ex Parte* Reexamination Certificate at 3).

Petitioner offers no rebuttal to (or even comment on) this highly relevant secondary considerations testimony.  Petitioner's utter failure to contest this additional persuasive evidence of the '808 patent's validity further undermines the likelihood that its challenge of Claims 9 and 10 will succeed, and alone supports denial of the Petition under 35 U.S.C. § 314(a).

> **2.  There Is No Reasonable Basis For Finding That A Person Of Ordinary Skill Would Consider Combining The Gilliam Patent's Engine Leak Testing Equipment With The Theatrical Smoke Machines Described In The Petitioner's Secondary References**

Although a rigid application of the teaching-suggestion-motivation test is inconsistent with recent case law, identifying a motivation or reason why a person of ordinary skill would combine prior-art elements to arrive at a claimed invention is still an important part of assessing patentability and protects against the dangers of hindsight bias.  *Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*, 492 F.3d 1350, 1356–1357 (Fed. Cir. 2007) (citing *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 418 (2007)); *Rolls-Royce, PLC v. United Techs. Corp.*, 603 F.3d 1325, 1338 (Fed. Cir. 2010).  Then-available literature provides the primary lens for judging whether those of ordinary skill in the art would have had a motivation at the critical time, though this evidence can also be found "within the knowledge and creativity of ordinarily skilled artisans."  *Ortho-McNeil Pharm. v. Mylan Labs.*, 520 F.3d

1358, 1365 (Fed. Cir. 2008). In a few very straightforward cases, the Federal Circuit has even held that common sense may be enough to support a finding of motivation. *See, e.g.*, *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1240 (Fed. Cir. 2010).

Petitioner here fails to provide a reasonable basis to conclude that a person of ordinary skill in the art at the time of invention would even consider combining the engine leak testing equipment described in U.S. Patent No. 5,107,698 to Gilliam ("the Gilliam Patent") and the alleged prior-art Vacutec Operating and Maintenance Instructions ("the Vacutec Reference"), on the one hand, and the theatrical smoke machines described in the secondary references, on the other hand. And Petitioner offers no testimony that this alleged motivation and expectation of success could be found within the knowledge and creativity of a person of ordinary skill at the critical time. Indeed, Petitioner's own references undercut these suggestions and confirm that trying to make Petitioner's proposed combinations would conflict with common sense.

Petitioner's primary evidence of motivation is the Gilliam Patent's reference to using a "spark-arrestor." Petition at 26–27, 31, 37. This spark-arrestor, according to Petitioner, would motivate or suggest to a person or ordinary skill to look to the theatrical smoke generators, which use inert gas. Petition at 26–27, 31. There is no evidence, however, that using a spark-arrestor to prevent sparks indicates any concern with the separate feature of using atmospheric air to generate smoke. For example, there is no indication that using atmospheric air was generating or contributing to the sparks. At most, the Gilliam Patent's reference to

preventing sparks indicates a concern about sparks — not atmospheric air.

And there is no suggestion elsewhere in the Gilliam Patent to reduce or eliminate the use of atmospheric air, as Petitioner apparently recognizes by failing to cite any other teachings of the patent. *See* Petition at 26–27, 31, 37. The Gilliam Patent's later reference to the smoke-generating fluid possibly producing flames is, at most, a suggestion to modify the fluid — there is no testimony or other evidence indicating that this discussion of the fluid would motivate a person of ordinary skill in the art to modify the use of atmospheric air. *See* Ex. 1005 at 7:57–59.

The Vacutec Reference similarly fails to establish motivation. There is no testimony or other evidence that this reference shows a motivation or would motivate a person of ordinary skill in the art to reduce or eliminate the use of atmospheric air in generating and carrying smoke in the Vacutec device (or the Gilliam device, for that matter). Petitioner erroneously suggests that "safety warnings" in the Vacutec Reference show this motivation. Petition at 26. These "safety warnings," however, do not relate to the use of atmospheric air in the Vacutec smoke generator, but instead the risk of fuel vapors escaping from the evaporative system, which could possibly ignite *outside the machine* by a spark or cigarette flame. Ex. 1006 at 6B. There is no concern expressed or suggested in the Vacutec Reference regarding the use of atmospheric air in generating and carrying smoke inside the described systems.

Even assuming a person of ordinary skill in the art would have been motivated to reduce or eliminate the use of atmospheric air in an evaporative

IPR2013-00106
Redline Detection, LLC v. STAR EnviroTech, Inc.

system leak testing device, there is no evidence that these artisans would look to Petitioner's theatrical smoke generators for guidance in that regard. Petitioner once again provides no testimony to support its assertion that persons of ordinary skill in the art would look to these references, which describe smoke generators primarily for plays, movies, and fire simulations.

Instead of testimony, Petitioner relies on pages apparently taken from the Internet that were allegedly available in January 1999 ("the 1999 Website Pages"). Petition at 33–34, 36.[2] These pages, according to Petitioner, show that smoke machines could be "interchangeably used for leak testing in vehicles as well as for theatrical purposes . . . ." Petition at 33. But this attorney argument is incorrect. These pages repeatedly emphasize that the company offers a "range of smoke generators" and multiple "smoke machines" for potential applications. Ex. 1013 at 1–2. If anything, these statements suggest different smoke generators for different applications — the opposite of interchangeability. The 1999 Website Pages do not "provide[ ] a suggestion to leak test vehicles using the smoke machines" from the secondary references, in contrast to Petitioner's suggestion. Petition at 33–34.

Neither does the Gilliam Patent's reference to U.S. Patent No. 4,303,397 to Swiatosz ("the Swiatosz Patent") provide any suggestion to use smoke machines to leak test vehicles. *See* Petition at 32–33. The Swiatosz Patent is just one of over a

_____

[2]    STAR disputes the authenticity and prior-art status of the 1999 Website Pages, but STAR will raise this evidentiary challenge only if necessary and at the appropriate time.

dozen prior-art patents cited in the Gilliam Patent. Ex. 1005 at 1:50–2:47, 5:60–65. That a single patent on a laundry list of more than a dozen prior-art documents mentions generating smoke for fire simulations cannot establish that a person of ordinary skill in the art at the time of invention would have been motivated to modify the Gilliam Patent's use of atmospheric air for use in leak testing motor vehicle evaporative systems by looking to the theatrical smoke machines in the secondary references. Regardless, the Swiatosz Patent is materially different from the other secondary references in that it does not teach or suggest any use of inert gas. *See* Ex. 1012. Thus, even if a person of ordinary skill in the art were motivated to look to the Swiatosz Patent, this cannot be evidence that this artisan would look to the other, distinct secondary references, which according to Petitioner suggest the use of inert gas. Petition at 26–32.

The other secondary references similarly fail to indicate any invitation for use in the separate and technically distinct area of testing for leaks in explosive environments, such as a motor vehicle evaporative system. These references teach machines for generating large volumes of smoke at high pressures, features that would conflict with the use in sensitive, confined, and potentially explosive systems such as the evaporative systems of a motor vehicle.

For example, G.B. Patent No. 640,266 to Pauley ("the Pauley Patent") teaches creating a "heavy fog or mist" for use in making movies and other theatrical work. Ex. 1010 at 1:6-35. The other British Patent, G.B. Patent No. 1,240,867 to Stoyle ("the Stoyle Patent"), similarly teaches a smoke machine to improve on machines that "do not permit [ ] a very high output of smoke" by

incorporating a larger heating surface into the machine.  Ex. 1008 at 1:30–34, 1:39–45.  The alleged prior-art Aircraft Engineering commercial promotion ("the AE Reference") briefly outlines certain selling points of two smoke generating machines, one of which is said to have a high-volume output of 2,000 c.f.m., while the other is "designed for large volume output and for use in the open air."  Ex. 1007 at 1.  The alleged prior-art "booklet" from the Entertainment Services & Technology Association ("the ESTA Reference") also provides an abbreviated, non-technical discussion of fog machines for use in movies and plays, describing them as producing small amounts up to "billowing clouds of fog."  Ex. 1011 at 3, 6.  Finally, the alleged prior-art Industrial Fire Journal commercial promotion ("the IFJ Journal"), like the AE Reference, offers a few selling  points for certain smoke generators used for fire simulations, and includes a few pictures showing the production of smoke at apparently high volumes and pressure.  Ex. 1009 at 1.

The Gilliam Patent, on the other hand, expressly warns against introducing smoke at high pressure.  The patent cautions that introducing smoke at high pressure may cause damage to the vacuum systems in the internal combustion engine.  Ex. 1005 at 3:36–40, 5:40–44.  The risk of damaging the evaporative system of a motor vehicle, which can be more sensitive than engine systems, would reasonably teach a person of ordinary skill in the art away from the use of the theatrical smoke machines of Petitioner's secondary references.

Moreover, the IFJ Reference, Pauley Patent, and ESTA Reference fail to suggest using the machines for any type of leak testing.  Indeed, Petitioner concedes these references' failure to suggest a use in leak testing by including the

IPR2013-00106
Redline Detection, LLC v. STAR EnviroTech, Inc.

1999 Website Pages — the alleged missing link to leak testing — in its proposed unpatentability Grounds 4–6. *See* Petition at 25–26, 37. The AE Reference and Stoyle Patent, meanwhile, arguably suggest some leak testing, but give as examples large and benign systems such as luggage bins, fuselages, and vessels — structures that are materially distinct from the confined and sensitive evaporative system of a motor vehicle. *See* Ex. 1007 at 1; Ex. 1008 at 1:15–16, 3:4–6.

In sum, Petitioner once again fails to provide any testimony to support its attorney argument that a person of ordinary skill in the art would have been motivated to modify the use of atmospheric air in the Gilliam Patent's engine leak testing equipment. Attorney argument is not evidence. *Huang*, 100 F.3d at 139–40; *De Blauwe*, 736 F.2d at 705. And even assuming a motivation existed, there is no testimony that a skilled artisan would look to Petitioner's theatrical smoke generators for guidance. The secondary references, in fact, undermine this conclusion. The tensions apparent between the high volume, high pressure smoke generators in the secondary references, on the one hand, and leak testing devices for the sensitive, confined, and potentially explosive evaporative system of a motor vehicle, on the other hand, undermine any realistic conclusion that a person of ordinary skill in the art would have been motivated to try Petitioner's proposed combinations. Indeed, the tensions apparent in the secondary references reveal that doing so would have conflicted with common sense at that time.

### 3. There Is No Evidence A Person Of Ordinary Skill Would Have Had A Reasonable Expectation Of Successfully Combining The Gilliam Patent's Engine Leak Testing Equipment With The Theatrical Smoke Machine Art Of Petitioner's Secondary References

In addition to a motivation to combine, a patent challenger also bears the burden of proving that a person of ordinary skill would have had a reasonable expectation at the time of invention of successfully making the proposed combination and arriving at the claimed invention. *Amgen Inc. v. Hoffman-La Roche Ltd.*, 580 F.3d 1340, 1362 (Fed. Cir. 2009).

Petitioner once again fails to offer any testimony on this point. The most Petitioner can muster is another reference to the 1999 Website Pages and the Swiatosz Patent, and the wholly conclusory attorney argument that "one skilled in the art would have readily used smoke machines for theatrical work and firefighter training in vehicle leak detection." Petition at 36. As detailed above in Part II.B.2, however, the 1999 Website Pages show specialization and differentiation among smoke machines — not interchangeability; and they certainly do not show a reasonable expectation of successfully combining the Gilliam Patent's engine leak testing equipment with the theatrical smoke machines. The Gilliam Patent's passing reference to the Swiatosz Patent among a dozen other patents also cannot show a blanket expectation that the Gilliam Patent's engine leak testing equipment could be successfully combined with all theatrical smoke machines.

Indeed, a review of Petitioner's theatrical smoke machine art readily undermines any reasonable expectation of success. As an initial matter, the AE Reference, IFJ Reference, and ESTA Reference fail to provide virtually any

IPR2013-00106
Redline Detection, LLC v. STAR EnviroTech, Inc.

technical details.  *See* Ex. 1007; Ex. 1009; Ex. 1011.  These references are short commercial promotions (in the case of the AE and IFJ References) or a simple non-technical primer for stagehands (in the case of the ESTA Reference).  There are no explanations or figures showing the machines' internal parts, layout, plumbing, or structure.  It is not reasonable to conclude that a person of ordinary skill in the art, without knowing how these machines operate to generate smoke, could expect to successfully modify them to arrive at the claimed evaporative system leak testing equipment.

To the extent Petitioner's prior art contains any technical details, the smoke generators in those references, which appear to show high pressure, high volume generators, teach away from the use in constricted, sensitive motor vehicle evaporative systems.  *See supra* Part II.B.2.

### 4. The Alleged Prior Art Fails To Show Material Claim Limitations And There Is No Reasonable Showing That A Person Of Ordinary Skill Would Fill In The Gaps

Not only is the evidence of a motivation and reasonable expectation of success absent, Petitioner's proposed prior-art combinations also fail to show material limitations in challenged Claims 9 and 10.  In particular, none of the alleged prior art teaches or suggests producing smoke in an inert environment within a closed smoke-producing chamber, as required in Claims 9 and 10.  Ex. 1001 at p. 14, col. 1, ln. 31 to col. 2, ln. 13.

For example, Petitioner acknowledges that the Gilliam Patent expressly teaches using atmospheric air to generate smoke.  Petition at 21.  Indeed, in reference to the patent's figures, the Gilliam Patent teaches that its smoke-

generating chamber **20** includes an air inlet **7** through which atmospheric air is pumped to fill the chamber. Ex. 1005 at 5:31–40. The Vacutec Reference, which the Petitioner (without support) describes as "a commercial embodiment of the Gilliam Patent" (Petition at 20-21), suggests nothing different. *See* Ex. 1006.

The Pauley Patent also teaches using atmospheric air to generate smoke. Specifically, the Pauley Patent, in reference to its figure, teaches discharging an oil composition from a reservoir *a*. Ex. 1010 at 2:63–68. The oil is discharged and sprayed against the wall of a heated tube *d* by a jet of carbon dioxide or nitrogen. *Id*. at 2:28–47, 2:68–77, 2:95–3:2. After traveling through the heated tube *d*, the heated oil composition optionally passes through cooling chamber *g*, and then reaches discharge tube *f* before being introduced to the surrounding air. *Id*. at 3:3–38. Importantly, while the reservoir *a* in the Pauley Patent is described as a "closed vessel" (*id*. at 2:63–64), the heated tube *d*, cooling chamber *g*, and discharge tube *f* are not. The Pauley Patent figure confirms that the heated tube *d* and cooling chamber *g* are tubes that are open to the air, and thus by extension the discharge tube *f* is as well. *Id*. at 4–6. Thus, in contrast to the Petitioner's suggestion, the heated tube *d* is not a "closed vessel." *See* Petition at 39.

Consequently, while carbon dioxide or nitrogen gas may be used in the Pauley Patent apparatus to spray the oil against the walls of the heated tube *d* (Ex. 1010 at 2:29–47), smoke is not generated according to the patent without openly exposing the oil to atmospheric air. Indeed, the patent teaches that the carbon dioxide or nitrogen gas "reduces" but does not eliminate the mixture's tendency to ignite. *Id*. at 2:37–47. Therefore, the Pauley Patent does not teach the

claim element of generating smoke in an inert environment within a closed smoke-producing chamber. *See* Petition at 29–31.

The AE Reference, meanwhile, includes seven paragraphs describing two smoke generators made by a British company in the 1960s. Ex. 1007 at 1. Notably, there is no indication that smoke is generated *inside* either machine, let alone inside a closed chamber comprising an inert atmosphere, as recited in Claims 9 and 10. The AE Reference contains no picture or drawing of the internal structure or mechanics of the machine. The article only provides what appears to be a very small, barely visible photograph of a smoke generator, with smoke generated outside in the air. *Id*. The article states that the two machines use "a medicinal grade oil propelled by carbon dioxide gas," but there is no indication that the smoke is formed before the heated oil composition is exposed to the outside, atmospheric air. *Id*.

Moreover, while the AE Reference says the smoke generated is "non-flammable," this is not an indication that inert gas was exclusively used to generate it. *Id*. Since the smoke mingles with the outside air, as even apparently shown in the article's small picture of the machine, any resistance to flame cannot be due to the smoke's carrier, which would necessarily include oxygen. Therefore, even combining the AE Reference with the Gilliam Patent and the Vacutec Reference, there is no teaching or suggestion of generating smoke in an inert environment inside a closed chamber.

The IFJ Reference, similar to the AE Reference, contains no picture or figure of the machines' internal structure or mechanics. Indeed, the article appears

IPR2013-00106
Redline Detection, LLC v. STAR EnviroTech, Inc.

to be a sales promotion with roughly three paragraphs providing a high-level description of the machines' system. Ex. 1009 at 1. Also, like the AE Reference, there is no indication that the smoke generators described in the IFJ Reference form smoke inside the machines, before the heated oil composition is exposed to atmospheric air. *Id.* Notably, in contrast to Petitioner's suggestion (Petition at 28–29), a description of smoke "entrained in inert gas" does not indicate smoke formation in an inert atmosphere. That the inert carrier gas is still present or even dominates the composition of the smoke does not mean that the smoke was generated in the absence of atmospheric air. Indeed, the pictures in the IFJ Reference show just that: smoke generated in the outside, atmospheric air. *Id.*

The Stoyle Patent likewise teaches generating smoke after a heated oil composition leaves the smoke generating machine and is exposed to atmospheric air. Ex. 1008 at 1:11–39, 2:99–108. Specifically, in reference to the patent's figures, the Stoyle Patent describes a machine with an inlet **14** for receiving a mixture of oil and carbon dioxide. *Id.* at 2:99–104. The mixture is heated as it passes through the machine, eventually reaching an outlet **10**, where the mixture "emerges in the form of a mist or smoke." *Id.* at 2:104–109. The Stoyle Patent thus teaches generating a smoke in the presence of atmospheric air. There is no suggestion that the smoke is or can be formed in an inert environment inside a closed chamber.[3]

---

[3]    While not critical to its Preliminary Response, Patent Owner notes that there is no evidentiary support for Petitioner's suggestion that the Stoyle

IPR2013-00106
Redline Detection, LLC v. STAR EnviroTech, Inc.

The ESTA Reference and the Swiatosz Patent similarly fail to teach or suggest generating smoke in an inert environment within a closed chamber. Both references teach forming smoke or aerosol only after a heated oil composition is forced out of the machine and mixed with atmospheric air. Ex. 1011 at 5–6 ("The fluid's own expansion into vapor forces the heated material out the front of the machine where, when it mixes with cooler air, it forms an opaque aerosol."); Ex. 1012 at Abstract ("The superheated smoke producing agent is then released through a solenoid valve into the atmosphere so as to form a vapor."). Finally, the 1999 Website Pages, which seemingly reflect another sales promotion, do not describe how smoke is generated, let alone teach or suggest forming smoke inside a closed chamber comprising an atmosphere of inert gas. *See* Ex. 1013.

Importantly, Petitioner offers no testimony from the perspective of a person of ordinary skill in the art indicating that any of Petitioner's prior art teaches or suggests the material claim limitation of generating smoke in an inert environment inside a closed smoke-producing chamber. Similarly, Petitioner offers no testimony indicating that a person of ordinary skill in the art would fill in this missing limitation to arrive at the invention of Claims 9 and 10.

None of Petitioner's proposed prior-art combinations (Petition at 5–7) teach or suggest generating smoke inside a closed chamber comprising an atmosphere of inert gas. All of Petitioner's prior art shows generating smoke outside a chamber, in atmospheric air, or having atmospheric air present in an open chamber where the

_____

Patent was the patent referenced in the AE Reference. *See* Petition at 28.

IPR2013-00106
Redline Detection, LLC v. STAR EnviroTech, Inc.

smoke is formed. This glaring omission of a material claim limitation fatally undermines any likelihood of the Petitioner successfully proving unpatentability.[4]

In sum, Petitioner (1) fails to address two critical *Graham* factors; (2) fails to provide a reasonable basis for finding that one of ordinary skill in the art would try making the proposed prior-art combinations; (3) fails to provide evidence that one of ordinary skill in the art would have had a reasonable expectation of successfully making the proposed combinations and arriving at the claimed invention; and (4) fails to show that its alleged prior-art combinations teach all of the material limitations of Claims 9 and 10. The unsupported attorney arguments offered to address some of these fundamental shortcomings fail as a matter of law. *Huang*, 100 F.3d at 139–40; *De Blauwe*, 736 F.2d at 705. Petitioner thus fails to meet the evidentiary requirements under 35 U.S.C. § 312(a)(3) and 37 C.F.R. §§ 42.22(a)(2), 42.104(b)(4), and 42.104(b)(5), and thus fails to show a reasonable likelihood of proving unpatentability. The Petition should therefore be denied

---

[4]    That none of Petitioner's prior art combinations teach or suggest the material limitation of generating smoke in an inert environment inside a closed chamber is further evidence that a person of ordinary skill in the art would not have had a reasonable expectation of successfully arriving at the claimed invention at the relevant time. In other words, even granting Petitioner's suggested combinations, there is no evidence one of ordinary skill would reasonably expect to successfully modify them to fill in this missing feature and arrive at the claimed invention. *See Amgen*, 580 F.3d at 1362.; *see also supra* Part II.B.3.

under 35 U.S.C. § 314(a) on this separate and distinct basis.

### C.  Petitioner Relies On The Same Or Substantially The Same Prior Art And Arguments Presented During The Initial Prosecution And In Its Two Previous Reexaminations Of The '808 Patent, Further Undermining The Likelihood Of Proving Unpatentability

Petitioner presents substantially the same prior art and arguments already considered and rejected by the USPTO in the initial prosecution of the '808 patent and Petitioner's two previous *ex parte* reexaminations. In fact, Petitioner recycles some of the identical prior art and attorney arguments that Petitioner presented to the USPTO previously. Petitioner's cumulative prior art and unpatentability arguments are a critical factor in the Board's review of the Petition (s*ee* 35 U.S.C. § 325(d)), and further independently justifies denial of the Petition under 35 U.S.C. § 314(a) for failing to show a substantial likelihood of proving unpatentability.

### 1.  The Gilliam Patent Was Previously Presented To, And Considered By, The USPTO

Petitioner's primary reference, the Gilliam Patent, has already been presented to and addressed by the USPTO. Indeed, over the course of the '808 patent's extensive prosecution history, the USPTO has seen and addressed the Gilliam Patent several times.

The Gilliam Patent was first identified by the USPTO Examiner. In the initial examination of the application leading to the '808 patent, Examiner Garber cited the Gilliam Patent, characterizing it as an example of the state of the art and as sharing one or more features of the invention claimed in the '808 patent. Ex. 1002 at 91, 93 ('808 Patent PH, April 20, 2001 Office Action at 7, Notice of References Cited at 1).

IPR2013-00106
Redline Detection, LLC v. STAR EnviroTech, Inc.

The USPTO addressed the Gilliam Patent again during the first reexamination of the '808 patent, which Petitioner initiated in 2010. Ex. 1003 at 325 ('808 Patent First Reexamination PH, February 9, 2010 Request for *Ex Parte* Reexamination Transmittal at 1). During the first reexamination, a set of three patent examiners relied on the Gilliam Patent in rejecting then-pending Claims 10 and 11, which were eventually rewritten as current Claims 9 and 10. Ex. 1003 at 93–95, 109 (March 10, 2011 Office Action at 6-8, 22); *Id*. at 32–33, 35 (May 10, 2011 Response To Final Office Action at 2-3, 5). In the end, however, the CRU agreed with STAR's response to the rejections, and allowed the claims over the Gilliam Patent and the other prior art. *Id*. at 15–16 (May 26, 2011 Notice of Intent to Issue *Ex Parte* Reexamination Certificate at 2-3).

The Gilliam Patent took an even more prominent role in the second reexamination of the '808 patent, which Petitioner initiated in 2011. Ex. 1004 at 197 ('808 Patent Second Reexamination PH, September 23, 2011 Request for *Ex Parte* Reexamination Transmittal Form at 1). In its second reexamination request, Petitioner argued that the Gilliam Patent, when combined with U.S. Reissue Patent RE38,686 to Loblick ("the Loblick Patent"), raised a substantial new question of patentability regarding Claims 9 and 10. *Id*. at 214–221 (September 23, 2011 Request For *Ex Parte* Reexamination at 16–23).

The CRU initially agreed, issuing a rejection by a new set of patent Examiners, including a Supervisory Patent Examiner. *Id*. at 129–132, 136 (December 7, 2011 Office Action in *Ex Parte* Reexamination at 3-6, 10). The Examiners initially rejected Claims 9 and 10 as obvious over the Gilliam-Loblick

combination, preliminarily determining that the Gilliam Patent describes a smoke generator for use in detecting leaks in an internal combustion engine used in automobiles. *Id*. at 130.  And while acknowledging that the Gilliam Patent did not suggest using an inert gas in the smoke generator, the CRU relied on the Loblick Patent as providing the missing element.  *Id*.

STAR responded to the CRU's rejection over the Gilliam-Loblick combination, explaining how these references do not teach or suggest several novel features recited in Claims 9 and 10, including the use of an inert gas to form an inert environment in a smoke-producing chamber.  *Id*. at 36–40 (February 6, 2012 Amendment at 8-12).  After careful review, the Examiners agreed, confirming the patentability of Claims 9 and 10 over the Gilliam and Loblick Patents.  *Id*. at 7–8 (April 6, 2012 Notice of Intent to Issue *Ex Parte* Reexamination Certificate at 2–3).

Petitioner has now trotted out the Gilliam Patent for a third time, challenging the patentability of Claims 9 and 10 using essentially the same attorney arguments.  As detailed above, however, the USPTO has already thoroughly considered the Gilliam Patent, and there is no basis for the Petitioner's suggestion that the Gilliam Patent was misunderstood or misapplied by the USPTO.  *See* Petition at 57.  Indeed, the Gilliam Patent was reviewed and addressed by multiple patent examiners on multiple occasions during the initial prosecution and reexamination of the '808 patent.

### 2.    The Vacutec Reference And Pauley Patent Are

### Substantially The Same As The Previously Considered Gilliam Patent And Other References

Petitioner characterizes its other primary reference, the Vacutec Reference, as substantially the same as the previously considered Gilliam Patent. The Petition itself describes the Vacutec Reference as an "overlapping reference[ ]" that "disclose[s] the same products" as the Gilliam Patent. Petition at 5, 24–25. Moreover, Petitioner offers that the Vacutec Reference is simply an "operation manual" and lacks detail regarding the smoke generator's construction. *Id.* at 24. Indeed, Petitioner fails to identify any difference between the Vacutec Reference and the Gilliam Patent, instead admitting to relying on this purported "operation manual" simply to "ensure completeness of disclosure." *Id*. While STAR does not accede to Petitioner's unsupported characterizations of the Vacutec Reference, Petitioner's admissions nevertheless support a finding that the Vacutec Reference is substantially similar to the previously and thoroughly considered Gilliam Patent and therefore fails to offer any additional, material evidence supporting the Petitioner's likelihood of proving unpatentability of Claims 9 and 10.

The Pauley Patent is also substantially the same as the Gilliam Patent. As detailed above in Part II.B.4, the Pauley Patent, like the Gilliam Patent, teaches using atmospheric air to generate smoke. Again, the Pauley Patent's heating tube *d,* where the oil composition is heated to generate smoke, is open to the atmospheric air. Thus, while carbon dioxide or nitrogen gas may be used to spray the oil against the walls of the heated tube *d* (Ex. 1010 at 2:29–47), smoke is not generated according to the patent in an inert environment inside a closed smoke-

IPR2013-00106
Redline Detection, LLC v. STAR EnviroTech, Inc.

producing chamber, as recited in Claims 9 and 10. Petitioner's general characterization of the Pauley Patent as teaching the method of Claim 9, as well as its more specific characterization of the Pauley Patent's heating tube *d* as a "closed chamber," are simply inaccurate. *See* Petition at 29, 39. In sum, the Pauley Patent provides no additional material disclosure beyond the Gilliam Patent and is substantially the same as this previously considered patent.

The Pauley Patent is also substantially the same as other references previously presented to and considered by the USPTO. For example, the previously considered U.S. Patent No. RE38,686 to Loblick ("the Loblick Patent") (Ex. 2002) similarly taught the use of atmospheric air and an inert gas in generating and propagating smoke. Figure 2 of the Loblick Patent shows a general overview of its smoke generator, and is reproduced below.



FIG. 2

The smoke generator in Loblick includes a source of pressurized air **26**, a

reservoir for holding a smoke generating fluid **13**, a combustion chamber **14** with a helical heating element **20**, and a conduit **32** connecting the reservoir to the chamber. Ex. 2002 at 3:50–4:7. The pressurized air forces the fluid from the reservoir through the conduit, eventually reaching the combustion chamber. *Id*. at 5:3–7. After reaching the combustion chamber, the fluid is injected onto the heating element, where it combusts in the presence of atmospheric air, generating smoke. *Id*. at 1:30–39, 2:7–9, 5:7–12, 5:24–27. Air is also used to create a venturi inside the combustion chamber to carry the smoke away from the chamber. *Id*. at 5:19–24. In some alternative applications, an inert carrier gas may instead be used to transport the smoke away from the chamber. *Id*. at 3:67–4:2.

Petitioner makes the same argument about the Pauley Patent here as the USPTO previously rejected with respect to the Loblick Patent. Specifically, in its second reexamination request, Petitioner argued to the CRU that the Loblick Patent taught producing an inert environment inside a closed smoke-producing chamber. Ex. 1004 at 212, 217 ('808 Patent Second Reexamination PH, September 23, 2011 Request For Reexamination at 14, 19). Thus, according to Petitioner, combining the smoke generator of Loblick with the engine leak testing equipment of the Gilliam Patent renders obvious Claims 9 and 10 of the '808 patent. *Id*. at 214–221.

Importantly, however, Petitioner's mischaracterization of the Loblick Patent conflicted with the patent's express teachings, including its intended purpose of "improved combustion" and the presence of "oxygen to support combustion in the air flow through the combustion chamber." Ex. 2002 at 1:37–39, 2:7–10. The CRU rejected Petitioner's misplaced characterization of the Loblick Patent and

rejected the argument that combining it with the Gilliam Patent rendered obvious Claims 9 and 10 of the '808 patent.  Ex. 1004 at 7 ('808 Patent Second Reexamination PH, Notice Of Intent To Issue *Ex Parte* Reexamination Certificate at 2) ("Loblick '686 shows and describes a combustion chamber 14 in which air ('oxygen') is mixed with fluid . . . to produce smoke by combustion in combustion chamber 14 (col. 2, lines 5-9 and col. 5, lines 4-27).").

The Board here, like the CRU during the previous reexamination, should similarly reject Petitioner's mischaracterization of the Pauley Patent, as well as Petitioner's suggestion that combining the Pauley and Gilliam Patents renders obvious Claims 9 and 10.

### 3.    The Remaining Secondary References Are Substantially The Same As The Previously Considered Popkin Patent

Petitioner's remaining secondary references — the AE Reference, the IFJ Reference, the Stoyle Patent, and the ESTA Reference — are substantially the same as the previously considered GB Patent No. 1,039,729 to Popkin ("the Popkin Patent") (Ex. 2003).[5]

———————————

[5]    The 1999 Website Pages fail to provide any technical disclosure, and the Swiatosz Patent fails to suggest any use of an inert gas.  *See supra* Parts II.B.2, II.B.4.  These documents appear to have been included by Petitioner simply to argue for a motivation to combine references.  *See* Petition at 33–34, 37.  However, to the extent that these alleged prior art materials contribute technical details to Petitioner's invalidity argument, they provide nothing substantively different from

IPR2013-00106
Redline Detection, LLC v. STAR EnviroTech, Inc.

The Popkin Patent describes an apparatus and method for generating smoke. The general layout of the apparatus is shown in Figure 1 of the patent, which is reproduced below:



The apparatus includes, in reference to this figure, a reservoir of carbon dioxide **A**, connected to a pressure vessel **Z** containing an oil **O**. Ex. 2003 at 2:19–45. The carbon dioxide is pumped into the pressure vessel **Z** and mixed with the oil **O** to form a foam. *Id.* at 2:40–99. The foam, which comprises the oil and

---

the Popkin Patent or other references previously considered by the USPTO in deeming Claims 9 and 10 of the '808 patent to be patentable.

IPR2013-00106
Redline Detection, LLC v. STAR EnviroTech, Inc.

bubbles of the gas, leaves the pressure vessel *Z* and travels through a pipe *R*. *Id*. at 2:87–99. The pipe *R* leads to and wraps around a heating element *Q*, where the foam mixture is heated as it travels through the pipe *R*. *Id*. at 2:100–3:7. The mixture eventually reaches a nozzle or jet *U*, where the heated foam is released under high pressure to the atmospheric air and rapidly condenses to generate smoke. *Id*. at 3:18–35.

Importantly, the Popkin Patent teaches that the oil-gas mixture remains in its foam state while in the pipe *R*. *Id*. at 2:89–95 ("This mixture is a foam of oil and tiny bubbles of carbon dioxide. Leading from the adaptor *L* is a copper pipe *R* of small bore, the small bore having the effect of maintaining the character of the foam and thus being very important to the correct functioning of the apparatus."). Thus, while the Popkin Patent teaches the use of an inert gas (carbon dioxide) in the machine, the smoke is generated only after the heated oil-gas foam is openly exposed to the atmospheric air. Indeed, the Popkin Patent emphasizes that mixing the foam with atmospheric air is critical for generating smoke. *Id*. at 3:108–120.

Petitioner presented the Popkin Patent to the USPTO in Petitioner's first request for reexamination of the '808 patent. Ex. 1003 at 256, 267–268 ('808 Patent First Reexamination PH, March 18, 2010 Replacement Request For *Ex Parte* Reexamination at 3, 14–15). Petitioner characterized the Popkin Patent as teaching the formation of smoke in an inert environment inside a smoke-producing chamber. *Id*. at 267–268. Petitioner further asserted that combining the Popkin Patent with U.S. Patent No. 5,922,944 to Pieroni ("the Pieroni Patent") rendered obvious then-pending Claim 9 of the '808 patent. *Id*. at 295–297.

-33-

IPR2013-00106
Redline Detection, LLC v. STAR EnviroTech, Inc.

The CRU initially accepted Petitioner's arguments, rejecting then-pending Claims 10 and 11 of the '808 patent (which eventually became Claims 9 and 10) as obvious over the Popkin and Pieroni Patents in further view of the Gilliam Patent. *Id*. at 93 (March 10, 2011 Office Action at 6). STAR responded to the CRU's rejection, however, clarifying that the Popkin Patent taught generating smoke only *after* the oil-gas mixture was openly exposed to atmospheric air. *Id*. at 38–41 (May 10, 2011 Response To Final Office Action at 8–11). STAR also pointed out that the Gilliam Patent similarly failed to teach or suggest creating smoke in an inert environment within a smoke-producing chamber. *Id*. at 46–47. Thereafter, the CRU agreed with STAR, finding that neither Popkin nor Gilliam, nor any of the other prior art for that matter, taught the limitations of Claims 9 and 10. *Id*. at 15 (Notice Of Intent To Issue *Ex Parte* Reexamination Certificate at 2). Indeed, the CRU specifically noted that the prior art failed to teach generating smoke in an inert environment within a smoke-producing chamber. *Id*.

Petitioner's secondary references here — the AE Reference, the IFJ Reference, the Stoyle Patent, and the ESTA Reference — are substantially similar to the Popkin Patent. As detailed above in Part II.B.4, while these secondary references may suggest the use of an inert gas (such as carbon dioxide or nitrogen) in connection with a smoke generator, the references fail to teach generating smoke without openly exposing the fuel to atmospheric air.

The AE and IFJ References, for example, show photographs of smoke generators, with smoke generated outside in the air. Ex. 1007 at 1; Ex. 1009 at 1. There is no suggestion of generating smoke in an inert environment inside a closed

chamber. The Stoyle Patent, meanwhile, teaches heating a mixture of oil and carbon dioxide as it passes through the machine, eventually reaching an outlet where the mixture "emerges in the form of a mist or smoke." Ex. 1008 at 2:104–109. The ESTA Reference similarly teaches forming smoke or aerosol only after a heated oil composition is openly exposed to atmospheric air. Ex. 1011 at 5–6 ("The fluid's own expansion into vapor forces the heated material out the front of the machine where, when it mixes with cooler air, it forms an opaque aerosol.").

In sum, in this third time around, Petitioner offers nothing materially different from the prior art references, mischaracterizations of those references, and conclusory attorney arguments that Petitioner presented to the USPTO during the previous reexaminations — prior art and arguments that were soundly rejected. The Board should therefore deny Petitioner's cumulative challenge under 35 U.S.C. §§ 314(a) and 325(d) for this separate and distinct reason.

### D. A Denial Of The Petition Is Consistent With The AIA's Policy Of Ensuring The Integrity Of The Patent System And The Efficient Administration Of The USPTO

*Inter partes* reviews are to be administered to ensure the integrity of the patent system and the efficient administration of the USPTO. *See* 35 U.S.C. § 316(b). One extension of these policies is the estoppel provision of 35 U.S.C. § 315(e), which restricts the circumstances under which a subsequent *inter partes* review petition may be filed or maintained. Repeat patent trials increase the risk of improperly employing the patent system to harm a competitor and places needless strain on USPTO resources. Curbing these serial challenges thus promotes the integrity and efficient administration of the patent system and the USPTO.

IPR2013-00106
Redline Detection, LLC v. STAR EnviroTech, Inc.

This is now the third time Petitioner is challenging Claims 9 and 10 before the USPTO. Admittedly, Petitioner may not be subject to the formal estoppel provided by 35 U.S.C. § 315(e) because Petitioner's two previous challenges were brought as *ex parte* reexaminations, before the September 16, 2012 commencement of *inter partes* reviews. Yet the policies underpinning the America Invents Act — ensuring the integrity of the patent system and the efficient administration of the USPTO — strongly favor a denial of the Petition.

As detailed above, there is no material difference between Petitioner's challenges to Claims 9 and 10 presented to the Board here, on the one hand, and Petitioner's previous attorney arguments and prior art presented to the CRU, on the other hand. Indeed, Petitioner appears primarily motivated to secure a stay in the co-pending district court litigation rather than mounting a substantively different challenge to Claims 9 and 10 in an *inter partes* review. In fact, Petitioner already succeeded in convincing the district court to stay the co-pending litigation, even though the Board has not yet decided whether to institute an *inter partes* review of the '808 patent. Ex. 2004 at 2–3.

Petitioner also appears motivated to seek some sort of advisory claim construction from the Board that Redline might then use in the co-pending district court litigation (or perhaps statements from the Board and/or STAR regarding the meaning of certain claim terms). For example, Petitioner offers a construction of the claim term "locating", even though Petitioner nowhere identifies any relationship between that claim term's proposed meaning and Petitioner's challenges to Claim 9 and 10. Petition at 19–20. Indeed, there is no suggestion by

IPR2013-00106
Redline Detection, LLC v. STAR EnviroTech, Inc.

Petitioner that its prior art or arguments turn in any way on the meaning of the "locating" claim term. *See* Petition at 20–37.

Similarly, Petitioner proposes a construction of the term "flammable fluid", under the pretext that the construction of this term may somehow affect the prior-art status of the Gilliam Patent. Petition at 18. But the prior-art status of the Gilliam Patent, which the USPTO Examiners and STAR addressed during the original prosecution and both reexaminations, has never been in dispute. Instead, Petitioner's claim construction discussion appears to be an invitation to the Board to provide extraneous comments that Redline might be able to use in the district court litigation. Of course, the Board should be wary of providing advisory claim constructions simply because one party proposes that the Board do so. Construing claim terms should be focused on the issues raised in the *inter partes* review before the Board, not with the goal of providing "ammunition" for one party or the other in co-pending litigation.[6]

---

[6]    STAR notes that while Petitioner's claim construction positions are irrelevant to the issues raised in the *inter partes* review petition, STAR nevertheless expressly disagrees with Petitioner's proposed claim interpretations because, *inter alia*, they are unsupported by both the intrinsic and extrinsic evidence. *See Phillips v. AWH Corp.,* 415 F.3d 1303, 1313–1319 (Fed. Cir. 2005). Accordingly, STAR in no way acquiesces to Petitioner's proposed claim constructions. STAR will address those claim construction issues at the appropriate time in the district court litigation.

**A110**

IPR2013-00106
Redline Detection, LLC v. STAR EnviroTech, Inc.

In this case, the integrity of the patent system and the efficiency of the Board are ill-served by Petitioner's attempt to leverage an *inter partes* review in the apparent hopes of gaining some tactical advantage in the co-pending district court proceeding. Further, Redline's successive filing of patentability challenges unnecessarily burdens the USPTO with duplicative serial attacks on the '808 patent. Moreover, accepting the Petitioner's recycled and entirely unsupported attorney arguments as sufficient to initiate a time-consuming and expensive Board trial would establish a dangerously low threshold for instituting an *inter partes* review. The policies undergirding the America Invents Act therefore strongly support the Board's denial of the multiply deficient Petition here.

## III. <u>CONCLUSION</u>

For the foregoing reasons, Petitioner respectfully requests that the Board deny the Petition for *inter partes* review of the '808 patent.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: <u>April 10, 2013</u>     By: <u>/Edward A. Schlatter/</u>
                                    Edward A. Schlatter, Reg. No. 32,297
                                    Brenton R. Babcock, Reg. No. 39,592
                                    Attorneys for Patent Owner
                                    STAR EnviroTech, Inc.

IPR2013-00106
Redline Detection, LLC v. STAR EnviroTech, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of **STAR ENVIROTECH, INC.'S PRELIMINARY RESPONSE PURSUANT TO 37 C.F.R. § 42.107** is being served on April 10, 2013, via FedEx overnight and via email pursuant to 37 C.F.R. § 42.6(e) to counsel for petitioner Redline Detection, LLC, at the addresses below:

Matthew A. Newboles
mnewboles@stetinalaw.com
Lowell Anderson
landerson@stetinalaw.com
STETINA BRUNDA GARRED & BRUCKER
75 Enterprise, Suite 250
Aliso Viejo, CA 92656


Dated:  April 10, 2013          /Edward A. Schlatter/
                               Edward A. Schlatter, Reg. No. 32,297
                               Brenton R. Babcock, Reg. No. 39,592
                               Attorneys for Patent Owner
                               STAR EnviroTech, Inc.


14905565
022513

**A112**

Trials@uspto.gov
Tel: 571-272-7822

Paper 17
Entered: July 1, 2013

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

REDLINE DETECTION, LLC
Petitioner

v.

STAR ENVIROTECH, INC.
Patent Owner

_____

Case IPR2013-00106
Patent 6,526,808 B1

_____

Before SALLY C. MEDLEY, JENNIFER S. BISK, and JAMES B. ARPIN,
*Administrative Patent Judges.*

ARPIN, *Administrative Patent Judge.*

DECISION
Institution of *Inter Partes* Review
*37 C.F.R. § 42.108*

Case IPR2013-00106
Patent 6,526,808 B1

# I.    INTRODUCTION

Redline Detection, LLC ("Petitioner") filed a petition to institute an *inter partes* review of claims 9 and 10 of Patent No. US 6,526,808 B1 (Ex. 1001; the "'808 Patent") (Paper 8; "Pet."). Star Envirotech, Inc. ("Patent Owner") has filed a patent owner preliminary response (Paper 13; "Prel. Resp."). We have jurisdiction under 35 U.S.C. § 314.

The standard for instituting an *inter partes* review is set forth in 35 U.S.C. § 314(a) which provides as follows:

> THRESHOLD -- The Director may not authorize an inter partes review to be instituted unless the Director determines that the information presented in the petition filed under section 311 and any response filed under section 313 shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition.

Upon consideration of the petition and patent owner preliminary response, we determine that the information presented in the petition establishes that there is a reasonable likelihood that Petitioner would prevail with respect to claims 9 and 10 of the '808 Patent. Accordingly, pursuant to 35 U.S.C. § 314, we authorize an *inter partes* review to be instituted as to claims 9 and 10 of the '808 Patent.

## A.    *Related Proceedings*

The '808 Patent is involved in concurrent district court litigation. On October 25, 2012, Patent Owner filed an action against Petitioner and Kenneth A. Pieroni, a named inventor on the '808 Patent, for infringement of the '808 Patent and other asserted claims, *Star EnviroTech, Inc. v. Redline Detection, LLC et al.*, SACV12-1861-DOC (C.D. Cal.). *See* Pet. 1. On April 13, 2013, the U.S. District Court for the Central District of California stayed this litigation pending the outcome of the U.S. Patent and Trademark Office's (the "Office's") proceedings in

2

Case IPR2013-00106
Patent 6,526,808 B1

regard to this Petition. Ex. 2004 (Civil Minutes - General).

### B.    The '808 Patent

The '808 Patent relates to methods for generating smoke for use in a volatile, potentially explosive environment. '808 Patent, col. 6, ll. 44-67. In particular, the '808 Patent describes methods for generating smoke, in which a flammable fluid is vaporized into smoke in an inert environment created within a closed smoke producing chamber. *Id.* at col. 2, ll. 8-13; col. 6, ll. 54-57.

A system, suitable for use in performing such methods, is illustrated in Figure 1, and Figure 1 is reproduced below:



3

Case IPR2013-00106
Patent 6,526,808 B1

In Figure 1, a schematic of a smoke and clean air generating apparatus 1 for verifying the presence and detecting the location of leaks in a fluid system under test is depicted.   '808 Patent, col. 2, ll. 62-65.  Apparatus 1 comprises a sealed chamber 6 containing a non-toxic oil supply 8.  *Id.* at col. 3, ll. 25-27.  An air inlet tube 10 projects upwardly from the bottom of chamber 6 and extends above the level of oil supply 8. *Id.* at ll. 27-28.  Chamber 6 further comprises a resistor heating grid (e.g., a coil) 14, as well as a fluid baffle 18 having a smoke outlet orifice 20.  *Id.* at ll. 32-33, 35-36. Both heating grid 14 and baffle 18 extend laterally across chamber 6, and baffle 18 is disposed above heating grid 14.  *Id.* at ll. 32-40.

In an embodiment, air from an air compressor 25 may be delivered via air inlet tube 10 at a sufficient rate to cause some of the oil from oil supply 8 to be drawn through an oil inlet orifice 12 into inlet tube 10.  *Id.* at ll. 41-46.  The mixture of compressed air and oil then is blown upwardly and outwardly from inlet tube 10 towards and into contact with heated grid 14.  *Id.* at ll. 46-50.  Upon contacting heated grid 14, the oil is vaporized instantaneously into smoke, and the rising smoke passes through orifice 20 in baffle 18 and is taken up by a smoke outlet line 2.  *Id.* at ll. 50-52.  Smoke from outlet line 2 may be conveyed via a smoke supply line 4 to a system undergoing testing.  *Id.* at ll. 52-56.

In another embodiment,

gases *other than air* may be supplied to the air inlet tube 10 of apparatus 1 to cause a mixture of such gas and oil to be blown towards the heating grid 14. . . . *As an alternative to pressurized air*, carbon

4

**A116**

Case IPR2013-00106
Patent 6,526,808 B1

> dioxide or nitrogen gas from a pressure and flow regulated tank or
> bottle 60 can be used because of their non-flammable and *inert*
> characteristics. . . . Moreover, producing smoke with nitrogen gas
> rather than air would enable a variety of high pressure systems . . . *to
> be tested at high operating temperatures but without the inherent risks
> of explosion.*

*Id.* at col. 6, ll. 46-67 (emphases added). Thus, the '808 Patent describes at least

two embodiments: one in which smoke is produced using pressurized air and

another in which smoke is produced using another gas, such as carbon dioxide or

nitrogen, *instead of air*.

## C.    Exemplary Claims

Of the challenged claims, claim 9 is independent; and claim 10 depends

directly from independent claim 9. Claim 9 was amended and claim 10 was added

during a first reexamination of the '808 Patent (Ex. 1001 (Ex Parte Reexamination

Certificate No. US 6,526,808 C1)) and their patentability later was confirmed

during a second reexamination of the '808 Patent (Ex. 1001 (Ex Parte

Reexamination Certificate No. US 6,526,808 C2)). Because only these two claims

are presented for *inter partes* review in the petition, claims 9 and 10 are reproduced

below to demonstrate the claimed subject matter (emphases showing material

added in italics and deleted in brackets during reexamination):

> 9.    A method for generating smoke for use at a volatile, potentially
> explosive environment, said method comprising the steps of:

> locating a heating element within a closed smoke producing
> chamber, said smoke producing chamber having a gas inlet and a
> smoke outlet;

5

**A117**

Case IPR2013-00106
Patent 6,526,808 B1

delivering a flammable fluid to said heating element within the
closed smoke producing chamber;

energizing said heating element for vaporizing into smoke [and]
*within the closed smoke producing chamber* the flammable fluid that
is delivered thereto;

blowing a supply of non-combustible gas under pressure into
the closed smoke producing chamber by way of said gas inlet thereof
for (1) creating an inert environment within said chamber so as to
prevent ignition and thereby avoid the possibility of an explosion
when said flammable fluid is vaporized into smoke by said heating
element and (2) for carrying the smoke to the volatile potentially
[hazardous] *explosive* environment by way of the smoke outlet of the
closed smoke producing chamber, *said volatile potentially explosive
environment being a closed system undergoing testing for leaks; and*

*connecting the smoke outlet of said closed smoke producing
chamber to the closed system undergoing testing, said supply of non-
combustible gas for creating an inert environment within the closed
system to which the smoke is carried, said inert environment with the
closed system preventing ignition within the closed system during the
testing thereof;*

*wherein the closed system to be tested for leaks at the volatile,
potentially explosive environment is the evaporative system of a motor
vehicle including a fuel tank, further comprising delivering smoke
from the smoke outlet of said smoke producing chamber to the fuel
tank.*

10.    *The method for generating smoke recited by Claim 9,
comprising the additional step of regulating the pressure at which the
smoke is carried by said non-combustible gas from said closed smoke
producing chamber to the closed system undergoing testing.*

6

**A118**

Case IPR2013-00106
Patent 6,526,808 B1

### D.    *Prior Art Relied Upon*

Petitioner relies upon the following prior art references:

| | | | |
|---|---|---|---|
| Swiatosz | US 4,303,397 | Dec. 1, 1981 | (Ex. 1012) |
| Gilliam | US 5,107,698 | Apr. 28, 1992 | (Ex. 1005) |
| Pauley[1] | GB   640,266 | July 19, 1950 | (Ex. 1010) |
| Stoyle[2] | GB 1,240,867 | July 28, 1971 | (Ex. 1008) |

Emi-Tech, Inc., VACUTEC® Operating and Maintenance Instructions (1995) (hereinafter "VACUTEC") (Ex. 1006)

 "Research and Testing," AIRCRAFT ENGINEERING AND AEROSPACE TECHNOLOGY, Vol. 41, Issue 1, pg. 44 (Jan. 1969) (hereinafter the "AE Article") (Ex. 1007)

T. Dunnington, "High Temperature Smoke Training – the Way Forward," INDUSTRIAL FIRE JOURNAL, 56 (Dec. 1995-Jan. 1996) (hereinafter the "IJF Article") (Ex. 1009)

Entertainment Services & Technology Association, Introduction to Modern Atmospheric Effects (2nd ed. 1998) (hereinafter the "ESTA Article") (Ex. 1011)

---

[1] Petitioner refers to this reference as "GB '266" in the petition (Pet. 4), and Patent Owner refers to this reference as "the Pauley Patent" in the patent owner preliminary response (Prel. Resp. 15).  In this decision, we refer to this reference simply as "Pauley."

[2] Petitioner refers to this reference as "GB '867" in the petition (Pet. 4), and Patent Owner refers to this reference as "the Stoyle Patent" in the patent owner preliminary response (Prel. Resp. 15).  In this decision, we refer to this reference simply as "Stoyle."

Case IPR2013-00106
Patent 6,526,808 B1

Applications For The Smoke Generator, http://www.smokemachines.com (January 28, 1999) (hereinafter the "1999 Website") (Ex. 1013)

### E.    The Asserted Grounds

Petitioner alleges that the challenged claims are unpatentable under 35 U.S.C. § 103(a) based upon the listed prior art references in various combinations. The specific grounds are detailed in the table below:

| Grounds | Claims | Statutory Basis | Applied References |
|---------|--------|-----------------|--------------------|
| 1 | 9 and 10 | 35 U.S.C. § 103(a) | Gilliam and the AE Article |
| 2 | 9 and 10 | 35 U.S.C. § 103(a) | Gilliam and Stoyle |
| 3 | 9 and 10 | 35 U.S.C. § 103(a) | Gilliam, the IJF Article, and Swiatosz |
| 4 | 9 and 10 | 35 U.S.C. § 103(a) | Gilliam, the IJF Article, and the 1999 Website |
| 5 | 9 and 10 | 35 U.S.C. § 103(a) | Gilliam, Pauley, and the 1999 Website |
| 6 | 9 and 10 | 35 U.S.C. § 103(a) | Gilliam, the ESTA Article, and the 1999 Website |
| 7 | 9 and 10 | 35 U.S.C. § 103(a) | VACUTEC, Gilliam, and the AE Article |
| 8 | 9 and 10 | 35 U.S.C. § 103(a) | VACUTEC, Gilliam, Stoyle, and the AE Article |
| 9 | 9 and 10 | 35 U.S.C. § 103(a) | VACUTEC, Gilliam, the IJF Article, and Swiatosz |

8

**A120**

Case IPR2013-00106
Patent 6,526,808 B1

| 10 | 9 and 10 | 35 U.S.C. § 103(a) | VACUTEC, Gilliam, Pauley, and the 1999 Website |
| 11 | 9 and 10 | 35 U.S.C. § 103(a) | VACUTEC, Gilliam, IJF Article, and the 1999 Website |
| 12 | 9 and 10 | 35 U.S.C. § 103(a) | VACUTEC, Gilliam, the ESTA Article, and the 1999 Website |

## II.    ANALYSIS

### A.    Claim Construction

As a first step in our analysis for determining whether to institute a trial, we interpret the claims.  In an *inter partes* review, claim terms in an unexpired patent are given their broadest reasonable interpretation in light of the specification of the patent in which they appear. 37 C.F.R. § 42.100(b); *see* Office Patent Trial Practice Guide, 77 Fed. Reg. 48756, 48766 (Aug. 14, 2012).  Under the broadest reasonable interpretation standard, claim terms are presumed to be given their ordinary and customary meaning as understood by one of ordinary skill in the art at the time of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).  An inventor may rebut that presumption by providing a definition of the term in the specification with reasonable clarity, deliberateness, and precision. *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).  In this regard, however, we are careful not to read a particular embodiment appearing in the written description into the claim if the claim language is broader than the embodiment.  *In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993).

With the exception of the terms: "flammable fluid" and "locating,"

9

**A121**

Case IPR2013-00106
Patent 6,526,808 B1

Petitioner proposes that we adopt the broadest reasonable interpretation of the claim terms in view of the Specification. Pet. 7-8. Additionally, Petitioner provides express interpretations for these contested claim terms. *Id.* at 16-19. Patent Owner contends that the interpretation of neither term is necessary to the evaluation of Petitioner's challenge to claims 9 and 10. Prel. Resp. 36-37. In particular, the Patent Owner suggests that Petitioner is seeking to obtain an "advisory claim construction" from the Board for later use in co-pending district court litigation. *Id.* at 36. Nevertheless, we interpret the claims solely for the purpose of determining whether to institute *inter partes* review, and we here interpret expressly the claim terms: "flammable fluid" and "locating," for which Petitioner proposes meanings other than their ordinary and customary meanings, as well as the claim terms: "closed," "smoke," and "inert environment," in order to determine whether to institute a trial.

1.    *"Flammable Fluid"*

Independent claim 9 recites the step of "delivering a *flammable fluid* to said heating element within the closed smoke producing chamber" (emphasis added). The Specification does not define, or even recite, the term: "flammable fluid." Instead, the '808 Patent generally describes vaporizing oil, such as a non-toxic oil, in a closed smoke producing chamber to produce smoke. '808 Patent, col. 3, ll. 25-27. A pertinent definition of the word: "flammable" is "easily set on fire; combustible." RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY, 497 (2nd Random House ed. 1999); s*ee also* MCGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS, 727 (4th ed. 1988) ("[o]f material, capable of supporting

10

Case IPR2013-00106
Patent 6,526,808 B1

combustion"). Further, a pertinent definition of the word: "combustible" is "capable of catching fire and burning." RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY at 263. Similarly, a pertinent definition of the word: "fluid" is "a substance, as a liquid or gas, that is capable of flowing and that changes shape at a steady shape when acted upon by a force." *Id.* at 504.

Petitioner contends that accepted definitions of the word "flammable," at the time the '808 Patent was filed, referred to fluids with flash points below 141ºF (60ºC). Pet. 18. Petitioner further contends that the Specification incorporates the disclosure of U.S. Patent Application No. 09/020,841 by reference and that this application describes a preferred embodiment of a smoke generating apparatus, which uses Citgo POA 46 oil, having a flash point of 468ºF (242ºC), to generate smoke. *Id.* at 17 (citing '808 Patent, col. 1, ll. 18-21). Consequently, Petitioner contends that the '808 Patent "encompasses the preferred smoke generating fluid with its 468ºF flash point" and that "the claim term 'flammable fluid' should include any fluid with a flash point of at least 468ºF or lower." *Id.* at 17-18. Nevertheless, Petitioner fails to demonstrate where Patent Owner adopted the use of the preferred oil of the incorporated reference. Thus, we are not persuaded that the Petitioner's proposed construction of this claim term is appropriate. Instead, for purposes of this decision, we conclude that the broadest reasonable interpretation of the term: "flammable fluid" is a fluid, including a liquid or gas (e.g., an oil), capable of catching fire and burning.

　　　2.　　"*Locating*"

Independent claim 9 recites the step of "*locating* a heating element within a

11

**A123**

Case IPR2013-00106
Patent 6,526,808 B1

closed smoke producing chamber . . ." (emphasis added).  The Specification does not define the term: "locating."  A pertinent definition of the word: "to locate" is "to identify or discover the place or location of" or "to establish in a position, situation or locality."  RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY at 778. Petitioner contends that the term: "locating" should refer to "forming, placing, or positioning" an element, rather than merely "identifying" that element's location. Pet. 19.  We do not adopt Petitioner's proposed definition of the term "locating" because Petitioner has not shown where in the Specification there is support for a definition of the term other than its plain and ordinary meaning.  Nor has Petitioner directed us to evidence in the form of a declaration from one of ordinary skill in the art in support of the proposed definition.  Therefore, for purposes of this decision, we conclude that the broadest reasonable interpretation of the term: "locating" is to establish an element in a position, situation or locality.

> 3.    *"Closed"*

Independent claim 9 recites the step of "delivering a flammable fluid to said heating element within the *closed* smoke producing chamber" and "connecting the smoke outlet of said closed smoke producing chamber to the *closed* system undergoing testing . . ." (emphases added). Although the Specification does not define the term: "closed," the Specification identifies "a sealed chamber 6," as an embodiment of the "*closed* smoke producing chamber" (emphasis added). '808 Patent, col. 3, ll. 25-27.  A pertinent definition of the word: "to close" is "to stop or obstruct the entrances, apertures, or gaps in."  RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY at 249.  Therefore, for purposes of this decision and

12

**A124**

Case IPR2013-00106
Patent 6,526,808 B1

consistent with the Specification, we conclude that the broadest reasonable interpretation of the term: "closed" is an adjective describing a chamber or other container the entrances, apertures, or gaps of which have been stopped or obstructed, e.g., sealed.

>    *4.    "Smoke"*

Independent claim 9 recites the step of "energizing said heating element *for vaporizing into smoke* within the closed smoke producing *chamber the flammable fluid that is delivered thereto*" (emphases added). A pertinent definition of the word: "smoke" is the visible vapor and gases given off by a burning substance, esp. the mixture of gases and suspended carbon particles resulting from the combustion of wood or other organic matter . . . something resembling this, as a vapor or mist." RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY at 1237; *but see* ESTA Article at 22 ("**Smoke:** small, solid particles dispersed in air that reduce visibility and reflect light."); *cf.* ESTA Article at 21 (defining "Fog" and "Mist"). The Specification also describes that "the droplets of oil that are blown towards heating grid 14 from oil supply 8 *will be vaporized into smoke* within chamber 6."

'808 Patent, col. 4, ll. 43-45 (emphasis added).  Claim terms are construed consistently with the disclosure provided in the Specification.  *See Phillips*, 415 F.3d at 1316 ("the specification necessarily informs the proper construction of the claims").  We interpret the term: "smoke" as a vapor or mist produced by blowing a flammable liquid against a heating element.

>    *5.    "Inert Environment"*

Independent claim 9 recites the step of "creating *an inert environment* within

13

Case IPR2013-00106
Patent 6,526,808 B1

said chamber *so as to prevent ignition and thereby avoid the possibility of an explosion* when said flammable fluid is vaporized into smoke by said heating element" (emphases added). The Specification does not define the term: "inert environment." A pertinent definition of the word: "inert" is "[l]acking an activity, reactivity, or effect." MCGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS at 956. According to claim 9, the "inert environment" achieves two results: (1) it prevents ignition and (2) it avoids the possibility of an explosion, when flammable fluid is vaporized by the heating element. The Specification explains that these "non-flammable and inert characteristics" may be achieved by the use of carbon dioxide or nitrogen gas, instead of pressurized air, to blow the flammable liquid against the heating element. *See* '808 Patent, col. 6, ll. 54-57. As noted above, claim terms are construed consistently with the disclosure provided in the Specification. *See Phillips*, 415 F.3d at 1316. Therefore, we interpret the term: "inert environment" as an environment formed within the closed smoke producing chamber and comprising a non-combustible gas, such as carbon dioxide or nitrogen, in which a vapor or mist of flammable fluid is suspended, in such a manner that the flammable fluid *cannot* ignite or explode.

## III.    DECISION ON PETITION

For the reasons described below, we institute an *inter partes* review of each of claims 9 and 10 based on unpatentability due to obviousness over Gilliam and Stoyle or over Gilliam, Pauley, and the 1999 Website. We deny as redundant institution based on alleged unpatentability due to obviousness over Gilliam in combination with one of the AE Article, the IJF Article, and the ESTA Article,

14

Case IPR2013-00106
Patent 6,526,808 B1

alone or in combination with Swiatosz or the 1999 Website. We also deny, as redundant, institution based on alleged unpatentability due to obviousness over Gilliam and VACUTEC in combination with one or more of the other applied references. *See* Pet. 23 ("VACUTEC teaches the use of the smoke machine of the Gilliam Patent . . ..  The Gilliam Patent thus is used to supply any details of the construction not found in the VACUTEC reference."), 25 ("[Stoyle] was filed in 1968 and is the 'patent applied for' in the 1969 AE Article"); 26 (IFJ Article describing the ViCount smoke system of the AE Article).

### a.    *Assignor Estoppel*

Patent Owner contends that Kenneth Alan Pieroni, a named inventor and assignor of the '808 Patent, is the founder and a current officer of Petitioner. Prel. Resp. 3-4. Patent Owner further contends that Mr. Pieroni is in privity with Petitioner. *Id.* at 2-4. Therefore, Patent Owner contends that Petitioner should be barred from pursuing an *inter partes* review of the '808 Patent under the equitable doctrine of assignor estoppel. *Id.* at 4-6 (citing 37 C.F.R. § 42.101(c)).

As the Federal Circuit has explained,

> Assignor estoppel is an equitable doctrine that prevents one who has assigned the rights to a patent (or patent application) from later contending that what was assigned is a nullity. *The estoppel also operates to bar other parties in privity with the assignor, such as a corporation founded by the assignor.* . . . The estoppel historically has applied to invalidity challenges based on "novelty, utility, patentable invention, anticipatory matter, and the state of the art."

*Diamond Scientific Co. v. Ambico, Inc.*, 848 F.2d 1220, 1224 (Fed. Cir. 1988) (citation omitted)(emphasis added). To the extent that the Board has the authority

Case IPR2013-00106
Patent 6,526,808 B1

to act in equity to deny a trial based on assignor estoppel,[3] application of assignor estoppel requires a *balancing* of equities among the parties. *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1579 (Fed. Cir. 1993).

We are not persuaded that Patent Owner's contentions *alone* support a finding of assignor estoppel. Further, because the claims at issue in the present petition have been amended during the course of two, *ex parte* reexaminations; it is clear that the claims at issue are *not* the same claims of the '808 Patent that the named inventors assigned to Patent Owner. Consequently, the claims at issue were amended without the participation or approval of Mr. Pieroni. *See Q.G. Prods., Inc. v. Shorty, Inc.*, 992 F.2d 1211, 1212-1213 (Fed Cir. 1993) (citing *Westinghouse Elec. & Mfg. v. Formica Insulation Co.*, 266 U.S. 342, 351 (1924)). Thus, even accepting the contentions presented by Patent Owner as true, Patent Owner has not shown sufficient grounds for barring the institution of a trial on the basis of assignor estoppel.

*b.*      35 U.S.C. § 325(d)

Patent Owner asserts that each of the references relied upon by Petitioner in the petition for *inter partes* review either was considered by the Office during the examination of the claims for which review is sought or that, to the extent that the applied references themselves were not considered previously, the references are cumulative with respect to previously considered references. Prel. Resp. 25-38 (citing 35 U.S.C. § 325(d)). Therefore, Patent Owner concludes that the Board should not institute a trial on any of the proposed grounds for review.

---

[3] Patent Owner contends that the Board has this authority. S*ee* Prel. Resp. 5-6.

16

Case IPR2013-00106
Patent 6,526,808 B1

Although Gilliam has been considered previously with respect to the claims at issue, Petitioner presents different arguments regarding new combinations of references and new supporting evidence, that were not before the Office. As such, we decline to deny the proposed grounds of review under 35 U.S.C. § 325(d).

## IV.   GROUNDS FOR REVIEW

### A.   *Failure to Establish the Level of Ordinary Skill*

Initially, we note that Patent Owner opposes the proposed combination of the applied references and argues that Petitioner fails to establish the level of ordinary skill in the art in support of the combination of the teachings of the applied references. We are not persuaded by Patent Owner's arguments.

Patent Owner argues that Petitioner fails to offer testimony or other evidence to establish the level of ordinary skill in the relevant art. Prel. Resp. 8. Nevertheless, Patent Owner does not argue that the combinations of the teachings of Gilliam and Stoyle or of Gilliam, Pauley, and the 1999 Website are beyond the level of skill of a person of ordinary skill in the relevant art; nor does Patent Owner suggest a required level of skill of a person of ordinary skill in the relevant art. Patent Owner acknowledges that "the level of skill in the art might be gleaned from the prior art itself." *Id.* at 9 (citing *Litton Indust. Prods. V. Solid State Sys. Corp.*, 755 F.2d 158, 163-164 (Fed. Cir. 1985)). As the Federal Circuit has explained,

> While it is always preferable for the factfinder below to specify the level of skill it has found to apply to the invention at issue, the absence of specific findings on the level of skill in the art does not give rise to reversible error *"where the prior art itself reflects an appropriate level and a need for testimony is not shown."*

17

Case IPR2013-00106
Patent 6,526,808 B1

*Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (finding that the
Board was not required to set forth express findings as to level of skill in art and
quoting *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158,163 (Fed.
Circ. 1985)(emphasis added)).  Here, we find that, for purposes of this decision, the
prior art adequately reflects an appropriate level of skill and that Patent Owner
does not demonstrate a need for testimony or other evidence to establish the level
of skill of a person of ordinary skill in the relevant art.

### B.    Gilliam and Stoyle

Petitioner argues that independent claim 9 and dependent claim 10 are
unpatentable under 35 U.S.C. § 103(a) over Gilliam and Stoyle.  Pet. 34-44.
Petitioner argues that Gilliam teaches all of the limitations of claims 9 and 10 of the
'808 Patent, "except [that Gilliam uses] air instead of inert gas to generate smoke and
carry that smoke to systems being tested."  Pet. 20.  Thus, Petitioner argues that "but
for the use of an inert gas, the Gilliam Patent discloses the claimed invention."  *Id.* at
23.  We agree with Petitioner.  Petitioner relies on Stoyle for disclosing the use of an
inert gas.

Figure 3 of Gilliam (Ex. 1005) is reproduced below.

18

**A130**

Case IPR2013-00106
Patent 6,526,808 B1



Figure 3 depicts a front, cut-away view of a smoke generating apparatus for use in detecting leaks. Gilliam, col. 4, l. 67-col. 5, l. 4.  Referring to Figure 3, Gilliam describes a smoke generating assembly 35 that comprises an air pump 15 which introduced pressurized air into a chamber 30.  *Id.* at col. 6, ll. 20-41.  A smoke-producing fluid is introduced into chamber 30 via a filler port 6, and air generated by pump 15 circulates the smoke-producing fluid within chamber 30.  *Id.* at ll. 22-23, 58-60.  When the smoke-producing fluid comes in contact with a ceramic heating element 11, the smoke-producing fluid vaporizes within chamber 30. *Id.* at col. 6, ll. 34-36.  Smoke generated within chamber 30 then is conveyed via conduit 22 to a particular

19

Case IPR2013-00106
Patent 6,526,808 B1

automotive system for leak testing. *Id.* at col. 8, ll. 8-13.

Smoke from assembly 35 may be "sealably communicated" to a vacuum system in an internal combustion engine to visibly identify "leaks of any and all sizes, regardless of their location" in an internal combustion engine and "in virtually any closed vacuum system in the automobile." *Id.* at col. 3, ll. 7-11, 15-19, 48-52. Referring to Figure 5 (not reproduced here), assembly 35 further may comprise a "spark-arrestor 3 which is disposed at the remote end of conduit 22 as an interface with the vehicles engine." *Id.* at col. 7, ll. 51-53. "[S]park-arrestor 3 prevents sparks or even flames from entering a vehicle's engine, thereby causing an explosion. *Flames could be generated, for example, if a flammable fluid mixture was inadvertently created in chamber [30].*" *Id.* at ll. 55-59 (emphasis added). Thus, Gilliam cautions against the potential risk of explosion if flammable smoke, generated within chamber 30 of assembly 35, is introduced into portions of an automobile, such as a fuel tank, for testing. *See* Pet. 24, 45. We agree with Petitioner that Gilliam discloses substantially all of the limitations of independent claim 9, except the use of an inert gas. Patent Owner does not appear to dispute this conclusion. *See* Prel. Resp. 12-15.

Figure 3 of Stoyle (Ex. 1008) is reproduced below.



20

Case IPR2013-00106
Patent 6,526,808 B1

Figure 3 depicts a longitudinal sectional view of the apparatus for heating mixtures of carbon dioxide and oil to produce a smoke or mist. Stoyle, 2:60-67. Stoyle describes that a smoke or mist for testing ventilation systems, or for theatrical effects, may be generated by heating a mixture of oil and carbon dioxide. *Id.* at 1:11-17. Referring to Figure 3, the mixture of oil and carbon dioxide is forced from a fluid inlet means 14 (not shown) into a space 7 between a plug 11 and a bore 12, which eventually joins with an outlet means 10. *Id.* at 2:86-93, 2:99-108; *see* Pet. 38, 40, 42. Stoyle describes that the mixture of oil and carbon dioxide "emerges [from outlet means 10] in the form of a mist or smoke." *Id.* at 2:107-8. We agree with Petitioner that Stoyle discloses the use of an inert gas to produce smoke. *See* Pet. 41-42.

Patent Owner argues that Stoyle teaches an apparatus that generates smoke only after the mixture of heated oil and carbon dioxide gas leaves the apparatus and, therefore, does not disclose "producing smoke in an inert environment within a closed smoke-producing chamber." Prel. Resp. 19, 22. In particular, Stoyle describes that the mixture "emerges in the form of a mist or smoke." *Id.* (citing Stoyle, 2:104-109). Nevertheless, Petitioner relies on Gilliam, not Stoyle, to teach or suggest where the smoke is generated. Pet. 38-40. Petitioner relies on Stoyle to teach or suggest the combination of a flammable fluid with a non-combustible gas, e.g., carbon dioxide gas. *Id.* at 41-42. Further, although Stoyle describes that the mixture "emerges" from outlet means 10 in the form of a mist or smoke, Stoyle is silent on where the mist or smoke is generated. Patent Owner argues that Stoyle teaches that the mist or smoke is generated "in the presence of atmospheric air," but cites to no portion of Stoyle in support of this argument. Prel. Resp. 22. Therefore, we are not persuaded that

21

Case IPR2013-00106
Patent 6,526,808 B1

Gilliam in combination with Stoyle fails to teach or suggest the recited limitations.

Petitioner identifies as a reason to combine the teaching of Gilliam and Stoyle, the disclosure of the safety advantages of Stoyle's mist or smoke produced with an inert gas, i.e., carbon dioxide gas, and Gilliam's cautions about the dangers of the introduction of flammable smoke into tested systems. According to Petitioner, a person skilled in the relevant art would have reason to combine the teachings of Gilliam and Stoyle to achieve the invention recited in independent claim 9. Pet. 38, 40, 42. In support of this reasoning, Petitioner demonstrates that the dangers associated with leak testing in an explosive environment and of generating smoke using flammable fluid were known at the time of the filing of the '808 Patent. Gilliam, col. 7, ll. 57-59; *see* Pet. 22, 28, 37-43. Petitioner also asserts that the teachings of Gilliam and Stoyle were known in the same field of endeavor, e.g., the generation of smoke for leak testing (Gilliam, col. 2, l. 66-67; Stoyle, 1:15-17), at the time of the filing of the '808 Patent.

Patent Owner argues that this reasoning is flawed because there is no specific suggestion in Gilliam to reduce or eliminate the use of atmospheric air. Prel. Resp. 12-13. This argument is not persuasive. As the U.S. Supreme Court has explained,

> If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability. *For the same reason, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill.*

*KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 417 (2007). Patent Owner does not

22

**A134**

Case IPR2013-00106
Patent 6,526,808 B1

argue here that carbon dioxide, used in Stoyle's apparatus, was not known to be an inert gas at the time of the filing of the '808 Patent. *See* Stoyle, 1:11-17. Nor does Patent Owner argue that the proposed combination of the teachings of Gilliam and Stoyle was beyond the skill of a person of ordinary skill in the art. Petitioner's reason to combine the two reference is rationale and is supported by articulated reasoning. We are not persuaded that further evidence to support the Petitioner's proposed combination is needed.

Claim 10 recites that the method of claim 9 comprises "the additional step of regulating the pressure at which the smoke is carried by said non-combustible gas from said closed smoke producing chamber to the closed system undergoing testing." Referring again to Figure 3, Gilliam teaches that

> Pressure release knob 4, comprising a conventional ball valve, *regulates* the pressure manifest by the smoke generated within chamber 20. Thus, depending upon the particular closed system being tested for leaks, all of the pressure generated may not be necessary for testing, or may not be appropriate because of pressure constraints in the system being tested. By suitably rotating knob 4, the cooperating valve is caused to thereby release a proportional amount of pressurized vapor. *Of course, knob 4 could be marked or calibrated to indicate specific pressure levels which would be useful for applying prescribed pressures to particular automotive systems.*

Gilliam, col. 5, ll. 36-49 (emphases added). Thus, we agree with Petitioner that Gilliam teaches the additional limitations of claim 10. *See also* Pet. 45(citing Stoyle, 3:7-13 (describing a controlled pressure drop to tested vessels)). Patent Owner makes no specific arguments regarding claim 10 as to this grounds for unpatentability. *See* Prel. Resp. 19-24.

23

Case IPR2013-00106
Patent 6,526,808 B1

### C.    Gilliam, Pauley, and the 1999 Website

Petitioner argues that Gilliam discloses substantially all of the limitations of independent claim 9, except the use of an inert gas. We agree.  Pauley, however, teaches the use of carbon dioxide or nitrogen gas as a medium for atomizing and propelling the fog, smoke, or mist forming liquid in order to reduce any risk of ignition.  Pet. 29-30.  Further, the 1999 Website is relied upon to support Petitioner's reasoning for combining the teachings of Gilliam and Pauley.  *Id.* at 23-24.  The foregoing description of Gilliam's teachings applies equally to the proposed combination of Gilliam with Pauley and the 1999 Website and is not reproduced here.

The Figure of Pauley (Ex. 1010) is reproduced below.



Pauley's Figure depicts a schematic drawing of an arrangement of apparatus adapted to create artificial fog, mist, or smoke.  Pauley, 2:57-62.  Referring to this Figure, Pauley teaches that a hydrocarbon oil from a closed vessel *a* may be

24

Case IPR2013-00106
Patent 6,526,808 B1

atomized by a jet of carbon dioxide or nitrogen from a cylinder $c^1$. *Id.* at 2:63-83.

The oil from vessel $a$ may be delivered to a nozzle $b^3$ and the gas from cylinder $c^1$

may be delivered to a nozzle $c$ within a heated tubular member $d$. *Id.* at 2:68-77.

Upon contacting the heated surface of tubular member $d$, droplets of oil, carried in

the expanding gas, immediately are vaporized and form a cooled fog or mist. *Id.* at

2:105-7.

Patent Owner argues that Pauley does not teach that heated tubular member

$d$ is a "closed vessel." Prel. Resp. 20 (citing Pet. 39). Nevertheless, Petitioner

does not rely on Pauley to describe tubular member $d$ as a "closed smoke

producing chamber." Pet. 37-38. Instead, Petitioner relies on Gilliam's chamber

20 to teach or suggest this limitation. *Id.* Instead, Petitioner relies upon Pauley to

teach that flammable fluid and a non-combustible gas, e.g., carbon dioxide or

nitrogen, may be delivered to the closed smoke producing chamber. Pet. 38-41.

Therefore, we are persuaded that Gilliam in combination with Pauley teaches or

suggests

> *delivering a flammable fluid to said heating element within the
> closed smoke producing chamber*;

> energizing said heating element *for vaporizing into smoke
> within the closed smoke producing chamber* the flammable fluid that
> is delivered thereto;

> *blowing a supply of non-combustible gas under pressure into
> the closed smoke producing chamber* by way of said gas inlet thereof
> (emphases added).

Pauley further explains that

25

**A137**

Case IPR2013-00106
Patent 6,526,808 B1

> The use of the carbon dioxide or nitrogen gas under pressure as a
> medium for atomizing and propelling the fog forming liquid is
> advantageous not merely because of its cooling effects upon the
> mixture *but also because its presence greatly reduces any tendency to
> ignition of the vapour should the liquid medium be one of an
> inflammable nature*.

*Id.* at 1:36-44 (emphasis added); *see* Pet. 29-31. Thus, Pauley teaches that the

smoke producing fluid may be a "flammable fluid" and that the presence of carbon

dioxide or nitrogen gas in the smoke producing chamber, e.g., tubular member *d*,

"greatly reduces *any* tendency to ignition." Pauley, 1:42-44 (emphasis added); *see*

Pet. 29.  Moreover, Pauley explains that the presence of these gases "*reduces to a

minimum any tendency to ignition* of the vapour should the liquid employed be of

an inflammable nature." *Id.* at 2:113-116 (emphasis added); *see* Pet. 30-31.

Patent Owner argues that Pauley teaches *reducing*, but not eliminating (e.g.,

not preventing), the mixture's *tendency* to ignite.  Prel. Resp. 20-21 (citing

Pauley, 2: 29-47).  As noted above, however, Pauley describes that the presence of

carbon dioxide or nitrogen gas may reduce "to a minimum any tendency to

ignition." Pauley, 2:113-116.  Because Pauley describes reducing "*any*" tendency

to ignition "*to a minimum*," Pauley teaches or suggests eliminating, e.g.,

preventing, ignition.  Therefore, we are persuaded that Pauley teaches or suggests

the use of carbon dioxide or nitrogen gas to "creat[e] *an inert environment* within

said chamber *so as to prevent ignition*" (emphases added).  *See* Pet. 42.

Petitioner identifies as a reason to combine the teachings of these three

references the disclosure of the safety advantages of Pauley's mist or smoke

produced with an inert gas, i.e., carbon dioxide gas; Gilliam's cautions about the

26

**A138**

Case IPR2013-00106
Patent 6,526,808 B1

dangers of the introduction of flammable smoke into tested systems; and the 1999
Website's disclosure that smoke generating apparatus may be used for theatrical
purposes and for leak testing. Pet. 23-24. We are persuaded by this reason to
combine these teachings. Pauley describes methods and apparatus to generate and
distribute in the atmosphere an artificial fog, mist, or smoke for use in theatrical
and cinematographic work. Pauley, 2:9-17. Although Pauley does not teach that
its methods or apparatus may be used for leak testing, Pauley acknowledges that its
methods and apparatus may be used for "other applications." *Id.* Further, the
1999 Website (Ex. 1013) teaches that smoke generating apparatus generally may
be used for leak testing and for smoke, mist, or fog effects in the theater and in
movies. 1999 Website, pg. 2 ("Leak Testing" and "Entertainment"). In particular,
the 1999 Website teaches the use of smoke generating apparatus in the leak testing
of "vehicles." *Id.*; *see* Pet. 42-45. As noted above, Gilliam cautions regarding the
use of smoke produced from flammable liquids when leak testing in a potentially
explosive environment. Gilliam, col. 7, ll. 55-59; *see* Pet. 24, 45. Consequently,
Petitioner argues that a person skilled in the relevant art would have reason to
combine the teachings of Gilliam with those of Pauley, regarding the "other
applications" of smoke generating apparatus, and those of the 1999 Website, to
achieve the invention recited in independent claim 9. Pet. 30-31, 42-45.

Patent Owner argues that, contrary to Petitioner's assertion (Pet. 33), the
smoke generators used for leak detection are not *interchangeable* with those used
for other applications and, therefore, a person of skill in the art would not have
combined the theatrical smoke generators described by Pauley with the smoke

27

**A139**

Case IPR2013-00106
Patent 6,526,808 B1

generator described by Gilliam.  Prel. Resp. 13-14.  Petitioner adequately

demonstrates that there are multiple purposes, e.g., applications, for generating

smoke.  1999 Website, pg. 2.  In addition, Pauley itself suggests that some smoke

generators, in fact, may be used interchangeably.  Pauley, 2:15-17; *see also*

Stoyle, 1:15-17.  A person skilled in the art would have reason to apply the

teachings regarding a machine for one such purpose to those of a machine for

another purpose.  Pet. 33-34; *see KSR*, 550 U.S. at 417 (quoted above).  Moreover,

one of ordinary skill in the art has ordinary creativity and is not an automaton.

*KSR,* 550 U.S. at 421.  Therefore, we are persuaded by Petitioner's arguments

regarding the reason for and manner of combining the teachings of Gilliam,

Pauley, and the 1999 Website.

    As noted above, claim 10 recites that the method of claim 9 comprises "the

additional step of regulating the pressure at which the smoke is carried by said non-

combustible gas from said closed smoke producing chamber to the closed system

undergoing testing."  Petitioner argues that Gilliam teaches the additional limitations

of claim 10.  Pet. 46 (citing (Gilliam, col. 5, ll. 35-49; Fig. 3).

    In addition, Pauley teaches that "[t]he gas under pressure may be derived from a

cylinder . . . and may be conveyed to the nozzle c by way of a feed pipe $c^2$ containing

*a control valve $c^3$* by means of which the flow of gas may be started and stopped as

and when required."  Pauley, 2:77-83 (emphasis added).  We agree with Petitioner that

Gilliam in combination with Pauley also teaches "*regulating the pressure* at which the

smoke is carried by said non-combustible gas from said closed smoke producing

chamber to the closed system undergoing testing" (emphasis added).  Pet 44.  Again,

28

**A140**

Case IPR2013-00106
Patent 6,526,808 B1

Patent Owner makes no separate arguments regarding claim 10 and this combination.

### D.    Other Asserted Grounds

Petitioner also asserts that claims 9 and 10 are unpatentable over Gilliam in combination with one of the AE Article, the IJF Article, and the ESTA Article, alone or in combination with Swiatosz or the 1999 Website, i.e., Grounds 1, 3, 4, and 6 in the table set forth above, or over Gilliam and VACUTEC in combination with one or more of the other applied references, i.e., Grounds 7-12 in table set forth above. As noted above, Petitioner acknowledges that the teachings of some of these additional references are themselves redundant. *See* Pet. 23 ("VACUTEC teaches the use of the smoke machine of the Gilliam Patent . . .. The Gilliam Patent is thus used to supply any details of the construction not found in the VACUTEC reference."), 25 ("[Stoyle] was filed in 1968 and is the 'patent applied for' in the 1969 AE Article"); 26 (IFJ Article describing the ViCount smoke system of the AE Article). Nevertheless, we deny as redundant institution based on alleged unpatentability due to obviousness over these additional asserted grounds in light of the determination that there is a reasonable likelihood that the challenged claims are unpatentable based on the grounds of unpatentablility on which we institute an *inter partes* review. *See* 37 C.F.R. § 42.108(a).

### E.    Failure to Address the Previously Submitted Evidence of Secondary Considerations

Patent Owner further argues that Petitioner fails to respond here to certain statements by experts submitted during the second *ex parte* reexamination of the '808 Patent allegedly establishing secondary considerations supporting

29

**A141**

Case IPR2013-00106
Patent 6,526,808 B1

patentability.  We are not persuaded by Patent Owner's arguments.

In particular, Patent Owner argues that, during the second, *ex parte* reexamination of the '808 Patent, Patent Owner submitted declarations by five experts in the relevant art asserting the existence of secondary considerations supporting the patentability of claims 9 and 10 of the '808 Patent.  Prel. Resp. 10. Patent Owner argues that "Petitioner offers no rebuttal to (or even comment on) this highly relevant secondary considerations testimony." *Id.* at 11.  Patent Owner does not argue here that the previously-presented evidence of secondary considerations rebuts or outweighs the evidence presented by Petitioner supporting the unpatentability of claims 9 and 10 of the '808 Patent over Gilliam and Stoyle or over Gilliam, Pauley, and the 1999 Website.  Moreover, the existence of previously-presented evidence of secondary considerations does not act as a bar to the institution of a trial or an additional burden which the Petitioner must overcome in demonstrating a reasonable likelihood that it would prevail in demonstrating the unpatentabilty of claims 9 and 10 of the '808 Patent. *In re Reinhart*, 531 F.2d 1048, 1052 (CCPA 1976) ("Facts established by rebuttal evidence must be evaluated along with the facts on which the earlier conclusion was reached, not against the conclusion itself.").

## V.    CONCLUSION

Petitioner has demonstrated that there is a reasonable likelihood of prevailing on its challenge to the patentability of claims 9 and 10 of the '808 Patent.

The Petition is granted as to the following grounds for review:

30

**A142**

Case IPR2013-00106
Patent 6,526,808 B1

claims 9 and 10 as unpatentable over Gilliam and Stoyle; and

claims 9 and 10 as unpatentable over Gilliam, Pauley, and the 1999 Website.

## VI.  ORDER

For the reasons given, it is

**ORDERED** that the Petition is granted as to claims 9 and 10 of the '808 Patent.

**FURTHER ORDERED** that pursuant to 35 U.S.C. § 314(a), *inter partes* review of the '808 Patent is hereby instituted commencing on the entry date of this Order, and pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4, notice is hereby given of the institution of a trial.

**FURTHER ORDERED** that the trial is limited to obviousness over Gilliam and Stoyle or Gilliam, Pauley, and the 1999 Website; and no other grounds are authorized.

**FURTHER ORDERED** that an initial conference call with the Board is scheduled for 2 PM ET on August 1, 2013.  The parties are directed to the Office Trial Practice Guide, 77 Fed. Reg. 48756, 48765-66 (Aug. 14, 2012) for guidance in preparing for the initial conference call, and should come prepared to discuss any proposed changes to the Scheduling Order entered herewith and any motions the parties anticipate filing during the trial.

31

Case IPR2013-00106
Patent 6,526,808 B1

PETITIONER:

Matthew A. Newboles
Lowell Anderson
Stetina Brunda Garred & Brucker
Email: mnewboles@stetinalaw.com
Email: landerson@stetinalaw.com

PATENT OWNER:

Edward A. Schlatter
Brenton R. Babcock
Knobbe, Martens, Olson & Bear, LLP
Email: Edward.Schlatter@knobbe.com
Email: Brent.Babcock@knobbe.com

32

**A144**



# McGraw-Hill
# DICTIONARY OF
# SCIENTIFIC AND
# TECHNICAL TERMS
## Fourth Edition

On the cover: Pattern produced from white light by a computer-generated diffraction plate containing 529 square apertures arranged in a 23 × 23 array. (R. B. Hoover, Marshall Space Flight Center)

On the title pages: Aerial photograph of the Sinai Peninsula made by Gemini spacecraft. (NASA)

Included in this Dictionary are definitions which have been published previously in the following works: P. B. Jordain, *Condensed Computer Encyclopedia*, Copyright © 1969 by McGraw-Hill, Inc. All rights reserved. J. Markus, *Electronics and Nucleonics Dictionary*, 4th ed., Copyright © 1960, 1966, 1978 by McGraw-Hill, Inc. All rights reserved. J. Quick, *Artists' and Illustrators' Encyclopedia*, Copyright © 1969 by McGraw-Hill, Inc. All rights reserved. *Blakiston's Gould Medical Dictionary*, 3d ed., Copyright © 1956, 1972 by McGraw-Hill, Inc. All rights reserved. T. Baumeister and L. S. Marks, eds., *Standard Handbook for Mechanical Engineers*, 7th ed., Copyright © 1958, 1967 by McGraw-Hill, Inc. All rights reserved.

In addition, material has been drawn from the following references: R. E. Huschke, *Glossary of Meteorology*, American Meteorological Society, 1959; *U.S. Air Force Glossary of Standardized Terms*, AF Manual 11-1, vol. 1, 1972; *Communications-Electronics Terminology*, AF Manual 11-1, vol. 3, 1970; W. H. Allen, ed., *Dictionary of Technical Terms for Aerospace Use*, 1st ed., National Aeronautics and Space Administration, 1965; J. M. Gilliland, *Solar-Terrestrial Physics: A Glossary of Terms and Abbreviations*, Royal Aircraft Establishment Technical Report 67158, 1967; *Glossary of Air Traffic Control Terms*, Federal Aviation Agency; *A Glossary of Range Terminology*, White Sands Missile Range, New Mexico, National Bureau of Standards, AD 467-424; *A DOD Glossary of Mapping, Charting and Geodetic Terms*, 1st ed., Department of Defense, 1967; P. W. Thrush, comp. and ed., *A Dictionary of Mining, Mineral, and Related Terms*, Bureau of Mines, 1968; *Nuclear Terms: A Glossary*, 2d ed., Atomic Energy Commission; F. Casey, ed., *Compilation of Terms in Information Sciences Technology*, Federal Council for Science and Technology, 1970; *Glossary of Stinfo Terminology*, Office of Aerospace Research, U.S. Air Force, 1963; *Naval Dictionary of Electronic, Technical, and Imperative Terms*, Bureau of Naval Personnel, 1962; *ADP Glossary*, Department of the Navy, NAVSO P-3097.

**McGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS,**
**Fourth Edition**

Copyright © 1989, 1984, 1978, 1976, 1974 by McGraw-Hill, Inc. All rights reserved. Printed in the United States of America. Except as permitted under the United States Copyright Act of 1976, no part of this publication may be reproduced or distributed in any form or by any means, or stored in a data base or retrieval system, without the prior written permission of the publisher.

3 4 5 6 7 8 9 0    DOW/DOW    9 5 4 3 2 1 0

ISBN 0-07-045270-9

**Library of Congress Cataloging-in-Publication Data**

McGraw-Hill dictionary of scientific and technical terms.

1. Science—Dictionaries. 2. Technology—Dictionaries.
I. Parker, Sybil P.
Q123.M34    1989    503'/21    88-13490
ISBN 0-07-045270-9

**For more information about other McGraw-Hill materials, call 1-800-2-MCGRAW in the United States. In other countries, call your nearest McGraw-Hill office.**

technique in which the solution containing the sample to be alyzed is optically excited in an oxyhydrogen or oxyacetylene me. { 'fläm ¸mish·ən¸spek'trās·kə·pē }

**ne excitation** [SPECT] Use of a high-temperature flame ich as oxyacetylene) to excite spectra emission lines from ali and alkaline-earth elements and metals. { ¦fläm ¸ek-sə̇'tā·shən }

**ne gouging** [MET] A form of oxygen cutting by means a cutting torch with a slightly curved tip, enabling the flame strike the metal surface at a low angle and making shallow ts possible. Also known as oxygen gouging. { 'fläm ¸gauj· }

**ne hardening** [MET] A method for local surface hard-ing of steel by passing an oxyacetylene or similar flame over ç work at a predetermined rate. { ¦fläm ¸härd·ən·iŋ }

**neholder** [AERO ENG] A device that sustains combustion a flowing mixture within the combustion chamber of some pes of jet engines. { 'fläm¸hōl·dər }

**ne ionization detector** [ANALY CHEM] A device in which : measured change in conductivity of a standard flame (usu-y hydrogen) due to the insertion of another gas or vapor is ed to detect the gas or vapor. { ¦fläm ¸ī·ə·nə'zā·shən di¸tek-r }

**ne laser** [OPTICS] A molecular gas laser in which gases ich as carbon disulfide and oxygen are mixed at low pressures d ignited; the flame is then self-sustaining and produces rbon monoxide laser emission. { ¦fläm ¸lā·zər }

**meout** [AERO ENG] The extinguishing of the flame in a action engine, especially in a jet engine. { 'fläm¸aut }

**me photometer** [SPECT] One of several types of instru-ents used in flame photometry, such as the emission flame notometer and the atomic absorption spectrophotometer, in ich of which a solution of the chemical being analyzed is porized; the spectral lines resulting from the light source ping through the vapors enters a monochromator that selects e band or bands of interest. { ¦fläm ¸fə'täm·əd·ər }

**me photometry** [SPECT] A branch of spectrochemical alysis in which samples in solution are excited to produce ne emission spectra by introduction into a flame. { ¦fläm ¸'täm·ə·trē }

**me plate** [ENG] One of the plates on a boiler firebox which : subjected to the maximum furnace temperature. { ¦fläm 'lāt }

**me plating** [MET] Coating a thin layer of refractory ma-rial on a surface by exploding a mixture of plating powder, xygen, and acetylene. Also known as flame coating. { ¦fläm 'läd·iŋ }

**me propagation** [CHEM] The spread of a flame in a com-ustible environment outward from the point at which the com-ustion started. { ¦fläm ¸präp·ə'gā·shən }

**me-retarded resin** [MATER] A resin which is com-ounded with certain chemicals to reduce or eliminate its ndency to burn. { ¦fläm ri¸tärd·əd 'rez·ən }

**me repellent** [TEXT] Referring to a fabric that has been indered resistant to flash or sustained burning by chemical reatment. { ¦fläm ri¸pel·ənt }

**me spectrometry** [SPECT] A procedure used to measure ne spectra or to determine wavelengths emitted by flame-xcited substances. { ¦fläm spek'träm·ə·trē }

**me spectrophotometry** [SPECT] A method used to de-ermine the intensity of radiations of various wavelengths in a pectrum emitted by a chemical inserted into a flame. { ¦fläm spek·trə·fə'täm·ə·trē }

**me spectrum** [SPECT] An emission spectrum obtained by vaporating substances in a nonluminous flame. { 'fläm ¸spek-rəm }

**me speed** [CHEM] The rate at which combustion moves hrough an explosive mixture. { 'fläm ¸spēd }

**me spraying** [ENG] **1.** A method of applying a plastic :oating onto a surface in which finely powdered fragments of he plastic, together with suitable fluxes, are projected through 1 cone of flame. **2.** Deposition of a conductor on a board in nolten form, generally through a metal mask or stencil, by neans of a spray gun that feeds wire into a gas flame and drives he molten particles against the work. { 'fläm ¸sprā·iŋ }

**me straightening** [MET] Correcting distorted structural netal to a straight form by local application of a gas-flame heat. { 'fläm ¸strāt·ən·iŋ }

**amethrower** [ENG] A device used to project ignited fuel

from a nozzle so as to cause casualties to personnel or to destroy material such as weeds or insects. { 'fläm¸thrō·ər }

**flame trap** [ENG] A device that prevents a gas flame from entering the supply pipe. { 'fläm ¸trap }

**flame treating** [ENG] A method of rendering inert thermo-plastic objects receptive to inks, lacquers, paints, or adhesives, in which the object is bathed in an open flame to promote oxidation of the surface. { 'fläm ¸trēd·iŋ }

**flamingo** [VERT ZOO] Any of various long-legged and long-necked aquatic birds of the family Phoenicopteridae character-ized by a broad bill resembling that of a duck but abruptly bent downward and rosy-white plumage with scarlet coverts. { flə'miŋ·gō }

**flammability** [CHEM] A measure of the extent to which a material will support combustion. Also known as inflamma-bility. { ¸flam·ə'bil·əd·ē }

**flammability limits** [CHEM] The stoichiometric composition limits (maximum and minimum) of an ignited oxidizer-fuel mixture what will burn indefinitely at given conditions of tem-perature and pressure without further ignition. { ¸flam·ə'bil-əd·ē ¸lim·əts }

**flammable** [MATER] Of a material, capable of supporting combustion. { 'flam·ə·bəl }

**flammable liquid** [MATER] A liquid which gives off com-bustible vapors. { ¦flam·ə·bəl ¦lik·wəd }

**Flamsteed's number** [ASTRON] A number sometimes used with the possessive form of the Latin name of the constellation to identify a star, for example, 72 Ophiuchi. { 'flam¸stēdz ¸nəm·bər }

**flan** [METEOROL] In Scotland, a sudden gust or squall of wind from land. { flan }

**Flanders storm** [METEOROL] In England, a heavy fall of snow coming with the south wind. { 'flan·dərz ¸stórm }

**Flandrian transgression** [OCEANOGR] The rapid rise of the North Sea between 8000 and 3000 B.C. from about 180 feet (55 meters) below to about 20 feet (6 meters) below its present level. { 'flan·drē·ən tranz'gresh·ən }

**flange** [SCI TECH] A projecting rim of an organism or me-chanical part. { flanj }

**flanged pipe** [DES ENG] A pipe with flanges at the ends; can be bolted end to end to another pipe. { ¦flanjd 'pīp }

**flangeway** [CIV ENG] Open way through a rail or track struc-ture that provides a passageway for the flange of a wheel. { 'flanj¸wā }

**flank** [CIV ENG] The outer edge of a carriageway. [DES ENG] **1.** The end surface of a cutting tool, adjacent to the cutting edge. **2.** The side of a screw thread. [GEOL] *See* limb. [VERT ZOO] The part of a quadruped mammal between the ribs and the pelvic girdle. { flaŋk }

**flank angle** [DES ENG] The angle made by the flank of a screw thread with a line perpendicular to the axis of the screw. { 'flaŋk ¸aŋ·gəl }

**flank hole** [MIN ENG] **1.** A hole bored in advance of a working place when approaching old workings. **2.** A borehole driven from the side of an underground excavation, not parallel with the center line of the excavation, to detect water, gas, or other danger. { 'flaŋk ¸hōl }

**flank observation** [ORD] Observation of fire from a place on, or near, the flank of the target; the angle at the target between the gun and the observer is between 75 and 105°. { ¦flaŋk äb·zər'vā·shən }

**flank wear** [ENG] Loss of relief on the flank of a tool behind the cutting edge. { 'flaŋk ¸wer }

**flannel** [TEXT] A loosely woven, generally wool fabric with the weave concealed by a napped surface. { 'flan·əl }

**flannelette** [TEXT] Plain cotton weave finished with a nap on one side. Also known as kimono flannel. { ¸flan·əl'et }

**flap** [AERO ENG] **1.** Any control surface, such as a speed brake, dive brake, or dive-recovery brake, used primarily to increase the lift or drag on an airplane, or to aid in recovery from a dive. **2.** Any rudder attached to a rocket and acting either in the air or within the jet stream. { flap }

**flap attenuator** [ELECTROMAG] A waveguide attenuator in which a contoured sheet of dissipative material is moved into the guide through a nonradiating slot to provide a desired amount of power absorption. Also known as vane attenuator. { 'flap·ə¸ten·yə¸wād·ər }

**flaperon** [AERO ENG] A control surface used both as a flap and as an aileron. { 'flap·ə¸rän }



**FLAME PHOTOMETER**

light chopper / vaporizer-burner
light source / monochromator-detector
solution / tuned amplifier
recorder

Schematic diagram of atomic absorption spectrophotometer for determining metal concentrations.

**industrial engineering** [ENG] A branch of engineering concerned with the design, improvement, and installation of integrated systems of people, materials, and equipment. Also known as management engineering. { in'dəs·trē·əl ˌen·jə'nir·iŋ }

**industrial frequency bands** [COMMUN] The radio-frequency bands allocated in the United States for land mobile communications of private industries other than transportation. { in'dəs·trē·əl 'frē·kwən·sē ˌbanz }

**industrial geography** [GEOGR] A branch of geography that deals with location, raw materials, products, and distribution, as influenced by geography. { in'dəs·trē·əl jē'äg·rə·fē }

**industrial glass** [MATER] Any glass molded into shapes for product parts, for example, lime glass and lead glass. { in'dəs·trē·əl 'glas }

**industrial hygiene** [MED] The science that deals with the anticipation and control of unhealthy conditions in workplaces in order to prevent illness among employees. { in'dəs·trē·əl 'hī‚jēn }

**industrial jewel** [MINERAL] A hard stone, such as ruby or sapphire, used for bearings and impulse pins in instruments and for recording needles. { in'dəs·trē·əl 'jül }

**industrial meteorology** [METEOROL] The application of meteorological information and techniques to industrial problems. { in'dəs·trē·əl ˌmē·dē·ə'räl·ə·jē }

**industrial microbiology** [MICROBIO] The study, utilization, and manipulation of those microorganisms capable of economically producing desirable substances or changes in substances, and the control of undesirable microorganisms. { in'dəs·trē·əl ‚mīˌkrō·bī'äl·ə·jē }

**industrial microorganism** [MICROBIO] Any microorganism utilized for industrial microbiology. { in'dəs·trē·əl ‚mīˌkrō'or·gə‚niz·əm }

**industrial mobilization** [IND ENG] Transformation of industry and other productive facilities and contributory services from their peacetime activities to the fulfillment of the munitions program necessary to support a military effort. { in'dəs·trē·əl ‚mō·bə·lə'zā·shən }

**industrial psychology** [PSYCH] Psychology applied to problems in industry, dealing chiefly with the selection, efficiency, and mental health of personnel. { in'dəs·trē·əl sī'käl·ə·jē }

**industrial railway** [IND ENG] 1. A usually short feeder line that is either owned or controlled and wholly operated by an industrial firm. 2. Narrow-gage rail lines used on construction jobs or around industrial plants. { in'dəs·trē·əl 'rāl‚wā }

**industrial revolution** [IND ENG] A widespread change in industrial or production methods, toward production by machine and away from manual labor. { in'dəs·trē·əl ‚rev·ə'lü·shən }

**industrial security** [IND ENG] The portion of internal security which refers to the protection of industrial installations, resources, utilities, materials, and classified information essential to production from loss or damage. { in'dəs·trē·əl si'kyur·əd·ē }

**industrial television** [COMMUN] Closed-circuit television used for remote viewing of industrial processes and operations. Abbreviated ITV. { in'dəs·trē·əl 'tel·ə‚vizh·ən }

**industrial waste** [ENG] Worthless materials remaining from industrial operations. { in'dəs·trē·əl 'wāst }

**industrial yeast** [MICROBIO] Any yeast used for the production of fermented foods and beverages, for baking, or for the production of vitamins, proteins, alcohol, glycerol, and enzymes. { in'dəs·trē·əl 'yēst }

**indwelling catheter** [MED] A thin tube communicating to the body surface, inserted into the vascular system and positioned to permit pressure measurements or blood sampling over a long period of time. { 'in‚dwel·iŋ 'kath·əd·ər }

**ineffective time** [COMPUT SCI] Time during which a computer can operate normally but which is not used effectively because of mistakes or inefficiency in operating the installation or for other reasons. { ‚in·i'fek·tiv 'tīm }

**inelastic** [MECH] Not capable of sustaining a deformation without permanent change in size or shape. { ‚in·ə'las·tik }

**inelastic buckling** [MECH] Sudden increase of deflection or twist in a column when compressive stress reaches the elastic limit but before elastic buckling develops. { ‚in·ə'las·tik 'bək·liŋ }

**inelastic collision** [MECH] A collision in which the total kinetic energy of the colliding particles is not the same after the collision as before it. { ‚in·ə'las·tik kə'lizh·ən }

**inelastic cross section** [PHYS] The cross section for an inelastic collision. { ‚in·ə'las·tik 'kros ‚sek·shən }

**inelastic neutron scattering** *See* slow-neutron spectroscopy. { ‚in·ə'las·tik 'nüˌträn ‚skad·ə·riŋ }

**inelastic scattering** [PHYS] Scattering that results from inelastic collisions. { ‚in·ə'las·tik 'skad·ə·riŋ }

**inelastic stress** [MECH] A force acting on a solid which produces a deformation such that the original shape and size of the solid are not restored after removal of the force. { ‚in·ə'las·tik 'stres }

**inequality** [MATH] A statement that one quantity is less than, less than or equal to, greater than, or greater than or equal to another quantity. { ‚in·i'kwäl·əd·ē }

**inequality of Clausius** *See* Clausius inequality. { ‚in·i'kwäl·əd·ē əv 'klau·zē·əs }

**inequilateral** [BIOL] Having the two sides or ends unequal, as the ends of a bivalve mollusk on either side of a line from umbo to gape. { in‚ē·kwə'lad·ə·rəl }

**inermous** [BIOL] Lacking mechanisms for defense or offense, especially spines. { i'nər·məs }

**inert** [SCI TECH] Lacking an activity, reactivity, or effect. { i'nərt }

**inert atmosphere** [CHEM ENG] A nonreactive gas atmosphere, such as nitrogen, carbon dioxide, or helium; used to blanket reactive liquids in storage, to purge process lines and vessels of reactive gases and liquids, and to cover a reaction mix in a partially filled vessel. { i'nərt 'at·mə‚sfir }

**inert gas** *See* noble gas. { i'nərt 'gas }

**inert-gas cutting** [MET] Cutting of metal while inert gas flows around the cutting area to prevent oxidation. { i'nərt 'gas 'kəd·iŋ }

**inert gas-shielded arc welding** [MET] An arc-welding process in which the weld area is shielded by an inert gas to prevent oxidation. Also known as Heliarc welding. { i'nərt 'gas 'shēld·əd 'ärk ‚weld·iŋ }

**inertia** [MECH] That property of matter which manifests itself as a resistance to any change in the momentum of a body. [MED] Sluggishness, especially of muscular activity. { i'nər·shə }

**inertia currents** [OCEANOGR] Currents resulting after the cessation of wind in a generating area or after the water movement has left the generating area; circular currents with a period of one-half pendulum day. { i'nər·shə ‚kə·rəns }

**inertia ellipsoid** [MECH] An ellipsoid used in describing the motion of a rigid body; it is fixed in the body, and the distance from its center to its surface in any direction is inversely proportional to the square root of the moment of inertia about the corresponding axis. Also known as momental ellipsoid; Poinsot ellipsoid. { i'nər·shə i'lip‚soid }

**inertia governor** [MECH ENG] A speed-control device utilizing suspended masses that respond to speed changes by reason of their inertia. { i'nər·shə ‚gəv·ər·nər }

**inertial circle** [METEOROL] A loop in the path of an air parcel in inertial flow, which is approximately circular if the latitudinal displacement is small. Also known as circle of inertia. [OCEANOGR] The circle described by inertial motion in a body of ocean water and having a radius $R = C/f$, where $C$ is the particle velocity in a given direction and $f$ is the Coriolis parameter. { i'nər·shəl ‚sər·kəl }

**inertial confinement** [NUCLEO] The rapid implosion of a high-density pellet, under bombardment by laser or charged-particle beams, to produce a core that is heated to extremely high temperatures before it can fly apart; proposed as a method for generating power from controlled thermonuclear reactions. { i'nər·shəl kən'fīn·mənt }

**inertial coordinate system** *See* inertial reference frame. { i'nər·shəl kō'ord·ən‚ət ‚sis·təm }

**inertial flow** [FL MECH] Flow in which no external forces are exerted on a fluid. [GEOPHYS] Frictionless flow in a geopotential surface in which there is no pressure gradient; the centrifugal and Coriolis accelerations must therefore be equal and opposite, and the constant inertial wind speed $V_i$ is given by $V_i = fR$, where $f$ is the Coriolis parameter and $R$ the radius of curvature of the path. { i'nər·shəl 'flō }

**inertial force** [MECH] The fictitious force acting on a body as a result of using a noninertial frame of reference; examples are the centrifugal and Coriolis forces that appear in rotating

coordinate s
shəl 'fors ]
**inertial guid·
ations meas
by the use o
ans }
**inertial insta
which the co
state and the
hydrodynam
the velocity
disturbance
tation. Als
stə'bil·əd·ē
**inertial mas
by Newton'
by the prop
'mas }
**inertial navi
that can au
attitude of a
of the outpu
vehicle or s
as inertial n
**inertial nav·
'nav·ə‚gād·
is subject o
or a spacec
{ in'ərshəl
**inertial plat
that mainta
orientation
**inertial refe
which a bo
is acting o
{ i'nərshəl
**inertial siz·
inertial siz
erence defi
relative to
long perio
**inertial the
motion of
the Coriol
{ i'nərshə
**inertia ma
energy $T$ o
from an e
½q'Mq,
derivative
respect to
triks }
**inertia per
properties
total energ
**inertia pe
particle to
**inertia sta
ciples to
{ i'nərshə
**inertia sw
change in
{ i'nərshə
**inertia te
whose pr
angular m
**inertia w
form of i
general i
Rossby v
strictedly
of the dis
axis in th
the inert
‚wāv }
**inertia w
utilizes k

NEW WORDS FOR THE NEW MILLENNIUM



NEWER WORDS FASTER

# RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY

More New Words Than Any Other Dictionary

Over 207,000 Definitions

The Most Common, Up-to-Date Meanings Given First

Clear Guidance on Avoiding Offensive Language

UPDATED ANNUALLY

*Random House Webster's College Dictionary*
Copyright © 1999 by Random House, Inc.

All rights reserved under International and Pan-American Copyright Conventions. No part of this form may be reproduced in any form or by any means, electronic or mechanical, including photocopying, without the written permission of the publisher. All inquiries should be addressed to Reference & Information Publishing, Random House, Inc., 201 East 50th Street, New York, NY 10022-7703. Published in the United States by Random House, Inc., New York and simultaneously in Canada by Random House of Canada Limited.

The Random House Living Dictionary Database™, Random House and colophon are registered trademarks of Random House, Inc.

The first Random House college dictionary, the *American College Dictionary*, was published in 1947 to critical acclaim. The first edition of the *Random House Webster's College Dictionary* was published in 1991. Subsequent revisions were published in 1992, 1995, and 1996. A second, completely redesigned, revised, and updated edition was published in 1997, with updates published annually thereafter. Copyright © 1998, 1996, 1995, 1992, 1991 by Random House, Inc.

**Trademarks**
A number of entered words which we have reason to believe constitute trademarks have been designated as such. However, no attempt has been made to designate as trademarks or service marks all words or terms in which proprietary rights might exist. The inclusion, exclusion, or definition of a word or term is not intended to affect, or to express a judgment on, the validity or legal status of the word or term as a trademark, service mark, or other proprietary term.

This book is available for special purchases in bulk by organizations and institutions, not for resale, at special discounts. Please direct your inquiries to the Random House Special Sales Department, toll-free 888–591-1200 or fax 212–572-4961.

Please address inquiries about electronic licensing of this division's products, for use on a network or in software or on CD-ROM, to the Subsidiary Rights Department, Random House Reference & Information Publishing, fax 212–940-7370.

**Library of Congress Cataloging-in-Publication Data**

Random House Webster's college dictionary -- 2nd. ed.
    p.  cm.
  ISBN 0-375-40741-3 (hardcover).
    1. English language--Dictionaries.    i. Random House (Firm)
PE1628.R28  1999
423--DC21                            99-12620
                                      CIP

Visit the Random House Web site at www.randomhouse.com

Typeset and Printed in the United States of America
Typeset by the Random House Reference & Information Publishing Group

1999 Second Random House Edition
9 8 7 6 5 4 3 2 1
April 1999

ISBN: 0-375-40741-3

New York   Toronto   London   Sydney   Auckland

v

...sionately analytic; so... ...taining to or used in... *fi•cal•ly, adv.* ...hology dealing with o... personality disorder...

...meter used to meas...

...er qualified person who... of living patients, as for... ...0–75] ...to make a light, sharp... ...n. 2. a clinking soun...

[1505–15; after *Clin*... door latch] ...untible matter fused in... ...tch brick, used esp. in... ...slag] ...clinks. [1680–90] ...ote in a musical piece... ...that is a failure; a res... ...slag]

...ld formed with overlap... ...us) + BUILT] ...numerur for determini... ...cli/no•met/ric (-na me... ...eme•try, n. ...isp, with tinsel; decke... ...eaf; tinsel; false glitte... ...D klinken to sound])

...28, U.S. statesman: 1... ...1805–12. 3. Sir Henry... ...i the American Revolu... ...1946, 42nd president of...

...plant of the genus *Clito*... ...low flowers on a climb... ...ne -A]... ...the Muse of history, t... ...advertising industry fr... ...L < Gk Kleiō] ...ed with a sing. v.) the... ...D] —cli/o•met/ric, ..._(-mi tris/an)_, n. ...—v. t. to cut, or cut of... ...bush. 2. to trim by cu... ...or fleece of; shear. 4.... ...swindle. —v. i. 7. to do... ...ares from a newspape... ...recycle clipped *artw* ...act of clipping. 14. a... ...ingle shearing of sheep... **16. clips,** (used wit... ...Informal. cartridge cl... ...pace: at a rapid clip.... ...cut] —clip/pa•ble, ad... ...a device that grips or... ...olding together paper... ...insertion into the maga... ...ther decoration clippe... ...o embrace. —v. t. 5... ...hold tightly. **8.** to exc... ...gally by throwing one'... ...d. **10.** to fasten or hol... ...11. to clip a football... ...embrace, surround, f...

...le, as in a book or ma... ...d serving as a portable... ...ing papers. [1905–10] ...e of entertainment, the... ...customers. [1930–35] ...clip•on *how tie.* —... ...-10] ...true, clear enunciation... ...ng one or more syllable... ...age in meaning, as dec...

... clips or cuts. **2.** Often... ...tool, esp. shears; *hair*... *pl. v.*) a mechanical d... ...lames of a machine th... U.S. 1845–70. **5.** a per... 1400] ...or thing that clips; a...

article, advertisement, etc., clipped from a newspaper or magazine. [1300–50] —clip/ping•ly, *adv.*

**clique** (klēk, klik), *n., v.,* cliqued, cliqu•ing. —*n.* **1.** a small, exclusive group of people; coterie; set. —*v. i.* **2.** to form or associate in a clique. [1705–15; < F, appar. metaphorical use of MF *clique* latch, or n. der. of *cliquer* to make noise] —**cli/quey, cli/quy,** *adj.* —**cli/quish, *adj.*** —**cli/quish•ness,** *n.* —**cli/quish•ness,** *n.*

**cli•tic** (klit/ik), *n.* enclitic or proclitic. [1945–50; by extraction]

**clit•o•ris** (klit/ər is, kli̅ tōr/is, -tôr/-), *n., pl.* **clit•o•ri•des** (kli•tôr/i•dēz...

**Clive** (klīv), *n.* **Robert** (*Baron Clive of Plassey*), 1725–74, British gen-eral and statesman in India.

**clo•a•ca** (klō ā/ka), *n., pl.* **-cae** (-sē). **1. a.** the common cavity into which the intestinal, urinary, and generative canals open in birds, rep-tiles, amphibians, many fishes, and certain mammals. **b.** a similar cavity in invertebrates. **2.** a sewer, esp. an ancient sewer. [1650–60; < L *clo(ā)ca, cluāca* sewer, drain] —**clo•a/cal,** *adj.*

**cloak** (klōk), *n.* **1.** a loose outer garment, as a cape or coat. **2.** some-thing that covers or conceals; disguise; pretense. —*v. t.* **3.** to cover with a cloak. **4.** to hide; conceal. [1175–1225; ME *cloke* (< OF) < ML *clocca* bell-shaped cape]

**cloak/-and-dag/ger,** *adj.* pertaining to, characteristic of, or dealing in espionage or intrigue, esp. of a romantic or dramatic kind. [1835]

**cloak•room** (klōk/rōōm/, -rōōm/), *n.* **1.** a room in which outer gar-ments, umbrellas, etc., may be left temporarily, as in a restaurant. **2.** Brit. a baggage room, as at a railway station. [1850–55]

**clob•ber** (klob/ər), *v. t. Informal.* **1.** to batter severely; strike heavily. **2.** to defeat decisively; drub; trounce. **3.** to denounce or criticize vig-orously. [1940–45, *Amer.;* orig. uncert.]

**clob•ber** (klob/ər), *n.* clothing; clothes. [1875–80; of obscure orig.]

**clo•chard** (klō/shärd), *n.* a beggar; vagrant; tramp. [1940–45; < F, der. of *clocher* to limp or < L *clopus* lame]

**cloche** (klōsh, klôsh), *n.* a woman's close-fitting hat with a deep, bell-shaped crown and often a narrow, turned-down brim. [1905–10; < F, bell; bell-jar, OF *cloca, cloche*. See CLOAK]

**clock[1]** (klok), *n.* **1.** an instrument, normally larger than a watch, for measuring and recording time, usu. with hands or changing numbers to indicate the hour and minute. **2.** time clock. **3.** a meter for meas-uring and recording speed, distance covered, etc. **4.** BIOLOGICAL CLOCK. —*v. t.* **5.** to time, test, or determine by means of a clock or watch: *The racehorse was clocked at two minutes flat.* **6.** Slang. to strike sharply or heavily: *clocked him in the face.* —*v. i.* **7.** clock in (or out), to begin (or end) the day's work, esp. by punching a time clock. —*Idiom.* **8. around the clock,** a. for the entire 24-hour day without pause. b. without stopping for rest; tirelessly. [1350–1400; ME *clok(ke)* < MD *clocke* bell, clock, akin to OE *clugge*, OHG *glocka,* OIr *clocc* bell; cf. CLOAK] —**clock/er,** *n.*

**clock[2]** (klok), *n.* an embroidered or woven design on the side of a sock or stocking at the ankle or leg. [1520–30; orig. uncert.]

**clock•like** (klok/līk/), *adj.* highly systematic, precise, and dependable. [1735–45]

**clock•mak•er** (klok/mā/kər), *n.* a person who makes or repairs clocks. [1600–50] —**clock/mak/ing,** *n.*

**clock/ ra/di•o,** *n.* a radio combined with an alarm clock serving as a timer to turn the radio on or off at a preset time. [1960–65, *Amer.*]

**clock•wise** (klok/wīz/), *adv.* **1.** in the direction of the rotation of the hands of a clock as viewed from the front or above. —*adj.* **2.** directed clockwise: *a clockwise movement.* [1885–90]

**clock•work** (klok/wûrk/), *n.* **1.** the mechanism of a clock. **2.** any mechanism similar to that of a clock. —*Idiom.* **3.** like clockwork, with perfect regularity or precision. [1560–70]

**clod** (klod), *n.* **1.** a lump or mass, esp. of earth or clay. **2.** a stupid person; dolt. **3.** earth; soil. [1400–50; late ME *clodde,* OE *clod-* (in *clodhamer* fieldfare)] —**clod/dish,** *adj.* —**clod/dish•ness,** *n.*

**clod•hop•per** (klod/hop/ər), *n.* **1.** a clumsy boor; rustic; bumpkin. **2.** clodhoppers, strong, heavy shoes. [1680–90]

**clog** (klog, klôg), *v.,* **clogged, clog•ging,** *n.* —*v. t.* **1.** to hinder or ob-struct with thick or sticky matter; choke up: *to clog a drain.* **2.** to crowd excessively; overfill: *Cars clogged the highway.* **3.** to encumber; hamper; hinder. —*v. i.* **4.** to become clogged or choked up. **5.** to stick; stick together. **6.** to do a clog dance. —*n.* **7.** anything that impedes movement, encumbrance or hindrance. **8.** a shoe or sandal with a thick sole of wood, cork, or rubber. [1275–1400; ME] of uncert. orig.] —**clog/gi•ly,** *adv.* —**clog/gi•ness,** *n.* —**clog/gy,** *adj.*

**clog/ dance/,** *n.* a dance in which clogs or heavy shoes are worn for hammering out the lively rhythm. [1880–85] —**clog/ danc/er,** *n.* —**clog/ danc/ing,** *n.*

**cloi•son•né** (kloi/zə nā/; Fr. klwa zô nā/), *n.* enamelwork in which colored areas are separated by thin metal bands. [1860–65; < F, der. of *cloison* partition < VL \**clausiō* < L *claudere* to CLOSE]

**clois•ter** (kloi/stər), *n.* **1.** a covered walk, esp. in a religious institu-tion, having an open arcade or colonnade usu. opening onto a court-yard. **2.** a courtyard, esp. in a religious institution, bordered with such walks. **3.** a place of religious seclusion, as a monastery or con-vent. **4.** any quiet, secluded place. **5.** life in a monastery or convent. —*v. t.* **6.** to confine in a monastery or convent. **7.** to confine in retire-ment; seclude. **8.** to furnish with a cloister or covered walk. **9.** to convert into a monastery or convent. [1250–1300; ME *cloistre* < AF; OF < b. *cloison* partition (see CLOISONNÉ) and *clostre* < L *claustrum* bar-rier]

**clois•tered** (kloi/stərd), *adj.* **1.** secluded from the world; sheltered. **2.** having a cloister. [1575–85]

**clois•tral** (kloi/stral), *adj.* **1.** of, pertaining to, or living in a cloister. **2.** resembling a cloister; cloisterlike. [1595–1605]

**clomp** (klomp), *v. i.* CLUMP (def. 5).

**clone** (klōn), *n., v.,* **cloned, clon•ing.** —*n.* **1. a.** a cell, cell product, or organism genetically identical to the unit or individual from which it was asexually derived. **b.** a population of identical units, cells, or in-dividuals derived asexually from the same ancestral line. **2.** a person or thing that duplicates, imitates, or closely resembles another in ap-pearance, function, etc.: *The new computers are clones of the original model.* —*v. t.* **3.** to produce a copy or imitation of. **4. a.** to cause to grow as a clone. b. to separate (a batch of cells or cell products) so that each portion produces only its own kind. —*v. i.* **5.** to grow as a clone. [1900–05; < Gk *klōn* a slip, twig] —**clon/al,** *adj.* —**clon/al•ly,** *adv.*

**clon•i•dine** (klon/i den/, klō/ni-), *n.* a synthetic white crystalline sub-stance, $C_9H_9Cl_2N_3$, used in the treatment of high blood pressure. [1965–70; cl(o)n(o) + -IDINE]

**clonk** (klongk, klôngk) also **chunk,** *n., v.* **clonked, clonk•ing.** —*n.* **1.** a low, dull sound of impact, as of a heavy object striking against an-other. —*v. i., v. t.* **2.** to make or cause to make such a sound. [1925]

**clo•nus** (klō/nəs), *n., pl.* **-nus•es.** a rapid succession of flexions and extensions of a muscle group during movement, often symptomatic of a nervous system disorder. [1810–20; < NL < Gk *klónos* turmoil] —**clon/ic** (klon/ik), *adj.* —**clo•nic/i•ty** (klō nis/i tē, klô-), *n.*

**cloot** (klōōt), *n. Chiefly Scot.* **1.** a cloven hoof. **2. Cloots,** the devil. [1715–25; perh. akin to D *klauwtje* = *klauw* CLAW + *-tje* dim. suffix]

**cloot•ie** (klōō/tē), *n. Chiefly Scot.* CLOOT (def. 2).

**clop** (klop), *n., v.,* **clopped, clop•ping.** —*n.* **1.** a sound made by or as if by a horse's hoof striking the ground. —*v. i.* **2.** to make or move with such a sound. [1895–1900; imit.]

**clo•que** or **clo•qué** (klō kā/), *n.* any fabric woven with an irregular raised design in a puckered or blistered effect. [1945–50; < F *cloqué* blistered < dial. F (Picard) *cloque* bell, blister (see CLOAK)]

**close** (v. klōz; *adj., adv.* klōs), *v.,* **closed, clos•ing,** *adj.,* **clos•er, clos•est,** *adv., n.* —*v. t.* **1.** to put (something) in a position to obstruct an entrance or opening; shut. **2.** to stop or obstruct (a gap, entrance, aperture, etc.): *to close a hole in the wall.* **3.** to block or hinder passage across or access to: *to close a border to tourists.* **4.** to stop or obstruct the entrances, aper-tures, or gaps in: *to close a box.* **5.** to make imperceptive or inaccessi-ble: *to close one's mind to criticisms.* **6.** to bring together the parts of; join (often fol. by *up*): *Close up ranks!* **7.** to bring to an end; to close a debate. **8.** to conclude successfully; consummate: *to close a deal.* **9.** to stop rendering the customary services of: *to close a store for the night.* **10.** to reinstate or suspend the operation of: *The police closed the bar for selling liquor to minors.* **11.** Naut. to come close to. **12.** *Archaic.* to enclose; cover in. —*v. i.* **13.** to become closed; shut: *The door closed with a bang.* **14.** to come together; unite: *Her lips closed firmly.* **15.** to come close: *His pursuers closed rapidly.* **16.** to grapple; engage in close encounter (often fol. by *with*): *to close with enemy troops.* **17.** to come to an end; terminate. **18.** to cease to offer the cus-tomary activities or services: *The school closed for the summer.* **19.** to cease to be performed: *The play closed yesterday.* **20.** to enter into or reach an agreement, usu. as a contract. **21.** (of a stock or security) to be priced or show a change in price as specified at the end of a trad-ing period. **22. close down,** to terminate the operation of; discon-tinue. **23. close in** or **on,** to approach stealthily, as to cap-ture. b. to envelop or seem to envelop, as if to suffocate. **24. close out,** a. to reduce the price of (merchandise) for quick sale. b. to dis-pose of completely; liquidate: *to close out a bank account.* —*adj.* **25.** having the parts or elements too near one another; close design. **26.** compact; dense: *a close weave.* **27.** being in or having proximity in space or time. **28.** marked by similarity in degree, action, feeling, etc.: *Dark pink is close to red.* **29.** near, or near together, in kind or rela-tionship: *a close relative.* **30.** intimate or confidential: *dear.* **31.** based on a strong uniting feeling of respect, honor, or love: *a close friend.* **32.** fitting tightly: *a close sweater.* **33.** cut flush with the surface or very short: *a close haircut.* **34.** not deviating from the subject under consideration. **35.** strict; searching; minute: *close investigation.* **36.** not deviating from a model or original: *a close translation.* **37.** nearly even or equal: *a close contest.* **38.** strictly logical: *close reasoning.* **39.** shut; shut tight; not open: *a close hatch.* **40.** stifling; close air; hot. **41.** completely surrounding: *a close siege.* **42.** without opening; with all openings closed. **43.** confined; narrow; stuffy: *close rooms.* **44.** heavy; oppressive; dose, sultry weather. **45.** narrowly confined, as a prisoner. **46.** practicing or keeping secrecy; secretive; reticent. **47.** parsimoni-ous; stingy. **48.** scarce, as money. **49.** not open to public or general admission; competition or the like. **50.** (of a vowel) articulated with a small opening between the tongue and the roof of the mouth, as the vowel (ē) as compared with (a). —*adv.* **51.** in a close manner; close-ly. **52.** near; close by. —*n.* **53.** the act of closing. **54.** the end or conclusion. **55.** an enclosed place or enclosure, esp. one beside a cathedral. **56.** any piece of land held as private property. **57. a.** the closing price on a stock. **b.** the closing prices on an exchange market. **58.** Brit. **a.** a narrow alley terminating in a dead end. **b.** a courtyard with one entrance. —*Idiom.* **59. close ranks,** to unite forces as a show of loyalty, esp. to deal with challenge or adversity. [1250–50; (n., adj.) ME *clos* < AF, OF < L *clausus,* ptp. of *claudere* to close (cf. CLAUSE); (v.) ME, der. of the adj.] —**clos•a•ble, close•a•**

**co·lum·bite** (kə lum′bīt), n. a black mineral, mainly iron niobate, (Fe, Mn)Nb₂O₆, the chief ore of niobium. [1795–1805]

**co·lum·bi·um** (kə lum′bē əm), n. former name of NIOBIUM. Symbol: Cb [1801; COLUMB(IA) (def. 5) + -IUM]

**Co·lum·bus** (kə lum′bəs), n. 1. Christopher (Sp. Cristóbal Colón; It. Cristoforo Colombo), 1446?–1506, Italian navigator in Spanish service: traditionally considered the discoverer of America 1492. 2. the capital of Ohio, in the central part. 657,053. 3. a city in W Georgia. 182,828.

**Colum′bus Day′,** n. a holiday honoring Columbus's landing in the West Indies on Oct. 12, 1492: observed variously in the U.S. on Oct. 12 or on the second Monday in October. [1890–95, Amer.]

**col·u·mel·la** (kol′yə mel′ə), n., pl. -mel·lae (-mel′ē). 1. any of various small, columnlike structures of animals or plants; rod or axis. 2. the middle ear bone of amphibians, reptiles, and birds. [1575–85; < L, dim. of columna COLUMN; see -ELLE] —col′u·mel′lar, adj. —col′u·mel′late (-it, -āt), adj.

**col·umn** (kol′əm), n. 1. a rigid, slender upright support composed of relatively few pieces. b. a decorative pillar, often of stone, typically having a cylindrical or polygonal shaft with a capital and usu. a base. 2. any columnlike object, mass, or formation: a column of smoke. 3. a vertical row or list: Add this column of figures. 4. a vertical arrangement on a page of horizontal lines of type, usu. typographically justified: There are two columns on this page. 5. an article constituting a regular feature of a newspaper or magazine, and usu. reporting or commenting on political or social affairs, the arts, etc. 6. a long, narrow file of troops (disting. from line). 7. a formation of ships in single file. [1400–50; late ME colompne, columne (< AF) < L columna, akin to columen peak; cf. HILL] —co·lum′nar, adj.



column (def. 1b)
(Roman Doric order)

**co·lum·nar** (kə lum′nər), adj. 1. shaped like a column. 2. characterized by columns. 3. Also, co·lum′nal. printed or arranged in columns. [1720–30; < LL]

**co·lum·na·tion** (kol′əm nā′shən), n. 1. the employment of architectural columns. 2. the system of columns in a structure. [1585–95; extracted from INTERCOLUMNATION]

**col′umn inch′,** n. type or space one column wide and 1 in. (2.54 cm) deep, used esp. in measuring printed advertisements. [1935–40]

**col·um·nist** (kol′əm nist, -ə mist), n. a person who writes a newspaper or magazine column. [1915–20; Amer.]

**col·za** (kol′zə, kōl′-), n. RAPE². RAPESEED. [1705–15; < F < D koolzaad = kool COLE + zaad seed]

**COM** (kom), n. Comedy Central (a cable television channel).

**com-,** a prefix occurring in loanwords from Latin, where it and its variants meant "with," "together with," and denoted joint or simultaneous action (colloquy; confer; convene); partnership (colleague), union (connect; combine), or enclosure (content), or marked the completed nature of the action of a verb (conclude; confection); com- is used before b, p, m (combine; compare; commingle). For variants before other sounds, see CO-, CON-, COR-. [< L cum with]

**Com.,** 1. Commander. 2. Commission. 3. Commissioner. 4. Committee. 5. Commodore. 6. Commonwealth.

**com.,** 1. comedy. 2. comma. 3. command. 4. commerce. 5. commercial. 6. commission. 7. committee. 8. commissioner. 9. common. 10. common. 11. communications.

**co·ma¹** (kō′mə), n., pl. -mas. a state of prolonged unconsciousness, including a lack of response to stimuli, from which it is impossible to rouse a person. [1640–50; < Gk kôma deep sleep]

**co·ma²** (kō′mə), n., pl. -mae (-mē). 1. the nebulous envelope around the nucleus of a comet. 2. a monochromatic aberration of a lens or optical system in which the image from a point source cannot be focused. 3. a tuft of hairs on a seed or a terminal cluster of leaves or bracts, as on a stem. [1660–70; < L: hair < Gk kómē]

**Co·man·che** (kə man′chē, kō-), n., pl. -ches, (esp. collectively) -che. 1. a member of a Plains Indian people ranging in the mid-19th century over a large area of the S Great Plains: later confined to a reservation in Oklahoma. 2. the Uto-Aztecan language of the Comanche, closely related to Shoshone. [1800–10, Amer.]

**co·mate** (kō′māt), adj. hairy; tufted. [1590–1600; < L comātus]

**com·a·tose** (kom′ə tōs′, kō′mə-), adj. 1. affected with or characterized by coma. 2. lacking vitality or alertness: torpid. [1745–55; < Gk kōmat-, s. of kôma COMA¹ + -OSE¹] —com′a·tose′ly, adv.

**comb** (kōm), n. 1. a toothed strip of hard material, as plastic, bone, or metal, used to untangle, arrange, or hold the hair. 2. CURRYCOMB. 3. any combine instrument, object, or formation. 4. the fleshy outgrowth on the head of certain roosters. 5. something resembling or suggesting this, as the crest of a wave. 6. a honeycomb. 7. a machine for separating choice cotton or wool fibers from soil. —v.t. 8. to smooth, arrange, or adorn (the hair) with a comb. 9. to use (something) in the manner of a comb. 10. to remove (anything undesirable) with or as if with a comb. 11. to search everywhere in: to comb the files for a lost letter. 12. to separate (textile fibers) with a comb. 13. to currycomb. 14. to sweep across; rake: High winds combed the coast. —v.i. 15. (of a wave) to roll over or break at the crest. [bef. 900; ME; OE comb, camb; c. OS camb, OHG chamb, ON kambr, Gk gómphos pin, peg; cf. CAM]

**comb.,** 1. combination. 2. combined. 3. combining. 4. combustion.

**com·bat** (v. kəm bat′, kom′bat; n. kom′bat), v., -bat·ed, -bat·ing or (esp. Brit.) -bat·ted, -bat·ting, n. —v.t. 1. to fight or contend against; oppose vigorously: to combat crime. —v.i. 2. to battle; contend: to combat with disease. —n. 3. active, armed fighting with enemy forces. 4. a fight, struggle, or controversy, as between two persons, parties, or ideas. [1535–45; < MF combat (n.), combattre (v.) < LL combattere < L com- + battuere to strike, beat] —com·bat′a·ble, adj.

**com·bat·ant** (kəm bat′nt, kom′bə tnt), n. 1. one prepared for or engaged in active combat. —adj. 2. engaged in combat; fighting. 3. disposed to combat; combative. [1425–75; late ME < MF]

**com′bat fatigue′,** n. BATTLE FATIGUE. [1940–45]

**com·bat·ive** (kəm bat′iv), adj. ready or inclined to fight; pugnacious. [1825–35] —com·bat′ive·ly, adv. —com·bat′ive·ness, n.

**combe** (kōōm, kōm), n. Brit. a valley constituting but all but one side. [bef. 1000; OE cumb valley < British Celtic; cf. CWM]

**comb·er** (kō′mər), n. 1. a person or thing that combs. 2. a long curling ocean wave. [1640–50]

**com·bin·a·ble** (kəm bī′nə bəl), adj. capable of combining or being combined. [1740–50] —com·bin′a·bil′i·ty, n. —com·bin′a·bly, adv.

**com·bi·na·tion** (kom′bə nā′shən), n. 1. the act of combining or the state of being combined. 2. a number of things combined; mixture: a combination of ideas. 3. something formed by combining: A chord is a combination of notes. 4. an alliance of persons, parties, countries, etc. 5. the series of numbers or letters used in setting the mechanism of a combination lock. 6. the parts of the mechanism operated by this. 7. one-piece underwear uniting two garments, esp. a shirt and pants. 8. Math. a. the arranging together of elements without regard to their order. b. an arrangement thus formed. Compare PERMUTATION (def. 2). [1350–1400; ME (< MF) < LL] —com′bi·na′tion·al, adj.

**combina′tion lock′,** n. a lock opened by rotating one or more dials through a set of positions in a prescribed order and direction.

**combina′tion shot′,** n. a shot in pool in which at least one object ball pockets another. [1905–10]

**com·bi·na·tive** (kom′bə nā′tiv, kəm bī′nə-), adj. 1. tending or serving to combine. 2. pertaining to or resulting from combination. [1850–55]

**com·bi·na·to·ri·al** (kəm bī′nə tôr′ē əl, -tōr′-, kom′bə-), adj. 1. of, pertaining to, or involving the combination of elements, as in phonetics or music. 2. of or pertaining to the enumeration of the number of ways of doing or arranging something in a specific way. 3. of or pertaining to mathematical combinations. [1810–20]

**com·bi·na·to·ry** (kom′bə nə tôr′ē, -tōr′ē), adj. 1. combinative. 2. combinatorial. [1660–50]

**com·bine** (v. kəm bīn′ for 1, 2, 6, kom′bīn for 3, 7; n. kom′bīn), v., -bined, -bin·ing, n. —v.t. 1. to bring into or join in a close union or whole; unite: to combine the ingredients for a cake. 2. to possess or exhibit in union: a plan that combines practicality and originality. 3. to harvest (grain) with a combine. —v.i. 4. to unite; coalesce: The clay and sugar combined into a thick paste. 5. to unite for a common purpose; join forces: Two factions combined to defeat the proposal. 6. to enter into chemical union. 7. to use a combine in harvesting. —n. 8. a combination, esp. a combination of persons or groups for the furtherance of their own special interests, as a syndicate, cartel, or bloc. 9. a harvesting machine for cutting and threshing grain in the field. [1375–1425; late ME (< MF combinen) < LL combinare < L com- + bīnī by twos (cf. BINARY)] —com·bin′er, n. —Syn. See MIX.

**comb·ings** (kō′mingz), n.pl. hairs removed with a comb or a brush. [1565–75]

**comb′ing form′,** n. a linguistic form that occurs only in combination with other forms and may conjoin with an independent word [mini- + skirt] or another combining form [photo- + -graphy]. Compare AFFIX (def. 5). [1880–85]

**comb′ jel′ly** (kōm), n. any marine invertebrate of the phylum Ctenophora, having an oval, transparent body with eight rows of comblike ciliated bands used for swimming. Also called ctenophore. [1885–90]

**com·bo** (kom′bō), n., pl. -bos. Informal. 1. a small jazz or dance band. 2. a combination. [1920–25; COMB(INATION) + -O]

**com·bust** (kəm bust′), v.t., v.i., -bust·ed, -bust·ing. to burn. [1325–75; ME < L combūstus, ptp. of combūrere to burn up]

**com·bus·ti·ble** (kəm bus′tə bəl), adj. 1. capable of catching fire and burning; inflammable; flammable. 2. easily excited. —n. 3. a combustible substance. [1520–30; < LL] —com·bus′ti·bil′i·ty, n.

**com·bus·tion** (kəm bus′chən), n. 1. the act or process of burning. 2.

96   497

**flagitious to flannelet**

fla·gi·tious (flə jish′əs), *adj.* heinous or flagrant, as a crime; infamous [1350–1400; ME *flagicious* < L *flāgitiōsus*, der. of *flāgiti(um)* shame, scandal] —fla·gi′tious·ly, *adv.* —fla·gi′tious·ness, *n.*

flag·man (flag′mən), *n., pl.* -men. a person who signals with or carries a flag. [1825–35]

flag′ of′fi·cer, *n.* a naval officer above the rank of captain. [1655–65]

flag′ of truce′, *n.* a white flag displayed to the enemy as an invitation to suspend military hostilities temporarily and confer. [1620–30]

flag·on (flag′ən), *n.* 1. a large bottle for wine, liquors, etc. 2. a container for holding liquids with a handle, a spout, and usu. a cover. [1425–75; late ME *flakon*, var. of *flakon* < MF *flā(s)con* < LL *flaschōnem*, acc. of *flascō*]

flag·pole (flag′pōl′), *n.* 1. Also called flagstaff. a staff or pole on which a flag is or can be displayed. —*Idiom.* 2. run (something) up the flagpole, to announce as a test to gauge reactions. [1880]

flag′ rank′, *n.* naval rank above that of captain. [1890–95]

fla·grant (flā′grənt), *adj.* 1. shockingly noticeable or evident; obvious; glaring: *a flagrant error.* 2. notorious; scandalous: *a flagrant offender.* 3. *Archaic.* blazing, burning, or glowing. [1400–50; late ME < L *flagrant-*, s. of *flagrāns*, orig. prp. of *flagrāre* to burn] —fla′gran·cy, fla′grance, fla′grant·ness, *n.* —fla′grant·ly, *adv.* —Syn. FLAGRANT, GLARING, GROSS suggest something offensive that cannot be overlooked. FLAGRANT implies a conspicuous offense so far beyond the limits of decency as to be insupportable: *a flagrant violation of the law.* GLARING emphasizes conspicuousness but lacks the imputation of evil or immorality: *a glaring error for a bank teller.* GROSS suggests a mistake or impropriety of major proportions: *a gross miscarriage of justice.*

fla·gran·te de·lic·to (flə gran′tē di lik′tō), *adv.* in the very act of committing the offense. [< L: while the offense is (still) burning]

flag·ship (flag′ship′), *n.* 1. a ship carrying the commander of a fleet, squadron, or the like, and displaying the officer's commander's flag. 2. the main vessel of a shipping line. 3. the most important one of a group or system. [1665–75]

Flag·stad (flag′stad), *n.* Kirsten Marie, 1895–1962, Norwegian soprano.

flag·staff (flag′staf′, -stäf′), *n.* FLAGPOLE. [1605–1615]

flag·stick (flag′stik′), *n. Golf.* PIN (def. 10). [1925–30]

flag·stone (flag′stōn′), *n.* a stone slab used for paving. [1720–30]

flag′-wav′ing, *n.* an ostentatiously emotional display of patriotism or factionalism. [1890–95] —flag′-wav′er, *n.*

Fla·her·ty (flā′ər tē, flä′-), *n.* Robert Joseph, 1884–1951, U.S. pioneer in the production of documentary motion pictures.

flail (flāl), *n.* 1. an instrument for threshing grain, consisting of a staff or handle to one end of which is attached a freely swinging stick or bar. —*v.t.* 2. to beat or swing with; or as if with a flail. [bef. 1100; ME *fleil*, OE *fligel*. See FLAGELLUM]

flair (flâr), *n.* 1. a natural talent, aptitude, or ability. 2. smartness of style or manner: *She dresses with great flair.* [1350–1400; ME < F, OF *flarier*, der. of *flarier* to reek < VL *flāgrāre*, dissimilated var. of L *fragrāre*. See FRAGRANT]

flak or flack (flak), *n.* 1. antiaircraft fire. 2. critical or hostile reaction. [1935–40; < G Fl(*ieger*)a(*bwehr*)k(*anone*) antiaircraft gun]

flake¹ (flāk), *n., v.*, flaked, flak·ing. —*n.* 1. a small, flat, thin piece, esp. one that has been or become detached from a larger piece or mass. 2. any small piece or mass. 3. a stratum or layer. 4. *Slang.* an eccentric person; screwball. 5. *Slang.* COCAINE. —*v.t.* 6. to peel off or form into flakes. —*v.t.* 7. to remove in flakes. 8. to cover with or as if with flakes. 9. to break or form into flakes. [1350–1400; ME]

flake² (flāk), *n.* a frame, as for drying fish. [1300–50; ME < ON *flaki, fleki*]

flake³ (flāk), *v.i.*, flaked, flak·ing. flake out, *Slang.* to fall asleep. [1935–40; perh. expressive var. of FLAG²]

flake′ tool′, *n.* a Paleolithic or later stone tool made from a flake struck from a larger core. [1945–50]

flak′ jack′et, *n.* a protective vest. Also called flak′ vest′.

flak·y or flak·ey (flā′kē), *adj.*, flak·i·er, flak·i·est. 1. of like flakes. 2. lying or cleaving off in flakes or layers. 3. *Slang.* eccentric; wacky; dizzy. [1570–80] —flak′i·ly, *adv.* —flak′i·ness, *n.*

flam (flam), *n.* a drumbeat consisting of two notes in quick succession with the accent on the second. [1790–1800; imit.]

flam·bé (fläm bā′, flam′bā′, *adj.* 1. (of food) served in flaming liquor. —*v.t.* 2. to pour liquor over and ignite. [1885–90; < F, ptp. of *flamber* to flame. See FLAMBEAU]

flam·beau (flam′bō), *n., pl.* -beaux (-bōz), -beaus. 1. a flaming torch. 2. a large ornamental candlestick. [1625–35; < F torch]

flam·boy·ant (flam boi′ənt), *adj.* 1. strikingly bold or brilliant; showy: *flamboyant clothes.* 2. extravagantly dashing and colorful; flamboyant behavior. 3. florid; ornate; elaborately styled. 4. (*often cap.*) (in architecture) having the flamelike form of an ogee, as designating French Gothic architecture of the late 14th to mid-16th centuries, characterized by wavy, flamelike tracery and delicate detailing. [1825–35; < F, prp. of *flamboyer* to flame, der. of *flambe* flame] —flam·boy′ance, flam·boy′an·cy, *n.* —flam·boy′ant·ly, *adv.*

flame (flām), *n., v.*, flamed, flam·ing. —*n.* 1. burning gas or vapor, as from wood undergoing rapid combustion. 2. Often, flames. the state or condition of blazing combustion. 3. inflamed condition. 4. brilliant light; scintillating luster. 5. bright coloring; a streak or patch of color. 6. bright reddish orange color. 7. intense ardor, zeal, or passion. 8. *Informal.* the object of one's passionate love; sweetheart. 9. *Computer Slang.* an instance of angry criticism or disparagement, esp. on a computer network. —*v.i.* 10. to burn with a flame or flames; burst into

flames; blaze. 11. to glow like flame; shine brilliantly; flash. 12. to burn or burst forth with strong emotion; break into open anger, indignation, etc. 13. *Computer Slang.* to behave in an offensive manner, esp. on a computer network; rant. —*v.t.* 14. to subject to the action of flame or fire. 15. *Computer Slang.* to insult or criticize angrily, esp. on a computer network. [1300–50; ME *flaume* < AF, var. of *flaumbe*; OF *flambe*, earlier *flamble* < L *flammula*] —flam′er, *n.* —flame′less, *adj.* —flame′like′, *adj.* —flam′y, *adj.*

flame′ cell′, *n.* one of the hollow cells terminating the branches of the excretory tubules of certain invertebrates. [1885–90]

fla·men (flā′mən, -men), *n., pl.* fla·mens, fla·mi·nes (flā′mə nēz′). (in ancient Rome) one of a group of priests. [1525–35; < L *flamen*]

fla·men·co (flə meng′kō, flä-), *n., pl.* -cos, *adj.* —*n.* 1. a dance style characteristic of the Andalusian Gypsies that is marked by clapping and stamping of the feet. b. a dance in this style. 2. music suitable for accompanying flamenco. [1895–1900; < Sp: lit., FLEMISH]

flame′-out′, *n.* the failure of a jet engine due to an interruption of the fuel supply or to faulty combustion. [1945–50]

flame-proof (flām′prōōf′), *adj.* resisting the effect of flames; not readily ignited or burned by flames. [1885–90]

flame′-retard′ant, *adj.* not subject to quick or easy burning esp. through chemical treatment: *flame-retardant curtains.* [1945–50]

flame-throw·er (flām′thrō′ər), *n.* a device, either mounted or portable, that sprays ignited incendiary fuel for some distance. [1915–20]

flame′ tree′, *n.* 1. either of two Australian trees, *Brachychiton acerifolius* or *B. australis*, having lobed leaves and clusters of scarlet flowers. 2. ROYAL POINCIANA. [1865–70]

flam·ing (flā′ming), *adj.* 1. emitting flames. 2. like a flame in brilliance, heat, or shape. 3. ardent. [1350–1400] —flam′ing·ly, *adv.*

fla·min·go (flə ming′gō), *n., pl.* -gos, -goes. any of several wading birds comprising the family Phoenicopteridae, having webbed feet, a bill bent downward at the tip, and pinkish to scarlet plumage. [1555–65; cf. Pg. *flamengo*, Sp *flamenco* lit., FLEMISH; cf. FLAMENCO]; appar. orig. a jocular name, from the conventional Romance image of the Flemish as ruddy-complexioned]



flamingo, *Phoenicopterus ruber,*
standing height 5 ft. (1.5 m)

Fla·min·i·an Way′ (flə min′ē ən), *n.* an ancient Roman road extending N from Rome to what is now Rimini. 215 mi. (345 km) long.

fiam·ma·ble (flam′ə bəl), *adj.* easily set on fire; combustible. [1805–15; < L *flammā(re)* to set on fire + -BLE] —fiam′ma·bil′i·ty, *n.* —Usage. See INFLAMMABLE.

Flam·ma·rion (flə mär′ē yōn′), *n.* (Nicolas) Camille, 1842–1925, French astronomer.

flan (flän, flan; *for 2 also* flän), *n.* 1. a Spanish dessert of baked sweetened egg custard with a caramel topping. 2. an open, tartlike pastry, filled with cheese, custard, fruit, etc. 3. a piece of metal shaped ready to form a coin but not yet stamped by the die. [1840–50; (< *Sp*) < F; OF *flaon* < LL *fladōnem*, acc. of *fladō* < Gmc]

Flan·ders (flan′dərz), *n.* a medieval country in W Europe, extending along the North Sea from the Strait of Dover to the Scheldt River: the corresponding modern regions include the provinces of East Flanders and West Flanders in W Belgium and the adjacent parts of N France and SW Netherlands.

flâ·neur (flä nŒr′), *n., pl.* -neurs (-nŒr′). French. idler; dawdler.

flange (flanj), *n., v.*, flanged, flang·ing. —*n.* 1. a projecting rim, collar, ring, or pair of ridges projecting usu. at right angles from a shaft, pipe, machine housing, etc., as to strengthen it, provide support, or enable attachment of objects. [1425–75; late ME *flaunche* side charge (on shield face) < MF *flenche*, fem. der. of *flanc* RANK] —flange′less, *adj.*

flank (flangk), *n.* 1. the side of an animal or a person between the ribs and hip. 2. the thin piece of flesh constituting this part. 3. a cut of meat from the flank of an animal. 4. the side of anything. 5. the extreme right or left side of an army or fleet. 6. the part of a bastion that extends from the curtain to the face. —*v.t.* 7. to stand or be placed or posted at the flank or side of. 8. to defend or guard at the flank. 9. to menace or attack the flank of. 10. to pass around or turn the flank of. [bef. 1100; ME; late OE *flanc* < OF < Frankish]

flank·en (fläng′kən), *n.* a strip of meat from the front end of the short ribs of beef, often boiled and served with horseradish. [1945–50; < Yiddish, pl. of *flank* < F or OF; see FLANK]

flank·er (flang′kər), *n.* 1. a person or thing that flanks. 2. *Football.* a. Also called flank′er back′. an offensive back who lines up slightly outside of an end. b. SPLIT END. [1540–50]

flan·nel (flan′l), *n.* 1. a soft, slightly napped fabric of wool or wool and another fiber, used for trousers, jackets, shirts, etc. 2. a soft, warm, light fabric of cotton, thickly napped on one side. 3. flannels, *n.* an outer garment, esp. trousers, made of flannel. b. woolen undergarments. [1300–50; ME *flannen(l)* —flag*] —flan′nel·ly, *adj.*

flan·nel·et or flan·nel·ette (flan′l et′), *n.* a soft cotton flannel.

A153

**flowerage** to **fluorescent lamp**     504

to decorate with a floral design. [1150–1200; ME *flour* flower, best of anything < OF *flor, flour, flur* < L *flōrem* acc. of *flōs*] —**flow·er·less**, *adj.* —**flow·er·like**, *adj.*



stigma — anther, filament — stamen
style — petal
ovule
ovary — sepal — receptacle
pistil

flower (def. 1) (in cross section)



**flow·er·age** (flou′ər ij), *n.* the process or state of flowering. [1680–90]

**flow·er bug′**, *n.* any of several small speckled black bugs of the family Anthocoridae that feed on aphids and other plant pests. [1885]

**flow·er child′**, *n.* a hippie, esp. in the 1960s, advocating love, peace, and simple idealistic values. [1965–70]

**flow·er·er** (flou′ər ər), *n.* a plant that flowers at a specific time or in a certain manner. [1850–55]

**flow·er·et** (flou′ər it), *n.* FLORET. [1350–1400]

**flow·er girl′**, *n.* a young girl in a wedding procession who precedes the bride, carrying or scattering flowers.

**flow·er head′**, *n.* a dense cluster of small flowers in a single receptacle. [1885–45]

**flow′ering dog′wood**, *n.* the North American dogwood, *Cornus florida*, having tiny green flowers surrounded by large white or pink petallike bracts. [1835–45]

**flow′ering ma′ple**, *n.* any plant of the genus *Abutilon*, of the mallow family, having large, bright-colored flowers. Also called *abutilon*.

**flow′ering plant′**, *n.* a seed plant that produces flowers, fruit, and seeds; angiosperm. [1860–65]

**flow′ering quince′**, *n.* any E Asian shrubs of the genus *Chaenomeles*, of the rose family, having large flowers and a quincelike fruit.

**flow′er peo′ple**, *n.* flower children. [1965–70]

**flow·er·pot** (flou′ər pot′), *n.* a container in which to grow and display plants. [1590–1600]

**flow·er·y** (flou′ə rē), *adj.*, **-er·i·er, -er·i·est.** 1. covered with or having many flowers. 2. decorated with floral designs. 3. rhetorically ornate or precious: *flowery language.* 4. resembling a flower, as in fragrance. [1300–50] —**flow′er·i·ness**, *n.* —See BOMBASTIC.

**flow·ing** (flō′ing), *adj.* long, smooth, and graceful: *flowing lines; flowing gestures.* [1545–55] —**flow′ing·ly**, *adv.* —**flow′ing·ness**, *n.*

**flown¹** (flōn), *v.* a pp. of FLY¹.

**flown²** (flōn), *adj.* *Archaic.* filled to excess. [ME *flōwen*; ptp. of FLOW]

**flow′ sheet′**, *n.* FLOW CHART. [1910–15]

**flow·stone** (flō′stōn′), *n.* a layered deposit of calcium carbonate, CaCO₃, left by thin sheets of flowing water, as in a cave. [1920–25]

**fl. oz.**, fluid ounce.

**flu** (flōō), *n.* 1. influenza. 2. a specific variety of influenza, usu. named for its point of dissemination or its animal vector. [1830–40]

**flub** (flub), *v.*, **flubbed, flub·bing**, *n.* *Informal.* —*v.t.* 1. to botch or bungle: *to flub a game.* —*n.* 2. a bungle; blunder. [1920–25, *Amer.*; orig. uncert.]

**flub·dub** (flub′dub′), *n.* pretentious show; airs. [1885–90, *Amer.*]

**fluc·tu·ant** (fluk′chōō ənt), *adj.* 1. fluctuating; varying; unstable. 2. moving or seeming to move to waves; undulating. [1650–60; < L]

**fluc·tu·ate** (fluk′chōō āt′), *v.*, **-at·ed, -at·ing.** —*v.i.* 1. to change continually; vary irregularly; shift back and forth or up and down: *Prices fluctuated wildly.* 2. to move in waves; undulate. —*v.t.* 3. to cause to fluctuate. [1625–35; < L *fluctuātus* to surge, after *of fluctus* wave, flood, der. of *fluere* to flow] —**fluc′tu·a′tion**, *n.*

**flue** (flōō), *n.* 1. a passage or duct for smoke in a chimney. 2. any duct or passage for air, gas, or the like. 3. a tube, esp. a large one, in a fire-tube boiler. 4. a narrow slit in the upper end of an organ pipe through which the air current is directed. [1555–65; earlier *flew*, perh. repr. OE *flēona* a flowing, the form *fleus* being taken as pl.]

**flu·ent** (flōō′ənt), *adj.* 1. spoken or written with ease: *fluent French.* 2. able to speak or write smoothly, easily, or readily: *fluent in three languages.* 3. smooth; easy: graceful: *fluent motion.* 4. flowing or capable of flowing; fluid. [1580–90; < L *fluere* to flow, stream] —**flu′en·cy, flu′ent·ness**, *n.* —**flu′ent·ly**, *adv.* —**Syn.** FLUENT, GLIB, VOLUBLE may refer to an easy flow of words or to a person able to communicate with ease. FLUENT suggests the easy and ready flow of an accomplished speaker or writer; it is usu. a term of commendation: *a fluent orator.* GLIB implies an excessive fluency and lack of sincerity or profundity; it suggests talking smoothly and hurriedly to cover up or deceive: *a glib salesperson.* VOLUBLE implies the copious and often rapid flow of words characteristic of a person who loves to talk and will spare the audience no details: *a voluble gossip.*

**flue′ pipe′**, *n.* an organ pipe having a flue. [1850–55]

**flue′ stop′**, *n.* a rank of flue pipes in an organ. [1850–55]

**fluff** (fluf), *n.* 1. light downy particles, as of cotton. 2. a soft light downy mass. 3. something light or frivolous: *The book is pure fluff, but fun to read.* 4. an error or blunder, esp. an actor's memory lapse

in the delivery of lines. —*v.t.* 5. to make fluffy; shake or puff out into a fluffy mass: *to fluff up the pillows.* 6. to make a mistake in, as in leading man fluffed his lines. —*v.i.* 7. to become fluffy; move, flow, or settle down like fluff. 8. to make a mistake, esp. in performing. [1780–90; perh. b. FLUE and PUFF] —**fluff′er**, *n.*

**fluff·y** (fluf′ē), *adj.*, **fluff·i·er, fluff·i·est.** 1. of, resembling, or covered with fluff. 2. light or airy: *a fluffy cake.* 3. superficial or frivolous. [1815–25] —**fluff′i·ly**, *adv.* —**fluff′i·ness**, *n.*

**flu·gel·horn** or **flue·gel·horn** (flōō′gəl hôrn′), *n.* a brass wind instrument with three valves, usu. pitched in B♭ and used esp. in military bands. [1850–55; < G, = *Flügel* wing + *Horn*] —**flu′gel·horn′ist**, *n.*

**flu·id** (flōō′id), *n.* 1. a substance, as a liquid or gas, that is capable of flowing and that changes its shape at a steady rate when acted upon by a force. —*adj.* 2. pertaining to a substance that easily changes its shape; capable of flowing. 3. consisting of or pertaining to fluids. 4. changing easily or readily; not fixed, stable, or rigid. 5. smooth and flowing: *fluid movements.* 6. convertible into cash; liquid: *fluid assets.* [1595–1605; < L *fluidus* flowing freely, der. of *fluere* to flow] —**flu·id·al, adj.** —**flu′id·ly, flu′id·al·ly**, *adv.* —**flu′id·ness**, *n.* —Syn. See LIQUID.

**flu′id dram′**, *n.* the eighth part of a fluid ounce. *Abbr.:* fl dr; Symbol.

**flu·id·ex·tract** (flōō′id ek′strakt), *n.* a liquid preparation of a drug containing in each cubic centimeter the medicinal activity of one gram of the powdered drug. [1850–55]

**flu·id·ics** (flōō id′iks), *n.* (used with a sing. *v.*) the technology dealing with the use of a flowing liquid or gas in various devices, esp. controls, to perform functions usu. performed by an electric current in electronic devices. [1960–65] —**flu·id′ic**, *adj.*

**flu·id·i·ty** (flōō id′i tē), *n.* 1. the quality or state of being fluid. 2. the ability of a substance to flow. [1595–1605]

**flu·id·ize** (flōō′i dīz′), *v.t.*, **-ized, -iz·ing.** 1. to make fluid. 2. to suspend or transport (finely divided particles) in a stream of gas or air. [1850–55] —**flu′id·i·za′tion**, *n.* —**flu′id·iz′er**, *n.*

**flu′id mechan′ics**, *n.* an applied science dealing with the basic principles of gaseous and liquid matter. [1940–45]

**flu′id ounce′**, *n.* a measure of capacity equal to ¹⁄₁₆ pint or 1.804 cubic inches (29.573 milliliters) in the U.S., and equal to ¹⁄₂₀ of an imperial pint or 1.7339 cubic inches (28.413 milliliters) in Great Britain. *Abbr.:* fl. oz. [1880–85]

**fluke¹** (flōōk), *n.* 1. the part of an anchor that catches in the ground, esp. the flat triangular piece at the end of each arm. 2. the barbed head of a harpoon, spear, arrow, etc. 3. either half of the triangular tail of a whale. [1555–55]

**fluke²** (flōōk), *n.* 1. a stroke of good luck: *I got the job by a fluke.* 2. a chance happening; accident. 3. an accidentally successful stroke, as in billiards. [1855–60; of obscure orig.; cf. dial. *fluke* a guess]

**fluke³** (flōōk), *n.* 1. any of several American flounders of the genus *Paralichthys*, esp. *P. dentatus*, of the Atlantic Ocean. 2. TREMATODE. [bef. 900; ME *floke*(*e*), *fluke*, OE *flōc*; c. ON *flōki*]

**fluk·y** or **fluk·ey** (flōō′kē), *adj.*, **fluk·i·er, fluk·i·est.** 1. obtained by happening by chance rather than skill. 2. uncertain, as a wind; changeable. [1865–70] —**fluk′i·ness**, *n.*

**flume** (flōōm), *n.* 1. a deep narrow defile containing a mountain stream or torrent. 2. an artificial channel or trough for conducting water. 3. an amusement park ride in which passengers are conveyed through a water-filled chute or over a water slide. [1125–75; ME *flum* < OF < L *flūmen* stream]

**flum·mer·y** (flum′ə rē), *n.*, *pl.* **-mer·ies.** 1. any of various insect puddings or custards, as a blancmange or fruit custard. 2. a pudding of oatmeal or flour boiled with water. 3. complete nonsense; foolish humbug. [1615–25; < Welsh *llymru*, with ending assimilated to *-ery*]

**flum·mox** (flum′əks), *v.t.* *Informal.* to bewilder; confound; confuse. [1830–40; orig. uncert.]

**flung** (flung), *v.* pt. and pp. of FLING.

**flunk** (flungk), *v.i.* 1. to fail in a course or examination. —*v.t.* 2. to get a failing mark in. 3. to give a failing grade to. 4. flunk out, to dismiss or be dismissed from a school because of failing grades: *to flunk out of college.* —*n.* 5. a failure, as in a course or examination. [1815–25, *Amer.*; akin to FUNK1, FUNK²]

**flun·ky** or **flun·key** (flung′kē), *n.*, *pl.* **-kies** or **-keys.** 1. a male servant in livery. 2. an assistant who does menial work. 3. a servile follower; toady; yes-man. [1775–85; perh. alter. of FLANKER]

**flu·or** (flōō′ôr, -ər), *n.* FLUORITE. [1655–65; < NL (1546), as trans. of G *Flüsse*, L: discharge, flow; so called from its use as a flux]

**flu·o·resce** (flōō res′, flōō-, flō-), *v.i.*, **-resced, -resc·ing.** to exhibit fluorescence. [1870–75] —**flu·o·resc′ent**, *n.*

**flu·o·res·ce·in** (flōō res′ē in, flōō-, flō-), *n.* a red crystalline compound, C₂₀H₁₂O₅, that in alkaline solutions produces an intense green fluorescence; used as a tracer and in dyes. [1875–80]

**flu·o·res·cence** (flōō res′əns, flōō-, flō-), *n.* 1. the emission of radiation, esp. of visible light, by a substance during exposure to external radiation. 2. the property possessed by such a substance. 3. the radiation so produced. [1852; FLUOR(SPAR) + (OPAL)ESCENCE]

**fluores′cence-ac′tivated cell′ sort′er**, *n.* See FACS.

**flu·o·res·cent** (flōō res′ənt, flōō-, flō-), *adj.* 1. possessing the property of fluorescence; exhibiting fluorescence. 2. strikingly bright or glowing. —*n.* 3. a lighting fixture that utilizes a fluorescent lamp. [1850]

**fluores′cent lamp′**, *n.* a tubular electric discharge lamp in which light is produced by the fluorescence of phosphors coating the inside of the tube. [1895–1900]



**loblolly** to **locking pliers**

778

[1730–40; < NL, after Matthias de Lobel (1538–1616), Flemish botanist]

**lob·lol·ly** (lob′lol′ē), n., pl. **-lies. 1.** *South Midland and Southern U.S.* a mire; mudhole. **2.** a thick gruel. [1590–1600; cf. dial. (Yorkshire) *lob* (of porridge) to bubble while boiling; second element is obscure]

**lob′lolly pine′,** n. a coniferous tree, *Pinus taeda,* of the southeastern U.S., having bundles of stout, often twisted needles and blackish gray bark. **2.** the wood of this tree, used for timber and pulpwood. [1750–60]

**lo·bo** (lō′bō), n., pl. **-bos.** the gray or timber wolf of the western U.S. [1830–40; < Sp < L *lupus* wolf]

**lo·bot·o·mize** (lə bot′ə mīz′, lō-), v.t., **-mized, -miz·ing. 1.** to perform a lobotomy on. **2.** to make [someone or something] abnormally tranquil or sluggish. [1940–45] —**lo·bot′o·mist,** n. —**lo·bot′o·mi·za′tion,** n.

**lo·bot·o·my** (lə bot′ə mē, lō-), n., pl. **-mies.** a surgical incision into or across a lobe, esp. the prefrontal lobe, of the brain to sever nerves for the purpose of relieving a mental disorder or treating psychotic behavior. [1935–40]; LOBE + -O- + -TOMY]

**lob·scouse** (lob′skous), n. a sailor's stew of meat, potatoes, onions, hardtack, etc. [1700–10; obscurely akin to LOBLOLLY]

**lob·ster** (lob′stər), n., pl. (esp. collectively) **-ster,** (esp. for kinds or species) **-sters. 1.** any of various large, marine, stalk-eyed decapod crustaceans, esp. of the genus *Homarus,* having large, asymmetrical pincers. **2.** any of various similar crustaceans, as certain crayfishes. **3.** the edible meat of these animals. [bef. 1000; ME *lopster,* OE *loppestre* lit., spidery creature (*loppe* spider (see LOB) + -stre -STER)]

**lob·ster·ing** (lob′stər ing), n. the business of capturing lobsters.

**lob′ster·man** (lob′stər man), n., pl. **-men.** a person who traps lobsters. [1880–85] —Usage. See MAN.

**lob′ster pot′,** n. a trap for catching lobsters, typically a box made of wooden slats with a funnellike entrance to the bait. Also called **lob′ster trap′.** [1755–65]

**lob′ster shift′,** n. *Informal.* a late night work shift, esp. at a newspaper office. Also called **lob′ster trick′.**

**lob′ster ther′midor** (or *Ther′midor*), n. a dish of cooked lobster meat placed back in the shell with a cream sauce, sprinkled with grated cheese, and browned in the oven. [1930–35; after *Thermidor,* the 11th month in the French Revolutionary calendar]

**lob·stick** (lob′stik′), n. CANADIAN. LOPSTICK.

**lob·u·lar** (lob′yə lər), adj. composed of, having the form of, or pertaining to lobules or small lobes. [1815–25]

**lob·u·late** (lob′yə lit, -lāt′) also **lob′u·lat′ed,** adj. consisting of, divided into, or having lobes. [1860–65] —**lob′u·la′tion,** n.

**lob·ule** (lob′yōōl), n. **1.** a small lobe. **2.** a subdivision of a lobe.

**loc.,** locative.

**lo·cal** (lō′kəl), adj. **1.** pertaining to or characterized by place or position in space; spatial. **2.** pertaining to, characteristic of, or restricted to a particular place: *a local custom.* **3.** pertaining to a city, town, or small district rather than an entire state or country: *local transportation.* **4.** stopping at most or all stations along a local train. **5.** pertaining to or affecting a particular part or particular parts, as of a physical system or organism: *a local disease.* **6.** (of anesthesia or an anesthetic) affecting only a particular part or area of the body without concomitant loss of consciousness. —n. **7.** a local train, bus, etc. **8.** a newspaper item of local interest. **9.** a local branch of a union, fraternity, etc. **10.** a local anesthetic. **11.** Often, **locals.** a. a local person or resident. b. a local athletic team. —v.i. [1400–50; late ME < LL *locālis.* See LOCUS, -AL²] —**lo′cal·ly,** adv. —Usage. See LOCUS.

**lo·cale** (lō kal′, -käl′), n. **1.** a place or locality, esp. with reference to events or circumstances connected with it: *to move to a warmer locale.* **2.** the scene or setting, as of a novel, play, or motion picture. [1765–75; alter. of earlier *local* < F; n. use of the adj. See LOCAL]

**lo′cal gov′ernment,** n. **1.** the administration of the local affairs of a city, town, or other district by its inhabitants. **2.** the governing body of such a district. [1835–45]

**Lo′cal Group′,** n. the group of galaxies, at least 25 of which are known, that includes the Milky Way. [1915–20]

**lo·cal·ism** (lō′kə liz′əm), n. **1.** a word, phrase, pronunciation, or manner of speaking that is peculiar to one locality. **2.** a local custom. **3.** excessive devotion to and promotion of the interests of a particular locality; sectionalism. [1815–25] —**lo′cal·is′tic,** adj.

**lo·cal·i·ty** (lō kal′i tē), n., pl. **-ties.** one who lives in a particular locality.

**lo·cal·i·ty** (lō kal′i tē), n., pl. **-ties. 1.** a specific place or area; location: *They moved to a new locality.* **2.** the state or fact of having a location: *the locality that every material object must have.* [1620–30]

**lo·cal·ize** (lō′kə līz′), v., **-ized, -iz·ing.** —v.t. **1.** to confine or restrict to a particular place. —v.i. **2.** to gather, collect, or concentrate in one locality. [1785–95] —**lo′cal·iz′a·ble,** adj. —**lo′cal·i·za′tion,** n.

**lo′cal op′tion,** n. a right of choice exercised by a minor political division, as a county, esp. as to allowing the sale of liquor. [1875–80]

**lo′cal time′,** n. the time based on the meridian through a specific

place, as a city, in contrast to that of the time zone within which the place is located. [1825–35]

**Lo·car·no** (lō kär′nō), n. a town in S Switzerland, on Lake Maggiore. 15,300.

**lo·cate** (lō′kāt, lō kāt′), v., **-cat·ed, -cat·ing.** —v.t. **1.** to identify or discover the place or location of: *to locate a missing book.* **2.** to establish in a position, situation, or locality. **3.** to assign or ascribe a particular location to (something), as by knowledge or opinion: *Some texts locate the Garden of Eden in Babylonia.* **4.** to survey and designate the limits of; claim to a tract of land. —v.i. **5.** to establish one's business or residence in a place; settle. [1645–55; Amer.; < L *locātus,* ptp. of *locāre* to put in a given position, place; see LOCUS, -ATE²] —**lo′ca·ble,** adj.

**lo·ca·tion** (lō kā′shən), n. **1.** a place or situation occupied. **2.** a place of settlement, activity, or residence: *a good location for a young doctor.* **3.** a tract of land of designated situation or limits: *a mining location.* **4.** a site outside a movie studio used for shooting all or part of a film. **5.** the act of locating or state of being located. —**Idiom. 6.** on location, (of a motion picture) in filming at a place away from the studio, esp. one that is or is like the setting of the screenplay: *on location in Rome.* [1585–95; < L] —**lo·ca′tion·al·ly,** adv.

**lo·ca·tive** (lok′ə tiv), adj. **1.** of or designating a grammatical case that typically indicates place in or at which, as Latin *domī* "at home." —n. **2.** the locative case. **3.** a word or other form in the locative case. [1795–1805; LOCATE + -IVE, on the model of VOCATIVE]

**lo·ca·tor** (lō′kā tər, lō kā′tər), n. **1.** a person who locates something. **2.** a person who determines or establishes the boundaries of land or a mining claim. Sometimes, **lo′cat·er.** [1815–20; Amer.]

**loc. cit.** (lok′ sit′), in the place cited. [< L *locō citātō*]

**loch** (lok, lonH), n. *Scot.* **1.** a lake. **2.** a partially landlocked or protected bay: a narrow arm of the sea. [1350–1400; ME (Scots) *loch,* *locht* < ScotGael *loch,* OIr *loch,* cf. L *lacus* LAKE¹, LOONE]

**Loch·in·var** (lok′in vär′, lonH′-), n. **1.** the hero of a ballad included in the narrative poem *Marmion* (1808) by Sir Walter Scott. **2.** a romantic suitor.

**Loch Ness** (lok′ nes′, lonH′-), n. NESS, LOCH.

**lo·ci** (lō′sī, -kē, -kī), n. pl. of LOCUS.

**lock¹** (lok), n. **1.** a device for securing a door, gate, lid, drawer, or the like when closed, consisting of a bolt or system of bolts propelled and withdrawn by a mechanism operated by a key, dial, etc. **2.** any contrivance for fastening or securing something. **3.** (in a firearm) the mechanism that explodes the charge; gunlock. **4.** an enclosed chamber in a canal, dam, etc., with gates at each end, for raising or lowering vessels from one level to another by admitting or releasing water. **5.** an air lock or decompression chamber. **6.** complete and unchallenged control; an unbreakable hold: *to have a lock on the senatorial nomination.* **7.** *Slang.* someone or something certain of success; sure thing. **8.** any of various wrestling holds, esp. a hold secured on the arm, leg, or head. —v.t. **9.** to fasten or secure (a door, window, building, etc.) by the operation of a lock or locks. **10.** to shut in by or as if by means of a lock, as for security or restraint. **11.** to make fast or immovable by or as if by a lock: *to lock the steering wheel on a car.* **12.** to join or unite firmly by interlinking or intertwining: *to lock arms.* **13.** to hold fast in an embrace. **14.** to move (a ship) by means of a lock or locks, as in a canal. **15.** to furnish with locks, as a canal. —v.i. **16.** to become locked: *This door locks with a key.* **17.** to become fastened, fixed, or interlocked: *gears that lock into place.* **18.** to go or pass by means of a lock or locks, as a vessel. **19.** *lock in,* a. to commit to unalterably. b. (of an investor) to be unable or unwilling to sell or shift securities. **20.** *lock on,* to track an object automatically by electronic means. **21.** *lock out,* a. to keep out by or as if by a lock. b. to subject (employees) to a lockout. **22.** *lock up,* a. to imprison for a crime. b. to make (type) immovable in a chase by securing the quoins. c. to fasten or secure with a lock or locks. d. to lock the doors of a house, automobile, etc. e. to fasten or fix firmly, as by engaging parts. —*Idiom.* **23.** *lock horns,* to come into conflict; clash. **24.** *lock, stock, and barrel,* with every part or item included completely. [bef. 900; ME; OE *loc* fastening, bar, c. OS *lok,* OHG *loh* hole, ON *lok* lid, end, Go *-luk* in *usluk* opening] —**lock′a·ble,** adj.

**lock²** (lok), n. **1.** a tress, curl, or ringlet of hair. **2.** locks, a. the hair of the head. b. short wool of inferior quality. [bef. 900; ME *lokke,* OE *locc,* c. OS *lok,* OHG *loc,* ON *lokkr*]

**lock·age** (lok′ij), n. **1.** the construction, use, or operation of locks, as in a canal or stream. **2.** a toll paid for passage through a lock.

**lock′box′** (lok′boks′), n. **1.** a strongbox. **2.** a rented post-office box equipped with a lock.

**lock·down** (lok′doun′), n. the confining of prisoners to their cells, as following a riot or other disturbance. [1970–75]

**Locke** (lok), n. **John,** 1632–1704, English philosopher.

**lock·er** (lok′ər), n. **1.** a chest, compartment, or closet in which clothing and valuables may be locked for safekeeping. **2.** a large, typically room-size compartment, as in a cold-storage plant, for keeping frozen foods. **3.** a person or thing that locks. [1375–1425]

**lock′er room′,** n. a room containing lockers, as in a gymnasium, factory, or school, for changing clothes and storing belongings.

**lock′er-room′,** adj. of, characteristic of, or suitable to conversation in a locker room; earthy or bawdy: *locker-room humor.* [1945–50]

**lock·et** (lok′it), n. **1.** a small case for a miniature portrait, a lock of hair, or other keepsake, usu. worn on a necklace. **2.** the uppermost mount of a scabbard. [1325–75; ME *loket* cross-bar in a framework, dim. of OF *loquet.* < ME *lock¹,* -ET]

**lock′ing pli′ers,** n. (used with a sing. or pl. v.) pliers whose jaws

perceive the odor or scent of something. **5.** to give off or have an odor or scent. **6.** to have a particular odor or scent: *to smell of fish.* **7.** to give out an offensive odor; stink. **8.** to have a trace or suggestion (fol. by *of*): **9.** to search or investigate (fol. by *around* or *about*). **10.** *Informal.* to be of inferior quality; stink. **11.** *Informal.* to appear to be guilty, corrupt, etc. **12. smell out**, to look for or detect by or as if by smelling. **13. smell up**, to fill with an offensive odor; stink up. —*n.* **14.** the sense of smell; faculty of smelling. **15.** that quality of a thing that is or may be smelled; odor; scent. **16.** a trace or suggestion. **17.** an act or instance of smelling. **18.** a pervading appearance, character, quality, or influence: *the smell of money.* —**Idiom. 19. smell a rat,** to suspect that something is wrong. [1125–75; early ME *smel, smull*] —smell′er, *n.* —**Syn.** See *scent.*

**smell′ing salts′,** *n.* (*used with a sing. or pl. v.*) a preparation for smelling, essentially of ammonium carbonate with some agreeable scent, used as a stimulant and restorative. [1880–40]

**smell•y** (smel′ē), *adj.,* smell•i•er, smell•i•est. emitting a strong or unpleasant odor. [1860–65] —smell′i•ness, *n.*

**smelt** (smelt), *v.t.* **1.** to fuse or melt (ore) so as to separate the metal it. **2.** to obtain or refine (metal) in this way. [1535–45; prob. < MD or MLG *smelten,* c. OHG *smelzan*]

**smelt** (smelt), *n., pl.* (*esp. collectively*) smelt, (*esp. for kinds or species*) smelts. any of various small, silvery food fishes of the family Osmeridae, found in northern waters. [bef. 900]

**smelt** (smelt), *v.* a pt. and pp. of *smell.*

**smelt•er** (smel′tar), *n.* **1.** a person or thing that smelts. **2.** a place where ores are smelted. [1425–75]

**Sme•ta•na** (smet′n ə), *n.* **Bedřich,** 1824–84, Czech composer.

**smew** (smyōō), *n.* a Eurasian duck, *Mergellus albellus,* closely akin to mergansers. [1665–75; orig. uncert.]

**smid•gen** or **smid•gin** or **smid•geon** (smij′ən), *n.* a very small amount. [1835–45; orig. uncert.]

**smier•case** (smēr′käs′), *n.* SMEARCASE.

**smi•lax** (smī′laks), *n.* **1.** any plant of the genus *Smilax,* of the lily family, growing in tropical and temperate zones, consisting mostly of woody-stemmed vines. **2.** a delicate, twining plant, *Asparagus asparagoides,* of the lily family, having glossy egg-shaped leaves: cultivated by florists. [1595–1605; < L *smīlax* bindweed < Gk]

**smile** (smīl), *v.,* smiled, smil•ing, *n.* —*v.i.* **1.** to assume a facial expression indicating pleasure, favor, or amusement, but sometimes derision or scorn, characterized by an upturning of the corners of the mouth. **2.** to regard with favor: *Luck smiled on my efforts.* **3.** to have a pleasant or agreeable appearance or aspect, as natural scenes or objects. —*v.t.* **4.** to assume or give (a smile, esp. of a given kind): *She smiled a friendly smile.* **5.** to express by a smile or smile. **6.** to bring, put, drive, etc., by or as if by smiling: *to smile one's tears away.* —*n.* **7.** an act or instance of smiling; a smiling expression of the face. **8.** favor or kindly regard: *fortune's smile.* **9.** a pleasant or agreeable appearance, look, or aspect. [1250–1300; ME *smijlen* (v.), akin to MHG *smielen,* Dan *smile*]

**smil•ey** (smī′lē), *n., pl.* -eys. a sideways representation, as a winking face, :-), or a sad face, :-(, created by keystrokes and used to communicate humor, sarcasm, sadness, etc., in an electronic message. Compare EMOTICON. [1985–90]

**Smi•ley** (smī′lē), *n.* **Jane,** born 1949, U.S. novelist.

**smirch** (smûrch), *v.t.* **1.** to discolor or soil; spot or smudge with or as if with soot, dirt, etc. **2.** to sully or tarnish (a reputation, character, etc.); disgrace. —*n.* **3.** a dirty mark or smear. **4.** a stain or blot, as on reputation. [1485–95; orig. uncert.]

**smirk** (smûrk), *v.i.* **1.** to smile in an affected, smug, or offensively familiar way. —*n.* **2.** the facial expression of a person who smirks. [bef. 900] ME *smirken* (v.), OE *sme(a)rcian*]

**smite** (smīt), *v.,* smote, smit•ten or smit (smit) or smote, smit•ing. —*v.t.* **1.** to strike or hit hard, with or as if with the hand, a stick, or other weapon. **2.** to deliver or deal (a blow) by striking hard. **3.** to strike down, injure, or slay. **4.** to afflict or attack with deadly or disastrous effect: *smitten by polio.* **5.** to affect mentally, morally, or emotionally with a strong and sudden feeling: *They were smitten with love.* **6.** to impress favorably; enamor: *He was smitten by her charms.* —*v.i.* **7.** to strike; deal a blow. [bef. 900; ME, OE *smītan* to smear, defile, c. OFris *smīta,* OHG *smīzan,* Go -*smeitan* ] —smit′er, *n.*

**smith** (smith), *n.* **1.** a worker in metal. **2.** BLACKSMITH. [bef. 900; ME, OE, c. OFris *smith,* OHG *smid,* ON *smithr,* Go -*smitha*]

**Smith** (smith), *n.* **1. Adam,** 1723–90, Scottish economist. **2. Alfred** (Emanuel), 1873–1944, U.S. political leader. **3. Bessie,** 1894?–1937, U.S. singer. **4. Betty W(ehner),** 1904–72, U.S. novelist and playwright. **5. David,** 1906–65, U.S. sculptor. **6. Edmond Kirby,** 1824–93, Confederate general in the Civil War. **7. John,** 1580–1631, English adventurer and colonist in Virginia. **8. Joseph,** 1805–44, U.S. religious leader: founded the Church of Jesus Christ of Latter-day Saints. **9. Leon Polk,** 1906, U.S. painter. **10. Lillian,** 1897?–1966, U.S. writer and civil rights activist. **11. Margaret Chase,** 1897–1995, U.S. politician. **12. Stevie,** 1902–71, English poet. **13. Sydney,** 1771–1845, English clergyman, writer, and wit. **14.** **Sir William Sidney,** 1764–1840, British admiral. —smith, suffix

**-smith,** a suffix meaning "a worker in (the metal or material specified)" (*goldsmith; whitesmith*) or "a skilled user of the thing specified" (*wordsmith; gunsmith*). [ME, OE; see SMITH]

**smith•er•eens** (smith′ə rēnz′), *n.pl.* small pieces; bits: *smashed to smithereens.* [1820–30; dial. *smithers* (of obscure orig.)]

**smith•er•y** (smith′ə rē), *n., pl.* -er•ies. the work, craft, or workshop of a smith. [1615–25]

**Smith•son** (smith′sən), *n.* **James,** 1765–1829, English chemist and mineralogist.

---

**Smith•so′ni•an Institu′tion** (smith sō′nē ən), *n.* an institution and national museum in Washington, D.C., founded in 1846 with a grant from James Smithson.

**smith•son•ite** (smith′sə nīt′), *n.* a mineral, zinc carbonate, ZnCO$_3$, found in crusts and masses: an ore of zinc. [1825–35; after J. SMITH-SON, who distinguished it from calamine; see -ITE]

**smith•y** (smith′ē, smith′ē), *n., pl.* smith•ies. **1.** the workshop of a smith, esp. a blacksmith. **2.** BLACKSMITH. [1250–1300; ME *smithi* < ON *smithja,* akin to OE *smiththe.* See SMITH]

**smit•ten** (smit′n), *v.* a pp. of *smite.*

**smock** (smok), *n.* **1.** a loose, lightweight overgarment worn to protect the clothing while working. —*v.t.* **2.** to clothe in a smock. **3.** to draw (a fabric) by needlework into a honeycomb pattern with diamond-shaped recesses. [bef. 1000; ME (n.), OE *smoc* orig. a garment with a hole for the head]

**smog** (smog, smôg), *n.* smoke or other atmospheric pollutants combined with fog in an unhealthy or irritating mixture. [1900–05; s(moke) + (f)og] —smog′gy, *adj.,* -gi•er, -gi•est.

**smoke** (smōk), *n., v.,* smoked, smok•ing. —*n.* **1.** the visible vapor and gases given off by a burning substance, esp. the mixture of gases and suspended carbon particles resulting from the combustion of wood or other organic matter. **2.** something resembling this, as vapor or mist. **3.** something unsubstantial, fleeting, or without result. **4.** an obscuring condition: *the smoke of controversy.* **5.** an act or spell of smoking something, esp. tobacco. **6.** something for smoking, as a cigarette. **7.** *Physics, Chem.* a system of solid particles suspended in a gaseous medium. **8.** a bluish or brownish gray. —*v.i.* **9.** to give off or emit smoke, as in burning. **10.** to give out smoke offensively or improperly, as a stove. **11.** to send forth steam or vapor, dust, or the like. **12.** to draw into the mouth and puff out the smoke of tobacco or the like, as from a pipe or cigarette. **13.** *Slang.* to move or travel with great speed. —*v.t.* **14.** to draw into the mouth and puff out the smoke of: *to smoke tobacco.* **15.** to use [a pipe, cigarette, etc.) in this process. **16.** to expose to smoke. **17.** to fumigate (rooms, furniture, etc.). **18.** to cure (meat, fish, etc.) by exposure to smoke. **19.** to color or darken by smoke. **20. smoke out, a.** to drive from a refuge by means of smoke. **b.** to force into public view or knowledge; expose. —**Idiom. 21. blow smoke,** a. to speak deceitfully or misleadingly. **b.** to boast; exaggerate. **22. go up in smoke,** to terminate without producing a result; be unsuccessful. [bef. 1000; (n.), ME, OE *smoca,* akin to MD *smoock,* MHG *smouch;* (v.) ME *smoken,* OE *smocian*] —smok′a•ble, smoke′a•ble, *adj.* —smoke′less, *adj.*

**smoke′ and mir′rors,** *n.* (*used with a sing. or pl. v.*) something that distorts or blurs facts, figures, etc.; artful deception. [1980–85]

**smoke′ detec′tor,** *n.* an electronic fire alarm that is activated by the presence of smoke. Also called smoke′ alarm′. [1925–30]

**smoke′-filled′ room′,** *n.* a place, as a hotel room, for conducting secret negotiations, devising strategy, etc. [1915–20, *Amer.*]

**smoke•house** (smōk′hous′), *n., pl.* -hous•es (-hou′ziz). a building or place in which meat, fish, etc., are cured with smoke. [1665–75]

**smoke•jump•er** (smōk′jum′pər), *n.* a firefighter who parachutes to forest fires inaccessible to ground crews. [1925–30]

**smoke′less pow′der,** *n.* any of various substitutes for ordinary gunpowder that give off little or no smoke.

**smok•er** (smō′kər), *n.* **1.** one that smokes. **2.** Also, smok′ing car′. a railroad passenger car for those who wish to smoke. **3.** an informal gathering of men for discussion or the like. [1590–1600]

**smoke′ screen′,** *n.* **1.** a mass of dense smoke produced to conceal an area, vessel, or plane from the enemy. **2.** something intended to disguise, conceal, or deceive. [1910–15]

**smoke•stack** (smōk′stak′), *n.* **1.** a pipe for the escape of the smoke or gases of combustion, as on a steamboat, locomotive, or factory. —*adj.* **2.** pertaining to, engaged in, or dependent on a basic heavy industry, as steel or automaking: *smokestack companies.* [1855–60]

**smoke′ tree′,** *n.* **1.** a tree, *Cotinus obovatus,* of the cashew family, native to the south central U.S., having egg-shaped leaves and large clusters of small white flowers. **2.** a related shrub, *C. coggygria,* of Eurasia, having elliptical leaves and clusters of hairy, purple flowers.

**smok′ing gun′,** *n.* indisputable proof or evidence, esp. of a crime. [1975–80]

**smok′ing jack′et,** *n.* a loose-fitting jacket for men, often of a heavy fabric and trimmed with braid, worn indoors, esp. for lounging.

**smok•y** (smō′kē), *adj.,* smok•i•er, smok•i•est. **1.** emitting smoke, esp. in large amounts. **2.** hazy; darkened or begrimed with smoke. **3.** having the character or appearance of smoke: *smoky colors.* **4.** pertaining to or suggestive of smoke: *a smoky haze.* **5.** of a dull or brownish gray. [1275–1325] —smok′i•ly, *adv.* —smok′i•ness, *n.*

**Smok′y Hills′,** *n.* a river flowing E from E Colorado to the Republican River in central Kansas. 540 mi. (870 km) long.

**Smok′y Moun′tains,** *n.pl.* GREAT SMOKY MOUNTAINS.

**smok′y quartz′,** *n.* a smoky yellow to dark brown or black variety of quartz, used as a gem. [1830–40]

**smok′y to′paz,** *n.* smoky quartz used as a gemstone.

**smol•der** or **smoul•der** (smōl′dər), *v.i.* **1.** to burn without flame; undergo slow or suppressed combustion. **2.** to exist or continue in a suppressed state or without outward demonstration: *Hatred smoldered in his smile.* **3.** to display repressed feelings, as of indignation, anger, or the like. —*n.* **4.** dense smoke resulting from slow or suppressed combustion. **5.** a smoldering fire. [1275–1325; ME *smolder* dissimilated var. of *smorther* SMOTHER]

**Smo•lensk** (smō lensk′), *n.* a city in the W Russian Federation in Europe on the upper Dnieper. 338,000.

Filed:  August 2, 2013

Filed on behalf of:
     Patent Owner STAR EnviroTech, Inc.
By:  Edward A. Schlatter, Reg. No. 32,297
     Edward.Schlatter@knobbe.com
     Brenton R. Babcock, Reg. No. 39,592
     Brent.Babcock@knobbe.com
     KNOBBE, MARTENS, OLSON & BEAR, LLP
     2040 Main Street, 14th Floor
     Irvine, CA 92614
     Tel:  (949) 760-0404
     Fax:  (949) 760-9502

## UNITED STATES PATENT AND TRADEMARK OFFICE

—————————————————

## BEFORE THE PATENT TRIAL AND APPEAL BOARD

—————————————————

REDLINE DETECTION, LLC
Petitioner

v.

STAR ENVIROTECH, INC.
Patent Owner

—————————————

**Case IPR2013-00106**
Patent 6,526,808

—————————————

## STAR NOTICE OF FILING TRANSCRIPT OF AUGUST 1, 2013 INITIAL CONFERENCE CALL

**A157**

IPR2013-00106
Redline Detection v. STAR EnviroTech

Pursuant to direction from APJ Jennifer S. Bisk during the Aug. 1, 2013, initial conference call of the parties, Patent Holder STAR EnviroTech provides as Appendix A to this Notice a copy of the transcript of the proceedings.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  /August 2, 2013/          By:/Edward A. Schlatter/
                                      Edward A. Schlatter, Reg. No. 32,297
                                      Brenton R. Babcock, Reg. No. 39,592
                                      Attorneys for Patent Owner
                                      STAR EnviroTech, Inc.

1

IPR2013-00106
Redline Detection v. STAR EnviroTech

# Appendix A

# In The Matter Of:

*REDLINE DETECTION, LLC  v.*
*STAR ENVIROTECH, INC.*

---

*TELECONFERENCE PROCEEDINGS*
*August 1, 2013*

---

*Barkley Court Reporters*
*barkley.com*
*800.222.1231*

Original File 362286.TXT
Min-U-Script® with Word Index

**A160**

TELECONFERENCE PROCEEDINGS

```
1              UNITED STATES PATENT AND TRADEMARK OFFICE

2               BEFORE THE PATENT TRIAL AND APPEAL BOARD

3

4

5    REDLINE DETECTION, LLC,        )
                                    )
6              Petitioner,          )
                                    )
7    vs.                            )Case No. IPR2013-
                                    )00106
8    STAR ENVIROTECH, INC.,         )
                                    )
9              Patent Owner.        )
     _____)
10

11

12

13

14

15

16           TRANSCRIPT OF TELECONFERENCE PROCEEDINGS taken

17   on behalf of the Patent Owner, Star EnviroTech,

18   Inc., at 2040 Main Street, Fourteenth Floor, Irvine,

19   California, beginning at 11:00 a.m., on Thursday,

20   August 1, 2013, before Tracy Mafi, Certified Shorthand

21   Reporter No. 11850.

22

23

24

25
```

2

BARKLEY
Court Reporters

TELECONFERENCE PROCEEDINGS

```
 1   APPEARANCES OF COUNSEL:

 2   For Petitioner Redline Detection, LLC

 3           STETINA, BRUNDA, GARRED & BRUCKER
             BY:  MATTHEW A. NEWBOLES, ESQ.
 4               LOWELL ANDERSON, ESQ.
             75 Enterprise
 5           Suite 250
             Aliso Viejo, California 92656
 6           (949) 855-1246
              mnewboles@stetinalaw.com
 7

 8
     For Patent Owner Star EnviroTech, Inc.:
 9
             KNOBBE, MARTENS
10           BY:  BRENTON R. BABCOCK, ESQ.
                 EDWARD A. SCHLATTER, ESQ.
11               JARED C. BUNKER, ESQ.
             2040 Main Street
12           Fourteenth Floor
             Irvine, California 92614
13           (949) 760-0404
             brenton.babcock@kmob.com
14           edward.schlatter@kmob.com
             jared.bunker@kmob.com
15

16

17
     ALSO PRESENT:
18
             JUDGE BISK
19           JUDGE ARPIN
             JUDGE MEDLEY
20           TERRY SNOEYENBOS

21

22

23

24

25
```

3

BARKLEY
Court Reporters

**A162**

TELECONFERENCE PROCEEDINGS

```
 1                    IRVINE, CALIFORNIA;

 2              Thursday, August 1, 2013; 11:00 a.m.

 3

 4              MR. NEWBOLES:  Good afternoon, your Honors.

 5    Matt Newboles and Lowell Anderson for petitioner,

 6    Redline Detection.

 7              JUDGE BISK:  Okay.

 8              MR. BABCOCK:  Good afternoon, your Honors.

 9    For Star EnviroTech, the patent owner, this is

10    Brent Babcock.

11              Also with me is Ed Schlatter and

12    Jared Bunker, J-a-r-e-d, B-u-n-k-e-r, our paralegal,

13    Terry, T-e-r-r-y, Snoeyenbos, S-n-o-e-y-e-n-b-o-s.

14              And we do have a court reporter who's with us

15    today transcribing the teleconference, and her name is

16    Tracy --

17              THE REPORTER:  Mafi.

18              MR. BABCOCK:  -- Mafi, M-a-f-i.  She's with

19    Barkley, B-a-r-k-l-e-y, Court Reporters in Irvine,

20    California.

21              JUDGE BISK:  Okay.  Thank you very much.

22              MR. BABCOCK:  You're welcome.

23              JUDGE BISK:  So this is the initial conference

24    call for IPR2013-00106.  I have an agenda here today

25    from you, so let's begin with those.  And I'm going to
```

4

BARKLEY
Court Reporters

**A163**

1    start with the petitioner's list.

2         I just want to quickly note that the motions

3    list is a little bit on the wordy side of what we're

4    looking for.  The purpose of the motions list is to --

5    just to provide the Board and the opposing party

6    adequate notice to prepare for the initial call.  It's

7    not really an opportunity to submit a motion itself.

8    It should contain a short, concise statement generally

9    relating enough information for the Board and opposing

10   counsel to understand the proposed motion.

11        And in this motion list, it actually provides

12   facts and arguments related to a motion that has

13   already been filed, and that is the motion to

14   supplement -- to submit supplemental information.

15        So just for future reference, the motions list

16   should be just a concise list.

17        MR. NEWBOLES:  My apologies, Your Honor.  It's

18   Matt Newboles speaking.  Thank you for the

19   clarification.

20        JUDGE BISK:  That's okay.  No problem.  I

21   realize everything is new and just for future

22   reference.

23        Okay.  So let's move from there onto the

24   motion to supplement.  So the first order of business

25   is -- I believe that -- I know the rules may be a

5

BARKLEY
Court Reporters

A164

TELECONFERENCE PROCEEDINGS

1    little bit ambiguous on this, but I believe you're

2    supposed to request authorization for this type of

3    motion under 42.123(a)(1).  And since there's a

4    deadline on this, the one-month deadline, we're just

5    going to -- I'm just going to mention it again for

6    future reference.  And we'll just -- we'll just

7    consider that the actual filing of the motion was the

8    request for authorization.

9         Okay.  So I just want to have each of the

10   sides give a little discussion of what you -- what you

11   think about the motion to supplement.

12        And can we start with petitioner.

13        MR. NEWBOLES:  Thank you very much, your

14   Honor.

15        In terms of the motion, we've tried to comply

16   in all respects with 123(a)(1) in terms of the timing

17   of the motion and that it is -- meets the criteria for

18   that motion.

19        We think the motion supplement should be

20   granted.  It seems to be consistent with the regs and,

21   in particular, 42.53(d)(2), which provides for further

22   evidence before the deposition or testimony is to be

23   taken.

24        We don't think this results in any prejudice

25   to the patent owner.  There's really nothing new in the

BARKLEY
Court Reporters

**A165**

1    declaration we're submitting, and it's only one

2    declaration.

3           And we think that the submission of the

4    declaration at this point makes things far less complex

5    than had we had an expert opine as to all 12 grounds as

6    originally submitted in our petition.

7           And just, in our view, given the fact this is

8    simple technology that's easy to understand and a

9    limited body of prior art, we think this won't cause

10   any undue hardship and should be considered and made a

11   part of the record.

12          JUDGE BISK:  Okay.  Can I hear from the patent

13   owner?

14          MR. BABCOCK:  Yes, your Honor.  This is

15   Brent Babcock, and we could not disagree more heartily

16   with Mr. Newboles' comments.

17          The submission of a new declaration at this

18   stage in the proceeding is entirely improper, entirely

19   inconsistent with the IPR procedures, and extremely

20   prejudicial to the patent owner.

21          I've got an outline of an argument.  It will

22   take me maybe about five minutes to get through it.

23   I've got at least four points I'd like to make with the

24   Board with regards to the --

25          JUDGE BISK:  Can I interrupt you for a minute?

7

BARKLEY
Court Reporters

**A166**

1  It sounds like you have a long argument.  Would it be

2  better for us to authorize you to file a written

3  opposition so that we can get it all on the record?

4           MR. BABCOCK:  Well, that's one reason we have

5  the court reporter here.  We're certainly -- at the end

6  of my argument I'm going to ask, at a minimum, if the

7  Board is inclined at all to grant this motion, then we

8  would certainly request a written opposition.

9           I think, given what I can tell you today, your

10  Honor, that you should deny the motion as we sit here

11  and you should expunge the documents from the record

12  now.

13           But to the extent the Board is considering

14  allowing the expert declaration in, then yes, of course

15  we'd rather brief the issue.  We'd like to do that and

16  explain in writing why allowing such a declaration to

17  come in at this stage would be entirely improper.

18           But if you'll allow me, your Honor, I can

19  explain to you now why I think this can be shortened by

20  just simply understanding what they've done here

21  violates the rules, violates the law, and it's

22  extremely prejudicial, and it may permit the Board to

23  make a decision without extensive briefing.

24           JUDGE BISK:  Okay.  All right.  Go ahead.

25           MR. BABCOCK:  Well, to begin with, the

BARKLEY
Court Reporters

TELECONFERENCE PROCEEDINGS

```
 1   substantive issues is how Congress in authorizing IPR
 2   petitions, particularly under 312, what they
 3   contemplated, and under 312(a)(3)(B), an affidavit
 4   supporting a declaration has to be filed with the
 5   petition.  You can't file your affidavit later.
 6            Certainly the issue of a declaration
 7   supporting the petition, the rule says these petitions
 8   can be considered only if the petition identifies the
 9   evidence that supports the grounds for the challenge to
10   each claim in affidavits or declarations or supporting
11   evidence and opinions, if the petitioner relies on
12   those opinions, are submitted with the petition.
13            So certainly the statutory scheme is that the
14   petitioner submits the petition with the declaration at
15   that time.
16            Now, with regards to this particular
17   declaration, this is not just supplemental evidence.
18   This is a complete supplemental argument.  There are
19   brand new arguments in this declaration, including
20   brand new claim charts.  They've added at least seven
21   to eight pages of claim charts on pages 30 to 34 and 44
22   to 48.  These claim charts, about 70 percent of the
23   claim chart information is brand new.
24            And there's a couple of cases that already
25   address this.  In the preliminary response context, the
```

9

BARKLEY
Court Reporters

**A168**

1    EMC Corp., versus Personal Web, IPR -- the IPR is

2    2013-82 and 2013-85.  And they found just simply new

3    claim charts being submitted was improper and did not

4    allow those new claim charts to come in.

5         But here we also have two new claim terms that

6    were not argued in the petition.  The word "smoke" in

7    paragraph 27 and the word "closed" in paragraph 28.

8         There's a whole new section on a person of

9    ordinary skill in the art, which is nowhere in the

10   petition, on pages [sic] 7 to 19.

11        There's a whole new section on what a person

12   of skill in the art had understood at the time of the

13   alleged invention, on pages [sic] 10 and 64.

14        The declaration relies on prior art that's not

15   a part of this trial on a reference called "Popkin,"

16   not part of this trial; pages --- paragraphs 41, 78,

17   and 85.

18        It also discusses two new patents that weren't

19   part of the petition, a patent of Fortney and a patent

20   of Dickman, on paragraph 36.

21        And the expert also adds brand new

22   characterizations of two references that were never

23   part of the petition.  It references to Pauley in

24   paragraph 34 -- or 54 and Stoyle in paragraph 49.

25        In addition, in this particular declaration,

BARKLEY
Court Reporters

1  this is a declaration that responds to the Board's

2  order deciding to grant the petition.  So this is a

3  responsive declaration post -- post initiation where

4  the declarant actually references the Board's decision,

5  and not only does the declarant reference the Board

6  decision, but the declarant now takes positions that

7  are inconsistent with the positions taken -- for

8  instance, in the word "flammable" -- the definition of

9  the word "flammable," the declarant now adopts the

10 position with the Board in paragraphs 24 and 25,

11 inconsistent with what the patent owner said -- the

12 petitioner said in the petition.

13         And with regards to the word "locating" in

14 paragraph 27 -- paragraph 26, again, a different

15 position than the petitioner took in the initial

16 petition.

17         The prejudice here is extreme.  We've been

18 evaluating the petition for six months and evaluating

19 the decision for one month.  There's only two months

20 left before our response.

21         It requires us to now quickly digest a very

22 complicated 60-page expert opinion, which is longer

23 than the petition.  It actually doubles the length of

24 the material that we have to evaluate.

25         We have to prepare to review this new expert

11

BARKLEY
Court Reporters

A170

TELECONFERENCE PROCEEDINGS

1    declaration, potentially prepare for a deposition, all

2    in this span of a short period of time.

3            From a policy basis, Your Honors, this creates

4    a huge policy problem.  It will fundamentally change

5    how IPR practice is conducted.  The petitioner is not

6    allowed to sandbag the patent owner by waiting for the

7    petition to be granted and then responding to the grant

8    by submitting new arguments and brand new theories in

9    response to the grant of the trial.

10           The petitioner -- this is kind of a "wait and

11   see" approach to see what the Board does, and it allows

12   them to kind of streamline and hone in on the arguments

13   the Board likes, allowing them -- like Mr. Newboles

14   said, kind of a very focused declaration just on the

15   issues that the Board granted, as opposed to a typical

16   declaration which has to address all of the issues.

17           JUDGE BISK:  Okay.  I think we understand your

18   point of view.

19           Does the petitioner want to respond?

20           MR. NEWBOLES:  Yeah.  Okay.  First of all,

21   123(a) authorizes a motion to submit supplemental

22   evidence if it's filed within one month of the date

23   trial is instituted, and the supplemental information

24   is relevant for claim for which trial has been

25   instituted.  That is exactly what this declaration

12

BARKLEY
Court Reporters

A171

TELECONFERENCE PROCEEDINGS

1  encompasses, the absolute intent and purpose of 123-A.

2          There is no prejudice.  The rules expressly

3  provide for this procedure, for this submission of

4  evidence.  The claim charts go to grounds 1 and 2 and

5  how those would be deemed obvious.

6          This is not a prejudicial matter.  In fact, we

7  would say if the patent owner wants to argue this, then

8  we should go through the procedures where they file

9  written opposition, and we go through the prescribed

10 procedures for opposing and responding to motions.

11         There's still two months left.  There are two

12 claims.  There are essentially four pieces of prior art

13 that are being applied.  That's what the claim charts

14 go to.  It's objective evidence that shows where each

15 and every element is met, and it's nothing new.

16         There's not any type of prejudice, and we

17 should address this through a briefing to address this

18 motion.  And to the extent there are parts of the

19 declaration that are inconsistent with the decision, we

20 can -- we'll agree to strike those, but admit the ones

21 that are absolutely consistent with the decision.

22         JUDGE BISK:  Okay.  I'm going to put you on

23 hold for a moment while I discuss with my colleagues.

24 I'll be back in one or two minutes.

25         MR. BABCOCK:  Thank you, your Honors.

13

BARKLEY
Court Reporters

**A172**

TELECONFERENCE PROCEEDINGS

1          MR. NEWBOLES:  Thank you.

2              (Pause in the proceedings.)

3          JUDGE BISK:  Okay.  We've heard everything you

4    had to say, and we're going to take it under

5    advisement, just for us to think about it.

6          Patent owner, if we do authorize an opposition

7    in writing, how long will it take, do you think, to put

8    one together?

9          MR. BABCOCK:  We'd like 10 days -- 10 business

10   days, your Honor, if that's okay.

11         We would also request, your Honor, that if you

12   do decide that you want this briefed that at least for

13   the time being you expunge the exhibits from the

14   record.  They filed those exhibits with the Board.

15   They did not seek authorization to file those.  You're

16   not allowed to file exhibits willy-nilly, and we think

17   that at a minimum the exhibits ought to be expunged

18   unless and until the Board allows the evidence to come

19   in.

20         We certainly are confident -- hopefully we've

21   convinced you already; but if we haven't, we'll put it

22   in writing that this is not a proper type of evidence

23   that's permitted -- or that's considered supplemental

24   evidence by -- under the rules.

25         MR. NEWBOLES:  Matt Newboles speaking here.

14

TELECONFERENCE PROCEEDINGS

1          The statute says -- it authorizes a motion to

2    submit supplemental information if the motion is filed

3    within one month.

4          JUDGE BISK:  Okay.  We've heard both sides,

5    and I'm not deciding anything right now.  We're not

6    even going to decide on an opposition right now.  We're

7    going to take that under advisement.

8          An order will go out in the next day or two

9    that will tell everybody what the next steps are.

10         MR. BABCOCK:  Very good, your Honor.  Thank

11   you.

12         JUDGE BISK:  Let's move on to the next item on

13   our agenda here.  I'm continuing to go through the

14   petitioner's motions list.

15         There's a couple items that look like they

16   might be potential motions for additional discovery.

17   I'm just wondering if the petitioner has any detailed

18   information on that or if those are in the "wait and

19   see" stage right now.

20         MR. NEWBOLES:  Well, yeah, I mean, a lot of

21   what, you know, we will do will be responsive to what

22   the patent owner submits; but in terms of the motions

23   that we've identified that are contingent, an issue was

24   raised by patent owner regarding the authenticity of

25   the 1999 smokemachines.com Web site.  We think we've

BARKLEY
Court Reporters

**A174**

 1   addressed those concerns.  To the extent it's still an

 2   issue, to put that to rest for once and for all, we

 3   would request seeing discovery from archive.org to nail

 4   down the authenticity and admissibility of that

 5   reference.

 6          And also, again, responsive to whatever patent

 7   owner submits, in the prior re-examinations a number of

 8   declarations were submitted, and to the extent any of

 9   those declarations are submitted for purposes in this

10   IPR, we would want the right to take the depositions of

11   those individuals.

12          JUDGE BISK:  Okay.  So Item 2, I have two

13   separate responses to that.  The first one is what

14   you're contemplating third-party discovery.  We've not

15   actually authorized any third-party discovery that I'm

16   aware of in any of these proceedings.  So that would be

17   a new -- something new, so -- but it would be

18   considered additional discovery.

19          And I'm sure you're aware that when you move

20   for additional discovery, you have to show that it's in

21   the interest of justice.  And I just want to make you

22   aware of a case.  It's in the Garmin case 2012-00001,

23   paper 20.  So if you end up asking -- discussing

24   authorization to file such a motion, you'll want to

25   look at that case.

BARKLEY
Court Reporters

**A175**

TELECONFERENCE PROCEEDINGS

1          And just a question, has anyone filed an

2     objection to any evidence?

3          MR. BABCOCK:  Yes, your Honor.  This is

4     Brent Babcock for the patent owner.

5          We did object to some evidence, and the

6     petitioner filed a couple of things that we thought

7     were curious.

8          One, they filed some supplemental evidence,

9     which is fine.  They also -- I believe they only served

10    it, but they may have filed it.  They also served and

11    filed something called a "response" to our objections.

12    They put into arguments why they thought our objections

13    were not merited.

14         And we just wanted to make it clear in this

15    call that while they're entitled to supplement

16    evidence, they're not entitled to file any kind of

17    response or argument at this stage where they attack

18    the basis for our objections.

19         JUDGE BISK:  I don't see anything filed that

20    looks like that.

21         MR. BABCOCK:  Okay.  Then maybe they only

22    served it, but --

23         MR. NEWBOLES:  The rules say you don't -- you

24    serve those, so those were served.  And when it comes

25    to debating the evidence, that comes down later per the

17

BARKLEY
Court Reporters

**A176**

1  scheduling order.

2          MR. BABCOCK:  Right.  But we did receive from

3  you, Matt, a very detailed argument on not just the

4  supplemental evidence, but you filed -- you served on

5  us something in a formal pleading standpoint called a

6  "Response" -- "Redline Detection's Notice of Evidence

7  Responsive to Star EnviroTech's Objections."

8          And there's about three pages or four pages of

9  argument citing cases and explaining why you didn't

10  think our objections were appropriate.

11          So, again, if you're not planning to file

12  those, that's fine; but if you're planning to file

13  those, I think -- I don't think that's appropriate at

14  this time.

15          MR. NEWBOLES:  Okay.  Just for clarification,

16  that was submitted pursuant to 37 CFR 42.64(b)(2).  You

17  serve those, and that is supposed to address your

18  concerns, and to the extent they're not addressed, then

19  we -- my understanding is that the evidence -- the

20  motions to exclude -- that's where it's taken up again,

21  but that's why you received that response because

22  that's expressly called for per 64(b)(2).

23          MR. BABCOCK:  Just to clarify, the evidence is

24  called for, not the argument.  And what we're objecting

25  to is not the evidence; we're objecting to the

18

BARKLEY
Court Reporters

A177

 1  argument.

 2           JUDGE BISK:  Okay.  Can I interrupt here?  We

 3  haven't seen any of these arguments, so I kind of feel

 4  like we're a third party on this --

 5           MR. BABCOCK:  Sorry, your Honor.

 6           JUDGE BISK:  -- discussion.  So maybe you guys

 7  can take this offline.

 8           MR. NEWBOLES:  As we rightfully should.

 9           JUDGE BISK:  Yeah, nothing like this has been

10  filed, so I don't think this is the right forum for

11  this discussion.  So let's move on.

12           The other response I had to what was a

13  separate area was the depositions of any declarants

14  that patent owner might put in.  Those fall under

15  routine discovery under 42.51(b), and so you shouldn't

16  have to request anything from us in order to take those

17  cross-examinations.

18           So is there anything else that petitioner

19  would like to discuss from their motions list?

20           MR. NEWBOLES:  No, other than the fact that we

21  note that our original submission of exhibits do not

22  comply with 42.63(d), and our apologies to everyone for

23  that.  And what the Board would suggest, if you would

24  like us to resubmit those page numbers with all the

25  exhibits as filed --

                              19

BARKLEY
Court Reporters

**A178**

TELECONFERENCE PROCEEDINGS

1          JUDGE BISK:  No, we've discussed it, and we

2    think that -- since they're in there and we've referred

3    to them already in the decision to institute, let's

4    just leave them as is and not replace them.  Just going

5    forward, try to make sure that they comply.

6          MR. NEWBOLES:  Yes, your Honor.  Thank you.

7    They certainly shall.

8          JUDGE BISK:  Anything else?  And then we'll

9    move on to the patent owner's list.

10          MR. NEWBOLES:  Nothing further, your Honor.

11          JUDGE BISK:  Okay.  Patent owner, your list --

12    you had two things on your list.  The first was a

13    potential motion to amend, and I was wondering if you

14    had any details on that or if it's -- if it's still in

15    the discussion stage.

16          MR. SCHLATTER:  Well, we understand that the

17    claimed construction that was adopted which -- by the

18    Board, in the decision that we don't agree with, should

19    be addressed in the patent owner's response and not by

20    way of a separate motion.

21          That said, depending on the claimed

22    construction that is adopted eventually, we would --

23    we're contemplating a contingent motion to amend the

24    claims to emphasize the distinctions between the

25    invention and the prior art, in the proceeding.

BARKLEY
Court Reporters

**A179**

1          JUDGE BISK:  Okay.  That's not an unusual

2    posture for the patent owner to have.  However, you're

3    not going to be able to wait until we decide on the

4    response before you file your motion to amend.  It's

5    due at the same time as the response.  You can file it

6    as a contingent motion to amend, but you're going to

7    have to decide and file it at the same time.  We only

8    have a year for this to go through, so you can't wait

9    until we decide on the whole thing and then amend.  The

10   only way to do that would be to wait until this is over

11   and then try to amend in some other proceeding.

12          MR. SCHLATTER:  We understand.

13          JUDGE BISK:  Okay.  And once you do have any

14   details on what -- how you want to amend, the rules say

15   that you should have a conference with us to get some

16   guidance from us on the motion to amend.

17          MR. BABCOCK:  Okay.  Your Honor, so to the

18   extent that we decide we want to amend and we come up

19   with perhaps a limitation or two that we're

20   contemplating adding, you'd like us to have another

21   conference with you to discuss the merits in that

22   regard?

23          JUDGE BISK:  Well, we don't need to discuss

24   the actual limitation.  We just want to make sure that

25   everybody's aware of the rules in the motion to amend

21

BARKLEY
Court Reporters

**A180**

TELECONFERENCE PROCEEDINGS

1  so that we -- when you file the motion to amend, it's

2  something that we can actually accept.  We don't want

3  to have to bounce them, basically.

4          MR. BABCOCK:  Okay.  So just for us to be

5  clear, you'd like us to call you back to discuss the

6  motion to amend if we decide to proceed with that

7  motion?

8          JUDGE BISK:  Yes.

9          MR. BABCOCK:  Okay.  Very good.

10          MR. NEWBOLES:  121(a) requires that.

11          JUDGE BISK:  Say that again.

12          MR. NEWBOLES:  I'm sorry.  Matt Newboles here.

13          I think Rule 121(a) requires a conference call

14  with the P.T.A.B. beforehand.

15          JUDGE BISK:  Right.  And sometimes we do that

16  -- we consider the initial call -- that conference call

17  if the patent owner already has an idea of what the

18  motion to amend is going to look like, but that's not

19  always the case.

20          MR. BABCOCK:  Okay.  We appreciate that

21  flexibility, your Honor.  We will in short order make

22  that determination on whether we intend to amend it.

23  If we do, we will call you back with opposing counsel

24  and discuss those -- that motion in more detail.

25          JUDGE BISK:  Okay.  Great.  Thank you.

22

BARKLEY
Court Reporters

A181

TELECONFERENCE PROCEEDINGS

1          MR. BABCOCK:  Sure.

2          JUDGE BISK:  The second thing you have on your

3   list is a motion for discovery regarding privity, and I

4   was wondering if you have any more details on that.

5          MR. BABCOCK:  Yeah, we do in that regard, your

6   Honor.

7          You may recall that one of the issues that we

8   raised in the patent owner's response was assignor

9   estoppel, and the issue here is that one of the

10  inventors, Mr. Pieroni, on the patent that's being

11  challenged, is now -- is now part of or at least

12  somewhat involved with Redline.  We believe he's one of

13  their consultants and he founded Redline.  Possibly

14  still an employee.

15         The Board addressed the privity issue in the

16  petition and basically, I believe, said something to

17  the effect of, well, based upon the evidence we

18  presented, you weren't convinced that there was

19  sufficient privity.

20         So what we were contemplating with regards to

21  additional evidence was, I guess, four things.  One

22  would be a deposition of Mr. Pieroni.  Two would be a

23  deposition of the corporate Redline, so we'd get both

24  sides of the story there.  Redline is the petitioner.

25         There would be limited depositions focused not

23

BARKLEY
Court Reporters

**A182**

1    on finances and those kinds of things, so much as just

2    focusing on the privity issue, which is what is

3    Mr. Pieroni's involvement with Redline and how is he

4    affiliated with Redline, to establish that there is

5    privity between Mr. Pieroni and Redline.

6         The other two things that we are contemplating

7    would be a few production requests, just documents

8    pre-deposition, so that we would have a few documents

9    dealing with this relationship and contracts --

10   specifically consulting arrangements, consulting

11   contracts, those kinds of things.

12        And then the fourth thing would be maybe some

13   interrogatories, just a half a dozen or so,

14   specifically directed to this privity issue.  Just so

15   we can nail down with the evidence Mr. Pieroni's

16   relationship with Redline, so we can establish that

17   assignor estoppel would apply in this proceeding.

18        MR. NEWBOLES:  May I --

19        JUDGE BISK:  Yes, go ahead.

20        MR. NEWBOLES:  First of all, we're talking

21   about a third-party deposition.  Mr. Pieroni is not

22   part of this proceeding, so everything that you

23   mentioned earlier regarding third-party discovery would

24   apply.

25        But I think as the Board addressed in its

24

BARKLEY
Court Reporters

**A183**

 1    decision -- we're opposed to this, and if necessary,

 2    would brief the issue.

 3         But just on its face, I mean, Ken Pieroni did

 4    assign his interest in the application on October 26th,

 5    2001, so that's part of the assignment record.  And I

 6    have the reel and frame number, if you'd like.

 7         The claims that are at issue weren't even

 8    submitted until August 22nd, 2002, ten months after he

 9    assigned the application, and, of course, those were

10    amended twice further in re-examination in 2011.

11         So what he assigned and what -- the claims

12    even at issue weren't even in existence at the time the

13    assignment was made and recorded.

14         So we'd be opposed to trying to bring

15    Ken Pieroni into this action and basically asserting

16    that argument just on the facts on their face, that he

17    assigned this thing nearly a year before these claims

18    at issue were even submitted and he would have long

19    left, you know, Star at that time.  So in any event --

20         JUDGE BISK:  Okay.  Actually, I'm still not

21    really clear.  Are you asking for permission --

22    authorization to file this motion for discovery?  It

23    still sounds contingent to me, or do you actually know

24    that you would like to file this motion?

25         MR. BABCOCK:  Yes.  We'd like authorization

25

BARKLEY
Court Reporters

**A184**

1    now to file a motion seeking authorization to take

2    discovery.  Certainly the easier issue would be the

3    Redline -- discovery directed from Redline on this

4    issue because they are a party.  And then we would also

5    include in that motion third-party discovery for

6    Ken Pieroni.

7            We realize that third-party discovery is rare

8    and unique, but I'm not aware of any other IPR in which

9    the patent owner is in privity with the petitioner, and

10   this issue applies.  Assignor estoppel is a unique

11   situation, and I think this is the only one that I'm

12   aware of in which we have this issue arising.  And so

13   is it the first time the Board might authorize

14   third-party discovery?  Perhaps.  But would it be

15   appropriate here in this unusual circumstance?  We

16   think so.

17           JUDGE BISK:  Okay.  Well, we'll take this

18   under advisement as well.

19           MR. BABCOCK:  Thank you, your Honor.

20           JUDGE BISK:  Okay.  So let's move on.  Unless

21   there's anything else from patent owner's motion list

22   that you'd like to discuss.

23           MR. BABCOCK:  I'm looking here.  No, just one

24   procedural issue is that with regards to our

25   designation of counsel, we'd like to add Jared Bunker

BARKLEY
Court Reporters

A185

1   as a second backup lead on the caption.  So if it's

2   okay with the Board, we'll be adding him as our second

3   backup lead so we have another backup lead counsel.

4          I know some of the cases the Board's been

5   allowing three counsel on the case.

6          JUDGE BISK:  That's fine.  Just go through the

7   process -- I'm not sure exactly how you do that, but

8   that's fine with us.

9          MR. BABCOCK:  Terry, our paralegal here, knows

10  the procedures, so we'll get that done.  Thank you.

11         JUDGE BISK:  So let's go to the next item on

12  our agenda which is the scheduling order.  Does anyone

13  have any problems they need to bring up with the

14  schedule as it stands now?

15         MR. BABCOCK:  Brent Babcock for the patent

16  owner, your Honor.

17         I guess we'd like to see where the Board comes

18  out on this new evidence issue first.  If the Board is

19  inclined to allow briefing on it and then ultimately

20  allows a brand new declaration into the proceeding,

21  we're certainly going to be asking at that point in

22  time for more time and perhaps more pages as well; but

23  I think that's premature given that the Board may

24  reject the declaration out of hand and may simply

25  require briefing, and so perhaps we can have another

27

BARKLEY
Court Reporters

**A186**

 1  call after that issue is decided to discuss schedule.

 2  I don't know if we want to push it back now in light of

 3  the fact that it may not be necessary.

 4        JUDGE BISK:  Okay.  Well, we'll deal with that

 5  when we come to it.  You can always request another

 6  call if you have a problem that you need to address the

 7  schedule.

 8        And, also, I want to note that the parties

 9  can -- with each other they can stipulate to the first

10  few -- I think it's the first three due dates.  So you

11  can always work together to change those due dates if

12  you'd like.

13        JUDGE BISK:  Does the petitioner have any --

14        MR. NEWBOLES:  No.  The petitioner, we're fine

15  with the dates and we're flexible if we need to

16  accommodate any particular matter.  But the dates as

17  set by the P.T.A.B. are fine with us, and there's no

18  problem with anything.

19        JUDGE BISK:  Okay.  All right.  The last item

20  on my agenda is -- I wanted to inquire if the parties

21  had discussed settlement?

22        MR. NEWBOLES:  Matt Newboles for petitioner.

23        No, we have not.

24        JUDGE BISK:  Okay.

25        MR. SCHLATTER:  Not in the IPR proceeding, to

BARKLEY
Court Reporters

**A187**

TELECONFERENCE PROCEEDINGS

1  my knowledge.  Ed Schlatter for the patent owner.

2          JUDGE BISK:  Okay.  Well, that's all that's on

3  my agenda.  Are there any other issues that either side

4  wants to bring up before we adjourn?

5          MR. BABCOCK:  Yes, your Honor.  With regards

6  to the transcript, normally I know the Board -- after

7  the conference call is over, the Board asks us to file

8  the transcript, I guess, with the Board.  Is that

9  something you'd like us to do?

10          JUDGE BISK:  Yes, that would be very helpful.

11          MR. BABCOCK:  Okay.  Then we'll do that within

12  a day or so.

13          JUDGE BISK:  Okay.  Great.  Thank you.

14          Well, we are adjourned.  And, again, if

15  something comes up and you need to get ahold of us,

16  just E-mail the paralegals and we can set up a call.

17          And in a couple days you should see an order

18  that will let you know the next steps or issues that

19  are still open.

20          MR. BABCOCK:  Very good.  Thank you, your

21  Honors.

22          MR. NEWBOLES:  Thank you, your Honors.  We

23  appreciate it.

24      (Teleconference session concluded at 11:37 a.m.)

25                        -oOo-


                          29

BARKLEY
Court Reporters

**A188**

1                   DEPOSITION OFFICER'S CERTIFICATE

2

3    STATE OF CALIFORNIA )
                          ) ss.
4    COUNTY OF ORANGE     )

5

6         I, Tracy Mafi, hereby certify:

7         I am a duly qualified Certified Shorthand

8    Reporter in the State of California, holder of

9    Certificate Number CSR No. 11850 issued by the Court

10   Reporters Board of California and which is in full force

11   and effect.  (Fed. R. Civ. P. 28(a)).

12        I am authorized to administer oaths or

13   affirmations pursuant to California Code of Civil

14   Procedure, Section 2093(b) and prior to being examined,

15   the witness was first duly sworn by me.  (Fed. R. Civ.

16   P. 28(a), 30(f)(1)).

17        I am not a relative or employee or attorney or

18   counsel of any of the parties, nor am I a relative or

19   employee of such attorney or counsel, nor am I

20   financially interested in this action.  (Fed. R. Civ. P.

21   28).

22        I am the deposition officer that

23   stenographically recorded the testimony in the foregoing

24   proceeding and the foregoing transcript is a true record

25   of the testimony given by the witness.  (Fed. R. Civ. P.

                                30

BARKLEY
Court Reporters

**A189**

TELECONFERENCE PROCEEDINGS

1  30(f)(1)).

2       The persons who appeared at the proceeding are

3  set forth on Page 3 of the foregoing transcript.

4       The proceeding was taken at 2040 Main Street,

5  Fourteenth Floor, Irvine, California, and began at

6  11:00 a.m., on Thursday, August 1, 2013, and ended at

7  11:37 a.m.

8       Before completion of the proceeding, review of

9  the transcript was requested.  Changes made by the

10  deponent, are appended hereto and have also been made to

11  the transcript.  (Fed. R. Civ. P. 30(e)).

12

13  Dated:  AUGUST 2, 2013.

14

15       _____

                        Tracy Mafi
16           Certified Shorthand Reporter No. 11850, RPR

17

18

19

20

21

22

23

24

25

31

BARKLEY
Court Reporters

**A190**

REDLINE DETECTION, LLC v.
STAR ENVIROTECH, INC.

**[**

[sic] (2)
10:10,13

**A**

able (1)
21:3
absolute (1)
13:1
absolutely (1)
13:21
accept (1)
22:2
accommodate (1)
28:16
action (1)
25:15
actual (2)
6:7;21:24
actually (7)
5:11;11:4,23;
16:15;22:2;25:20,23
add (1)
26:25
added (1)
9:20
adding (2)
21:20;27:2
addition (1)
10:25
additional (4)
15:16;16:18,20;
23:21
address (6)
9:25;12:16;13:17,
17;18:17;28:6
addressed (5)
16:1;18:18;20:19;
23:15;24:25
adds (1)
10:21
adequate (1)
5:6
adjourn (1)
29:4
adjourned (1)
29:14
admissibility (1)
16:4
admit (1)
13:20
adopted (2)
20:17,22
adopts (1)
11:9
advisement (3)
14:5;15:7;26:18
affidavit (2)
9:3,5
affidavits (1)

9:10
affiliated (1)
24:4
afternoon (2)
4:4,8
again (7)
6:5;11:14;16:6;
18:11,20;22:11;
29:14
agenda (5)
4:24;15:13;27:12;
28:20;29:3
agree (2)
13:20;20:18
ahead (2)
8:24;24:19
ahold (1)
29:15
alleged (1)
10:13
allow (3)
8:18;10:4;27:19
allowed (2)
12:6;14:16
allowing (4)
8:14,16;12:13;
27:5
allows (3)
12:11;14:18;27:20
always (3)
22:19;28:5,11
ambiguous (1)
6:1
amend (14)
20:13,23;21:4,6,9,
11,14,16,18,25;22:1,
6,18,22
amended (1)
25:10
Anderson (1)
4:5
apologies (2)
5:17;19:22
application (2)
25:4,9
applied (1)
13:13
applies (1)
26:10
apply (2)
24:17,24
appreciate (2)
22:20;29:23
approach (1)
12:11
appropriate (3)
18:10,13;26:15
archiveorg (1)
16:3
area (1)
19:13
argue (1)
13:7

argued (1)
10:6
argument (10)
7:21;8:1,6;9:18;
17:17;18:3,9,24;
19:1;25:16
arguments (6)
5:12;9:19;12:8,12;
17:12;19:3
arising (1)
26:12
arrangements (1)
24:10
art (6)
7:9;10:9,12,14;
13:12;20:25
asserting (1)
25:15
assign (1)
25:4
assigned (3)
25:9,11,17
assignment (2)
25:5,13
assignor (3)
23:8;24:17;26:10
attack (1)
17:17
August (2)
4:2;25:8
authenticity (2)
15:24;16:4
authorization (7)
6:2,8;14:15;16:24;
25:22,25;26:1
authorize (3)
8:2;14:6;26:13
authorized (1)
16:15
authorizes (2)
12:21;15:1
authorizing (1)
9:1
aware (6)
16:16,19,22;
21:25;26:8,12

**B**

BABCOCK (32)
4:8,10,18,22;7:14,
15;8:4,25;13:25;
14:9;15:10;17:3,4,
21;18:2,23;19:5;
21:17;22:4,9,20;
23:1,5,25:25;26:19,
23;27:9,15,15;29:5,
11,20
back (4)
13:24;22:5,23;
28:2
backup (3)
27:1,3,3

Barkley (1)
4:19
B-a-r-k-l-e-y (1)
4:19
based (1)
23:17
basically (3)
22:3;23:16;25:15
basis (2)
12:3;17:18
beforehand (1)
22:14
begin (2)
4:25;8:25
better (1)
8:2
BISK (41)
4:7,21,23;5:20;
7:12,25;8:24;12:17;
13:22;14:3;15:4,12;
16:12;17:19;19:2,6,
9;20:1,8,11;21:1,13,
23;22:8,11,15,25;
23:2;24:19;25:20;
26:17,20;27:6,11;
28:4,13,19,24;29:2,
10,13
bit (2)
5:3;6:1
Board (25)
5:5,9;7:24;8:7,13,
22;11:5,10;12:11,13,
15;14:14,18;19:23;
20:18;23:15;24:25;
26:13;27:2,17,18,23;
29:6,7,8
Board's (3)
11:1,4;27:4
body (1)
7:9
both (2)
15:4;23:23
bounce (1)
22:3
brand (6)
9:19,20,23;10:21;
12:8;27:20
Brent (4)
4:10;7:15;17:4;
27:15
brief (2)
8:15;25:2
briefed (1)
14:12
briefing (4)
8:23;13:17;27:19,
25
bring (3)
25:14;27:13;29:4
Bunker (2)
4:12;26:25
B-u-n-k-e-r (1)
4:12

Barkley (1)
4:19
business (2)
5:24;14:9

**C**

CALIFORNIA (2)
4:1,20
call (12)
4:24;5:6;17:15;
22:5,13,16,16,23;
28:1,6;29:7,16
called (5)
10:15;17:11;18:5,
22,24
can (21)
6:12;7:12,25;8:3,
9,18,19;9:8;13:20;
19:2,7;21:5;22:2;
24:15,16;27:25;28:5,
9,9,11;29:16
caption (1)
27:1
case (5)
16:22,22,25;
22:19;27:5
cases (3)
9:24;18:9;27:4
cause (1)
7:9
certainly (8)
8:5,8;9:6,13;
14:20;20:7;26:2;
27:21
CFR (14)
18:16
challenge (1)
9:9
challenged (1)
23:11
change (2)
12:4;28:11
characterizations (1)
10:22
chart (1)
9:23
charts (7)
9:20,21,22;10:3,4;
13:4,13
circumstance (1)
26:15
citing (1)
18:9
claim (11)
9:10,20,21,22,23;
10:3,4,5;12:24;13:4,
13
claimed (2)
20:17,21
claims (5)
13:12;20:24;25:7,
11,17
clarification (2)
5:19;18:15

**clarify (1)**
18:23
**clear (3)**
17:14;22:5;25:21
**closed (1)**
10:7
**colleagues (1)**
13:23
**comments (1)**
7:16
**complete (1)**
9:18
**complex (1)**
7:4
**complicated (1)**
11:22
**comply (3)**
6:15;19:22;20:5
**concerns (2)**
16:1;18:18
**concise (2)**
5:8,16
**concluded (1)**
29:24
**conducted (1)**
12:5
**conference (6)**
4:23;21:15,21;
22:13,16;29:7
**confident (1)**
14:20
**Congress (1)**
9:1
**consider (2)**
6:7;22:16
**considered (4)**
7:10;9:8;14:23;
16:18
**considering (1)**
8:13
**consistent (2)**
6:20;13:21
**construction (2)**
20:17,22
**consultants (1)**
23:13
**consulting (2)**
24:10,10
**contain (1)**
5:8
**contemplated (1)**
9:3
**contemplating (5)**
16:14;20:23;
21:20;23:20;24:6
**context (1)**
9:25
**contingent (4)**
15:23;20:23;21:6;
25:23
**continuing (1)**
15:13
**contracts (2)**

24:9,11
**convinced (2)**
14:21;23:18
**Corp (1)**
10:1
**corporate (1)**
23:23
**counsel (5)**
5:10;22:23;26:25;
27:3,5
**couple (4)**
9:24;15:15;17:6;
29:17
**course (2)**
8:14;25:9
**court (3)**
4:14,19;8:5
**creates (1)**
12:3
**criteria (1)**
6:17
**cross-examinations (1)**
19:17
**curious (1)**
17:7

**D**

**date (1)**
12:22
**dates (4)**
28:10,11,15,16
**day (2)**
15:8;29:12
**days (3)**
14:9,10;29:17
**deadline (2)**
6:4,4
**deal (1)**
28:4
**dealing (1)**
24:9
**debating (1)**
17:25
**decide (7)**
14:12;15:6;21:3,7,
9,18;22:6
**decided (1)**
28:1
**deciding (2)**
11:2;15:5
**decision (9)**
8:23;11:4,6,19;
13:19,21;20:3,18;
25:1
**declarant (4)**
11:4,5,6,9
**declarants (1)**
19:13
**declaration (22)**
7:1,2,4,17;8:14,16;
9:4,6,14,17,19;
10:14,25;11:1,3;

12:1,14,16,25;13:19;
27:20,24
**declarations (3)**
9:10;16:8,9
**deemed (1)**
13:5
**definition (1)**
11:8
**deny (1)**
8:10
**depending (1)**
20:21
**deposition (5)**
6:22;12:1;23:22,
23;24:21
**depositions (3)**
16:10;19:13;23:25
**designation (1)**
26:25
**detail (1)**
22:24
**detailed (2)**
15:17;18:3
**details (3)**
20:14;21:14;23:4
**Detection (1)**
4:6
**Detection's (1)**
18:6
**determination (1)**
22:22
**Dickman (1)**
10:20
**different (1)**
11:14
**digest (1)**
11:21
**directed (2)**
24:14;26:3
**disagree (1)**
7:15
**discovery (15)**
15:16;16:3,14,15,
18,20;19:15;23:3;
24:23;25:22;26:2,3,
5,7,14
**discuss (8)**
13:23;19:19;
21:21,23;22:5,24;
26:22;28:1
**discussed (2)**
20:1;28:21
**discusses (1)**
10:18
**discussing (1)**
16:23
**discussion (4)**
6:10;19:6,11;
20:15
**distinctions (1)**
20:24
**documents (3)**
8:11;24:7,8

done (2)
8:20;27:10
**doubles (1)**
11:23
**down (3)**
16:4;17:25;24:15
**dozen (1)**
24:13
**due (3)**
21:5;28:10,11

**E**

**earlier (1)**
24:23
**easier (1)**
26:2
**easy (1)**
7:8
**Ed (2)**
4:11;29:1
**effect (1)**
23:17
**eight (1)**
9:21
**either (1)**
29:3
**element (1)**
13:15
**else (3)**
19:18;20:8;26:21
**E-mail (1)**
29:16
**EMC (1)**
10:1
**emphasize (1)**
20:24
**employee (1)**
23:14
**encompasses (1)**
13:1
**end (2)**
8:5;16:23
**enough (1)**
5:9
**entirely (1)**
7:18,18;8:17
**entitled (2)**
17:15,16
**EnviroTech (1)**
4:9
**EnviroTech's (1)**
18:7
**essentially (1)**
13:12
**establish (2)**
24:4,16
**estoppel (2)**
23:9;24:17;26:10
**evaluate (1)**
11:24
**evaluating (2)**
11:18,18

even (5)
15:6;25:7,12,12,18
**event (1)**
25:19
**eventually (1)**
20:22
**everybody (1)**
15:9
**everybody's (1)**
21:25
**everyone (1)**
19:22
**evidence (24)**
6:22;9:9,11,17;
12:22;13:4,14;14:18,
22,24;17:2,5,8,16,
25;18:4,6,19,23,25;
23:17,21;24:15;
27:18
**exactly (1)**
12:25;27:7
**exclude (1)**
18:20
**exhibits (6)**
14:13,14,16,17;
19:21,25
**existence (1)**
25:12
**expert (5)**
7:5;8:14;10:21;
11:22,25
**explain (2)**
8:16,19
**explaining (1)**
18:9
**expressly (1)**
13:2;18:22
**expunge (2)**
8:11;14:13
**expunged (1)**
14:17
**extensive (1)**
8:23
**extent (6)**
8:13;13:18;16:1,8;
18:18;21:18
**extreme (1)**
11:17
**extremely (2)**
7:19;8:22

**F**

**face (2)**
25:3,16
**fact (4)**
7:7;13:6;19:20;
28:3
**facts (2)**
5:12;25:16
**fall (1)**
19:14
**far (1)**

REDLINE DETECTION, LLC v.
STAR ENVIROTECH, INC.

7:4
**feel (1)**
19:3
**few (3)**
24:7,8;28:10
**file (17)**
8:2;9:5;13:8;
14:15,16;16:24;
17:16;18:11,12;21:4,
5,7;22:1;25:22,24;
26:1;29:7
**filed (14)**
5:13;9:4;12:22;
14:14;15:2;17:1,6,8,
10,11,19;18:4;19:10,
25
**filing (1)**
6:7
**finances (1)**
24:1
**fine (6)**
17:9;18:12;27:6,8;
28:14,17
**first (9)**
5:24;12:20;16:13;
20:12;24:20;26:13;
27:18;28:9,10
**five (1)**
7:22
**flammable (2)**
11:8,9
**flexibility (1)**
22:21
**flexible (1)**
28:15
**focused (2)**
12:14;23:25
**focusing (1)**
24:2
**formal (1)**
18:5
**Fortney (1)**
10:19
**forum (1)**
19:10
**forward (1)**
20:5
**found (1)**
10:2
**founded (1)**
23:13
**four (4)**
7:23;13:12;18:8;
23:21
**fourth (1)**
24:12
**frame (1)**
25:6
**fundamentally (1)**
12:4
**further (3)**
6:21;20:10;25:10
**future (3)**

5:15,21;6:6

## G

**Garmin (1)**
16:22
**generally (1)**
5:8
**given (3)**
7:7;8:9;27:23
**Good (5)**
4:4,8;15:10;22:9;
29:20
**grant (4)**
8:7;11:2;12:7,9
**granted (3)**
6:20;12:7,15
**Great (2)**
22:25;29:13
**grounds (3)**
7:5;9:9;13:4
**guess (3)**
23:21;27:17;29:8
**guidance (1)**
21:16
**guys (1)**
19:6

## H

**half (1)**
24:13
**hand (1)**
27:24
**hardship (1)**
7:10
**hear (1)**
7:12
**heard (2)**
14:3;15:4
**heartily (1)**
7:15
**helpful (1)**
29:10
**hold (1)**
13:23
**hone (1)**
12:12
**Honor (18)**
5:17;6:14;7:14;
8:10,18;14:10,11;
15:10;17:3;19:5;
20:6,10;21:17;
22:21;23:6;26:19;
27:16;29:5
**Honors (6)**
4:4,8;12:3;13:25;
29:21,22
**hopefully (1)**
14:20
**huge (1)**
12:4

## I

**idea (1)**
22:17
**identified (1)**
15:23
**identifies (1)**
9:8
**improper (3)**
7:18;8:17;10:3
**inclined (2)**
8:7;27:19
**include (1)**
26:5
**including (1)**
9:19
**inconsistent (4)**
7:19;11:7,11;
13:19
**individuals (1)**
16:11
**information (6)**
5:9,14;9:23;12:23;
15:2,18
**initial (4)**
4:23;5:6;11:15;
22:16
**initiation (1)**
11:3
**inquire (1)**
28:20
**instance (1)**
11:8
**institute (1)**
20:3
**instituted (1)**
12:23,25
**intend (1)**
22:22
**intent (1)**
13:1
**interest (2)**
16:21;25:4
**interrogatories (1)**
24:13
**interrupt (2)**
7:25;19:2
**into (3)**
17:12;25:15;27:20
**invention (2)**
10:13;20:25
**inventors (1)**
23:10
**involved (1)**
23:12
**involvement (1)**
24:3
**IPR (8)**
7:19;9:1;10:1,1;
12:5;16:10;26:8;
28:25
**IPR2013-00106 (1)**

4:24
**IRVINE (2)**
4:1,19
**issue (19)**
8:15;9:6;15:23;
16:2;23:9,15;24:2,
14;25:2,7,12,18;
26:2,4,10,12,24;
27:18;28:1
**issues (6)**
9:1;12:15,16;23:7;
29:3,18
**item (4)**
15:12;16:12;
27:11;28:19
**items (1)**
15:15

## J

**Jared (2)**
4:12;26:25
**J-a-r-e-d (1)**
4:12
**JUDGE (41)**
4:7,21,23;5:20;
7:12,25;8:24;12:17;
13:22;14:3;15:4,12;
16:12;17:19;19:2,6,
9;20:1,8,11;21:1,13,
23;22:8,11,15,25;
23:2;24:19;25:20;
26:17,20;27:6,11;
28:4,13,19,24;29:2,
10,13
**justice (1)**
16:21

## K

**Ken (3)**
25:3,15;26:6
**kind (5)**
12:10,12,14;
17:16;19:3
**kinds (2)**
24:1,11
**knowledge (1)**
29:1
**knows (1)**
27:9

## L

**last (1)**
28:19
**later (2)**
9:5;17:25
**law (1)**
8:21
**lead (3)**
27:1,3,3
**least (4)**

7:23;9:20;14:12;
23:11
**leave (1)**
20:4
**left (3)**
11:20;13:11;25:19
**length (1)**
11:23
**less (1)**
7:4
**light (1)**
28:2
**likes (1)**
12:13
**limitation (2)**
21:19,24
**limited (2)**
7:9;23:25
**list (13)**
5:1,3,4,11,15,16;
15:14;19:19;20:9,11,
12;23:3;26:21
**little (3)**
5:3;6:1,10
**locating (1)**
11:13
**long (3)**
8:1;14:7;25:18
**longer (1)**
11:22
**look (3)**
15:15;16:25;22:18
**looking (2)**
5:4;26:23
**looks (1)**
17:20
**lot (1)**
15:20
**Lowell (1)**
4:5

## M

**Mafi (2)**
4:17,18
**M-a-f-i (1)**
4:18
**makes (1)**
7:4
**material (1)**
11:24
**Matt (6)**
4:5;5:18;14:25;
18:3;22:12;28:22
**matter (2)**
13:6;28:16
**may (8)**
5:25;8:22;17:10;
23:7;24:18;27:23,
24;28:3
**maybe (4)**
7:22;17:21;19:6;
24:12

**mean (2)**
15:20;25:3
**meets (1)**
6:17
**mention (1)**
6:5
**mentioned (1)**
24:23
**merited (1)**
17:13
**merits (1)**
21:21
**met (1)**
13:15
**might (3)**
15:16;19:14;26:13
**minimum (2)**
8:6;14:17
**minute (1)**
7:25
**minutes (2)**
7:22;13:24
**moment (1)**
13:23
**month (3)**
11:19;12:22;15:3
**months (4)**
11:18,19;13:11;
25:8
**more (5)**
7:15;22:24;23:4;
27:22,22
**motion (38)**
5:7,10,11,12,13,
24;6:3,7,11,15,17,18,
19;8:7,10;12:21;
13:18;15:1,2;16:24;
20:13,20,23;21:4,6,
16,25;22:1,6,7,18,
24;23:3;25:22,24;
26:1,5,21
**motions (9)**
5:2,4,15;13:10;
15:14,16,22;18:20;
19:19
**move (6)**
5:23;15:12;16:19;
19:11;20:9;26:20
**much (3)**
4:21;6:13;24:1

**N**

**nail (2)**
16:3;24:15
**name (1)**
4:15
**nearly (1)**
25:17
**necessary (2)**
25:1;28:3
**need (5)**
21:23;27:13;28:6,

15;29:15
**new (21)**
5:21;6:25;7:17;
9:19,20,23;10:2,4,5,
8,11,18,21;11:25;
12:8,8;13:15;16:17,
17;27:18,20
**NEWBOLES (26)**
4:4,5;5:17,18;
6:13;12:13,20;14:1,
25,25;15:20;17:23;
18:15;19:8,20;20:6,
10;22:10,12,12;
24:18,20;28:14,22,
22;29:22
**Newboles' (1)**
7:16
**next (5)**
15:8,9,12;27:11;
29:18
**normally (1)**
29:6
**note (3)**
5:2;19:21;28:8
**notice (2)**
5:6;18:6
**nowhere (1)**
10:9
**number (2)**
16:7;25:6
**numbers (1)**
19:24

**O**

**object (1)**
17:5
**objecting (2)**
18:24,25
**objection (1)**
17:2
**objections (5)**
17:11,12,18;18:7,
10
**objective (1)**
13:14
**obvious (1)**
13:5
**October (1)**
25:4
**offline (1)**
19:7
**once (2)**
16:2;21:13
**one (15)**
7:1;8:4;11:19;
12:22;13:24;14:8;
15:3;16:13;17:8;
23:7,9,12,21;26:11,
23
**one-month (1)**
6:4
**ones (1)**

13:20
**only (9)**
7:1;9:8;11:5,19;
17:9,21;21:7,10;
26:11
**onto (1)**
5:23
**oOo- (1)**
29:25
**open (1)**
29:19
**opine (1)**
7:5
**opinion (1)**
11:22
**opinions (2)**
9:11,12
**opportunity (1)**
5:7
**opposed (3)**
12:15;25:1,14
**opposing (4)**
5:5;9:13:10;22:23
**opposition (5)**
8:3,8;13:9;14:6;
15:6
**order (8)**
5:24;11:2;15:8;
18:1;19:16;22:21;
27:12;29:17
**ordinary (1)**
10:9
**original (1)**
19:21
**originally (1)**
7:6
**ought (1)**
14:17
**out (3)**
15:8;27:18,24
**outline (1)**
7:21
**over (2)**
21:10;29:7
**owner (19)**
4:9;6:25;7:13,20;
11:11;12:6;13:7;
14:6;15:22,24;16:7;
17:4;19:14;20:11;
21:2;22:17;26:9;
27:16;29:1
**owner's (4)**
20:9,19;23:8;
26:21

**P**

**page (1)**
19:24
**pages (8)**
9:21,21;10:10,13,
16;18:8,8;27:22
**paper (1)**

16:23
**paragraph (7)**
10:7,7,20,24,24;
11:14,14
**paragraphs (2)**
10:16;11:10
**paralegal (2)**
4:12;27:9
**paralegals (1)**
29:16
**part (8)**
7:11;10:15,16,19,
23;23:11;24:22;25:5
**particular (4)**
6:21;9:16;10:25;
28:16
**particularly (1)**
9:2
**parties (2)**
28:8,20
**parts (1)**
13:18
**party (3)**
5:5;19:4;26:4
**patent (26)**
4:9;6:25;7:12,20;
10:19,19;11:11;
12:6;13:7;14:6;
15:22,24;16:6;17:4;
19:14;20:9,11,19;
21:2;22:17;23:8,10;
26:9,21;27:15;29:1
**patents (1)**
10:18
**Pauley (1)**
10:23
**Pause (1)**
14:2
**per (2)**
17:25;18:22
**percent (1)**
9:22
**perhaps (4)**
21:19;26:14;
27:22,25
**period (1)**
12:2
**permission (1)**
25:21
**permit (1)**
8:22
**permitted (1)**
14:23
**person (2)**
10:8,11
**Personal (1)**
10:1
**petition (17)**
7:6;9:5,7,8,12,14;
10:6,10,19,23;11:2,
12,16,18,23;12:7;
23:16
**petitioner (17)**

4:5;6:12;9:11,14;
11:12,15;12:5,10,19;
15:17;17:6;19:18;
23:24;26:9;28:13,14,
22
**petitioner's (2)**
5:1;15:14
**petitions (2)**
9:2,7
**pieces (1)**
13:12
**Pieroni (7)**
23:10,22;24:5,21;
25:3,15;26:6
**Pieroni's (2)**
24:3,15
**planning (2)**
18:11,12
**pleading (1)**
18:5
**point (3)**
7:4;12:18;27:21
**points (1)**
7:23
**policy (2)**
12:3,4
**Popkin (1)**
10:15
**position (2)**
11:10,15
**positions (2)**
11:6,7
**Possibly (1)**
23:13
**post (2)**
11:3,3
**posture (1)**
21:2
**potential (2)**
15:16;20:13
**potentially (1)**
12:1
**practice (1)**
12:5
**pre-deposition (1)**
24:8
**prejudice (4)**
6:24;11:17;13:2,
16
**prejudicial (3)**
7:20;8:22;13:6
**preliminary (1)**
9:25
**premature (1)**
27:23
**prepare (3)**
5:6;11:25;12:1
**prescribed (1)**
13:9
**presented (1)**
23:18
**prior (5)**
7:9;10:14;13:12;

REDLINE DETECTION, LLC v.
STAR ENVIROTECH, INC.

16:7;20:25
**privity (7)**
23:3,15,19;24:2,5,
14;26:9
**problem (4)**
5:20;12:4;28:6,18
**problems (1)**
27:13
**procedural (1)**
26:24
**procedure (1)**
13:3
**procedures (4)**
7:19;13:8,10;
27:10
**proceed (1)**
22:6
**proceeding (7)**
7:18;20:25;21:11;
24:17,22;27:20;
28:25
**proceedings (2)**
14:2;16:16
**process (1)**
27:7
**production (1)**
24:7
**proper (1)**
14:22
**proposed (1)**
5:10
**provide (2)**
5:5;13:3
**provides (2)**
5:11;6:21
**PTAB (2)**
22:14;28:17
**purpose (2)**
5:4;13:1
**purposes (1)**
16:9
**pursuant (1)**
18:16
**push (1)**
28:2
**put (6)**
13:22;14:7,21;
16:2;17:12;19:14

## Q

**quickly (2)**
5:2;11:21

## R

**raised (2)**
15:24;23:8
**rare (1)**
26:7
**rather (1)**
8:15
**realize (2)**

5:21;26:7
**really (3)**
5:7;6:25;25:21
**reason (1)**
8:4
**recall (1)**
23:7
**receive (1)**
18:2
**received (1)**
18:21
**record (5)**
7:11;8:3,11;14:14;
25:5
**recorded (1)**
25:13
**Redline (12)**
4:6;18:6;23:12,13,
23,24;24:3,4,5,16;
26:3,3
**reel (1)**
25:6
**re-examination (1)**
25:10
**re-examinations (1)**
16:7
**reference (6)**
5:15,22;6:6;10:15;
11:5;16:5
**references (3)**
10:22,23;11:4
**referred (1)**
20:2
**regard (2)**
21:22;23:5
**regarding (3)**
15:24;23:3;24:23
**regards (6)**
7:24;9:16;11:13;
23:20;26:24;29:5
**regs (1)**
6:20
**reject (1)**
27:24
**related (1)**
5:12
**relating (1)**
5:9
**relationship (2)**
24:9,16
**relevant (1)**
12:24
**relies (2)**
9:11;10:14
**replace (1)**
20:4
**reporter (3)**
4:14,17;8:5
**Reporters (1)**
4:19
**request (7)**
6:2,8;8:8;14:11;
16:3;19:16;28:5

**requests (1)**
24:7
**require (1)**
27:25
**requires (3)**
11:21;22:10,13
**respects (1)**
6:16
**respond (1)**
12:19
**responding (2)**
12:7;13:10
**responds (1)**
11:1
**response (12)**
9:25;11:20;12:9;
17:11,17;18:6,21;
19:12;20:19;21:4,5;
23:8
**responses (1)**
16:13
**responsive (4)**
11:3;15:21;16:6;
18:7
**rest (1)**
16:2
**resubmit (1)**
19:24
**results (1)**
6:24
**review (1)**
11:25
**right (9)**
8:24;15:5,6,19;
16:10;18:2;19:10;
22:15;28:19
**rightfully (1)**
19:8
**routine (1)**
19:15
**rule (2)**
9:7;22:13
**rules (7)**
5:25;8:21;13:2;
14:24;17:23;21:14,
25

## S

**same (2)**
21:5,7
**sandbag (1)**
12:6
**schedule (3)**
27:14;28:1,7
**scheduling (2)**
18:1;27:12
**scheme (1)**
9:13
**Schlatter (5)**
4:11;20:16;21:12;
28:25;29:1
**second (3)**

23:2;27:1,2
**section (2)**
10:8,11
**seeing (1)**
16:3
**seek (1)**
14:15
**seeking (1)**
26:1
**seems (1)**
6:20
**separate (3)**
16:13;19:13;20:20
**serve (2)**
17:24;18:17
**served (5)**
17:9,10,22,24;18:4
**session (1)**
29:24
**set (2)**
28:17;29:16
**settlement (1)**
28:21
**seven (1)**
9:20
**shall (1)**
20:7
**short (3)**
5:8;12:2;22:21
**shortened (1)**
8:19
**show (1)**
16:20
**shows (1)**
13:14
**side (2)**
5:3;29:3
**sides (3)**
6:10;15:4;23:24
**simple (1)**
7:8
**simply (3)**
8:20;10:2;27:24
**sit (1)**
8:10
**site (1)**
15:25
**situation (1)**
26:11
**six (1)**
11:18
**skill (2)**
10:9,12
**smoke (1)**
10:6
**smokemachinescom (1)**
15:25
**Snoeyenbos (1)**
4:13
**S-n-o-e-y-e-n-b-o-s (1)**
4:13
**sometimes (1)**
22:15

**somewhat (1)**
23:12
**Sorry (2)**
19:5;22:12
**sounds (2)**
8:1;25:23
**span (1)**
12:2
**speaking (2)**
5:18;14:25
**specifically (2)**
24:10,14
**stage (5)**
7:18;8:17;15:19;
17:17;20:15
**standpoint (1)**
18:5
**stands (1)**
27:14
**Star (3)**
4:9;18:7;25:19
**start (2)**
5:1;6:12
**statement (1)**
5:8
**statute (1)**
15:1
**statutory (1)**
9:13
**steps (2)**
15:9;29:18
**still (7)**
13:11;16:1;20:14;
23:14;25:20,23;
29:19
**stipulate (1)**
28:9
**story (1)**
23:24
**Stoyle (1)**
10:24
**streamline (1)**
12:12
**strike (1)**
13:20
**submission (4)**
7:3,17;13:3;19:21
**submit (4)**
5:7,14;12:21;15:2
**submits (3)**
9:14;15:22;16:7
**submitted (8)**
7:6;9:12;10:3;
16:8;9;18:16;25:8,18
**submitting (2)**
7:1;12:8
**substantive (1)**
9:1
**sufficient (1)**
23:19
**suggest (1)**
19:23
**supplement (5)**

5:14,24;6:11,19;
  17:15
supplemental (9)
  5:14;9:17,18;
  12:21,23;14:23;
  15:2;17:8;18:4
supporting (3)
  9:4,7,10
supports (1)
  9:9
supposed (2)
  6:2;18:17
sure (5)
  16:19;20:5;21:24;
  23:1;27:7

T

talking (1)
  24:20
technology (1)
  7:8
teleconference (2)
  4:15;29:24
ten (1)
  25:8
terms (4)
  6:15,16;10:5;
  15:22
Terry (2)
  4:13;27:9
T-e-r-r-y (1)
  4:13
testimony (1)
  6:22
theories (1)
  12:8
third (1)
  19:4
third-party (7)
  16:14,15;24:21,
  23;26:5,7,14
thought (2)
  17:6,12
three (3)
  18:8;27:5;28:10
Thursday (1)
  4:2
timing (1)
  6:16
today (3)
  4:15,24;8:9
together (2)
  14:8;28:11
took (1)
  11:15
Tracy (1)
  4:16
transcribing (1)
  4:15
transcript (2)
  29:6,8
trial (5)

5:14,16;12:9,23,
  24
tried (1)
  6:15
try (2)
  20:5;21:11
trying (1)
  25:14
twice (1)
  25:10
two (13)
  10:5,18,22;11:19;
  13:11,11,24;15:8;
  16:12;20:12;21:19;
  23:22;24:6
type (3)
  6:2;13:16;14:22
typical (1)
  12:15

U

ultimately (1)
  27:19
under (9)
  6:3;9:2,3;14:4,24;
  15:7;19:14,15;26:18
understood (1)
  10:12
undue (1)
  7:10
unique (2)
  26:8,10
unless (2)
  14:18;26:20
unusual (2)
  21:1;26:15
up (7)
  16:23;18:20;
  21:18;27:13;29:4,15,
  16
upon (1)
  23:17

V

versus (1)
  10:1
view (2)
  7:7;12:18
violates (2)
  8:21,21

W

wait (5)
  12:10;15:18;21:3,
  8,10
waiting (1)
  12:6
wants (2)
  13:7;29:4
way (2)

20:20;21:10
Web (2)
  10:1;15:25
welcome (1)
  4:22
weren't (4)
  10:18;23:18;25:7,
  12
whole (3)
  10:8,11;21:9
who's (1)
  4:14
willy-nilly (1)
  14:16
within (3)
  12:22;15:3;29:11
without (1)
  8:23
wondering (3)
  15:17;20:13;23:4
word (5)
  10:6,7;11:8,9,13
wordy (1)
  5:3
work (1)
  28:11
writing (3)
  8:16;14:7,22
written (3)
  8:2,8;13:9

Y

year (2)
  21:8;25:17

1

1 (2)
  4:2;13:4
10 (3)
  10:13;14:9,9
11:00 (1)
  4:2
11:37 (1)
  29:24
12 (1)
  7:5
121a (2)
  22:10,13
123a (1)
  12:21
123-A (1)
  13:1
123a1 (1)
  6:16
19 (1)
  10:10
1999 (1)
  15:25

2

2 (2)
  13:4;16:12
20 (1)
  16:23
2001 (1)
  25:5
2002 (1)
  25:8
2011 (1)
  25:10
2012-00001 (1)
  16:22
2013 (1)
  4:2
2013-82 (1)
  10:2
2013-85 (1)
  10:2
22nd (1)
  25:8
24 (1)
  11:10
25 (1)
  11:10
26 (1)
  11:14
26th (1)
  25:4
27 (2)
  10:7;11:14
28 (1)
  10:7

3

30 (1)
  9:21
312 (1)
  9:2
312a3B (1)
  9:3
34 (2)
  9:21;10:24
36 (1)
  10:20
37 (1)
  18:16

4

41 (1)
  10:16
42.123a1 (1)
  6:3
42.51b (1)
  19:15
42.53d2 (1)
  6:21
42.63d (1)
  19:22
42.64b2 (1)
  18:16
44 (1)

9:21
48 (1)
  9:22
49 (1)
  10:24

5

54 (1)
  10:24

6

60-page (1)
  11:22
64 (1)
  10:13
64b2 (1)
  18:22

7

7 (1)
  10:10
70 (1)
  9:22
78 (1)
  10:16

8

85 (1)
  10:17

IPR2013-00106
Redline Detection v. STAR EnviroTech

## <u>CERTIFICATE OF SERVICE</u>

    I hereby certify that true and correct copies of **STAR NOTICE OF FILING TRANSCRIPT OF AUGUST 1, 2013 INITIAL CONFERENCE CALL and THE TRANSCRIPT** are being served on August 2, 2013, via FedEx and via email pursuant to 37 C.F.R. § 42.6(e) to counsel for petitioner Redline Detection, LLC, at the addresses below:

Matthew A. Newboles
mnewboles@stetinalaw.com
Lowell Anderson
landerson@stetinalaw.com
STETINA BRUNDA GARRED & BRUCKER
75 Enterprise, Suite 250
Aliso Viejo, CA 92656

Dated: <u>August 2, 2013          </u>       /Edward A.Schlatter/
                                    Edward A. Schlatter, Reg. No. 32,297
                                    Brenton R. Babcock, Reg. No. 39,592
                                    Attorneys for Patent Owner
                                    STAR EnviroTech, Inc.

15938124

080213

Trials@uspto.gov
Tel: 571-272-7822

Paper 24
Entered: August 5, 2013

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

REDLINE DETECTION, LLC
Petitioner

v.

STAR ENVIROTECH, INC.
Patent Owner
_____

Case IPR2013-00106
Patent 6,526,808
_____

Before SALLY C. MEDLEY, JENNIFER S. BISK, and, JAMES B. ARPIN,
*Administrative Patent Judges.*

BISK, *Administrative Patent Judge*

ORDER
Conduct of the Proceeding
*37 C.F.R. § 42.5*

On August 1, 2013, the initial conference call for this proceeding was held
between respective counsel for the parties and Judges Medley, Bisk, and Arpin. A
court reporter was present on the call and a transcript of the call was filed on
August 2, 2013. Paper 23 ("Transcript"). Both parties filed a list of intended

**A198**

Case IPR2013-00106
Patent 6,526,808

motions list prior to the call.  Paper 21 ("Petitioner's List"); Paper 22 ("Patent Owner's List").

*Motion to Submit Supplemental Information*

On July 30, 2013, Petitioner ("Redline") filed a "Motion for Supplemental Disclosure of New Exhibits" ("Motion").  Paper 19 ("Mot.").  With respect to the filing of the Motion, we noted that section 37 C.F.R. § 42.123(a) requires the filing party to request authorization to file a motion to submit supplemental information. Redline made no such request prior to filing the Motion.  Because the Motion was filed within one month of date of institution, July 1, 2013, we stated that we would consider the filing of the Motion itself to include the request to file.  However, any future motions that require advance authorization may result in dismissal or expungement if they are filed without prior authorization.

The Motion seeks to submit four new exhibits: (1) Ex. 1039, a sixty page declaration of Dr. Michael St. Denis, a purported expert who "explains several aspects of the references on which the IPR was granted and further helps establish reasons for combining the references, and the reasons for unpatentability of claims 9 and 10 based on the references on which IPR was granted" (Mot. 2); (2) Ex. 1040, the resume of Michael St. Denis (Mot. 3); (3) Ex. 1041, a copy of U.S. Patent 3,250,723 ("Fortney") (*id.*); and (4) Ex. 1042, a copy of U.S. Patent 3,432,439 ("Dickman") (*id.*).  During the call, Redline stated that the Motion is consistent with our rules, in particular, § 42.53(d)(2), which provides for submission of further evidence before deposition or testimony is to be taken. Transcript 6.  Redline added that Patent Owner ("Star Envirotech") would not be prejudiced by the new exhibits because there is nothing new in the declaration.  *Id.* at 6-7.  Further, according to Redline, "submission of the declaration at this point makes things far less complex than had we had an expert opine as to all 12 grounds

Case IPR2013-00106
Patent 6,526,808

as originally submitted in our petition." *Id.* at 7.

Star Envirotech responds that submitting the new declaration violates both the law and the rules, and is extremely prejudicial. *Id.* at 8. First, Star Envirotech points to 35 U.S.C. § 312 (a)(3), which states that a petition "may be considered only if—the petitioner identifies in writing . . . the evidence that supports the grounds for the challenge to each claim, including-- (B) affidavits or declarations of supporting evidence and opinions, if the petitioner relies on expert opinions." *Id.* at 8-9. According to Star Envirotech, the statute requires a declaration to be filed with the petition, and not after institution. *Id.* at 9. Second, Star Envirotech argues that the new declaration is not just supplemental evidence, but is a completely new argument, with brand new claim charts that include new information and new claim terms that were not argued in the petition. *Id.* at 9-10. In addition to the claim charts, Star Envirotech asserts that the declaration adds information not included in the petition, including argument regarding the knowledge of a person of skill in the art, new characterizations of references that were not part of the petition, and discussions of references that are not part of the petition. *Id.* at 10. Finally, Star Envirotech argues that this declaration is a *responsive* declaration post-initiation in that it actually references the Board's decision and takes positions that are inconsistent with positions taken in the petition—for example, by adopting the Board's definition of "flammable," which is different than proposed in the petition. *Id.* at 10-11.

Star Envirotech asserts that it is extremely prejudicial to have to respond to what amounts to essentially a new petition with only two months left before the response is due. *Id.* at 11. According to Star Envirotech, Redline essentially has waited for the petition to be granted and then "sandbagged" Star Envirotech by creating a declaration including new argument and theories in response to the

**A200**

Case IPR2013-00106
Patent 6,526,808

Board's decision.  *Id.* at 12.

Under 37 C.F.R. § 42.123, a party may file a motion to submit supplemental information if a request for authorization to file such a motion is made within one month of the date the trial is instituted.  Nothing in the rule suggests, however, that such a motion would be granted no matter the circumstance.  We do not read 37 C.F.R. § 42.123 as permitting a petitioner to wait for the Board to narrow the grounds submitted in the petition in order to create a more focused declaration at less expense that will bolster its position in the chosen grounds.  *See id.* at 7, 12.  This is particularly true if the evidence contained in the declaration was reasonably available at the time of filing of the petition.  "The filing of a petition for *inter partes* review should not be turned into a two-stage process," first to get the Board to narrow the issues, and second to complete the petition based on the issues left in the case.  *ZTE Corp. v. ContentGuard Holdings, Inc.*, IPR2013-00139, Paper 27 at 3.

Here, Redline does not make any attempt to justify the submission of an expert declaration after filing its petition and after a decision to institute has been made except to note that the move was cost effective—"submission of the declaration at this point makes things far less complex than had we had an expert opine as to all 12 grounds as originally submitted in our petition."  Transcript 7.  Redline's petition did not rely on any expert opinion and Redline has not alleged that any of the arguments or evidence in the newly submitted declaration is information that reasonably could not have been submitted with the Petition.  The Board chose two of twelve grounds proposed by Redline, thus Redline could have submitted expert opinion testimony to support those grounds with the petition itself.  Further, Redline was aware of both Fortney and Dickman at the time of the filing of the Petition, yet chose not to introduce either reference at that time for the

Case IPR2013-00106
Patent 6,526,808

Board's consideration. *ZTE Corp. v. ContentGuard Holdings, Inc.*, IPR2013-00139 (Paper 27) 3. Therefore, Redline has not established sufficient basis now for submitting Fortney or Dickman.

Moreover, Redline's submission of the "supplemental evidence" is in essence something more than just supplemental evidence; at least the declaration contains arguments and responses to the Board's decision to institute the *inter partes* review. For example, the newly submitted declaration responds to the Board's claim interpretation and other points made in the decision. However, the proper course is for the Patent Owner to file a Patent Owner Response, followed by the filing of a reply by the Petitioner. Redline has not explained in any meaningful way why we should deviate from that course.

For the foregoing reasons, Redline has not established sufficient basis for submitting Exhibits 1039, 1040, 1041, and 1042 at this point in the proceeding.

*Motion for Additional Discovery*

Counsel for Star Envirotech requests authorization to file a motion for additional discovery relating to the defense of assignor estoppel. In particular, Star Envirotech seeks additional evidence relating to whether Mr. Pieroni, an inventor of the '808 patent is in privity with Redline, including a deposition of Mr. Pieroni, several related documents and contracts, and half a dozen or so interrogatories specifically directed to this issue. Transcript 23-24; Patent Owner's List 1.

Upon consideration of Star Envirotech's request, we determine that briefing on this matter is warranted. Therefore, Star Envirotech is authorized to file a motion for additional discovery. Star Envirotech should prepare its motion for additional discovery with the statutory and regulatory considerations and the relevant precedent regarding the defense of assignor estoppel in mind when explaining specifically what discovery is being requested and including a showing

5

Case IPR2013-00106
Patent 6,526,808

of why each item is necessary in the interests of justice.  In particular, the "Decision on Motion for Additional Discovery" entered in IPR2012-00001, Paper 26 can be used as guidance.  A discovery request will not be granted if the request is unduly broad or burdensome or if the showing consists of a mere allegation that something useful will be found.  In its motion, Star Envirotech also should apprise the Board of any efforts made to contact Mr. Pieroni to obtain his voluntary cooperation and the results of any such efforts.

Redline is authorized to file an opposition to the motion.  In its opposition, Redline should inform the Board of the extent to which, if any, they have control over Mr. Pieroni (i.e. Redline should inform the Board if Mr. Pieroni is an officer or employee that they can require to attend a deposition).

*Other Potential Motions*

Counsel for Redline represented that they may seek discovery from archive.org in the event that Star Envirotech challenges the authenticity of the 1999 smokemachines.com Web site.  We noted that in the event that authorization for such a motion is requested, this would be considered additional discovery.

Counsel for Star Envirotech represented that Star Envirotech may file a motion to amend.  As discussed, in filing its motion to amend, Star Envirotech should note the guidance provided in Paper 26 of IPR2012-00027, dated June 11, 2013.  Further guidance is available in the Office Patent Trial Practice Guide[1], 37 C.F.R. § 42.121, and IPR2012-00005, Paper 27.  Further, prior to filing a motion to amend Star Envirotech should request a call with the panel to confer.

Finally, the parties represented that they have no settlement discussions to report and that there are no problems, at the present time, with the Scheduling

---

[1] 77 Fed. Reg. 48766 (Aug. 14, 2012).

6

Case IPR2013-00106
Patent 6,526,808

Order, entered July 1, 2013.

Accordingly, it is

**ORDERED** that Redline's Motion to Submit Supplemental Information is *denied*;

**FURTHER ORDERED** that Exhibits 1039, 1040, 1041, and 1042 are expunged from the record;

**FURTHER ORDERED** that Star Envirotech is authorized to file a motion for additional discovery under 37 C.F.R. § 42.51(b)(2) by August 8, 2013, limited to 10 pages; Redline is authorized to file an opposition by August 13, 2013, also limited to 10 pages; and no reply is authorized;

**FURTHER ORDERED** that no other motions are authorized at this time; and

**FURTHER ORDERED** that the due dates specified in the Scheduling Order dated July 1, 2013 remain unchanged.

Case IPR2013-00106
Patent 6,526,808

PETITIONER:

Matthew A. Newboles
Lowell Anderson
STETINA BRUNDA GARRED & BRUCKER
mnewboles@stetinalaw.com
landerson@stetinlaw.com

PATENT OWNER:

Edward A. Schlatter
Brenton R. Babcock
KNOBBE, MARTENS, OLSON & BEAR, LLP
Edward.schlatter@knobbe.com
babcock@knobbe.com

8

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

Redline Detection, LLC
Petitioner

v.

Star Envirotech, Inc.
Patent Owner

Case IPR2013-00106
U.S. Patent No. 6,526,808

**PETITIONER'S REQUEST FOR REHEARING PURSUANT TO
37 C.F.R. § 42.71(d)**

# TABLE OF CONTENTS

**Page(s)**

I.   INTRODUCTION AND FACTUAL BACKGROUND           1

II.  STATUTORY REQUIREMENTS - REHEARINGS           4

III. REQUIREMENTS FOR FILING SUPPLEMENTAL
     INFORMATION PURSUANT TO 37 C.F.R. §42.123(A)    4

IV.  THE ORDER DENYING PETITIONER'S MOTION AND
     EXPUNGING EXHIBITS 1039-1042 IS CONTRARY TO
     THE REGULATIONS AND THE PTO INTERPRETATION
     OF THOSE REGULATIONS                           5

     A.  Legislative History of 37 C.F.R. §42.123(a) – (c) and the
         PTO's Interpretation of That Regulation      6

         1.  Rule 42.123(a), and the PTO's Interpretation of the
             Rule, Specifically Contemplate Filing
             Supplemental Information and State That the
             Patent Owner Has Sufficient Time to Respond     9

         2.  Limiting Supplemental Information under
             §42.123(a) to Rebuttal Evidence or Requiring
             Good Cause Was Rejected                        11

         3.  New Information Relevant to an IPR Claim Is
             Specifically Permitted While New Grounds May
             or May Not Be Permitted                        12

     B.  Petitioner Is Obligated To Comply With the
         Requirements of 37 C.F.R. §42.123(a), Not Some Other,
         Unarticulated Standard                             13

     C.  Further Procedural Defects in Denying Petitioner's
         Motion                                             14

V.   CONCLUSION                                            15

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*ZTE Corp. v. ContentGuard Holdings, Inc.*,
   IPR 2013-00139, paper 27 at 3, which issued July 30, 2013                    14

## STATUTES

35 U.S.C. §316(a)(3)                                                          6

35 U.S.C. §316(b)                                                         6, 13

37 C.F.R. §42.108(b)                                                        11

37 C.F.R. §42.123                        1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 15

37 C.F.R. §42.123(a)                      1, 3, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15

37 C.F.R. §42.123(b)                                                  3, 5, 8, 10

37 C.F.R. §42.123(c)                                                  3, 5, 8, 11

37 C.F.R. §42.71(d)                                                        1, 4

37 C.F.R. §42.223                                                      9, 10, 11

37 C.F.R. §42.223(b)                                                        10

37 C.F.R. §42.223(c)                                                        11

# I.     INTRODUCTION AND FACTUAL BACKGROUND

Pursuant to 37 C.F.R. § 42.71(d), Petitioner, Redline Detection, LLC ("Redline"), requests rehearing of the Order denying Petitioner's Motion to Submit Supplemental Information and expunging Exhibits 1039, 1040, 1041, and 1042 issued on August 5, 2013 ("Order"). Paper 24.  The Order is believed to be contrary to applicable law, especially as stated by the Patent Office's Regulations and Response to Comments on proposed regulation 42.123 and final regulation 42.123(a).

The supplemental information at issue is the Declaration of Dr. Michael St. Denis (Ex. 1039) and three documents discussed in the declaration: the resume of Dr. Michael St. Denis (Ex. 1040); United States Patent No. 3,250,723 to Fortney (Ex. 1041); and United States Patent No. 3,432,439 to Dickman (Ex. 1042), all submitted pursuant to 37 C.F.R. §42.123(a).   Petitioner's Motion was made within one month of the institution of trial, the motion explained that the four exhibits at issue were relevant to claims 9 and 10 of U.S. Patent No. 6,526,808 for which the trial had been instituted, and the Board considered the filing of the motion to be a request for authorization to file the motion. Notwithstanding, Petitioner's Motion was denied because:

> We do not read 37 C.F.R. § 42.123 as permitting a petitioner to
> wait for the Board to narrow the grounds submitted in the
> petition in order to create a more focused declaration at less
> expense that will bolster its petition in the chosen grounds. *See*
> *id.* at 7, 12.  This is particularly true if the evidence contained in
> the declaration was reasonably available at the time of filing the
> petition.  [Order at 4.]

As discussed later, this is contrary to the PTO's published interpretation of
Rule 42.123.

As to Petitioner's expert opinion testimony, the Order stated that
because "[t]he Board chose two of twelve grounds proposed by Redline,
thus Redline could have submitted expert opinion testimony to support those
grounds with the Petition itself."  *Id.*  The Order also indicated that
Petitioner "was aware of both Fortney and Dickman at the time of the filing
of the petition, yet chose not to introduce either reference at that time for the
Board's consideration" and thus Petitioner "has not established sufficient
basis now for submitting Fortney or Dickman."  *Id.* at 4-5.  The Board also
objected to Petitioner's submission, stating that Petitioner's "newly
submitted declaration responds to the Board's claim interpretation and other
points made in the Decision [granting *inter partes* review (IPR)]," and
concluded that Petitioner "has not established sufficient basis for submitting
the [subject exhibits] at this point in the proceeding."  *Id.* at 5.

The legislative history and the PTO "Response" to comments on the proposed §42.123 establish the PTO's position that previously known evidence submitted under issued §42.123(a) shall be entered as long as it is "relevant" to an IPR "claim," and further, that submitting the information within one month of the IPR being instituted does not prejudice the patent owner or warrant exclusion.   Indeed, §42.123(b) was added to address concerns on later submissions and §42.123(c) was added to address concerns on "irrelevant" information – thus reinforcing that the sole test under §42.123(a) is relevance to an IPR claim.  The PTO Responses reject the very bases on which Redline's supplemental information was excluded, and also explain that even information establishing a new ground of unpatentability may be submitted and accepted on a case-by-case basis. As such, any alleged "newness" of the present information does not prevent admission as the information is relevant to IPR claims 9 and 10 and, further, does not raise a new ground of unpatentability.

The Order makes no reference as to whether or not the supplemental information is relevant to an IPR claim, which is the sole basis for admissibility in a timely filed motion to submit supplemental evidence, per §42.123(a).  Relevance was also never disputed during the August 1st, 2013 phone conference. Paper 23. As the supplemental evidence provides

testimony and support for combining the references of record in the instituted IPR, it is relevant not just to IPR claims 9 and 10, but to the two existing IPR grounds while creating no new ground of unpatentability.

Since the relevance of the exhibits was never disputed and the requirements of §42.123(a) were satisfied, rehearing is requested to withdraw the Order and grant the motion to submit and file the exhibits.

## II.    STATUTORY REQUIREMENTS - REHEARINGS

37 C.F.R. § 42.71(d) provides a Request for Rehearing without prior authorization on the following basis:

> (d) . . . The request must specifically identify all matters the party believes the Board misapprehended or overlooked, and the place where each matter was previously addressed in a motion, an opposition, or a reply. A request for rehearing does not toll times for taking action. Any request must be filed:
>
> (1) Within 14 days of the entry of a non-final decision. . .

## III.    REQUIREMENTS FOR FILING SUPPLEMENTAL INFORMATION PURSUANT TO 37 C.F.R. §42.123(a)

The submission of supplemental information within one month of the institution of an *inter partes* review is governed by 37 C.F.R. §42.123(a), which provides as follows:

(a) *Motion to submit supplemental information*. Once a trial has been instituted, a party may file a motion to submit supplemental information in accordance with the following requirements:

(1) A request for the authorization to file a motion to submit supplemental information is made within one month of the date the trial is instituted.

(2) The supplemental information must be relevant to a claim for which the trial has been instituted.

Under §42.123(a), a motion to submit supplemental information only has two requirements, namely, 1) that the request be made within one month of the date the trial is instituted, and 2) that the supplemental information is relevant to a claim for which the trial has been instituted. Both requirements have been met in the present case. It is irrelevant whether or not Petitioner knew of the information when the petition was filed. Such analysis only applies to information submitted after one month (§42.123(b)), or if the information is not relevant to the IPR claims (§42.123(c)).

## IV. THE ORDER DENYING PETITIONER'S MOTION AND EXPUNGING EXHIBITS 1039-1042 IS CONTRARY TO THE REGULATIONS

Petitioner requests reconsideration and withdrawal of the Order, as the reasons articulated in the Order, and in particular at pages 4-5 thereof, apply

an incorrect standard. Specifically, the bases on which the Order was granted are contrary to the criteria of §42.123(a). As such, Redline's exhibits should be entered, as relevance (the only issue at hand) was never disputed.

## A. Legislative History of 37 C.F.R. §42.123(a) – (c) and the PTO's Interpretation of That Regulation

The standards for supplemental submissions under 37 C.F.R. §42.123(a) are set forth by the applicable statutes, regulations, and the Patent Office's explanatory Responses to comments that interpret those regulations. All of these show that the only criteria for submitting supplemental information under §42.123(a) are authorization, timeliness (i.e., within one month of instituting trial) and relevance to a claim on which trial has been instituted.

The Director of the Patent Office was authorized by statute to prescribe regulations for "establishing procedures for the submission of supplemental information after the petition is filed." 35 U.S.C. §316(a)(3). In doing so the "Director shall consider the effect of any such regulation on the economy, the integrity of the patent system, the efficient administration of the Office, and the ability of the Office to timely complete proceedings instituted under this chapter." 35 U.S.C. § 316(b).

Regulations prescribing the submission of supplemental information were proposed on January 31, 2012. Fed. Reg. Vol. 77, No. 28, Feb. 10, 2012 (Ex. 1045). Specifically, the discussion of proposed §42.123 noted that:

> As the institution of the *inter partes* review is not based upon supplemental information, the proposed rule would provide that motions identifying supplemental information be filed after the institution of the *inter partes* review. [*Id*. at 7047].

The proposed supplemental information rule placed no limits on the supplemental information's content other than that the information be relevant to a ground on which trial was instituted. No time limit was placed on when the information was acquired. The originally proposed Rule 42.123 read:

> Once a trial has been instituted, a petitioner may request authorization to file for a motion identifying supplemental information *relevant to a ground* for which the trial has been instituted. The request must be made within one month of the date the trial is instituted. [*Id.* at 7060 (emphasis added).]

Rule 42.123(a) as issued rearranged, but did not change, the one-month time limit or authorization request. However, the scope of potential supplemental information was *broadened* by requiring the supplemental information be relevant to a "claim," rather than relevant to the specific

"ground" or "grounds" for which trial was instituted. The Rule as issued by the Patent Office reads:

(a) *Motion to submit supplemental information.*  Once a trial has been instituted, a party may file a motion to submit supplemental information in accordance with the following requirements:

> *(1)* A request for the authorization to file a motion to submit supplemental information is made within one month of the date *the trial is instituted.*
>
> *(2)*  The supplemental information must be relevant to a claim for which the trial has been instituted.  [Fed. Reg. Vol. 77, No. 157, Aug. 14, 2012, 48729; 37 C.F.R. § 42.123 (Ex. 1046) (emphasis added).]

New §§42.123(b) and (c) were also added, with section (b) addressing the submission of supplemental information more than one month after trial was instituted and section (c) addressing the submission of information not relevant to a claim for which trial was instituted.   In explaining the differences between the proposed and final regulations, the Patent Office noted that on one hand supplemental information submitted within one month need only be "relevant" to an IPR claim while on the other hand later submitted information, or information not "relevant" to an IPR claim, must also meet the requirements that the submission be in the interests of justice and that the information could not have been reasonably obtained earlier:

As to filing a supplemental information during *inter partes,* post-grant and covered business method patent reviews, the final rule clarifies that a request for the authorization to file a motion to submit supplement information is made within one month of the date the trial is instituted, and the information must be relevant to a claim for which the trial has been instituted (§§42.123(a) and 42.223(a)). A petitioner who seeks to submit late information, or information that is not relevant to a claim under review, will be required to show why the information reasonably could not have been earlier obtained, and that consideration of the information would be in the interests-of-justice. [*Id.* at 48681-82.]

Thus, the only test under §42.123(a) is relevance to an IPR claim. This conclusion is reinforced by the following PTO interpretation of §42.123(a)-(c).

## 1.    Rule 42.123(a), and the PTO's Interpretation of the Rule, Specifically Contemplate Filing Supplemental Information and State That the Patent Owner Has Sufficient Time to Respond

In the comments published with the issuance of the revised regulations, the Patent Office noted that some parties wanted the entirety of the petitioner's case disclosed with the petition and expressed concern about the unfairness of holding back evidence, while others favored later submission and noted such submissions were authorized under the AIA.  *Id.*

at 48707, Comment 91.    The Patent Office's response was to create a compromise by authorizing submission of supplemental evidence within one month of an IPR's institution under §42.123(a) if it was relevant to an IPR claim, while setting higher standards for later submitted evidence or evidence that was not "relevant" to an IPR claim. In doing so, the Patent Office expressly found that the Patent Owner would have sufficient time to respond to any supplemental submission made under §42.123(a):

> *Response:* Since the request must be made within one month of the date the trial is instituted, the patent owner will have sufficient time to address any new information submitted by the petitioner, except in the situation where the party satisfies the requirements of §42.123(b) or 42.223(b). The Office understands the concerns related to late submissions of supplemental information. Therefore, the Office has modified the proposed provisions set forth in §§ 42.123 and 42.223 to provide that any request not made within one month must show why the information reasonably could not have been obtained earlier, and that consideration for the supplemental information would be in the interests-of-justice. *See* §§ 42.123(b) and 42.223(b).

> Further, supplemental information must be relevant to a claim for which the trial has been instituted. The final rule clarifies that if the submission is not relevant to a claim for which the trial has been instituted, the party must show that the

information reasonably could not have been obtained earlier and that consideration of the supplemental information would be in the interests-of-justice. *See* §§ 42.123(c) and 42.223(c). [*Id.*]

In short, the PTO has conclusively stated that 1) not all evidence must be presented with the petition, 2) the sole test for submitting supplemental information within one month under §42.123(a) is relevance to an IPR claim, 3) that the Patent Owner has enough time to respond to any such submission and will not be prejudiced.

## 2.    Limiting Supplemental Information under §42.123(a) to Rebuttal Evidence or Requiring Good Cause Was Rejected

Comment 92 addressed requests to limit supplemental information to rebuttal evidence, credibility evidence, or to require good cause. *Id.* at 48707-08. The PTO responded that the rules did not adopt the good cause standard, noting that "Petitioners are encouraged to set forth their best grounds of unpatentability and supporting evidence in their petitions, lest the petitioner risk a determination by the Board not to institute the review or deny the asserted grounds of unpatentability (§42.108(b))." *Id.* at 48708. Moreover, the ability to sanction for unnecessary delay, the "interests of justice" requirement for late submission, and the ability to extend time for

review were noted as tools for addressing a petitioner "sandbagging" a patent owner. *Id*. As such, not submitting information with the petition risks the IPR not being instituted, but does not affect the later, supplemental submission of information under §42.123(a).

### 3.    New Information Relevant to an IPR Claim Is Specifically Permitted While New Grounds May or May Not Be Permitted

Comment 93 addressed the submission of new evidence to ensure "all pertinent issues" were resolved, even new grounds of unpatentability. The PTO response found that the §42.123 standards were 1) sufficient to address timeliness and relevance of the information, 2) reaffirmed the "relevant to a claim for which the trial has been instituted" standard of 42.123(a), and 3) implied even new grounds could be raised if it were in the interests of justice. *Id.* Specifically, the Response recognized that Section 42.123, as adopted in the final rule, provides that a party may seek authorization to file a motion to submit supplemental evidence relevant to a claim for which the trial has been instituted within one month of the date the trial is instituted and, further, that "the evidence may be relevant to a new ground of unpatentability, [in that situation] the party, however, must additionally show that consideration of the supplemental evidence would be in the interests-of-justice." *Id.*

## B. Petitioner Is Obligated To Comply With the Requirements of 37 C.F.R. §42.123(a), Not Some Other, Unarticulated Standard

The Patent Office issued these regulations under its rulemaking authority, after notice and comment, as set forth in the Administrative Procedures Act (APA). *See Id.* at 48681. These regulations were prescribed in compliance with and implement the statutory considerations of economy, integrity, efficient administration and timely completeness of *inter partes* reviews. 35 U.S.C. § 316(b). Compliance with these requirements was expressly noted by the Patent Office in the response to Comment 91, which stated that issued §42.123(a) set forth the proper criteria for submitting supplemental information within one month. *Id.* at 48707.

The Order denying Petitioner's Motion to Submit Supplemental Information, however, is based on previously unarticulated standards entirely different from the published requirements of 37 C.F.R. §42.123(a) as interpreted by the PTO. Specifically, Petitioner's Motion under 42.123(a) was denied based upon the Board's position that Petitioner could have submitted its expert opinion testimony and the Fortney and Dickman references at the time of the filing of the Petition, and that the burden was on Petitioner to establish sufficient basis for submitting such exhibits at this point in the proceeding. Order at 4-5. Section 42.123(a) simply does not

place any such burden on Petitioner. Such obligations are set forth only under subsections (b) and (c) of §42.123. The PTO Responses to Comments 91-93 and §42.123(a) are contrary to the basis and criteria on which exclusion was ordered. Further, instead of reviewing Petitioner's Motion in compliance with the published requirements of 37 C.F.R. §42.123(a), the Order instead relies upon *ZTE Corp. v. ContentGuard Holdings, Inc.*, IPR 2013-00139, paper 27 at 3, which issued July 30, 2013. *ZTE* was cited for: "the filing of a Petition for *Inter Partes* Review should not be turned into a two-stage process, first to get the Board to narrow the issues, and second to complete the petition based on the issues left in the case." Order at 4. Such ruling, however, disregards the published requirements for submissions made pursuant to §42.123(a) and the PTO's position stated in Response to Comments 91-93. *Id.* at 48707-08. There is likewise no authority for the Board to impose requirements of subsections (b) and (c), namely, that such evidence could not have been obtained earlier, when those requirements were intentionally omitted from the final implementation of §42.123(a).

### C. <u>Further Procedural Defects in Denying Petitioner's Motion</u>

To preserve the record, Petitioner objects to the lack of due process in rendering the Order, which was based on oral argument at the initial conference call without any advance notice to Petitioner as to the basis on

which Star objected, without notice of the criteria to be applied other than

that of §42.123(a), and without the opportunity for a written response after

time to consider the objections and new criteria.

Redline therefore submits that the basis for denying its Motion to

Submit Supplemental Information and accompanying exhibits is contrary to

the law and established rules.  Indeed, if correct, the Board's Order makes

the application of §42.123(a) arbitrary and completely ineffectual for

Redline, or any future petitioner for that matter, to attempt to submit any

evidence that could have been submitted at the time of filing the petition.

## V.    **CONCLUSION**

For the foregoing reasons, Petitioner respectfully requests a rehearing

of the Order denying Petitioner's Motion to Submit Supplemental

Information and expunging exhibits 1039, 1040, 1041, and 1042.

Respectfully submitted,

STETINA BRUNDA GARRED & BRUCKER

Dated: <u>August 15, 2013</u>      <u>/Matthew A. Newboles/</u>
Matthew A. Newboles, Reg. No. 36,224
Attorney for Petitioner
Redline Detection, LLC

STETINA BRUNDA
GARRED & BRUCKER
75 Enterprise, Suite 250
Aliso Viejo, CA 92656
(949) 855-1246

## CERTIFICATE OF SERVICE

Pursuant to 37 C.F.R. §§ 42.8(e) and 42.105(b), the undersigned certifies that on August 15, 2013, a complete and entire copy of this Petitioner's Request for Rehearing Pursuant to 37 C.F.R. §42.71(d) was provided via Express Mail, costs prepaid, to the Patent Owner by serving the correspondence address of record as follows:

Edward Schlatter
Brenton Babcock
Knobbe Martens Olsen & Bear
2040 Main Street, 14th Floor
Irvine, California 92614


By:/Matthew A. Newboles/
Matthew A. Newboles
Reg. No. 36,224


T:\Client Documents\REDLN\025X\August 15 2013 Filing\Petitioners Request Rehearing.docx





# FEDERAL REGISTER

Vol. 77      Tuesday,

No. 157      August 14, 2012

Part III

## Department of Commerce

Patent and Trademark Office

37 CFR Part 42

Changes to Implement Inter Partes Review Proceedings, Post-Grant Review Proceedings, and Transitional Program for Covered Business Method Patents; Final Rule

REDLINE EXHIBIT 1046
Redline v. Star
Trial IPR2013-00106
p.1046-1

**DEPARTMENT OF COMMERCE**

**Patent and Trademark Office**

**37 CFR Part 42**

[Docket No. PTO–P–2011–0083]

RIN 0651–AC71

**Changes to Implement Inter Partes Review Proceedings, Post-Grant Review Proceedings, and Transitional Program for Covered Business Method Patents**

**AGENCY:** United States Patent and Trademark Office, Commerce.

**ACTION:** Final rule.

**SUMMARY:** The United States Patent and Trademark Office (Office or USPTO) is revising the rules of practice to implement the provisions of the Leahy-Smith America Invents Act ("AIA") that create the new *inter partes* review proceeding, post-grant review proceeding, and transitional post-grant review proceeding for covered business method patents, to be conducted before the Patent Trial and Appeal Board (Board). These provisions of the AIA will take effect on September 16, 2012, one year after the date of enactment.

**DATES:** *Effective Date:* September 16, 2012.

*Applicability Dates:* The changes for *inter partes* review proceedings apply to any patent issued before, on, or after September 16, 2012 (subpart B).

The changes for post-grant review proceedings generally apply to patents issuing from applications subject to first-inventor-to-file provisions of the AIA (subpart C). In addition, the Chief Administrative Patent Judge may, in the interests-of-justice, order an interferences commenced before September 16, 2012, to be dismissed without prejudice to the filing of a petition for post-grant review. See 42.200(d) and § 6(f)[(3)(A) of the AIA.

The changes for the transitional program for covered business method patents apply to any covered business method patent issued before, on, or after September 16, 2012 (subpart D).

**FOR FURTHER INFORMATION CONTACT:** Michael P. Tierney, Lead Administrative Patent Judge, Sally G. Lane, Administrative Patent Judge, Sally C. Medley, Administrative Patent Judge, Robert A. Clarke, Administrative Patent Judge, and Joni Y. Chang, Administrative Patent Judge, Board of Patent Appeals and Interferences, by telephone at (571) 272–9797.

**SUPPLEMENTARY INFORMATION:** *Executive Summary: Purpose:* On September 16, 2011, the AIA was enacted into law

(Pub. L. 112–29, 125 Stat. 284 (2011)). The purpose of the AIA and this final rule is to establish a more efficient and streamlined patent system that will improve patent quality and limit unnecessary and counterproductive litigation costs. The preamble of this notice sets forth in detail the procedures by which the Board will conduct *inter partes* review proceedings, post-grant review proceedings, and transitional post-grant review proceedings for covered business method patents. The USPTO is engaged in a transparent process to create a timely, cost-effective alternative to litigation. Moreover, the rules are designed to ensure the integrity of the trial procedures. *See* 35 U.S.C. 316(b), as amended, and 35 U.S.C. 326(b). This final rule would provide a set of rules relating to Board trial practice for *inter partes* review proceedings, post-grant review proceedings, and transitional post-grant review proceedings for covered business method patents.

*Summary of Major Provisions:* Consistent with section 6 of the AIA, this final rule sets forth for *inter partes* review: (1) The requirements for a petition to institute an *inter partes* review of a patent; (2) the standards for showing of sufficient grounds to institute an *inter partes* review; (3) the standards for instituting an *inter partes* review; (4) the procedures for conducting an *inter partes* review that permits a patent owner response, a submission of written comments, and an oral hearing; (5) the standards and procedures for discovery and for the patent owner to move to amend the patent; and (6) the time periods for completing the review (subpart B of 37 CFR part 42).

Consistent with section 6 of the AIA, this final rule sets forth for post-grant review: (1) The requirements for a petition to institute a post-grant review of a patent; (2) the standards for showing of sufficient grounds to institute a post-grant review; (3) the standards for instituting a post-grant review; (4) the procedures for conducting a post-grant review that permits a patent owner response, a submission of written comments, and an oral hearing; (5) the standards and procedures for discovery and for the patent owner to move to amend the patent; and (6) the time periods for completing the review (subpart C of 37 CFR part 42).

Consistent with sections 6 and 18 of the AIA, this final rule further sets forth for transitional post-grant review of covered business method patents: (1) The requirements for a petition to institute a post-grant review of a

covered business method patent; (2) the standards for showing of sufficient grounds to institute a post-grant review of a covered business method patent; (3) the standards for instituting a post-grant review of a covered business method patent; (4) the procedures for conducting a post-grant review that permits a patent owner response, a submission of written comments, and an oral hearing; (5) the standards and procedures for discovery and for the patent owner to move to amend the patent; and (6) the time periods for completing the review (subpart D of 37 CFR part 42).

*Costs and Benefits:* This rulemaking is not economically significant, but is significant, under Executive Order 12866 (Sept. 30, 1993), as amended by Executive Order 13258 (Feb. 26, 2002) and Executive Order 13422 (Jan. 18, 2007).

*Background:* To implement sections 6 and 18 of the AIA, the Office published the following notices of proposed rulemaking: (1) *Rules of Practice for Trials before the Patent Trial and Appeal Board and Judicial Review of Patent Trial and Appeal Board Decisions,* 77 FR 6879 (Feb. 9, 2012), to provide a consolidated set of rules relating to Board trial practice for *inter partes* review, post-grant review, derivation proceedings, the transitional program for covered business method patents, and judicial review of Board decisions by adding new parts 42 and 90 including a new subpart A to title 37 of the Code of Federal Regulations (RIN 0651–AC70); (2) *Changes to Implement Inter Partes Review Proceedings,* 77 FR 7041 (Feb. 10, 2012), to provide rules specific to *inter partes* review by adding a new subpart B to 37 CFR part 42 (RIN 0651–AC71); (3) *Changes to Implement Post-Grant Review Proceedings,* 77 FR 7060 (Feb. 10, 2012), to provide rules specific to post-grant review by adding a new subpart C to 37 CFR part 42 (RIN 0651–AC72); (4) *Changes to Implement Transitional Program for Covered Business Method Patents,* 77 FR 7080 (Feb. 10, 2012), to provide rules specific to the transitional program for covered business method patents by adding a new subpart D to 37 CFR part 42 (RIN 0651–AC73); (5) *Transitional Program for Covered Business Method Patents— Definition of Technological Invention,* 77 FR 7095 (Feb. 10, 2012), to add a new rule that sets forth the definition of technological invention for determining whether a patent is for a technological invention solely for purposes of the transitional program for covered business method patents (RIN 0651– AC75); and (6) *Changes to Implement Derivation Proceedings,* 77 FR 7028

p.1046-2

substitute claim would be needed to replace each challenged claim, and it may be rebutted by a demonstration of need.

(b) *Content.* A motion to amend claims must include a claim listing, show the changes clearly, and set forth:

(1) The support in the original disclosure of the patent for each claim that is added or amended: and

(2) The support in an earlier-filed disclosure for each claim for which benefit of the filing date of the earlier filed disclosure is sought.

(c) *Additional motion to amend.* In addition to the requirements set forth in paragraphs (a) and (b) of this section, any additional motion to amend may not be filed without Board authorization. An additional motion to amend may be authorized when there is a good cause showing or a joint request of the petitioner and the patent owner to materially advance a settlement. In determining whether to authorize such an additional motion to amend, the Board will consider whether a petitioner has submitted supplemental information after the time period set for filing a motion to amend in paragraph (a)(1) of this section.

### § 42.122   Multiple proceedings and Joinder.

(a) *Multiple proceedings.* Where another matter involving the patent is before the Office, the Board may during the pendency of the *inter partes* review enter any appropriate order regarding the additional matter including providing for the stay, transfer, consolidation, or termination of any such matter.

(b) *Request for joinder.* Joinder may be requested by a patent owner or petitioner. Any request for joinder must be filed, as a motion under § 42.22, no later than one month after the institution date of any *inter partes* review for which joinder is requested. The time period set forth in § 42.101(b) shall not apply when the petition is accompanied by a request for joinder.

### § 42.123   Filing of supplemental information.

(a) *Motion to submit supplemental information.* Once a trial has been instituted, a party may file a motion to submit supplemental information in accordance with the following requirements:

(1) A request for the authorization to file a motion to submit supplemental information is made within one month of the date the trial is instituted.

(2) The supplemental information must be relevant to a claim for which the trial has been instituted.

(b) *Late submission of supplemental information.* A party seeking to submit supplemental information more than

one month after the date the trial is instituted. must request authorization to file a motion to submit the information. The motion to submit supplemental information must show why the supplemental information reasonably could not have been obtained earlier. and that consideration of the supplemental information would be in the interests-of-justice.

(c) *Other supplemental information.* A party seeking to submit supplemental information not relevant to a claim for which the trial has been instituted must request authorization to file a motion to submit the information. The motion must show why the supplemental information reasonably could not have been obtained earlier, and that consideration of the supplemental information would be in the interests-of-justice.

■ 3. Add subpart C to read as follows:

**Subpart C—Post-Grant Review**

**General**

Sec.
42.200   Procedure; pendency.
42.201   Who may petition for a post-grant review.
42.202   Time for filing.
42.203   Post-grant review fee.
42.204   Content of petition.
42.205   Service of petition.
42.206   Filing date.
42.207   Preliminary response to petition.

**Instituting Post-Grant Review**

42.208   Institution of post-grant review.

**After Institution of Post-Grant Review**

42.220   Patent owner response.
42.221   Amendment of the patent.
42.222   Multiple proceedings.
42.223   Filing of supplemental information.
42.224   Discovery.

**Subpart C—Post-Grant Review**

**General**

### § 42.200   Procedure; pendency.

(a) A post-grant review is a trial subject to the procedures set forth in subpart A of this part.

(b) A claim in an unexpired patent shall be given its broadest reasonable construction in light of the specification of the patent in which it appears.

(c) A post-grant review proceeding shall be administered such that pendency before the Board after institution is normally no more than one year. The time can be extended by up to six months for good cause by the Chief Administrative Patent Judge, or adjusted by the Board in the case of joinder.

(d) Interferences commenced before September 16, 2012, shall proceed under part 41 of this chapter except as the Chief Administrative Patent Judge, acting on behalf of the Director, may

otherwise order in the interests-of-justice.

### § 42.201   Who may petition for a post-grant review.

A person who is not the owner of a patent may file with the Office a petition to institute a post-grant review of the patent unless:

(a) Before the date on which the petition for review is filed, the petitioner or real party-in-interest filed a civil action challenging the validity of a claim of the patent; or

(b) The petitioner, the petitioner's real party-in-interest, or a privy of the petitioner is estopped from challenging the claims on the grounds identified in the petition.

### § 42.202   Time for filing.

(a) A petition for a post-grant review of a patent must be filed no later than the date that is nine months after the date of the grant of a patent or of the issuance of a reissue patent. A petition, however, may not request a post-grant review for a claim in a reissue patent that is identical to or narrower than a claim in the original patent from which the reissue patent was issued unless the petition is filed not later than the date that is nine months after the date of the grant of the original patent.

(b) The Director may impose a limit on the number of post-grant reviews that may be instituted during each of the first four one-year periods in which 35 U.S.C. 321 is in effect by providing notice in the Office's Official Gazette or **Federal Register.** Petitions filed after an established limit has been reached will be deemed untimely.

### § 42.203   Post-grant review fee.

(a) A post-grant review fee set forth in § 42.15(b) must accompany the petition.

(b) No filing date will be accorded to the petition until full payment is received.

### § 42.204   Content of petition.

In addition to the requirements of §§ 42.6, 42.8, 42.22, and 42.24, the petition must set forth:

(a) *Grounds for standing.* The petitioner must certify that the patent for which review is sought is available for post-grant review and that the petitioner is not barred or estopped from requesting a post-grant review challenging the patent claims on the grounds identified in the petition.

(b) *Identification of challenge.* Provide a statement of the precise relief requested for each claim challenged. The statement must identify the following:

(1) The claim;

p.1046-3

(Feb. 10. 2012). to provide rules specific to derivation proceedings by adding a new subpart E to 37 CFR part 42 (RIN 0651–AC74).

This final rule adopts the proposed rules. with modifications, set forth in the three notices of proposed rulemaking: *Inter partes* review proceedings (77 FR 7041), post-grant review proceedings (77 FR 7060), and transitional post-grant review proceedings for covered business method patents (77 FR 7080), except for definitions of the terms "covered business method patent" and "technological invention" which are set forth in a separate final rule (RIN 0651–AC75). The definition of the term "technological invention" was proposed in another notice of proposed rulemaking (77 FR 7095).

In a separate final rule, the Office adopts the proposed rules, with modifications, set forth in *Rules of Practice for Trials before the Patent Trial and Appeal Board and Judicial Review of Patent Trial and Appeal Board Decisions*. 77 FR 6879 (Feb. 9, 2012). to provide a consolidated set of rules relating to Board trial practice for *inter partes* review, post-grant review, derivation proceedings, and the transitional program for covered business method patents, and judicial review of Board decisions by adding new parts 42 and 90 including a new subpart A to title 37 of the Code of Federal Regulations (RIN 0651–AC70).

In a third final rule, the Office adopts the proposed definitions of a "covered business method patent" and "technological invention" set forth in the following notices of proposed rulemaking: *Changes to Implement Transitional Program for Covered Business Method Patents*. 77 FR 7080 (Feb. 10, 2012); and *Transitional Program for Covered Business Method Patents—Definition of Technological Invention*, 77 FR 7095 (Feb. 10. 2012).

Additionally, the Office published a Patent Trial Practice Guide for the proposed rules in the **Federal Register** to provide the public an opportunity to comment. *Practice Guide for Proposed Trial Rules*, 77 FR 6868 (Feb. 9, 2012) (Request for Comments) (hereafter "*Practice Guide for Proposed Trial Rules*" or "Office Patent Trial Practice Guide"). The Office envisions publishing a revised Patent Trial Practice Guide for the final rules. The Office also hosted a series of public educational roadshows, across the country, regarding the proposed rules for the implementation of the AIA.

In response to the notices of proposed rulemaking and the Practice Guide notice, the Office received 251

submissions of written comments from intellectual property organizations, businesses, law firms, patent practitioners, and others, including a United States senator who was a principal author of section 18 of the AIA. The comments provided support for, opposition to, and diverse recommendations on the proposed rules. The Office appreciates the thoughtful comments, and has considered and analyzed the comments thoroughly. The Office's responses to the comments are provided in the 124 separate responses based on the topics raised in the 251 comments in the Response to Comments section *infra*.

In light of the comments, the Office has made modifications to the proposed rules to provide clarity and to balance the interests of the public, patent owners. patent challengers, and other interested parties, in light of the statutory requirements and considerations. such as the effect of the regulations on the economy, the integrity of the patent system. the efficient administration of the Office, and the ability of the Office to complete the proceedings timely.

**Differences between the Final Rule and the Proposed Rule**

The major differences between the rules as adopted in this final rule and the proposed rules include:

The final rule clarifies that the one-year period for completing an *inter partes* or post-grant review may be adjusted by the Board in the case of joinder (§§ 42.100(c) and 42.200(c)).

The final rule clarifies that a petitioner must certify that it is not estopped from requesting an *inter partes* or post-grant review for the challenged claims, as opposed to the patent (§§ 42.104(a) and 42.204(a)).

The final rule eliminates the requirement that the petitioner must contact the Board to discuss alternate modes of service when the petitioner cannot effect service of the petition for *inter partes*. post-grant and covered business method patent reviews (§§ 42.105(b) and 42.205(b)). Instead. the final rule further clarifies that (1) upon agreement of the parties. service may be made electronically, (2) personal service is not required, and (3) service may be by EXPRESS MAIL® or by means at least as fast and reliable as EXPRESS MAIL® (§§ 42.105(b) and 42.205(b)).

The time period for filing a patent owner preliminary response for *inter partes*, post-grant and covered business method patent reviews is extended from two months to three months (§§ 42.107(b) and 42.207(b)). Likewise, the default time period for filing a

patent owner response is extended from two months to three months (§§ 42.120(b) and 42.220(b)).

With respect to motions to amend challenged claims, the final rule clarifies that a patent owner may file one motion to amend but only after conferring with the Board, and it must be filed no later than the filing of a patent owner response for *inter partes*. post-grant and covered business method patent reviews (§§ 42.121(a) and 42.221(a)). The final rule provides that an additional motion to amend may be authorized during *inter partes*. post-grant and covered business method patent reviews when there is a good cause showing or a settlement (§§ 42.121(c) and 42.221(c)). In addition. the final rule clarifies that a reasonable number of substitute claims is presumed to be one substitute claim per challenged claim. which may be rebutted by a demonstration of need. The final rule further clarifies that a motion to amend may be denied where: (1) The amendment does not respond to a ground of unpatentability, or (2) the amendment seeks to enlarge the scope of the claims of the patent or introduce new subject matter (§§ 42.121(a) and 42.221(a)). The final rule also clarifies that an additional motion to amend may be authorized when there is a good cause showing or a joint request of the petitioner and the patent owner to materially advance a settlement (§§ 42.121(c) and 42.221(c)). Moreover, the final rule provides that in determining whether to authorize such an additional motion to amend, the Board will consider whether a petitioner has submitted supplemental information after the time period set for filing a motion to amend in § 42.121(a)(1) or 42.221(a)(1).

For joinder, the final rule clarifies that a joinder may be requested by a patent owner or petitioner during *inter partes*. post-grant or covered business method patent reviews, but provides that such a request must be filed. as a motion, no later than one month after institution of any review for which joinder is requested (§§ 42.122(b) and 42.222(b)). With respect to *inter partes* reviews, the time period set forth in § 42.101(b) does not apply when the petition is accompanied by a request for joinder (§ 42.122).

As to filing a supplemental information during *inter partes*, post-grant and covered business method patent reviews, the final rule clarifies that a request for the authorization to file a motion to submit supplement information is made within one month of the date the trial is instituted, and the information must be relevant to a claim

for which the trial has been instituted (§§ 42.123(a) and 42.223(a)). A petitioner who seeks to submit late information, or information that is not relevant to a claim under review, will be required to show why the information reasonably could not have been earlier obtained, and that consideration of the information would be in the interests-of-justice (§§ 42.123(b)–(c), 42.223(b)–(c)).

For covered business method patent reviews, the final rule defines the term "charged with infringement" to mean "a real and substantial controversy regarding infringement of a covered business method patent such that the petitioner would have standing to bring a declaratory judgment action in Federal court" (§ 42.302(a)). In addition, the final rule clarifies that a petitioner may challenge a claim based on the specific statutory grounds permitted under 35 U.S.C. 282(b)(2) or (3), except as modified by section 18(a)(1)(C) of the AIA (§ 42.304(b)).

## Discussion of Relevant Provisions of the AIA

### *Inter Partes* Review

Section 6 of the AIA is entitled "POST-GRANT REVIEW PROCEEDINGS" (Pub. L. 112–29, 125 Stat. 284, 299–305 (2011)). Section 6(a) of the AIA, entitled "INTER PARTES REVIEW," amends chapter 31 of title 35, United States Code, also entitled "INTER PARTES REVIEW." In particular, section 6(a) of the AIA amends 35 U.S.C. 311–318 and adds 35 U.S.C. 319.

Section 6(a) of the AIA amends 35 U.S.C. 311, entitled "Inter partes review." 35 U.S.C. 311(a), as amended, provides that, subject to the provisions of chapter 31 of title 35, United States Code, a person who is not the owner of a patent may file a petition with the Office to institute an *inter partes* review of the patent. As amended, 35 U.S.C. 311(a) also provides that the Director will establish, by regulation, fees to be paid by the person requesting the review, in such amounts as the Director determines to be reasonable, considering the aggregate costs of the review. 35 U.S.C. 311(b), as amended, provides that a petitioner in an *inter partes* review may request to cancel as unpatentable one or more claims of a patent only on a ground that could be raised under 35 U.S.C. 102 or 103 and only on the basis of prior art consisting of patents or printed publications. As amended, 35 U.S.C. 311(c) provides that a petition for *inter partes* review may be filed after the later of either: (1) The date that is nine months after the grant of a patent or issuance of a reissue of a

patent; or (2) if a post-grant review is instituted under chapter 32 of title 35, United States Code, the date of the termination of that post-grant review.

The grounds for seeking an *inter partes* review will be limited compared with post-grant review. The grounds for seeking *inter partes* review are limited to issues raised under 35 U.S.C. 102 or 103 and only on the basis of prior art consisting of patents or printed publications. In contrast, the grounds for seeking post-grant review include any ground that could be raised under 35 U.S.C. 282(b)(2) or (3). Such grounds for post-grant review include grounds that could be raised under 35 U.S.C. 102 or 103 including those based on prior art consisting of patents or printed publications. Other grounds available for post-grant review include 35 U.S.C. 101 and 112, with the exception of compliance with the best mode requirement.

Section 6(a) of the AIA amends 35 U.S.C. 312, entitled "Petitions." 35 U.S.C. 312(a), as amended, provides that a petition filed under 35 U.S.C. 311, as amended, may be considered only if certain conditions are met. First, the petition must be accompanied by payment of the fee established by the Director under 35 U.S.C. 311, as amended. Second, the petition must identify all real parties in interest. Third, the petition must identify, in writing and with particularity, each claim challenged, the grounds on which the challenge to each claim is based, and the evidence that supports the grounds for the challenge to each claim, including: (A) Copies of patents and printed publications that the petitioner relies upon in support of the petition and (B) affidavits or declarations of supporting evidence and opinions, if the petitioner relies on expert opinions. Fourth, the petition must provide such other information as the Director may require by regulation. Fifth, the petitioner must provide copies of any of the documents required under paragraphs (2), (3), and (4) of 35 U.S.C. 312(a), as amended, to the patent owner or, if applicable, the designated representative of the patent owner. 35 U.S.C. 312(b), as amended, provides that, as soon as practicable after the receipt of a petition under 35 U.S.C. 311, as amended, the Director will make the petition available to the public.

Section 6(a) of the AIA amends 35 U.S.C. 313, entitled "Preliminary response to petition." 35 U.S.C. 313, as amended, provides that, if an *inter partes* review petition is filed under 35 U.S.C. 311, as amended, within a time period set by the Director, the patent owner has the right to file a preliminary

response to the petition that sets forth reasons why no *inter partes* review should be instituted based upon the failure of the petition to meet any requirement of chapter 31 of title 35, United States Code.

Section 6(a) of the AIA amends 35 U.S.C. 314, entitled "Institution of inter partes review." 35 U.S.C. 314(a), as amended, provides that the Director may not authorize an *inter partes* review to be instituted, unless the Director determines that the information presented in the petition filed under 35 U.S.C. 311, as amended, and any response filed under 35 U.S.C. 313, as amended, shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least one of the claims challenged in the petition. 35 U.S.C. 314(b), as amended, provides that the Director will determine whether to institute an *inter partes* review under chapter 31 of title 35, United States Code, pursuant to a petition filed under 35 U.S.C. 311, as amended, within three months after: (1) Receiving a preliminary response to the petition under 35 U.S.C. 313, as amended; or (2) if no such preliminary response is filed, the last date on which such response may be filed. 35 U.S.C. 314(c), as amended, provides that the Director will notify the petitioner and patent owner, in writing, of the Director's determination under 35 U.S.C. 314(b), as amended, and make the notice available to the public as soon as is practicable. 35 U.S.C. 314(c), as amended, also provides that the notice will include the date on which the review will commence. 35 U.S.C. 314(d), as amended, provides that the determination by the Director whether to institute an *inter partes* review under 35 U.S.C. 314, as amended, will be final and nonappealable.

Section 6(a) of the AIA amends 35 U.S.C. 315, entitled "Relation to other proceedings or actions." As amended, 35 U.S.C. 315(a)(1) provides that an *inter partes* review may not be instituted if, before the date on which the petition for review is filed, the petitioner or real party-in-interest had filed a civil action challenging the validity of a claim of the patent. As amended, 35 U.S.C. 315(a)(2) provides for an automatic stay of a civil action brought by the petitioner or real party-in-interest challenging the validity of a claim of the patent and filed on or after the date on which the petition for *inter partes* review was filed, until certain specified conditions are met. 35 U.S.C. 315(a)(3), as amended, provides that a counterclaim challenging the validity of a claim of a patent does not constitute a civil action challenging the validity of a claim of a patent for

reply to the patent owner's response and any opposition to the motion to amend. Parties may request adjustments to the Scheduling Order at the initial conference call.

*Comment 86:* One comment suggested that the rules should expressly provide for the petitioner's right to present new evidence in an opposition to an amendment, and the patent owner's right to file a reply to petitioner's opposition to an amendment.

*Response:* Section 42.23 provides for oppositions and replies. As noted in the Office Patent Trial Practice Guide (Section H), a petitioner will be afforded an opportunity to respond fully to an amendment. The time for filing an opposition generally will be set in a Scheduling Order. No authorization is needed to file an opposition to an amendment. Petitioners may supplement evidence submitted with their petition to respond to new issues arising from proposed substitute claims. This includes the submission of new expert declarations that are directed to the proposed substitute claims. Additionally, § 42.23 provides that oppositions and replies must comply with the content requirements for motions, and a reply may only respond to arguments raised in the corresponding opposition. Section I of the Office Patent Trial Practice Guide also provides that a reply that raises a new issue or belatedly presents evidence will not be considered.

*Multiple Proceedings and Joinder (§§ 42.122 and 42.222)*

*Comment 87:* One comment asked for clarification as to what effect consolidating proceedings, for example, two post-grant review proceedings, would have on the total number of post-grant reviews allowed in a given year.

*Response:* Where multiple instituted proceedings are consolidated, each proceeding would be counted towards any limit that might be established as each is a separately instituted proceeding that is thereafter consolidated into a single proceeding.

*Comment 88:* One comment requested clarification on the timing for requesting joinder of parties or replacement of a consenting petitioner, and suggested that the Office permit joinder and replacement until the time of a final written decision under appropriate circumstances. The comment further suggested a list of factors that the Office might consider in determining whether to permit voluntary joinder or replacement (*e.g.,* the impact on the Scheduling Order). Another comment requested guidance as to when joinder might occur.

*Response:* Joinder may be requested by filing a motion within one month of the date that the trial is instituted. When the Office determines whether to grant a motion for joinder, the Office will consider the particular facts of each case including how the consolidation of the reviews impacts the Office's ability to complete reviews timely. In view of this comment, the Office modified §§ 42.122 and 42.222 to provide expressly for the time period for filing a request for joinder.

The AIA, however, does not provide for the "replacement" of a party. A petitioner may settle with the patent owner and upon entering the joint request, the review will terminate with respect to the petitioner. 35 U.S.C. 317, as amended, and 35 U.S.C. 327.

*Comment 89:* Several comments requested clarification regarding the effect of a stay or joinder on the ability of the Office to complete review within the one-year period.

*Response:* In the case of joinder, the Director may adjust the time periods allowing the Office to manage the more complex case. 35 U.S.C. 316 (a)(11), as amended, and 35 U.S.C. 326(a)(11). When multiple proceedings involving a single patent are instituted, joinder would allow the Office to consolidate issues and to account for timing issues that may arise. If another proceeding or matter involving the patent is before the Office, the Director may determine the manner in which the *inter partes* or post-grant review will proceed including providing for a stay of one of the matters or proceedings. 35 U.S.C. 315(d), as amended, and 35 U.S.C. 325(d). A stay of a matter that suspends the time for taking actions is expected to be a rare occurrence. In considering whether to order a stay, the goal of completing the proceeding in a timely manner will be taken into account.

*Comment 90:* One comment asked what effect a reissue application filed after institution of post-grant or *inter partes* review would have on the order in which the proceedings would be resolved. Another comment urged the Office not to merge an *inter partes* review with an *ex parte* proceeding due to different standards for conducting the proceedings.

*Response:* Under the rules, a stay, transfer, consolidation or termination would be an option in this situation. §§ 42.122 and 42.222. Both whether a stay, transfer, consolidation or termination would be ordered and the order of resolution would depend on particular facts and circumstances. The Board will take into consideration the impact on each proceeding on a case-by-case basis.

*Supplemental Information (§§ 42.123 and 42.223)*

*Comment 91:* Several comments opposed proposed §§ 42.123 and 42.223, providing for motions to file supplemental information. According to the comments, the petition should disclose the entirety of the petitioner's case, and the comments also expressed concerns that the petitioner may intentionally hold back some evidence which would be unfair to the patent owner. Conversely, other comments were in favor of the proposed rules, and noted that the procedure for submitting supplemental information is expressly provided in the AIA.

*Response:* Since the request must be made within one month of the date the trial is instituted, the patent owner will have sufficient time to address any new information submitted by the petitioner, except in the situation where the party satisfies the requirements of § 42.123(b) or 42.223(b). The Office understands the concerns related to late submissions of supplemental information. Therefore, the Office has modified the proposed provisions set forth in §§ 42.123 and 42.223 to provide that any request not made within one month must show why the information reasonably could not have been obtained earlier, and that consideration for the supplemental information would be in the interests-of-justice. *See* §§ 42.123(b) and 42.223(b).

Further, supplemental information must be relevant to a claim for which the trial has been instituted. The final rule clarifies that if the submission is not relevant to a claim for which the trial has been instituted, the party must show that the information reasonably could not have been obtained earlier and that consideration of the supplemental information would be in the interests-of-justice. *See* §§ 42.123(c) and 42.223(c).

As other comments pointed out, 35 U.S.C. 316(a)(3), as amended, and 35 U.S.C. 326(a)(3) provide that the Director shall prescribe regulations establishing procedures for the submission of supplemental information after the petition is filed. Consistent with these statutory provisions, §§ 42.123 and 42.223, as adopted in this final rule, establish the procedures in which parties may file supplemental information.

*Comment 92:* Several comments suggested that the rules should permit a party to file a motion to file supplemental information, and suggested that the motion should be granted only for good cause or be limited to rebuttal evidence and/or

evidence bearing on the credibility of witnesses.

*Response:* Petitioners are encouraged to set forth their best grounds of unpatentability and supporting evidence in their petitions, lest the petitioner risk a determination by the Board not to institute the review or deny the asserted grounds of unpatentability (§ 42.108(b)). Moreover, the Board may impose a sanction against a party for misconduct, including any action that harasses or causes unnecessary delay or cost (§ 42.12(a)(7)). Where a party needs to submit late supplemental information, the party must explain why the information reasonably could not have been obtained earlier, and that the consideration of the information would be in the interests-of-justice. If the Board grants such a motion, the Board may authorize the patent owner to take additional discovery or to file a motion to amend. Sections 42.121(c) and 42.221(c), as adopted in this final rule, clarify that in determining whether to authorize such an additional motion to amend, the Board will consider whether a petitioner has submitted supplemental information after the time period set for filing a motion to amend in § 42.121(a) or 42.221(a). The Board may also extend the time period for completing the review. Additionally, the Board may take into account whether a late submission represents an improper use of the proceeding. 35 U.S.C. 316(a)(6), as amended, and 35 U.S.C. 326(a)(6).

*Comment 93:* One comment stated that providing petitioners with a right to submit supplemental information will help ensure that all pertinent issues are resolved in the same proceeding, and suggested that the rule should allow petitioners to present new evidence obtained during discovery even for a new ground of unpatentability.

*Response:* As discussed previously, petitioners are strongly encouraged to submit all of the evidence that supports the grounds of unpatentability asserted in the petition. Sections 42.123 and 42.223, as adopted in this final rule, provide that a party may seek authorization to file a motion to submit supplemental evidence relevant to a claim for which the trial has been instituted within one month of the date the trial is instituted. The rules also provide standards by which later motions may be granted where the evidence reasonably could not have been obtained earlier. While the evidence may be relevant to a new ground of unpatentability, the party, however, must additionally show that consideration of the supplemental evidence would be in the interests-of-justice.

*Comment 94:* One comment recommended the time period for requesting the authorization to file supplemental information should be shortened to two weeks.

*Response:* The Office believes that the one-month time period is appropriate so that a party has sufficient opportunity to request the authorization to file the motion at the initial conference call.

*Comment 95:* One comment noted that the rules do not provide for raising new grounds of unpatentability and suggested that the rules should clarify that no estoppel applies for new grounds of unpatentability.

*Response:* 35 U.S.C. 316(a)(3), as amended, and 35 U.S.C. 326(a)(3) provide that the Director is to promulgate regulations that establish procedures for the submission of supplemental information after the petition is filed. The rules provide a timeframe for the submission of the supplemental information during the review. Whether a party is authorized to raise new grounds of unpatentability based upon the supplemental information will be determined on a case-by-case basis taking into account the particular facts surrounding supplemental information submitted.

Since estoppel applies for any ground that the petition raised or reasonably could have raised during the review (35 U.S.C. 315(e), as amended, and 35 U.S.C. 325(e)), estoppel would apply where a new ground is authorized.

*Intervening Rights*

*Comment 96:* One comment recommended that the rules or Practice Guide should note that the intervening rights applicable to an *inter partes* review or post-grant review should be based on 35 U.S.C. 318(c), as amended, and 35 U.S.C. 328(c) and 252 as interpreted by case law.

*Response:* Since the issue of intervening rights is not one decided by the Office in an *inter partes* review, post-grant review, or covered business method patent review, it is not necessary to include information regarding intervening rights in the rules of practice before the Office.

*Practice Guide*

*Comment 97:* One comment suggested that the timeline of the Practice Guide for Proposed Trial Rules favors the patentee and should be modified to allow the petitioner an additional month while shortening the patentee's time by a month. One comment suggested that in the scheduling order timeline of the Practice Guide for Proposed Trial Rules, a provision

should be made for modification of the scheduling order based on good cause.

*Response:* The scheduling order in the Office Patent Trial Practice Guide is a general guideline based on the rules. The parties are encouraged to recommend particular dates within the general framework of the scheduling order that work for both, prior to the initial conference call. The parties also may stipulate to modify most of the deadlines set within the scheduling order. Any further modification must be by authorized motion. § 42.20(b). Whether such a motion would be authorized or granted depends on the particular circumstances of the case including the Office's ability to complete the review in a timely manner.

*Covered Business Method Patent Review*

*Who May Petition for a Covered Business Method Patent Review (§ 42.302(a))*

*Comment 98:* Several comments requested that the Office provide guidance as to the standard for satisfying the "charged with infringement" requirement. One comment suggested that the Office should clarify that the "charged with infringement" criterion is something more than the showing required to establish declaratory judgment jurisdiction. Several other comments suggested that the standard should be based on the test for declaratory judgment jurisdiction. Lastly, one comment suggested that the rule should clarify that a patentee can discuss licensing with a party without making a charge of infringement.

*Response:* The suggestions are adopted in part. The Office will provide more guidance by providing a rule that sets forth the standard for "charged with infringement" in a revision to the Office Patent Trial Practice Guide. The final rule includes the standard based on the test for declaratory judgment jurisdiction in Federal court. The final rule provides that "charged with infringement" means a real and substantial controversy regarding infringement of a covered business method patent such that the petitioner would have standing to bring a declaratory judgment action in Federal court.

*Time for Filing Petition for a Covered Business Method Patent Review (§ 42.303)*

*Comment 99:* One comment suggested that the proposed rule apparently precludes the filing of a business method patent review of any patent (*i.e.*, first-to-invent and first-to-file patents)

Trials@uspto.gov                                          Paper 35
571-272-7822                            Entered: September 11, 2013

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

REDLINE DETECTION, LLC
Petitioner

v.

STAR ENVIROTECH, INC.
Patent Owner
_____

Case IPR2013-00106 (JSB)
Patent 6,526,808 B1
_____

Before SALLY C. MEDLEY, JENNIFER S. BISK, and JAMES B. ARPIN,
*Administrative Patent Judges.*

ARPIN, *Administrative Patent Judge*.

DECISION
Petitioner's Request for Rehearing
*37 C.F.R. § 42.71*

Case IPR2013-00106 (JSB)
Patent 6,526,808 B1

INTRODUCTION

Redline Detection, LLC ("Petitioner") filed a request for rehearing (Paper 29, "Req.") of the Order denying Petitioner's Motion to Submit Supplemental Information (Paper 24, "Order"). Petitioner requests that the Board withdraw the Order and grant Petitioner's motion to submit the following supplemental information: (a) Exhibit 1039: Declaration of Dr. Michael St. Denis ("Ex. 1039 (expunged)"); (b) Exhibit 1040: Resume of Dr. St. Denis ("Ex. 1040 (expunged)"); (c) Exhibit 1041: Patent No. US 3,250,723 to Fortney ("Ex. 1041 (expunged)"); and (d) Exhibit 1042: Patent No. US 3,432,439 to Dickman ("Ex. 1042 (expunged)"). Req. 4. The request for rehearing is *denied.*

ANALYSIS

Petitioner bears the burden of showing the decision should be modified and must specifically identify all matters that the party believes the Board misapprehended or overlooked. 37 C.F.R. § 42.71(d). When rehearing an interlocutory decision, a panel will review the decision for an abuse of discretion. 37 C.F.R. § 42.71(b). An abuse of discretion may be determined if a decision is based on an erroneous interpretation of law, if a factual finding is not supported by substantial evidence, or if the decision represents an unreasonable judgment in weighing relevant factors. *Star Fruits S.N.C. v. U.S.*, 393 F.3d 1277, 1281 (Fed. Cir. 2005); *Arnold P'ship v. Dudas*, 362 F.3d 1338, 1340 (Fed. Cir. 2004); and *In re Gartside*, 203 F.3d 1305, 1315-16 (Fed. Cir. 2000).

*1. Petitioner's Filing is Contrary to the Board's Statutory Duties*

Pursuant to 35 U.S.C. § 316(b), rules for *inter partes* review were promulgated taking into account their effect on "the economy, the integrity

2

**A233**

Case IPR2013-00106 (JSB)
Patent 6,526,808 B1

of the patent system, the efficient administration of the Office, and the ability of the Office to timely complete proceedings." The Board's rules provide that they are to be "construed to secure the just, speedy, and inexpensive resolution of every proceeding." 37 C.F.R. § 42.1(b).

Under 37 C.F.R. § 42.123, a party may file a motion to submit supplemental information if a request for authorization to file such a motion is made within one month of the date the trial is instituted. In this case, trial was instituted on July 1, 2013, and, thus, the "request," filed August 1, 2013, was made within one month of the institution of trial.[1] Petitioner contends that, under 37 C.F.R. § 42.123(a), "the *only* criteria for submitting supplemental information . . . [are] timeliness (i.e., within one month of instituting trial) and relevance to a claim on which trial has been instituted." Req. 6 (Sec. IV.A.; emphasis added); *see also* Req. 5 (Sec. III). Nevertheless, Petitioner cites to no statutory or regulatory authority for the proposition that these criteria are the "sole test" under which the Board may decide to admit supplemental information. Req. 3; *see also* Req. 6, 8. We conclude that nothing in 37 C.F.R. § 42.123 requires that a request to submit supplemental information satisfying these two criteria automatically be granted no matter the circumstance. *See* IPR2013-00139, Paper 27 at 2. A party filing a motion has the burden of proof to establish that it is entitled to the requested relief. 37 C.F.R. § 42.20. This is so, no matter the requested relief.

As noted above, the Board decides such motions in view of its

---

[1] In view of the expired filing deadline, we treated Petitioner's Motion for Supplemental Disclosure of New Exhibits 1039-1042 Per 35 U.S.C. § 316(3) and 37 C.F.R. § 42.123(a) (Paper 19) as a timely request for authorization to file such a motion. Conf. Tr. 5-6.

3

Case IPR2013-00106 (JSB)
Patent 6,526,808 B1

mandate to ensure the efficient administration of the Office and the ability of

the Office to complete IPR proceedings in a timely manner, as well as the

Board's duty "to secure the just, speedy, and inexpensive resolution of every

proceeding." Consequently, in determining whether to grant a motion to

submit supplemental information, the Board must ensure that the motion

meets the minimum requirements set forth by the applicable regulations. The

grant of such motion, however, also shall depend upon the Board's

determination that, in its discretion, the action sought by the movant is

consistent with the Board's statutory mandate.

During the initial conference call, Petitioner's counsel explained that

"we think that the submission of the declaration at this point makes things

far less complex than had we had an expert opine as to all 12 grounds as

originally submitted in our petition." Conf. Tr. 7. This statement implies

that the new declaration relates to a *ground* for which the trial was instituted,

rather than only to a *claim* of the patent, for which the trial was instituted.

As we explained in our order,

> [w]e do not read 37 C.F.R. § 42.123 as permitting a petitioner
> to wait for the Board to narrow the grounds submitted in the
> petition in order to create a more focused declaration at less
> expense that will bolster its position in the chosen grounds.
> [Conf. Tr. 7, 12.] This is particularly true if the evidence
> contained in the declaration was reasonably available at the
> time of filing of the petition. "The filing of a petition for *inter
> partes* review should not be turned into a two-stage process,"
> first to get the Board to narrow the issues, and second to
> complete the petition based on the issues left in the case. *ZTE
> Corp. v. ContentGuard Holdings, Inc.*, IPR2013-00139, Paper
> 27 at 3.

Order 4. The intentional delay in obtaining or presenting information to the

Board is not in the interest of the efficient administration of the Office, nor

4

**A235**

Case IPR2013-00106 (JSB)
Patent 6,526,808 B1

does it further the ability of the Office to complete IPR proceedings in a timely manner. Moreover, such delay in presenting information is counter to the "just, speedy, and inexpensive resolution of every proceeding."

    2. *The Proposed Exhibits Go Beyond What is Relevant to a Claim for Which the Trial Has Been Instituted*

Under 37 C.F.R. § 42.123(a), Petitioner also bears the burden of demonstrating that the supplemental information is "relevant to a claim for which the trial has been instituted." *See* Req. 1. Further, under 37 C.F.R. § 42.123(c), if a submission is not relevant to a *claim* for which a trial has been instituted, Petitioner must show that the information reasonably could not have been obtained earlier and that consideration of the supplemental information would be in the interests of justice.

In the request for rehearing, Petitioner contends that "[t]he Order makes no reference as to whether or not the supplemental information is relevant to an IPR claim, which is the sole basis for admissibility in a timely filed motion to submit supplemental evidence, per §42.123(a). *Relevance was also never disputed during the August 1st, 2013 phone conference.*" Req. 3 (emphasis added; citation omitted). This is not accurate. The discussion during the conference call clearly focused on the relevance (1) of the proposed exhibits to the *grounds* for unpatentability raised in the petition and in the decision to institute and (2) of the new references and the new arguments, as well as the new claim charts, presented in Dr. St. Denis's declaration to those *grounds* for unpatentability. *See* Order 3; Conf. Tr. 8-10.

    a. *Ex. 1041 (expunged) and Ex. 1042 (expunged)*

    Petitioner states that "Exhibit 1041 [(expunged)] is referred to in the St. Denis declaration at ¶ 36 *regarding uses of smoke machines and the[]*

Case IPR2013-00106 (JSB)
Patent 6,526,808 B1

*types of smoke generators* usable in Gilliam" and "Exhibit 1042
[(expunged)] is referred to in the St. Denis declaration at ¶ 36 *regarding uses
of smoke machines and the[] types of smoke generators* usable in Gilliam."
Motion 3 (emphases added).  Petitioner only makes reference to each
exhibit's relevance to the Gilliam reference "on which Ground 1 and Ground
2 of the IPR are based."  *Id.*  Petitioner fails to demonstrate that either Ex.
1041 (expunged) or Ex. 1042 (expunged) is relevant to either of claims 9
and 10 upon which trial was instituted.  Thus, neither exhibit meets the
requirements of 37 C.F.R. § 42.123(a)(2).

    *b.  Ex. 1039 (expunged) and Ex. 1040 (expunged)*

In its motion, Petitioner states that:

> *The declaration explains several aspects of the references on
> which the IPR was granted and further helps establish reasons
> for combining the references, and the reasons for
> unpatentability of claims 9 and 10 based on the references on
> which the IPR was granted.*  The declaration includes claim
> charts similar to those used in the Petition, *but directed to the
> two grounds on which the IPR was granted* and how one skilled
> in the art would deem claims 9 and 10 of the '808 patent
> obvious in view of the Gilliam and Stoyle references, *per
> Ground 1*, and obvious in view of the Gilliam, Pauley and 1999
> Website references, *per Ground 2*.

Motion 2 (emphases added).  Moreover, Petitioner explains in Petitioner's

Proposed Motions Prior to Initial Conference (Paper 21) that:

> Dr. Michael St. Denis, an expert in automobile evaporative
> systems, the diagnostic testing related to such systems,
> government regulations related to the testing of EVAP systems
> and the use of inert gases for such testing, *presents further
> evidence as to how one skilled in the art would deem claims 9
> and 10 of the '808 patent obvious* in view of the Gilliam and
> Stoyle references *per Ground 1*, as well as obvious in view of

6

**A237**

Case IPR2013-00106 (JSB)
Patent 6,526,808 B1

> the Gilliam, Pauley and 1999 Website references, *per Ground 2*.

Pet. Prop. Motions 2-3 (emphases added). Thus, at best, the declaration of Dr. St. Denis is directed to the *grounds* on which the trial was instituted, as well as to claims 9 and 10 on which trial was instituted. After the filing of its motion, Petitioner acknowledged this dual nature of Dr. St. Denis's declaration, stating that, "[a]s the supplemental evidence provides testimony and support for combining the references of record in the instituted IPR, it is relevant *not just* to IPR claims 9 and 10, *but to* the two existing IPR grounds while creating no new ground of unpatentability." Req. 2-3 (emphases added).

In its motion to submit supplemental information, Petitioner further states that "[t]he declaration *explains* several aspects of the references on which the IPR was granted and further *helps establish reasons* for combining the references, and *reasons* for unpatentability of claims 9 and 10 based on the references on which the IPR was granted." Motion 2 (emphases added). Moreover, as noted above, Petitioner states that Dr. St. Denis's declaration "presents further evidence as to *how one skilled in the art would deem claims 9 and 10 of the '808 patent obvious.*" Pet. Prop. Motions 2 (emphasis added). Finally, during the initial conference, Petitioner stated that "the submission of the declaration at this point makes things far less complex than had we had an expert *opine as to all 12 grounds* as originally submitted in our petition." Conf. Tr. 7 (emphasis added). Patent Owner contended that the declaration is a complete supplemental *argument*. Conf. Tr. 9. In our order, we agreed, explaining that the Petitioner's supplemental information contains arguments and responses to

7

**A238**

Case IPR2013-00106 (JSB)
Patent 6,526,808 B1

the Board's decision to institute the *inter partes* review. We further explained that the rules do not contemplate allowing arguments and responses from the Petitioner prior to receiving the Patent Owner response. Order 5. We are persuaded that the declaration is directed, at least in part, if not primarily, to the *grounds* for unpatentability on which trial was instituted and includes new arguments and responses to the Board's decision to institute. Therefore, for these and the other reasons set forth in the order and explained further herein, the declaration is not submitted properly here as "supplemental information."

During the initial conference, Patent Owner asserted that it would be prejudiced by the admission of the new arguments and new claim charts contained in Dr. St. Denis's declaration at this stage of the proceeding. Conf. Tr. 11-12. Petitioner suggests that, to the extent Petitioner and Patent Owner disagree on prejudice suffered by the submission of this evidence, the parties should "address this through a briefing to address this motion." *Id.* at 13. We note that, during the initial conference, Petitioner also indicated that "to the extent there are parts of the declaration that are inconsistent with the decision [to institute], we can – we'll agree to strike those, but admit the ones that are absolutely consistent with the decision," i.e., with the *grounds* on which trial was instituted. *Id.*

Although we agreed to treat Petitioner's Motion to Submit Supplemental Information as a timely request for authorization to file such a motion (*see* note 1, *supra*), we recognize that, by filing the proposed supplemental information as exhibits to the motion without requesting and receiving prior authorization, Petitioner did not allow Patent Owner the opportunity to oppose the request for authorization to file the motion or the

8

**A239**

Case IPR2013-00106 (JSB)
Patent 6,526,808 B1

Board to provide guidance regarding the information to be submitted.  *See* Conf. Tr. 5-6.  The process for submitting supplemental information does not rely on post-submission briefing to avoid prejudice or to prevent improper filings, but, instead, envisions Petitioner's filing of a request for authorization to submit supplemental information, followed by any opposition to such a request by Patent Owner, and, ultimately, the Board's decision to grant or deny, in whole or in part, the request to submit such information.  Petitioner's actions short-circuited that process.  Petitioner's offer to accept the post-submission parsing of a sixty page declaration to decide what portions may remain and what portions must be excluded – a process which itself is likely to result in further challenges – is not an acceptable alternative to the prescribed process.  Moreover, such an alternative is not conducive to the efficient administration of the Office, to the ability of the Office to complete IPR proceedings in a timely manner, or to the just, speedy, and inexpensive resolution of this proceeding.

    *3. Due Process*

    Petitioner contends that the rendering of an order based on oral argument at the initial conference call was (1) without advanced notice to Petitioner of the basis on which Patent Owner objected to the admission of the supplemental information, (2) without notice of the criteria to be applied other than that of Section 42.123(a), and (3) without the opportunity for a written response after time to consider the objections and new criteria.  Req. 14-15.  Petitioner's objection to the alleged lack of due process in the rendering of the order is without merit.

    First, regarding Petitioner's objection that it was not apprised of the basis on which Patent Owner objected to the admission of the supplemental

Case IPR2013-00106 (JSB)
Patent 6,526,808 B1

information, we note that Patent Owner was afforded the opportunity to present the basis for its objections, and did so during the initial conference. Conf. Tr. 7-12. Moreover, Patent Owner provided a court reporter and arranged for the preparation of a transcript of the initial conference and for the timely inclusion of that transcript in the record of this trial. *Id.* at 8; *see also* Star Notice of Filing of Transcript of August 1, 2013 Initial Conference Call (Paper 23) (filed August 2, 2013). Patent Owner filed this transcript well before the filing of Petitioner's request for rehearing on August 15, 2013. Thus, Petitioner was informed, orally and in writing, of the basis of Patent Owner's objections to Petitioner's motion.

Second, regarding Petitioner's objection that the order issued without notice of the criteria to be applied other than that of § 42.123(a), we note that the statutory and regulatory mandates, cited above, under which the Board conducts *inter partes* review were known well in advance of the initiation of the present proceeding. The Board provided further guidance concerning the criteria used to evaluate requests for authorization to submit supplemental information in its recent decision in *ZTE Corp. v. ContentGuard Holdings, Inc.*, IPR2013-00139 (Paper 27) (posted on-line on July 30, 2013, prior to the date of the initial conference call). The Board specifically cited to the *ZTE Corp.* decision and the application of the regulation in that decision in its order (Order 4-5), and Petitioner addressed the panel's citation to this decision in its request for rehearing (Req. 14). Thus, Petitioner was apprised of the criteria under which the Board decides *requests* for authorization to submit supplemental information.

Third, regarding Petitioner's objection that the order issued without the opportunity for Petitioner to file a written response after time to consider

10

**A241**

Case IPR2013-00106 (JSB)
Patent 6,526,808 B1

the objections and new criteria, we disagree.  Initially, we note that

Petitioner presented its arguments in favor of the admission of its

supplemental information in its Motion for Supplemental Disclosure of New

Exhibits 1037-1042 Per 35 U.S.C. § 316(3) and 37 C.F.R. § 42.123(a)

(Paper 19) and in Petitioner's Proposed Motions Prior to Initial Conference

(Paper 21).  *See* Conf. Tr. 4-5 ("And in this motion list, it actually provides

facts and arguments related to a motion that has already been filed, and that

is the motion to supplement – to submit supplemental information.").

During the initial conference, Petitioner was given the opportunity to

respond orally and responded orally to Patent Owner's objections.  Conf. Tr.

12-13.  Further, Petitioner has addressed both Patent Owner's objections and

the criteria under which the Board reviews requests to submit supplemental

information in the request for rehearing that is presently before us.  Req. 9-

14.  Thus, Petitioner took advantage of four separate opportunities to present

its arguments for the admission of the supplemental information, each of

which has been considered by the Board.

For the foregoing reasons, we conclude that Petitioner was afforded

multiple opportunities to present its arguments, both orally and in writing,

for the admission of its supplemental information.  Further, Petitioner was

apprised of the basis on which Patent Owner objected to the admission of the

supplemental information, given adequate notice of the criteria to be applied

in determining the admissibility of such supplemental information, and

given the opportunity for a written response to the Board's order, as

evidenced by its request for rehearing, after time to consider further Patent

Owner's objections and the criteria for review of Petitioner's motion.

11

**A242**

Case IPR2013-00106 (JSB)
Patent 6,526,808 B1

Petitioner has not carried its burden of demonstrating that the Board's decision not to admit the supplemental information in the instant *inter partes* review constitutes an abuse of discretion.

In consideration of the foregoing, it is hereby ORDERED that Petitioner's request for rehearing is *denied*.

12

Case IPR2013-00106 (JSB)
Patent 6,526,808 B1

PETITIONER

Matthew A. Newboles
Lowell Anderson
Stetina, Brunda, Garred & Brucker
Email: mnewboles@stetinalaw.com
Email: landerson@stetinalaw.com


PATENT OWNER:

Edward A. Schlatter
Brenton R. Babcock
Knobbe, Martens, Olson & Bear, LLP
Email: edward.schlatter@knobbe.com
Email: brent.babcock@knobbe.com

13

**A244**

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

# BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

Redline Detection, LLC
Petitioner

v.

Star Envirotech, Inc.
Patent Owner

Case IPR2013-00106
U.S. Patent No. 6,526,808

_____

## PETITIONER'S NOTICE OF FILING TRANSCRIPT OF SEPTEMBER 23, 2013 CONFERENCE CALL

1

*Inter Partes* Review - Patent No. 6,526,808
Case IPR2013-00106

Pursuant to the conference call taken place on September 23, 2013,

Petitioner, Redline Detection, LLC provides as Appendix A to this Notice a

copy of the transcript of the proceedings.

Respectfully submitted,

STETINA BRUNDA GARRED & BRUCKER

Dated: <u>September 24, 2013</u>     <u>/Matthew A. Newboles/</u>
                                     Matthew A. Newboles, Reg. No. 36,224
                                     Attorney for Petitioner
                                     Redline Detection, LLC

STETINA BRUNDA
GARRED & BRUCKER
75 Enterprise, Suite 250
Aliso Viejo, CA 92656
(949) 855-1246

**A246**

*Inter Partes* Review - Patent No. 6,526,808
Case IPR2013-00106

## CERTIFICATE OF SERVICE

Pursuant to 37 C.F.R. §§ 42.8(e) and 42.105(b), the undersigned certifies that on September 24, 2013, a complete and entire copy of this Petitioner's Notice of Filing Transcript of September 23, 2013 Conference Call was provided via Express Mail, costs prepaid, to the Patent Owner by serving the correspondence address of record as follows:

Edward Schlatter
Jared Bunker
Brenton Babcock
Knobbe Martens Olsen & Bear
2040 Main Street, 14th Floor
Irvine, California 92614

By:/Matthew A. Newboles/
Matthew A. Newboles
Reg. No. 36,224

T:\Client Documents\REDLN\025X\September 23, 2013 Filing\Notice.Filing.Transcript.docx

*Inter Partes* Review - Patent No. 6,526,808
Case IPR2013-00106

# Appendix A

**CERTIFIED COPY**

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

| | | |
|---|---|---|
| REDLINE DETECTION, LLC, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | Case No. |
| | ) | IPR2013-00106 |
| STAR ENVIRONTECH, INC., | ) | |
| | ) | |
| Patent Owner. | ) | |
| _____ | ) | |

TRANSCRIPT OF TELECONFERENCE PROCEEDINGS

September 23, 2013

Lisa Day, CSR No. 12960
364780

40 YEARS

**BARKLEY**
Court Reporters
barkley.com

(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco    (949) 955-0400 Irvine    (858) 455-5444 San Diego
(916) 922-5777 Sacramento    (408) 885-0550 San Jose    (760) 322-2240 Palm Springs    (951) 686-0606 Riverside
(818) 702-0202 Woodland Hills    (212) 808-8500 New York City    (347) 821-4611 Brooklyn    (518) 490-1910 Albany
(516) 277-9494 Garden City    (914) 510-9110 White Plains    (312) 379-5566 Chicago    (702) 366-0500 Las Vegas
+33 1 70 72 65 26 Paris    +971 4 8137744 Dubai    +852 3693 1522 Hong Kong

TELECONFERENCE PROCEEDINGS

```
1          UNITED STATES PATENT AND TRADEMARK OFFICE

2           BEFORE THE PATENT TRIAL AND APPEAL BOARD

3


4
    REDLINE DETECTION, LLC,        )
5                                  )
                Petitioner,        )
6                                  )
           vs.                     )   Case No.
7                                  )   IPR2013-00106
    STAR ENVIRONTECH, INC.,        )
8                                  )
                Patent Owner.      )
9    _____)

10

11

12

13          TRANSCRIPT OF TELECONFERENCE PROCEEDINGS taken

14   on behalf of the Petitioner, at 75 Enterprise, Suite

15   250, Aliso Viejo, California, beginning at 8:00 a.m.

16   and ending at 8:17 a.m., on Monday, September 23, 2013,

17   before Lisa Day, Certified Shorthand Reporter No.

18   12960.

19

20

21

22

23

24

25
```

BARKLEY
Court Reporters

**A250**

TELECONFERENCE PROCEEDINGS

```
 1   APPEARANCES OF COUNSEL:

 2   FOR THE PETITIONER REDLINE DETECTION, LLC:

 3          STETINA, BRUNDA, GARRED & BRUCKER
            BY:  MATTHEW A. NEWBOLES, ESQ.
 4          75 Enterprise
            Suite 250
 5          Aliso Viejo, California 92656
            (949) 855-1246
 6          mnewboles@stetinalaw.com

 7   FOR THE PATENT OWNER STAR ENVIROTECH, INC.:

 8          KNOBBE, MARTENS
            BY:  BRENTON R. BABCOCK, ESQ.
 9          2040 Main Street
            Suite 250
10          Irvine, California 92614
            (949) 760-0404
11          brenton.babcock@kmob.com

12

13   ALSO PRESENT:  JUDGE BISK
                    JUDGE ARPIN
14                  JUDGE MEDLEY
                    BEN DIEDERICH
15                  GREG CLARKSON

16

17

18

19

20

21

22

23

24

25
```

3

BARKLEY
Court Reporters

**A251**

TELECONFERENCE PROCEEDINGS

```
 1     ALISO VIEJO, CALIFORNIA; MONDAY, SEPTEMBER 23, 2013

 2                     8:00 a.m.

 3

 4          MR. NEWBOLES:  Good morning, this is Matt

 5   Newboles for Petitioner Redline Detection.

 6          JUDGE BISK:  Okay.  Do we have everyone or are

 7   we still waiting?

 8          MR. BABCOCK:  No, we have everyone I believe,

 9   your Honor.

10          JUDGE BISK:  Okay.  Great.  So this call is

11   for IPR2013-00106 and the call was requested by

12   petitioner in order to discuss some sort of stipulation

13   regarding expunged exhibits.  I must admit, I'm a

14   little confused about what exactly you're asking of us,

15   if anything, so I'm going to let petitioner go first

16   and tell me what you're looking for.

17          MR. NEWBOLES:  Thank you, your Honor.  Matt

18   Newboles speaking here.  Yes, thank you for your time.

19          Essentially we are looking for clarification.

20   The issue is how does the expungement of Exhibits 1039

21   through 1042 affect the use of those exhibits on appeal

22   in the case of a final decision of this matter if

23   anything were to be appealed.

24          Right now they're expunged and there's --

25   we're not sure if they're no longer part of the record.
```

4

BARKLEY
Court Reporters

TELECONFERENCE PROCEEDINGS

1 It appeared that they're not part of the record; and if
2 that were the case, then what would the effect of that
3 be in -- with respect to referencing those exhibits on
4 appeal?  We're not sure.  We don't know what the answer
5 is and we'd actually like to thank the counsel for
6 patent owner to -- for suggesting that perhaps just a
7 simple stipulation that in the case of appeal that it'd
8 be understood that the exhibits would -- we could
9 reference those and make use of those on appeal, but
10 we're not aware of any authority that would basically
11 validate that approach and we just wanted to know what
12 the Board's position or any guidance the Board could
13 provide, what that would be.
14      JUDGE BISK:  Well, let me just tell you what
15 my understanding is and, Judge Medley, and, Judge
16 Arpin, if you want to jump in, feel free.
17      So my understanding is normally when you would
18 file a motion to supplement, you would not actually put
19 the exhibit with the motion, so you would wait until we
20 either approve or deny the motion before that exhibit
21 comes into the record.
22      In this case we denied the motion, so that
23 exhibit really should never have been part of the
24 record in the first place.  We denied the motion, we
25 expunged the exhibit; therefore, it is not part of the

BARKLEY
Court Reporters

**A253**

1    record right now.  So my understanding is that it is

2    not part of the record and it would not be part of the

3    record going up to the federal circuit.

4          Any -- I -- your stipulation of what happens

5    after it leaves here, I don't really know if that is a

6    legitimate -- if you can add things to the record like

7    that or not.  If you can, it wouldn't really -- you

8    know, once the case leaves us, once you file a motion

9    to appeal, there's nothing we can do, so it leaves our

10   jurisdiction.  So I'm not sure that we can do anything

11   to -- I mean, that stipulation is between the two of

12   you and so that's really what my understanding is at

13   this point.  I don't know.

14         Judge Medley, do you have any other

15   understanding from interference practice?

16         JUDGE MEDLEY:  No, that sounds right to me.  I

17   just have a couple -- maybe a couple questions.

18         It seems sort of premature.  If the petitioner

19   wants to include these as part of the record, is that

20   because they're challenging our decision to expunge or

21   you would want it as part of the record on appeal

22   regardless of who's taking the appeal?

23         MR. NEWBOLES:  Matt Newboles speaking here.

24   What we'd like to do is to not be in a position where

25   we've waived the right to appeal any of those issues,

6

BARKLEY
Court Reporters

**A254**

TELECONFERENCE PROCEEDINGS

1  and hence the phone call is that if -- if things play

2  out such that if we want to make those of record that

3  we need to exhaust all administrative remedies, then

4  there is a timeline for doing that and there is a

5  deadline that would come up to the extent we would like

6  to try to get those into the record, and so -- I'm

7  sorry.

8          JUDGE BISK:  I believe you've exhausted your

9  administrative remedies for getting it into the record

10  as a supplement.  The proceeding is still ongoing and

11  you still have a patent owner replies, and if there's

12  something in the patent owner -- I'm sorry, the

13  petitioner's replies, the patent owner responds.  If

14  there's something in these exhibits that's responsive

15  to something that the patent owner argued, you can

16  always -- I mean, you can submit exhibits with your

17  reply and it's possible that there will be something in

18  these exhibits that will be relevant that you can -- I

19  mean, there's a possibility that these exhibits can

20  still be legitimately brought into this proceeding.

21          So like Judge Medley said, this might be very

22  early in the stages to be bringing this up.

23          MR. NEWBOLES:  And, no, I appreciate that.

24  Believe me, if there is any way that we can resolve

25  this matter just knowing that in the event we need

7

BARKLEY
Court Reporters

**A255**

1  to -- we just essentially want to preserve the issue on

2  appeal.

3         Now, we're not sure, we don't know, we can't

4  find an answer, but we're not sure if the recourse for

5  petitioner would be a petition to the director,

6  something under 181, we honestly don't know, and

7  essentially we just want to be able to preserve the

8  record or at least the issue.  We respect the Board's

9  decision that they don't want to have these exhibits

10  entered; but in terms of possibly waiving that on

11  appeal, we need to make sure that we've done everything

12  we can to preserve that issue and that's simply what

13  we're looking for and -- and I appreciate the fact that

14  there very well may be an opportunity to bring these

15  exhibits in in response to what patent owner may

16  submit.  But then again, it -- that may not be

17  responsive or legitimately responsive to anything that

18  patent owner submits.

19         JUDGE BISK:  If they weren't responsive to

20  something the patent owner submits, I don't know how

21  they would become part of the proceeding anyway.  It

22  would be sitting there in the record.

23         But if they're not responsive to anything

24  patent owner brought in, why would we have cause to

25  look at them.

8

BARKLEY
Court Reporters

**A256**

TELECONFERENCE PROCEEDINGS

1          MR. NEWBOLES:  Well, a -- it's for purposes of

2    appeal, your Honor.  That's essentially the only thing

3    we're trying to accomplish.  It's just one of procedure

4    that these documents and these exhibits and our expert

5    declaration, we have the right to at least reference

6    those and in the issue of whether or not they were

7    properly submitted in case that is ever an issue on

8    appeal.  And hopefully it won't be and it's a moot

9    issue, but our concern is if we have to address the

10   issue now or otherwise we've waived the issue, that's

11   our biggest concern.

12          JUDGE BISK:  Okay.  Well, as far as I know,

13   you tried to bring it in in a motion, it was denied.

14   You asked for rehearing, that was denied.  That's

15   really about all you can do at this point, and I can't

16   imagine that that would be seen as a waiver.

17          MR. NEWBOLES:  No, and that's fine.

18          So is it the Board's understanding that after

19   the request for rehearing, that's an exhaustion of

20   administrative remedies?

21          JUDGE BISK:  Well, I can't give you any legal

22   advice.

23          MR. NEWBOLES:  No, because either -- if that's

24   the case, then that significantly impacts whether or

25   not we leave it now or if we have to proceed as we

BARKLEY
Court Reporters

 1  would in other applications of the Administrative

 2  Procedure Act where we would go to the director and --

 3  for purposes of exhausting administrative remedies.  I

 4  don't see where it's provided for, but that's what you

 5  would typically do, if I understand correctly, in any

 6  other matter.

 7        JUDGE BISK:  As far as I know, although again

 8  I'm not giving you any advice or legal advice, in the

 9  rules, this is the motion, this is the request for

10  rehearing that you're given under the rules.

11        MR. NEWBOLES:  Okay.  That's fine.  Again,

12  it's not to bring up the substantive issue.  It's the

13  issue of have we exhausted administrative appeals and

14  whether or not if patent owner is still agreeable to

15  the extent a stipulation between the parties does carry

16  weight and allows these exhibits to at least be

17  referenced in case of appeal, whether that is

18  sufficient.

19        MR. BABCOCK:  Your Honor, this is Brent

20  Babcock if I just may --

21        JUDGE BISK:  Yeah, please do.

22        MR. BABCOCK:  Yeah, I think it really is the

23  Board's bailiwick at this point.  As a practical

24  matter, we've agreed that even if there's an appeal on

25  the particular issue that petitioner can include the

BARKLEY
Court Reporters

 1    documents in its joint appendix to the federal circuit,

 2    we will not object to the inclusion of those documents

 3    not as -- not as part of the record but as part of the

 4    documents that were not included and certainly

 5    petitioner has the right to challenge the Board's

 6    decision to expunge those exhibits.

 7         We don't view this as any different than any

 8    motion in limine that might be granted by a district

 9    court judge where certain exhibits were decided by the

10    district court not to go into the record.  Certainly

11    that issue could be appealed and this settlement could

12    review the district court's decision to expunge or to

13    exclude certain exhibits on motion in limine and

14    evaluate the relevance of exhibits and perhaps find it

15    an abuse of discretion, and I think that's exactly what

16    the issue is here.

17         So I don't think you guys as the Board can

18    authorize anything for the federal circuit or --

19         JUDGE BISK:  No.

20         MR. BABCOCK:  -- I think just between us, the

21    parties --

22         JUDGE BISK:  Right.

23         MR. BABCOCK:  -- I think we've agreed that

24    we'll sign a stip or draft a letter or whatever

25    Mr. Newboles would like, a statement to say clearly the

11

TELECONFERENCE PROCEEDINGS

1  joint appendix is, you know, Exhibit A1, we won't

2  object.  They can point to it and cite to it, explain

3  why they believe the Board got it wrong.  I think at

4  that point the federal circuit's not going to go beyond

5  that.  The parties agree, it's in the -- it's in the

6  joint appendix.  I think the federal circuit will

7  evaluate that issue if the petitioner raises it and I

8  think that's all we can do at this point.

9        JUDGE BISK:  Right.  I believe the stipulation

10  is between the parties --

11        MR. BABCOCK:  That's right.

12        JUDGE BISK:  -- so that's filed in the record.

13        MR. BABCOCK:  That's my view as well, yes, the

14  Board doesn't really have a -- you've made the decision

15  and you're out of this issue now; and unless they come

16  in on reply, we fight it again on reply, at this point

17  is there's nothing to do.

18        JUDGE BISK:  Right.  Petitioner, I'm still --

19  I guess I'm still confused, is there anything you want

20  us to do?

21        MR. NEWBOLES:  No, we were looking to see if

22  there was some clarification on this issue and whether

23  or not we needed to proceed with further administrative

24  remedies to make sure that we preserve this issue on

25  appeal.  And that's really the purpose for seeking the

BARKLEY
Court Reporters

**A260**

1   Board's input because you have expungement here and the

2   effect of that expungement and what its downstream

3   effect would be in view of the federal rules of

4   appellate procedure, and in particular Rule 30 and

5   what's required in that for the joint appendix and

6   proper reference to exhibits of record.  That's one

7   thing that we do not want to waive at this time, any

8   potential issues that could be associated with that and

9   whether or not we've exhausted the remedies, in which

10  case that's fine, and the fact then again our thanks to

11  opposing counsel for willing to stipulate, but whether

12  or not there is anything further that we would have to

13  do for sake of exhausting our administrative remedies.

14          I can tell you the case law on trying to

15  supplement a record -- you know, supplement evidence in

16  a joint appendix for purposes of appeal, that's very

17  difficult and the federal circuit says that's only done

18  in very limited circumstances, so hence trying to be

19  proactive so that we don't miss any timelines if we do

20  have to take further administrative action and so that

21  we can say safely and with the, you know, the Board's

22  presentation of the issue that we've done all that we

23  can to preserve this issue.

24          JUDGE BISK:  Okay.  Hang on just a minute.

25  I'm going to just talk with my colleagues.  I'll be

13

BARKLEY
Court Reporters

**A261**

1  right back.

2          Okay.  I think I'm going to end the call.  I'm

3  comfortable saying we can't give advisory opinions, and

4  what you've done so far is what's been contemplated by

5  the rules and about as far as I'm willing to go here.

6  So other than that, if you think of something that you

7  would like the Board to do, if there's a motion that

8  you would want to file or something that you want put

9  in the record that we can do, let us know.

10          Other than that, I think this is an issue that

11  needs to be resolved between the parties.

12          MR. NEWBOLES:  Your Honor, Matt Newboles

13  speaking here, would the Board entertain entering a

14  stipulation of the nature that we've been discussing

15  and to perhaps make the expunged exhibits filed under

16  seal so they're kept under -- out of the public record

17  just to address this one issue?

18          MR. BABCOCK:  We have not agreed to --

19          MR. NEWBOLES:  I know you haven't.  I just was

20  suggesting that just simply because we have everyone on

21  the line.  I didn't mean to throw something out without

22  you considering it, Brent.

23          MR. BABCOCK:  Yeah, we're not amenable to

24  that.

25          JUDGE BISK:  I don't -- I don't think that --

14

BARKLEY
Court Reporters

**A262**

1    I don't -- I'm not willing to rule on that right now,

2    but I'm -- I think that we've actually ruled on this

3    issue of whether we're going to have these exhibits in

4    the record and the answer has been no.  We've ruled on

5    it twice.  So I'm not sure we want to entertain

6    previous exhibits back in the record a third time.

7            MR. NEWBOLES:  Okay.  Thank you, your Honor.

8    I just was throwing it out there for sake of trying to

9    address the issue.  I appreciate it.  Thank you.

10           JUDGE BISK:  Okay.  Thank you.  All right.

11           Unless there was anything else, does the

12   petitioner have anything else while we're on the phone?

13           MR. NEWBOLES:  No, your Honor.  Again, my

14   thanks to everyone for making themselves available to

15   discuss this issue and on behalf of Redline Detection.

16   We appreciate it.

17           JUDGE BISK:  Okay.  Patent owner, anything

18   else?

19           MR. BABCOCK:  No, your Honor.  Thank you for

20   your time.

21           JUDGE BISK:  Okay.  Thank you very much.

22           (Telephonic conference concluded at 8:17 a.m.)

23                        -oOo-

24

25

BARKLEY
Court Reporters

A263

TELECONFERENCE PROCEEDINGS

```
1                 DEPOSITION OFFICER'S CERTIFICATE

2

3    STATE OF CALIFORNIA )
                          )  ss.
4    COUNTY OF ORANGE    )

5

6            I, Lisa Day, hereby certify:

7            I am a duly qualified Certified Shorthand

8    Reporter in the State of California, holder of

9    Certificate Number CSR No. 12960 issued by the Court

10   Reporters Board of California and which is in full force

11   and effect.  (Fed. R. Civ. P. 28(a)).

12           I am authorized to administer oaths or

13   affirmations pursuant to California Code of Civil

14   Procedure, Section 2093(b) and prior to being examined,

15   the witness was first duly sworn by me.  (Fed. R. Civ. P.

16   28(a), 30(f)(1)).

17           I am not a relative or employee or attorney or

18   counsel of any of the parties, nor am I a relative or

19   employee of such attorney or counsel, nor am I

20   financially interested in this action.  (Fed. R. Civ. P.

21   28).

22           I am the deposition officer that

23   stenographically recorded the testimony in the foregoing

24   deposition and the foregoing transcript is a true record

25   of the testimony given by the witness.  (Fed. R. Civ. P.


                              16
```

BARKLEY
Court Reporters

TELECONFERENCE PROCEEDINGS

1   30(f)(1)).

2           The persons who appeared at the proceeding are

3   set forth on page 3 of the foregoing transcript.

4   The proceeding was taken at 75 Enterprise, Suite 250, Aliso

5   Viejo, California, and began at 8:00 a.m., September 23,

6   2013, and ended at 8:17 a.m. (Fed. R. Civ. P. 30(e)).

7

8   Dated:   September 23, 2013

9

10

11                    Lisa Day, CA CSR NO. 12960, RPR

12

13

14

15

16

17

18

19

20

21

22

23

24

25

17

BARKLEY
Court Reporters

REDLINE DETECTION, LLC v.
STAR ENVIRONTECH, INC.

**A**

**A1 (1)**
12:1
**able (1)**
8:7
**abuse (1)**
11:15
**accomplish (1)**
9:3
**Act (1)**
10:2
**action (1)**
13:20
**actually (3)**
5:5,18;15:2
**add (1)**
6:6
**address (3)**
9:9;14:17;15:9
**administrative (9)**
7:3,9;9:20;10:1,3,
13;12:23;13:13,20
**admit (1)**
4:13
**advice (3)**
9:22;10:8,8
**advisory (1)**
14:3
**affect (1)**
4:21
**again (6)**
8:16;10:7,11;
12:16;13:10;15:13
**agree (1)**
12:5
**agreeable (1)**
10:14
**agreed (3)**
10:24;11:23;14:18
**ALISO (1)**
4:1
**allows (1)**
10:16
**although (1)**
10:7
**always (1)**
7:16
**amenable (1)**
14:23
**appeal (16)**
4:21;5:4,7,9;6:9,
21,22,25;8:2,11;9:2,
8;10:17,24;12:25;
13:16
**appealed (2)**
4:23;11:11
**appeals (1)**
10:13
**appeared (1)**
5:1
**appellate (1)**

13:4
**appendix (5)**
11:1;12:1,6;13:5,
16
**applications (1)**
10:1
**appreciate (4)**
7:23;8:13;15:9,16
**approach (1)**
5:11
**approve (1)**
5:20
**argued (1)**
7:15
**Arpin (1)**
5:16
**associated (1)**
13:8
**authority (1)**
5:10
**authorize (1)**
11:18
**available (1)**
15:14
**aware (1)**
5:10

**B**

**BABCOCK (11)**
4:8;10:19,20,22;
11:20,23;12:11,13;
14:18,23;15:19
**back (2)**
14:1;15:6
**bailiwick (1)**
10:23
**basically (1)**
5:10
**become (1)**
8:21
**behalf (1)**
15:15
**beyond (1)**
12:4
**biggest (1)**
9:11
**BISK (19)**
4:6,10;5:14;7:8;
8:19;9:12,21;10:7,
21;11:19,22;12:9,12,
18;13:24;14:25;
15:10,17,21
**Board (6)**
5:12;11:17;12:3,
14;14:7,13
**Board's (7)**
5:12;8:8;9:18;
10:23;11:5;13:1,21
**Brent (2)**
10:19;14:22
**bring (3)**
8:14;9:13;10:12

**bringing (1)**
7:22
**brought (2)**
7:20;8:24

**C**

**CALIFORNIA (1)**
4:1
**call (4)**
4:10,11;7:1;14:2
**can (19)**
6:6,7,9,10;7:15,16,
18,19,24;8:12;9:15;
10:25;11:17;12:2,8;
13:14,21,23;14:9
**carry (1)**
10:15
**case (10)**
4:22;5:2,7,22;6:8;
9:7,24;10:17;13:10,
14
**cause (1)**
8:24
**certain (1)**
11:9,13
**certainly (2)**
11:4,10
**challenge (1)**
11:5
**challenging (1)**
6:20
**circuit (5)**
6:3;11:1,18;12:6;
13:17
**circuit's (1)**
12:4
**circumstances (1)**
13:18
**cite (1)**
12:2
**clarification (2)**
4:19;12:22
**clearly (1)**
11:25
**colleagues (1)**
13:25
**comfortable (1)**
14:3
**concern (2)**
9:9,11
**concluded (1)**
15:22
**conference (1)**
15:22
**confused (2)**
4:14;12:19
**considering (1)**
14:22
**contemplated (1)**
14:4
**correctly (1)**
10:5

**counsel (2)**
5:5;13:11
**couple (2)**
6:17,17
**court (2)**
11:9,10
**court's (1)**
11:12

**D**

**deadline (1)**
7:5
**decided (1)**
11:9
**decision (6)**
4:22;6:20;8:9;
11:6,12;12:14
**declaration (1)**
9:5
**denied (4)**
5:22,24;9:13,14
**deny (1)**
5:20
**Detection (2)**
4:5;15:15
**different (1)**
11:7
**difficult (1)**
13:17
**director (2)**
8:5;10:2
**discretion (1)**
11:15
**discuss (2)**
4:12;15:15
**discussing (1)**
14:14
**district (3)**
11:8,10,12
**documents (4)**
9:4;11:1,2,4
**done (4)**
8:11;13:17,22;
14:4
**downstream (1)**
13:2
**draft (1)**
11:24

**E**

**early (1)**
7:22
**effect (3)**
5:2;13:2,3
**either (2)**
5:20;9:23
**else (3)**
15:11,12,18
**end (1)**
14:2
**entered (1)**

8:10
**entering (1)**
14:13
**entertain (2)**
14:13;15:5
**Essentially (4)**
4:19;8:1;7;9:2
**evaluate (2)**
11:14;12:7
**even (1)**
10:24
**event (1)**
7:25
**everyone (4)**
4:6,8;14:20;15:14
**evidence (1)**
13:15
**exactly (2)**
4:14;11:15
**exclude (1)**
11:13
**exhaust (1)**
7:3
**exhausted (3)**
7:8;10:13;13:9
**exhausting (2)**
10:3;13:13
**exhaustion (1)**
9:19
**exhibit (5)**
5:19,20,23,25;12:1
**exhibits (21)**
4:13,20,21;5:3,8;
7:14,16,18,19;8:9,
15:9;4:10:16;11:6,9,
13,14;13:6;14:15;
15:3,6
**expert (1)**
9:4
**explain (1)**
12:2
**expunge (3)**
6:20;11:6,12
**expunged (4)**
4:13,24;5:25;
14:15
**expungement (3)**
4:20;13:1,2
**extent (2)**
7:5;10:15

**F**

**fact (2)**
8:13;13:10
**far (4)**
9:12;10:7;14:4,5
**federal (7)**
6:3;11:1,18;12:4,
6;13:3,17
**feel (1)**
5:16
**fight (1)**

12:16
file (3)
    5:18;6:8;14:8
filed (2)
    12:12;14:15
final (1)
    4:22
find (2)
    8:4;11:14
fine (3)
    9:17;10:11;13:10
first (2)
    4:15;5:24
free (1)
    5:16
further (3)
    12:23;13:12,20

**G**

given (1)
    10:10
giving (1)
    10:8
Good (1)
    4:4
granted (1)
    11:8
Great (1)
    4:10
guess (1)
    12:19
guidance (1)
    5:12
guys (1)
    11:17

**H**

Hang (1)
    13:24
happens (1)
    6:4
hence (2)
    7:1;13:18
honestly (1)
    8:6
Honor (8)
    4:9,17;9:2;10:19;
    14:12;15:7,13,19
hopefully (1)
    9:8

**I**

imagine (1)
    9:16
impacts (1)
    9:24
include (2)
    6:19;10:25
included (1)
    11:4

inclusion (1)
    11:2
input (1)
    13:1
interference (1)
    6:15
into (5)
    5:21;7:6,9,20;
    11:10
IPR2013-00106 (1)
    4:11
issue (25)
    4:20;8:1,8,12;9:6,
    7,9,10,10;10:12,13,
    25;11:11,16;12:7,15,
    22,24;13:22,23;
    14:10,17;15:3,9,15
issues (2)
    6:25;13:8

**J**

joint (5)
    11:1;12:1,6;13:5,
    16
JUDGE (25)
    4:6,10;5:14,15,15;
    6:14,16;7:8,21;8:19;
    9:12,21;10:7,21;
    11:9,19,22;12:9,12,
    18;13:24;14:25;
    15:10,17,21
jump (1)
    5:16
jurisdiction (1)
    6:10

**K**

kept (1)
    14:16
knowing (1)
    7:25

**L**

law (1)
    13:14
least (3)
    8:8;9:5;10:16
leave (1)
    9:25
leaves (3)
    6:5,8,9
legal (2)
    9:21;10:8
legitimate (1)
    6:6
legitimately (2)
    7:20;8:17
letter (1)
    11:24
limine (2)

11:8,13
limited (1)
    13:18
line (1)
    14:21
little (1)
    4:14
longer (1)
    4:25
look (1)
    8:25
looking (4)
    4:16,19;8:13;
    12:21

**M**

making (1)
    15:14
Matt (4)
    4:4,17;6:23;14:12
matter (4)
    4:22;7:25;10:6,24
may (4)
    8:14,15,16;10:20
maybe (1)
    6:17
mean (4)
    6:11;7:16,19;
    14:21
Medley (4)
    5:15;6:14,16;7:21
might (2)
    7:21;11:8
minute (1)
    13:24
miss (1)
    13:19
MONDAY (1)
    4:1
moot (1)
    9:8
morning (1)
    4:4
motion (11)
    5:18,19,20,22,24;
    6:8;9:13;10:9;11:8,
    13;14:7
much (1)
    15:21
must (1)
    4:13

**N**

nature (1)
    14:14
need (3)
    7:3,25;8:11
needed (1)
    12:23
needs (1)
    14:11

NEWBOLES (18)
    4:4,5,17,18;6:23,
    23;7:23;9:1,17,23;
    10:11;11:25;12:21;
    14:12,12,19;15:7,13
normally (1)
    5:17

**O**

object (2)
    11:2;12:2
once (2)
    6:8,8
one (3)
    9:3;13:6;14:17
ongoing (1)
    7:10
only (2)
    9:2;13:17
oOo- (1)
    15:23
opinions (1)
    14:3
opportunity (1)
    8:14
opposing (1)
    13:11
order (1)
    4:12
otherwise (1)
    9:10
out (5)
    7:2;12:15;14:16,
    21;15:8
owner (11)
    5:6;7:11,12,13,15;
    8:15,18,20,24;10:14;
    15:17

**P**

part (11)
    4:25;5:1,23,25;
    6:2,2,19,21;8:21;
    11:3,3
particular (2)
    10:25;13:4
parties (5)
    10:15;11:21;12:5,
    10;14:11
patent (11)
    5:6;7:11,12,13,15;
    8:15,18,20,24;10:14;
    15:17
perhaps (3)
    5:6;11:14;14:15
petition (1)
    8:5
Petitioner (10)
    4:5,12,15;6:18;
    8:5;10:25;11:5;12:7,
    18;15:12

petitioner's (1)
    7:13
phone (2)
    7:1;15:12
place (1)
    5:24
play (1)
    7:1
please (1)
    10:21
point (7)
    6:13;9:15;10:23;
    12:2,4,8,16
position (2)
    5:12;6:24
possibility (1)
    7:19
possible (1)
    7:17
possibly (1)
    8:10
potential (1)
    13:8
practical (1)
    10:23
practice (1)
    6:15
premature (1)
    6:18
presentation (1)
    13:22
preserve (5)
    8:1,7,12;12:24;
    13:23
previous (1)
    15:6
proactive (1)
    13:19
procedure (3)
    9:3;10:2;13:4
proceed (2)
    9:25;12:23
proceeding (3)
    7:10,20;8:21
proper (1)
    13:6
properly (1)
    9:7
provide (1)
    5:13
provided (1)
    10:4
public (1)
    14:16
purpose (1)
    12:25
purposes (3)
    9:1;10:3;13:16
put (2)
    5:18;14:8

**R**

raises (1)
    12:7
really (8)
    5:23;6:5,7,12;
    9:15;10:22;12:14,25
record (24)
    4:25;5:1,21,24;
    6:1,2,3,6,19,21;7:2,6,
    9;8:8,22;11:3,10;
    12:12;13:6,15;14:9,
    16;15:4,6
recourse (1)
    8:4
Redline (2)
    4:5;15:15
reference (3)
    5:9;9:5;13:6
referenced (1)
    10:17
referencing (1)
    5:3
regarding (1)
    4:13
regardless (1)
    6:22
rehearing (3)
    9:14,19;10:10
relevance (1)
    11:14
relevant (1)
    7:18
remedies (7)
    7:3,9;9:20;10:3;
    12:24;13:9,13
replies (2)
    7:11,13
reply (3)
    7:17;12:16,16
request (2)
    9:19;10:9
requested (1)
    4:11
required (1)
    13:5
resolve (1)
    7:24
resolved (1)
    14:11
respect (2)
    5:3;8:8
responds (1)
    7:13
response (1)
    8:15
responsive (5)
    7:14;8:17,17,19,23
review (1)
    11:12
Right (13)
    4:24;6:1,16,25;
    9:5;11:5,22;12:9,11,
    18;14:1;15:1,10
Rule (2)

13:4;15:1
ruled (2)
    15:2,4
rules (4)
    10:9,10;13:3;14:5

S

safely (1)
    13:21
sake (2)
    13:13;15:8
saying (1)
    14:3
seal (1)
    14:16
seeking (1)
    12:25
seems (1)
    6:18
SEPTEMBER (1)
    4:1
settlement (1)
    11:11
sign (1)
    11:24
significantly (1)
    9:24
simple (1)
    5:7
simply (2)
    8:12;14:20
sitting (1)
    8:22
sorry (2)
    7:7,12
sort (2)
    4:12;6:18
sounds (1)
    6:16
speaking (3)
    4:18;6:23;14:13
stages (1)
    7:22
statement (1)
    11:25
still (7)
    4:7;7:10,11,20;
    10:14;12:18,19
stip (1)
    11:24
stipulate (1)
    13:11
stipulation (7)
    4:12;5:7;6:4,11;
    10:15;12:9;14:14
submit (2)
    7:16;8:16
submits (2)
    8:18,20
submitted (1)
    9:7
substantive (1)

10:12
sufficient (1)
    10:18
suggesting (2)
    5:6;14:20
supplement (4)
    5:18;7:10;13:15,
    15
sure (8)
    4:25;5:4;6:10;8:3,
    4,11;12:24;15:5

T

talk (1)
    13:25
Telephonic (1)
    15:22
terms (1)
    8:10
thanks (2)
    13:10;15:14
therefore (1)
    5:25
third (1)
    15:6
throw (1)
    14:21
throwing (1)
    15:8
timeline (1)
    7:4
timelines (1)
    13:19
tried (1)
    9:13
try (1)
    7:6
trying (4)
    9:3;13:14,18;15:8
twice (1)
    15:5
two (1)
    6:11
typically (1)
    10:5

U

under (4)
    8:6;10:10;14:15,
    16
understood (1)
    5:8
unless (2)
    12:15;15:11
up (4)
    6:3;7:5,22;10:12
use (2)
    4:21;5:9

V

validate (1)
    5:11
VIEJO (1)
    4:1
view (3)
    11:7;12:13;13:3

W

wait (1)
    5:19
waiting (1)
    4:7
waive (1)
    13:7
waived (2)
    6:25;9:10
waiver (1)
    9:16
waiving (1)
    8:10
wants (1)
    6:19
way (1)
    7:24
weight (1)
    10:16
weren't (1)
    8:19
what's (2)
    13:5;14:4
who's (1)
    6:22
willing (3)
    13:11;14:5;15:1
without (1)
    14:21
wrong (1)
    12:3

1

1039 (1)
    4:20
1042 (1)
    4:21
181 (1)
    8:6

2

2013 (1)
    4:1
23 (1)
    4:1

3

30 (1)
    13:4

8

8:00 (1)
    4:2
8:17 (1)
    15:22

Trial@uspto.gov                                                    Paper 18
571-272-7822                                       Entered: December 6, 2012

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

**CBS** INTERACTIVE INC., THE NEW YORK TIMES COMPANY, G4
MEDIA, LLC, BRAVO MEDIA LLC, and PHOENIX NEWPAPERS, INC.
Petitioner,

v.

**HELFERICH** PATENT LICENSING, LLC
Patent Owner,

————————————

Case IPR2013-00033 (JYC)
Patent 7,155,241

————————————

Before SCOTT R. BOALICK, KEVIN F. TURNER, and, JONI Y. CHANG,
*Administrative Patent Judges.*

CHANG, *Administrative Patent Judge.*

## ORDER

### *Expunging Papers – 37 C.F.R. § 42.7(a)*

1    On November 6, 2012, the Board issued an Order to stay the

2    concurrent reexamination 95/001,864.  (Paper 15.)  CBS filed a 37 C.F.R.

3    § 1.181 petition in the concurrent reexamination on November 27, 2012,

4    requesting the Office to lift the reexamination stay for the limited purpose of

5    deciding a petition to terminate the reexamination.

Case IPR2013-00033
CBS Interactive et al. v. Helferich Patent Licensing

1    Once the Board issues an Order to stay a concurrent proceeding

2    before the Office, the Board has the exclusive jurisdiction over such a

3    proceeding. 37 C.F.R. § 42.3(a). This means that the Board's Rules of

4    Practice for Trials set forth in part 42 of the C.F.R. apply to a party seeking

5    relief in the proceeding.

6    Under 37 C.F.R. § 42.20, any relief must be requested in the form of a

7    motion and a motion will not be entered without Board authorization.

8    Generally, a party seeking authorization to file a motion should contact the

9    Board support staff to request a conference call with the other party and the

10   Judge assigned to the proceeding.

11   Here, CBS's request for the Office to lift the reexamination stay is an

12   unauthorized paper because: (1) CBS did not contact the Board and seek

13   prior authorization to file a motion; and (2) the request was not filed in the

14   form of a motion before the Board. Such an unauthorized paper may be

15   expunged. 37 C.F.R. § 42.7(a).

16   Accordingly, it is

17   **ORDERED** that CBS's 37 C.F.R. § 1.181 petition filed in the

18   concurrent reexamination 95/001,864 on November 27, 2012, and the three

19   related exhibits are expunged from the record of the reexamination.

Case IPR2013-00033
CBS Interactive et al. v. Helferich Patent Licensing

1  via electronic transmission:
2
3  PETITIONER:
4
5  Andrea G. Reister, Esq.
6  Gregory S. Discher, Esq.
7  Covington & Burling LLP
8  areister@cov.com
9  gdischer@cov.com
10
11  and
12
13  Gregory S. Discher
14  Covington & Burling LLP
15  1201 Pennsylvania Ave, NW
16  Washington, DC 20004
17
18  PATENT OWNER:
19
20  Jon E. Kappes, Esq.
21  Steven G. Lisa, Esq.
22  Law Office of Steven G. Lisa, Ltd.
23  C/O Intellevate, LLC.
24  jonkappes@patentit.com
25  stevelisa@patentit.com
26
27

intention to make the decision public, objecting in writing on the ground that the decision discloses the objecting party's trade secret or other confidential information and stating with specificity that such information is not otherwise publicly available.

(b) *Record of proceeding.* (1) The record of a Board proceeding is available to the public, unless a patent application not otherwise available to the public is involved.

(2) Notwithstanding paragraph (b)(1) of this section, after a final Board decision in or judgment in a Board proceeding, the record of the Board proceeding will be made available to the public if any involved file is or becomes open to the public under § 1.11 of this title or an involved application is or becomes published under §§ 1.211 to 1.221 of this chapter.

Dated: January 31, 2012.

**David J. Kappos,**
*Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office.*

[FR Doc. 2012–2535 Filed 2–9–12; 8:45 am]

**BILLING CODE 3510–16–P**

---

**DEPARTMENT OF COMMERCE**

**Patent and Trademark Office**

**37 CFR Part 42**

**[Docket No. PTO–P–2011–0083]**

**RIN 0651–AC71**

**Changes to Implement Inter Partes Review Proceedings**

**AGENCY:** United States Patent and Trademark Office, Commerce.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The United States Patent and Trademark Office (Office or USPTO) proposes new rules to implement the provisions of the Leahy-Smith America Invents Act that create a new *inter partes* review proceeding to be conducted before the Patent Trial and Appeal Board (Board). These provisions of the Leahy-Smith America Invents Act will take effect on September 16, 2012, one year after the date of enactment, and apply to any patent issued before, on, or after the effective date.

**DATES:** The Office solicits comments from the public on this proposed rulemaking. Written comments must be received on or before April 10, 2012 to ensure consideration.

**ADDRESSES:** Comments should be sent by electronic mail message over the Internet addressed to:
*inter_partes_review@uspto.gov.*

Comments may also be submitted by postal mail addressed to: Mail Stop Patent Board, Director of the United States Patent and Trademark Office, P.O. Box 1450, Alexandria, VA 22313–1450, marked to the attention of "Lead Judge Michael Tierney, *Inter partes* Review Proposed Rules."

Comments may also be sent by electronic mail message over the Internet via the Federal eRulemaking Portal. *See* the Federal eRulemaking Portal Web site (*http://www.regulations.gov*) for additional instructions on providing comments via the Federal eRulemaking Portal.

Although comments may be submitted by postal mail, the Office prefers to receive comments by electronic mail message over the Internet because sharing comments with the public is more easily accomplished. Electronic comments are preferred to be submitted in plain text, but also may be submitted in ADOBE® portable document format or MICROSOFT WORD® format. Comments not submitted electronically should be submitted on paper in a format that facilitates convenient digital scanning into ADOBE® portable document format.

The comments will be available for public inspection at the Board of Patent Appeals and Interferences, currently located in Madison East, Ninth Floor, 600 Dulany Street, Alexandria, Virginia. Comments also will be available for viewing via the Office's Internet Web site (*http://www.uspto.gov*). Because comments will be made available for public inspection, information that the submitter does not desire to make public, such as an address or phone number, should not be included in the comments.

**FOR FURTHER INFORMATION CONTACT:**
Michael Tierney, Lead Administrative Patent Judge, Scott Boalick, Lead Administrative Patent Judge, Robert Clarke, Administrative Patent Judge, and Lynn Kryza, Senior Administrator, Board of Patent Appeals and Interferences, by telephone at (571) 272–9797.

**SUPPLEMENTARY INFORMATION:** On September 16, 2011, the Leahy-Smith America Invents Act was enacted into law (Pub. L. 112–29, 125 Stat. 284 (2011)). The purpose of the Leahy-Smith America Invents Act and these proposed regulations is to establish a more efficient and streamlined patent system that will improve patent quality and limit unnecessary and counterproductive litigation costs. The preamble of this notice sets forth in detail the procedures by which the

Board will conduct *inter partes* review proceedings. The USPTO is engaged in a transparent process to create a timely, cost-effective alternative to litigation. Moreover, the rulemaking process is designed to ensure the integrity of the trial procedures. *See* 35 U.S.C. 316(b), as amended. The proposed rules would provide a set of rules relating to Board trial practice for *inter partes* review.

Section 6 of the Leahy-Smith America Invents Act is entitled "POST–GRANT REVIEW PROCEEDINGS" (Pub. L. 112–29, 125 Stat. 284, 299–305 (2011)). Section 6(a) of the Leahy-Smith America Invents Act, entitled "INTER PARTES REVIEW," amends chapter 31 of title 35, United States Code, also entitled "INTER PARTES REVIEW." In particular, section 6(a) of the Leahy-Smith America Invents Act amends 35 U.S.C. 311–318 and adds 35 U.S.C. 319.

Section 6(a) of the Leahy-Smith America Invents Act amends 35 U.S.C. 311, entitled "Inter partes review." 35 U.S.C. 311(a), as amended, will provide that, subject to the provisions of chapter 31 of title 35, United States Code, a person who is not the owner of a patent may file a petition with the Office to institute an *inter partes* review of the patent. 35 U.S.C. 311(a), as amended, will also provide that the Director will establish, by regulation, fees to be paid by the person requesting the review, in such amounts as the Director determines to be reasonable, considering the aggregate costs of the review. 35 U.S.C. 311(b), as amended, will provide that a petitioner in an *inter partes* review may request to cancel as unpatentable one or more claims of a patent only on a ground that could be raised under 35 U.S.C. 102 or 103 and only on the basis of prior art consisting of patents or printed publications. 35 U.S.C. 311(c), as amended, will provide that a petition for *inter partes* review may be filed after the later of either: (1) the date that is nine months after the grant of a patent or issuance of a reissue of a patent; or (2) if a post-grant review is instituted under chapter 32 of title 35, United States Code, the date of the termination of that post-grant review.

The grounds for seeking an *inter partes* review will be limited compared with post-grant review. The grounds for seeking *inter partes* review are limited to issues raised under 35 U.S.C. 102 or 103 and only on the basis of prior art consisting of patents or printed publications. In contrast, the grounds for seeking post-grant review include any ground that could be raised under 35 U.S.C. 282(b)(2) or (3). Such grounds for post-grant review include grounds that could be raised under 35 U.S.C. 102 or 103 including those based on prior

REDLINE EXHIBIT 1045
Redline v. Star
Trial IPR2013-00106
p.1045-1

presented subject matter. Accordingly, the longer a patent owner waits to request authorization to file an additional motion to amend, the higher the likelihood the request will be denied. Similarly, motions to amend may be permitted upon a joint request of the petitioner and the patent owner to advance settlement where the motion does not jeopardize the ability of the Office to timely complete the proceeding.

*Section 42.122:* Proposed § 42.122 would prescribe a rule consistent with the requirements of 35 U.S.C. 315(d), as amended, regarding multiple proceedings involving the subject patent. When there is a question of a stay concerning a matter for which a statutory time period is running in one of the proceedings, it is expected that the Director would be consulted prior to issuance of a stay, given that the stay would impact the ability of the Office to meet the statutory deadline. For example, it is expected that the Board would consult the Director prior to the issuance of a stay in an *ex parte* reexamination proceeding where the three month statutory time period under 35 U.S.C. 303 is running.

*Section 42.123:* Proposed § 42.123 would provide for the filing of supplemental information. 35 U.S.C. 316(a)(3), as amended, provides that the Director will establish regulations establishing procedures for filing supplemental information after the petition is filed. 35 U.S.C. 314(a), as amended, provides that the institution of an *inter partes* review is based upon the information filed in the petition under 35 U.S.C. 311 and any response filed under 35 U.S.C. 313, as amended. As the institution of the *inter partes* review is not based upon supplemental information, the proposed rule would provide that motions identifying supplemental information be filed after the institution of the *inter partes* review.

**Rulemaking Considerations**

*A. Administrative Procedure Act (APA):* This notice proposes rules of practice concerning the procedure for requesting an *inter partes* review, and the trial process after initiation of such a review. The changes being proposed in this notice do not change the substantive criteria of patentability. These proposed changes involve rules of agency practice and procedure and/or interpretive rules. *See Bachow Commc'ns Inc.* v. *FCC,* 237 F.3d 683, 690 (DC Cir. 2001) (rules governing an application process are procedural under the Administrative Procedure Act); *Inova Alexandria Hosp.* v. *Shalala,* 244 F.3d 342, 350 (4th Cir. 2001) (rules for handling appeals were procedural where they did not change the substantive standard for reviewing claims); *Nat'l Org. of Veterans' Advocates* v. *Sec'y of Veterans Affairs,* 260 F.3d 1365, 1375 (Fed. Cir. 2001) (rule that clarifies interpretation of a statute is interpretive).

Accordingly, prior notice and opportunity for public comment are not required pursuant to 5 U.S.C. 553(b) or (c) (or any other law), and thirty-day advance publication is not required pursuant to 5 U.S.C. 553(d) (or any other law). *See Cooper Techs. Co.* v. *Dudas,* 536 F.3d 1330, 1336–37 (Fed. Cir. 2008) (stating that 5 U.S.C. 553, and thus 35 U.S.C. 2(b)(2)(B), does not require notice and comment rule making for "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice") (quoting 5 U.S.C. 553(b)(A)). The Office, however, is publishing these changes and the Initial Regulatory Flexibility Act analysis, below, for comment as it seeks the benefit of the public's views on the Office's proposed implementation of these provisions of the Leahy-Smith America Invents Act.

*B. Regulatory Flexibility Act:* The Office estimates that 460 petitions for *inter partes* review will be filed in fiscal year 2013. This will be the first fiscal year in which *inter partes* review proceedings will be available for an entire fiscal year. The estimate for *inter partes* review petitions is partially based on the number of *inter partes*

reexamination requests under 37 CFR 1.915 that have been filed in fiscal years 2010 and 2011.

The Office received 281 requests for *inter partes* reexamination in fiscal year 2010. *See* Table 13B of the United States Patent and Trademark Office Performance and Accountability Report for Fiscal Year 2010, *available at http://www.uspto.gov/about/stratplan/ar/2010/USPTOFY2010PAR.pdf.*

The Office received 374 requests for *inter partes* reexamination in fiscal year 2011. *See* Table 14B of the United States Patent and Trademark Office Performance and Accountability Report for Fiscal Year 2011, *available at http://www.uspto.gov/about/stratplan/ar/2011/USPTOFY2011PAR.pdf.*

Additionally, the Office takes into consideration the recent growth rate in the number of requests for *inter partes* reexamination, the projected growth due to an expansion in the number of eligible patents under the *inter partes* review provisions of the Leahy-Smith America Invents Act (*see* § 6(c)), and the more restrictive filing time period in 35 U.S.C. 315(b), as amended by the Leahy-Smith America Invents Act.

The Office has reviewed the entity status of patents for which *inter partes* reexamination was requested from October 1, 2000, to September 23, 2011. This data only includes filings granted a filing date in the particular year rather than fillings in which a request was received in the year. The first *inter partes* reexamination was filed on July 27, 2001. A summary of that review is provided in Table 1 below. As shown by Table 1, patents known to be owned by a small entity represented 32.79% of patents for which *inter partes* reexamination was requested. Based on an assumption that the same percentage of patents owned by small entities will be subject to *inter partes* review, it is estimated that 151 petitions for *inter partes* review would be filed to seek review of patents owned by a small entity in fiscal year 2013, the first full fiscal year that these proceedings will be available.

TABLE 1—INTER PARTES REEXAMINATION REQUESTS FILED WITH PARENT ENTITY TYPE *

| Fiscal year | Inter partes reexamination requests filed | Number filed where parent patent is small entity type | Percent small entity type of total |
|---|---|---|---|
| 2011 | 329 | 123 | 37.39 |
| 2010 | 255 | 94 | 36.86 |
| 2009 | 240 | 62 | 25.83 |
| 2008 | 155 | 52 | 33.55 |
| 2007 | 127 | 35 | 27.56 |
| 2006 | 61 | 17 | 27.87 |
| 2005 | 59 | 18 | 30.51 |
| 2004 | 26 | 5 | 19.23 |

7060    **Federal Register**/Vol. 77, No. 28/Friday, February 10, 2012/Proposed Rules

## Instituting Inter Partes Review

### §42.108  Institution of inter partes review.

(a) When instituting *inter partes* review, the Board may authorize the review to proceed on all or some of the challenged claims and on all or some of the grounds of unpatentability asserted for each claim.

(b) At any time prior to institution of *inter partes* review, the Board may deny some or all grounds for unpatentability for some or all of the challenged claims. Denial of a ground is a Board decision not to institute *inter partes* review on that ground.

(c) *Sufficient grounds. Inter partes* review shall not be instituted for a ground of unpatentability unless the Board decides that the petition supporting the ground would, if unrebutted, demonstrate that there is a reasonable likelihood that at least one of the claims challenged in the petition is unpatentable. The Board's decision will take into account a preliminary patent owner response where such a response is filed.

## After Institution of Inter Partes Review

### §42.120  Patent owner response.

(a) *Scope.* A patent owner may file a response to the petition addressing any ground for unpatentability not already denied. A patent owner response is filed as an opposition and is subject to the page limits provided in § 42.24.

(b) *Due date for response.* If no time for filing a patent owner response to a petition is provided in a Board order, the default date for filing a patent owner response is two months from the date the *inter partes* review was instituted.

### §42.121  Amendment of the patent.

(a) A patent owner may file one motion to amend a patent but only after conferring with the Board. Any additional motions to amend may not be filed without Board authorization.

(b) A motion to amend must set forth:

(1) The support in the original disclosure of the patent for each claim that is added or amended; and

(2) The support in an earlier filed disclosure for each claim for which benefit of the filing date of the earlier filed disclosure is sought.

(c) A motion to amend the claims of a patent will not be authorized where:

(1) The amendment does not respond to a ground of unpatentability involved in the trial; or

(2) The amendment seeks to enlarge the scope of the claims of the patent or introduce new subject matter.

### §42.122  Multiple proceedings.

Where another matter involving the patent is before the Office, the Board

may during the pendency of the *inter partes* review enter any appropriate order regarding the additional matter including providing for the stay, transfer, consolidation, or termination of any such matter.

### §42.123  Filing of supplemental information.

Once a trial has been instituted, a petitioner may request authorization to file a motion identifying supplemental information relevant to a ground for which the trial has been instituted. The request must be made within one month of the date the trial is instituted.

Dated: January 31, 2012.

**David J. Kappos,**
*Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office.*

[FR Doc. 2012–2534 Filed 2–9–12; 8:45 am]

**BILLING CODE 3510–16–P**

## DEPARTMENT OF COMMERCE

### Patent and Trademark Office

**37 CFR Part 42**

**[Docket No. PTO–P–2011–0084]**

**RIN 0651–AC72**

### Changes To Implement Post-Grant Review Proceedings

**AGENCY:** United States Patent and Trademark Office, Commerce.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The United States Patent and Trademark Office (Office or USPTO) proposes new rules to implement the provisions of the Leahy-Smith America Invents Act that create a new post-grant review proceeding to be conducted before the Patent Trial and Appeal Board (Board). These provisions of the Leahy-Smith America Invents Act will take effect on September 16, 2012, one year after the date of enactment, and generally apply to patents issuing from applications subject to first-inventor-to-file provisions of the Leahy-Smith America Invents Act.

**DATES:** The Office solicits comments from the public on this proposed rulemaking. Written comments must be received on or before April 10, 2012 to ensure consideration.

**ADDRESSES:** Comments should be sent by electronic mail message over the Internet addressed to: *post_grant_review@uspto.gov.* Comments may also be submitted by postal mail addressed to: Mail Stop Patent Board, Director of the United States Patent and Trademark Office,

P.O. Box 1450, Alexandria, VA 22313–1450, marked to the attention of "Lead Judge Michael Tierney, Post-Grant Review Proposed Rules."

Comments may also be sent by electronic mail message over the Internet via the Federal eRulemaking Portal. *See* the Federal eRulemaking Portal Web site (*http://www.regulations.gov*) for additional instructions on providing comments via the Federal eRulemaking Portal.

Although comments may be submitted by postal mail, the Office prefers to receive comments by electronic mail message over the Internet because sharing comments with the public is more easily accomplished. Electronic comments are preferred to be submitted in plain text, but also may be submitted in ADOBE® portable document format or MICROSOFT WORD® format. Comments not submitted electronically should be submitted on paper in a format that facilitates convenient digital scanning into ADOBE® portable document format.

The comments will be available for public inspection at the Board of Patent Appeals and Interferences, currently located in Madison East, Ninth Floor, 600 Dulany Street, Alexandria, Virginia. Comments also will be available for viewing via the Office's Internet Web site (*http://www.uspto.gov*). Because comments will be made available for public inspection, information that the submitter does not desire to make public, such as an address or phone number, should not be included in the comments.

**FOR FURTHER INFORMATION CONTACT:** Michael Tierney, Lead Administrative Patent Judge, Sally Lane, Administrative Patent Judge, Scott Boalick, Lead Administrative Patent Judge, and Robert Clarke, Administrative Patent Judge, Board of Patent Appeals and Interferences, by telephone at (571) 272–9797.

**SUPPLEMENTARY INFORMATION:** On September 16, 2011, the Leahy-Smith America Invents Act was enacted into law (Pub. L. 112–29, 125 Stat. 284 (2011)). The purpose of the Leahy-Smith America Invents Act and these proposed regulations is to establish a more efficient and streamlined patent system that will improve patent quality and limit unnecessary and counterproductive litigation costs. The preamble of this notice sets forth in detail the procedures by which the Board will conduct post-grant review proceedings. The USPTO is engaged in a transparent process to create a timely, cost-effective alternative to litigation.

p.1045-3

Trials@uspto.gov
571-272-7822

Paper 27
Date: July 30, 2013

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

**ZTE** CORPORATION AND ZTE (USA) INC.
Petitioner,

v.

**CONTENTGUARD** HOLDINGS INC.
Patent Owner.

————————

Case IPR2013-00139 (JL)
Patent 7,269,576

————————

Before JAMESON LEE, MICHAEL W. KIM, and
MICHAEL R. ZECHER, *Administrative Patent Judges.*

LEE, *Administrative Patent Judge*.

DECISION
Conduct of Proceeding
*37 C.F.R. § 42.10*

The initial telephone conference for this *inter partes* review was held on July 29, 2013, between respective counsel for the parties and Judges Lee, Kim, and Zecher. The purpose of the call was to discuss issues the parties may have regarding the Scheduling Order issued on July 9, 2013 (Paper 16), and any motion

IPR2013-00139
Patent 7,269,576

either party intends to file.  ZTE filed a proposed motions list (Paper 25) identifying a single item, a motion to file supplemental information under 37 C.F.R. § 41.123.  ContentGuard filed no proposed motions list.

According to counsel for ZTE, in light of the Board's construction of the claim term "repository" in the decision instituting *inter partes* review, two references Leroux (U.S. Patent 5,588,146) and Perritt (a printed publication) are more pertinent to the claimed subject matter than the prior art cited by the petitioner in its petition.  ZTE would like to submit, as supplemental information, those two references together with a description of how they help to render unpatentable the challenged claims of ContentGuard under the grounds for which this *inter partes* review was instituted.

Upon inquiry from the Board, counsel for ZTE explained that ZTE is not seeking to modify its petition, but simply desires to bolster its position in light of the Board's claim interpretation.

Counsel for ZTE acknowledged that the two references were known to ZTE at the time of filing of its petition, and that those references were applied by ZTE in related petitions for *inter partes* review of other patents of ContentGuard.  For example, Perritt is Exhibit 1006 in IPR2013-00137 and IPR2013-00138, and Leroux is Exhibit 1011 in IPR2013-00137 and IPR2013-00138.

Under 37 C.F.R. § 42.123, a party may file a motion to submit supplemental information if a request for authorization to file such a motion is made within one month of the date the trial is instituted.  In this case, trial was instituted on July 9, 2013, and thus the request was made within one month of the institution of trial.  Nothing in 37 C.F.R. § 42.123 suggests, however, that a request to submit supplemental information, if made within one month of the date the trial is instituted, automatically would be granted no matter the circumstance.

2

IPR2013-00139
Patent 7,269,576

As a general matter, we do not read 37 C.F.R. § 42.123 as permitting a petitioner to refrain from initially construing a key claim term, such as "repository" in this case, wait for the Board to render a construction for the term, and then ask to submit supplemental evidence based on that construction to bolster its position, particularly if that evidence was in the petitioner's possession at the time of filing of the petition. The filing of a petition for *inter partes* review should not be turned into a two-stage process, first to elicit a claim interpretation by the Board, and second to complete the petition on the basis of that claim interpretation.

ZTE in its petition did not expressly construe "repository." ZTE also had possession of both Perritt and Leroux when its petition was filed. Also, during the conference call, counsel for ZTE did not allege that there is anything in the Board's interpretation of "repository" that reasonably could not have been anticipated by ZTE when filing its petition. The Board interpreted "repository" based on the disclosure of the specification of U.S. Patent 7,269,576.

For the foregoing reasons, ZTE has not established sufficient basis for submitting Leroux and Perritt as supplemental information under 37 C.F.R. § 42.123.

Counsel for each party indicated that the due dates set in the Scheduling Order do not present a problem and need not be changed.

Order

It is

**ORDERED** that ZTE's request to submit supplemental information is *denied*; and

**FURTHER ORDERED** that the due dates specified in the Scheduling Order dated July 9, 2013, remain unchanged.

IPR2013-00139
Patent 7,269,576

For Petitioner:

Jon Beaupre
jbeaupre@brinkshofer.com
Miyoung Shin
mshin@brinkshofer.com
Jeremy Snodgrass
jsnodgrass@brinkshofer.com


For Patent Owner:

Robert Sterne
rsterne-PTAB@skgf.com
Jon Wright
Jwright-PTAB@skgf.com

4

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

# BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

Redline Detection, LLC
Petitioner

v.

Star Envirotech, Inc.
Patent Owner

Case IPR2013-00106
U.S. Patent No. 6,526,808
_____

## MOTION FOR SUPPLEMENTAL DISCLOSURE OF NEW EXHIBITS 1037-1042 PER 35 U.S.C. § 361(3) AND 37 C.F.R. § 123(a).

### Supplemental Submission Requirements

Petitioner, Redline Detection, LLC ("Redline"), makes this Supplemental Submission of Exhibits 1037-1042 pursuant to 35 U.S.C. § 316(a)(3), 37 C.F.R. § 42.123(a) and Final Rules of Practice I.J at Federal Register, Vol. 77, No. 157, page 48767, Tuesday, Aug. 14, 2012.

Section 42.123(a) authorizes a motion to submit supplemental information if: (1) the motion is filed within one month of the date the trial is instituted and (2) if the supplemental information is relevant to a claim for

1

which the trial has been instituted.

As this motion is filed within one month of the July 1, 2013 date on which trial was instituted, it is timely filed. The relevance to claims 9 and 10 on which trial is instituted is shown below. Granting the motion and entering the submitted Exhibits are respectfully requested.

A Revised Exhibit List is submitted herewith.

**Relevance Of The Supplemental Information**

**Exhibit 1039** is the declaration of Dr. Michael St. Denis, an expert in automobile evaporative (EVAP) systems, the diagnostic testing related to such systems, government regulations related to the testing of EVAP systems and the use of inert gases for such testing. The declaration explains several aspects of the references on which the IPR was granted and further helps establish reasons for combining the references, and the reasons for unpatentability of claims 9 and 10 based on the references on which the IPR was granted. The declaration includes claim charts similar to those used in the Petition, but directed to the two grounds on which the IPR was granted and how one skilled in the art would deem claims 9 and 10 of the '808 patent obvious in view of the Gilliam and Stoyle references, per Ground 1, and obvious in view of the Gilliam, Pauley and 1999 Website references, per Ground 2.

**Exhibit 1040** is the resume of Michael St. Denis.

**Exhibit 1041** is a copy of U.S. Patent 3,250,723 to Fortney that is referred to in the Gilliam patent of Exhibit 1005 on which Ground 1 and Ground 2 of the IPR are based. *See* Col. 5:63 of Gilliam. Exhibit 1041 is referred to in the St. Denis declaration at ¶ 36 regarding uses of smoke machines and they types of smoke generators usable in Gilliam.

**Exhibit 1042** is a copy of U.S. Patent 3,432,439 to Dickman that is referred to in the Gilliam patent of Exhibit 1005 on which ground 1 and ground 2 of the IPR are based. *See* Col. 5: 63-64 of Gilliam. Exhibit 1042 is referred to in the St. Denis declaration at ¶ 36 regarding uses of smoke machines and they types of smoke generators usable in Gilliam.

Respectfully submitted,

STETINA BRUNDA GARRED & BRUCKER

Dated: <u>July 30, 2013</u>          <u>/Matthew A. Newboles/</u>
                                    Matthew A. Newboles, Reg. No. 36,224
                                    Attorney for Petitioner
                                    Redline Detection, LLC

STETINA BRUNDA
GARRED & BRUCKER
75 Enterprise, Suite 250
Aliso Viejo, CA 92656
(949) 855-1246

*Inter Partes* Review of U.S. Patent No. 6,526,808

## CERTIFICATE OF SERVICE

Pursuant to 37 C.F.R. §§ 42.8(e) and 42.105(b), the undersigned certifies that on July 30, 2013, a complete and entire copy of this Motion for Supplemental Disclosure of New Exhibits 1037-1042 Per 35 U.S.C. § 361(3) and 37 C.F.R. § 123(a); Declaration of Michael St. Denis (Ex. 1039), St. Denis resume (Ex. 1040), Patent No. 3,250,723 (Ex. 1041) and Patent No. 3,432,439 (Ex. 1042) was provided via Express Mail, costs prepaid, to the Patent Owner by serving the correspondence address of record as follows:

Edward Schlatter
Brenton Babcock
Knobbe Martens
2040 Main Street, 14th Floor
Irvine, California 92614

By:/Matthew A. Newboles/
Matthew A. Newboles
Reg. No. 36,224

T:\Client Documents\REDLN\025X\July 30 2013 Filing\Supplemental Information CFR Comments.docx

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

# BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

Redline Detection, LLC
Petitioner

v.

Star Envirotech, Inc.
Patent Owner

Case IPR2013-00106
U.S. Patent No. 6,526,808

_____

## PETITIONER'S PROPOSED MOTIONS
## PRIOR TO INITIAL CONFERENCE

Pursuant to the Patent Trial and Appeal Board's decision to institute trial on July 1, 2013, and in advance of the initial conference scheduled for 2:00 PM Eastern Time, August 1, 2013, Petitioner identifies the motions it has filed and may request permission to file, in the above-captioned *Inter Partes R*eview proceeding.

Presently, Petitioner has filed a motion to submit supplemental information pursuant to 37 CFR §42.123(a)(1). Specifically, Petitioner has filed a motion to submit the expert declaration of Dr. Michael St. Denis and accompanying exhibits, namely, certain patents cited in the *Gilliam* Patent (Exhibit 1005). Petitioner's motion to submit supplemental information was made on July 30, 2013 and within one month of the date the trial was instituted, namely, July 1, 2013. Petitioner's expert declaration is directed to claims 9 and 10 of United States Patent No. 6,526,808 ("the '808 patent") on which the present *Inter Partes* Review has been instituted and that such claims are invalid per Grounds 1 and 2 as set forth in the Patent Trial and Appeal Board's decision.

In this regard, Dr. Michael St. Denis, an expert in automobile evaporative systems, the diagnostic testing related to such systems, government regulations related to the testing of EVAP systems and the use of inert gases for such testing, presents further evidence as to how one

skilled in the art would deem claims 9 and 10 of the '808 patent obvious in view of the *Gilliam* and *Stoyle* references per Ground 1, as well as obvious in view of the *Gilliam, Pauley* and *1999 Website* references, per Ground 2.

Petitioner expects that additional expected/scheduled motions for observations on cross examination, motions for additional discovery, and motions to exclude Patent Owner's evidence (including disqualification of purported experts), as well as opposition to Motion to Amend and opposition to Motion to Exclude Petitioner's Evidence, may be filed according to the Scheduling Order of July 1, 2013. To the extent necessary to address any concerns about the authenticity and admissibility of the *1999 Website* relied upon in Ground 2 of the rejection of claims 9 and 10, Petitioner preserves the right to seek discovery from archive.org and its archival records related to smokemachines.com.

Additionally, Petitioner is not aware of what amendments, remarks, and evidence the Patent Owner, Star Envirotech, Inc., may present in support of the validity of the '808 patent, such as in Patent Owner's Response to the Petition pursuant to CFR §42.120 scheduled for submission on October 1, 2013 or in Patent Owner's Reply to the Petitioner's Opposition scheduled for February 3, 2014. To the extent necessary, Petitioner preserves the right to request permission to file additional motions as may be required, such as

3

**A285**

potential motions to submit additional prior art to address claim amendments or motions to submit additional evidence or expert testimony as required in view of Patent Owner's future actions.  Petitioner specifically reserves the right to request permission to file one or more motions to take the deposition of any individual who submitted a declaration in the prior reexaminations of the '808 patent, which declaration is relied upon by Patent Owner for any purpose in the present *Inter Partes* Review.  Such individuals include co-inventor Jim Saffie, former co-inventor Denise Welch (previously Denise Yvette Haddad), Rick Escalambre, Michael Gouge, Fred Smith and Richard Banyard.

Lastly, upon review of its exhibits submitted in connection with its Petition for *Inter Partes* Review, Petitioner has noted that certain information related to the labeling requirements of 37 CFR §42.63(d) was omitted.    Petitioner stands ready to address such issue per any recommendations the Patent Trial and Appeal Board may suggest.  To that

end, the Patent Trial and Appeal Board's input on such matter is greatly

appreciated.

Respectfully submitted,

STETINA BRUNDA GARRED & BRUCKER

Dated: July 30, 2013          /Matthew A. Newboles/
                              Matthew A. Newboles, Reg. No. 36,224
                              Attorney for Petitioner
                              Redline Detection, LLC

STETINA BRUNDA
GARRED & BRUCKER
75 Enterprise, Suite 250
Aliso Viejo, CA 92656
(949) 855-1246

5

**A287**

## CERTIFICATE OF SERVICE

Pursuant to 37 C.F.R. §§ 42.8(e) and 42.105(b), the undersigned certifies that on July 30, 2013, a complete and entire copy of this Petitioner's Proposed Motions Prior to Initial Conference was provided via Express Mail, costs prepaid, to the Patent Owner by serving the correspondence address of record as follows:

Edward Schlatter
Brenton Babcock
Knobbe Martens Olsen & Bear
2040 Main Street, 14th Floor
Irvine, California 92614

By:/Matthew A. Newboles/
Matthew A. Newboles
Reg. No. 36,224

T:\Client Documents\REDLN\025X\Petitioners Motions Prior to Conference 07 25 13.docx

Trials@uspto.gov                                                                   Paper 21
Tel: 571-272-7822                                                    Entered: July 31, 2013

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

GNOSIS S.P.A., GNOSIS BIORESEARCH S.A., and GNOSIS U.S.A., INC.
Petitioners

v.

MERCK & CIE
Patent Owner

_____

Case IPR2013-00117
Patent 6,011,040

_____

Before MICHAEL P. TIERNEY, JACQUELINE WRIGHT BONILLA, and
SCOTT E. KAMHOLZ, *Administrative Patent Judges.*

KAMHOLZ, *Administrative Patent Judge.*

ORDER
Conduct of the Proceeding
*37 C.F.R. § 42.5*

Case IPR2013-00117
Patent 6,011,040

The initial conference call for this proceeding was held on July 24, 2013 between respective counsel for the parties and Judges Tierney, Bonilla, and Kamholz.  Both parties indicated that all issues raised during the call apply equally to related proceedings IPR2013-00116, IPR2013-00117, IPR2013-00118, and IPR2013-00119.

Each party filed a list of proposed motions before the call.  The following proposed motions and other matters were discussed during the call.

### A.  Patent Owner's Matters

#### 1.  Motion to Amend

Patent owner Merck & Cie (Merck) indicated that it may file a motion to cancel claims and to present substitute claims.  Merck asked the Board whether a dependent claim whose independent claim is canceled must be re-presented as a substitute claim in independent form.  The Board noted that a motion to amend containing an instruction to cancel the independent claim would suffice and that the Board expects no opposition to simple cancelation.  Merck asked whether a claim combining limitations from two claims both depending from the same independent claim must be presented as a substitute claim.  The Board stated that such an amendment must be presented as a substitute claim because the amendment would change the scope of the claims at issue.  Merck asked whether it must concede unpatentability of any canceled claim.  The Board stated that it need not.  Merck asked whether rewriting a dependent claim in independent form would be considered a substitute claim.  The Board stated that it would.

#### 2.  Motion for Additional Discovery

The parties represented that they contemplated agreeing to additional discovery between themselves.  37 C.F.R. § 42.51(b)(2).  The Board encouraged the parties to reach agreement on discovery by themselves and invited them to

2

Case IPR2013-00117
Patent 6,011,040

request a conference call with the Board if they cannot reach agreement regarding specific discovery disputes.

### 3. *Duty of Disclosure*

Merck asked whether there was a mechanism for submission of information akin to an information disclosure statement ("IDS") used in patent prosecution. The Board answered that there is no similar mechanism in AIA trials. Merck asked whether it is required under a duty of candor to identify any grounds of challenge beyond those raised in this proceeding by Gnosis. The Board noted that compliance with the duty of candor under 37 C.F.R. § 42.11 involves a fact specific inquiry.

### 4. *Observations on Cross-Examination of Reply Witnesses*

Merck noted that the Scheduling Order expressly allows for the petitioner to file a motion for observation on cross-examination testimony of a patent owner reply witness. Merck asked whether the patent owner will be afforded a similar opportunity to file a motion for observation on cross-examination testimony of a petitioner reply witness. The Board stated that if either party conducts a cross-examination of an opponent's reply witness, that party will be permitted to file a motion for observation.

### B. *Petitioners' Matters*

### 1. *Motion to File Supplemental Information*

Before the call, Gnosis submitted a request for authorization of a motion to file supplemental information. Paper 15. Gnosis simultaneously filed the motion. Paper 16. Merck stated during the call that Gnosis's supplemental information relates to arguments that Merck might make but has not yet made and asked whether they must address Gnosis's supplemental information in the response to the petition under 37 C.F.R. § 42.120. The Board indicated that Merck does not

3

have to address the supplemental information in the response because it does not at present form part of Gnosis's grounds for challenging patentability. The Board advised the parties to notify the Board if Gnosis's supplemental information raises issues that require additional briefing. Merck asked whether additional briefing is different from a rehearing request. The Board answered that it was, because a rehearing request would address whether the Board misapprehended or overlooked matter in a decision to institute based on the record before the Board at that time. Additional briefing, on the other hand, would be based on the supplemented record. Merck did not indicate an intention to oppose Gnosis's motion. The motion to file supplemental information is granted.

2. *Request to Modify Due Dates*

Gnosis proposed that Due Date 1 be advanced by two weeks, from September 24, 2013 to September 10, 2013. Gnosis explained that it needs an additional two weeks to prepare its reply to the patent owner response and its opposition to the motion to amend, due to the large amount of evidence it expects Merck to submit with its patent owner response. Merck opposed the request, arguing the Gnosis had had a year to prepare its petition and that Merck needs the full three months to prepare its response and motion to amend. The Board denied Gnosis' request. The Board reminded the parties that they may stipulate to changes of Due Dates 1, 2, and 3 and that they should contact the Board if they cannot agree on changes to those dates or have reason to seek changes of other Due Dates. The Board cautioned the parties that it would not likely grant any change in the schedule that would impair its ability to reach a final disposition within one year of institution.

Case IPR2013-00117
Patent 6,011,040

### C. Other Matters

#### 1. Protective Order

The parties indicated that they are discussing modifications to the default protective order. The Board reminded the parties that any motion proposing a protective order that deviates from the default protective order should explain the deviations. The Board would appreciate the inclusion of a marked-up comparison of the proposed and default protective orders so that the Board can readily understand the differences.

#### 2. Exhibit Numbers

Gnosis posed a question about inconsistent exhibit numbers between the four related proceedings. The Board authorized the parties to skip exhibit numbers as appropriate to maintain consistency of exhibit numbers.

Accordingly, it is hereby

**ORDERED** that Merck has met the requirement to confer with the Board prior to filing a motion to amend claims under 37 C.F.R. § 42.121(a) and is authorized to file a motion to amend no later than Due Date 1;

**FURTHER ORDERED** that Gnosis's motion to file supplemental information is *granted*;

**FURTHER ORDERED** that no motions for additional discovery are authorized at this time;

**FURTHER ORDERED** that Merck must inform the Board of any basis Merck has for knowing that any challenged claim is unpatentable, pursuant to Merck's duty of candor under 37 C.F.R. § 42.11;

**FURTHER ORDERED** that Gnosis is not authorized to file a motion to change Due Date 1 from September 24, 2013 to September 10, 2013;

Case IPR2013-00117
Patent 6,011,040

**FURTHER ORDERED** that guidance from the Board on the filing of motions for observations on cross-examination testimony of reply witnesses is forthcoming; and

**FURTHER ORDERED** that 37 C.F.R. § 42.63(c) is suspended during this proceeding only to the extent that the parties may skip exhibit numbers as appropriate to maintain consistency of exhibit numbers between the four proceedings IPR2013-00116, IPR2013-00117, IPR2013-00118, and IPR2013-00119.

Case IPR2013-00117
Patent 6,011,040

For PETITIONERS:

    Jonathan J. Krit
    Janine A. Moderson
    Amin Talati, LLC
    jonathan@amintalati.com
    jen@amintalati.com
    patent@amintalati.com

    Joseph E. Cwik
    Erik B. Flom
    Husch Blackwell LLP
    joseph.cwik@huschblackwell.com
    Erik.flom@huschblackwell.com

For PATENT OWNER:

    Anthony J. Zelano
    Brion P. Heaney
    Millen, White, Zelano & Branigan, P.C.
    zelano@mwzb.com
    heaney@mwzb.com

    Jitendra Malik
    Thomas Parker
    Alston & Bird, LLP
    jitty.malik@alston.com
    thomas.parker@alson.com

7

Trial@uspto.gov                                                                        Paper No. 28
571-272-4822                                                      Date Entered:  April 16, 2013

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

INTERTHINX, INC.
Petitioner

v.

CORELOGIC SOLUTIONS LLC
Patent Owner,
_____

Case CBM2012-00007
Patent 5,361,201
_____


Before MICHAEL P. TIERNEY, JONI Y. CHANG and,
BRIAN J. McNAMARA, *Administrative Patent Judges*

McNAMARA, *Administrative Patent Judge*.


**ORDER GRANTING PETITIONER'S MOTION TO SUBMIT
SUPPLMENTAL INFORMATION UNDER 37 C.F.R. § 42.223**
***Conduct of the Proceeding***
***37C.F.R. 42.5***

On February 27, 2013 Interthinx, Inc. (Petitioner) filed a Request For

Authorization To File Motion To Submit Supplemental Information Pursuant to 37

C.F.R. § 42.223 (Request To File Motion To Supplement) accompanied by the

Case No. CBM2012-00007
Patent 5,361,201

subject Motion To Submit Supplemental Information Pursuant To 37 C.F.R.

§ 42.223. (Motion To Supplement).

During an initial conference on March 1, 2013, Corelogic Solutions, Inc.

(Patent Owner) requested authorization to oppose Petitioner's Request To File

Motion To Supplement.  During the conference the Board stated that it would

consider the Motion To Supplement and denied Patent Owner authorization to file

such an opposition.

Having filed its request within one month of the institution of the trial, Rule

42.233(a) permits Petitioner to file supplemental information that is shown to be

relevant to a claim for which the trial has been instituted.  37 C.F.R. § 42.223(a).

The information Petitioner seeks to submit includes testimony by inventor, Dr.

Allen Jost , given in the trial of a patent infringement action brought in the U.S.

District Court for the Eastern District of Texas, captioned *CoreLogic Information*

*Solutions, Inc. v. Fiserv, Inc. et al.*, Civil Action No. 1:10-CV-132-RSP (E.D.

Texas).  Because the district court trial occurred after the Petition in this action was

filed, the trial testimony of Dr. Jost was not available when the Petition was filed.

Petitioner also seeks to submit testimony of inventor Krishna Gopinathan taken in

a deposition before the trial.

The testimony Petitioner seeks to submit concerns the scope of what the

inventors invented, i.e., whether the inventors invented an algorithm or an abstract

2

Case No. CBM2012-00007
Patent 5,361,201

idea.  This testimony bears directly on an issue for which trial has been instituted

in this Covered Business Method Patent Review, i.e., the patentability of  claims 1,

6, 9 and 10 of U.S. Patent 5,631,201 under 35 U.S.C. § 101.  Thus, the testimony is

relevant to a claim for which trial has been instituted under 37 C.F.R. § 42.223.

In granting petitioner's Motion To Supplement, it is premature for us

express any opinion concerning the above testimony, other than that it is relevant

to a claim for which trial has been instituted.  The Board will consider what, if any,

weight to assign the testimony at the appropriate time.

It is **ORDERED** that Petitioner's Motion To Submit Supplemental

Information Pursuant To 37 C.F.R. § 42.223 is **GRANTED**.


PETITIONER: (via electronic transmission)

Mark Nikolsky
Kia Freeman
McCarter & English, LLP
100 Mulberry Street
Newark, NJ 07102


PATENT OWNER: (via electronic transmission)

Scott McKeown
Michael Kiklis
Oblon Spivak
CPdocketMcKeown@oblon.com
CPdocketKiklis@oblon.com

Trials@uspto.gov                                    Paper 31
571-272-7822                                    Date: August 29, 2013

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

AMKOR TECHNOLOGY, INC.
Petitioner

v.

TESSERA, INC.
Patent Owner

_____

Case IPR2013-00242
U.S. Patent 6,046,076

_____

Before SCOTT R. BOALICK, KEVIN F. TURNER, and JUSTIN T. ARBES,
*Administrative Patent Judges.*

TURNER, *Administrative Patent Judge.*


DECISION
Joint Motion to Seal
*37 C.F.R. §§ 42.14 and 42.54*

Cased IPR2013-00242
U.S. Patent 6,046,076

## INTRODUCTION

On July 12, 2013, Patent Owner Tessera, Inc. ("Tessera") filed a Motion to Seal (Paper 7) seeking to maintain as confidential and under seal a license agreement (Ex. 2004) between Tessera and Petitioner Amkor Technology, Inc. ("Amkor"), as well as certain other documents, where the license agreement and other documents were submitted in support of Tessera's Patent Owner Preliminary Response (Paper 8).  Further to our Order (Paper 10), Amkor was given leave to file a Reply (Paper 11) to the Preliminary Response on the issue of standing, which it did on July 26, 2013, and Tessera was given leave to file a Sur-Reply (Paper 18) in response, which it did on August 2, 2013.  With both filings, the parties each included a Motion to Seal (Papers 13, 20) seeking to seal specific exhibits relating to the agreement between the parties and the arbitrations between the parties.

The parties later reached an agreement as to some of the documents requested to be sealed, and the Board issued an Order (Paper 25) authorizing the parties to file a joint motion to seal and deeming the previous three motions withdrawn.  Subsequently, the parties filed a Joint Motion to Seal ("Motion," Paper 26) on August 12, 2013.  For the reasons set forth below, the Board grants the Motion in part.

## DISCUSSION

There is a strong public policy in favor of making information filed in an *inter partes* review proceeding open to the public, especially because the proceeding determines the patentability of claims in an issued patent and, therefore, affects the rights of the public.  Under 35 U.S.C. § 316(a)(1), the default rule is that all papers filed in an *inter partes* review are open and available for

2

**A300**

Cased IPR2013-00242
U.S. Patent 6,046,076

access by the public; a party, however, may file a concurrent motion to seal and the information at issue is sealed pending the outcome of the motion.

Similarly, 37 C.F.R. § 42.14 provides:

> The record of a proceeding, including documents and things, shall be made available to the public, except as otherwise ordered. A party intending a document or thing to be sealed shall file a motion to seal concurrent with the filing of the document or thing to be sealed. The document or thing shall be provisionally sealed on receipt of the motion and remain so pending the outcome of the decision on the motion.

It is, however, only "confidential information" that is protected from disclosure. 35 U.S.C. § 316(a)(7) ("The Director shall prescribe regulations. . . providing for protective orders governing the exchange and submission of confidential information"). In that regard, the *Office Trial Practice Guide*, 77 *Fed. Reg.* 48756, 48760 (Aug. 14, 2012) provides:

> The rules aim to strike a balance between the public's interest in maintaining a complete and understandable file history and the parties' interest in protecting truly sensitive information.
>
> *        *        *
>
> *Confidential Information*: The rules identify confidential information in a manner consistent with Federal Rule of Civil Procedure 26(c)(1)(G), which provides for protective orders for trade secret or other confidential research, development, or commercial information. § 42.54.

The standard for granting a motion to seal is "for good cause." 37 C.F.R. § 42.54. As a joint motion, both parties bear the burden of proof in showing entitlement to the requested relief. 37 C.F.R. § 42.20(c). The Board needs to know why the information sought to be sealed constitutes confidential information.

With respect to Exhibits 1029, 2004, and 2027, the parties have submitted substitute exhibits with portions redacted from the originally submitted exhibits.

3

Cased IPR2013-00242
U.S. Patent 6,046,076

Motion 3. The parties request that the originally filed Exhibits 1029, 2004, and 2027 be expunged and the substituted documents be considered in their stead. *Id*.

The parties argue that the redacted portions of the substitute Exhibit 1029 should remain under seal because they relate to the manner in which Amkor's royalty obligations are calculated. *Id*. In reviewing the differences between the original and substitute Exhibits 1029, we agree that the redactions are narrowly tailored to the royalty obligations, and find that the parties have shown good cause to redact portions of the original Exhibit 1029.

With respect to substitute Exhibit 2004, the parties provide that the redacted portions relate to financial aspects of the Confidential License Agreement (CLA) and that Tessera would be greatly prejudiced in a critical portion of its business for the reasons provided in the Motion. Motion 3-5. The parties agree that the CLA is not relevant to the central issue of the *inter partes* review, namely patentability. Motion 5-6. We agree with the parties that sufficient portions of the substitute Exhibit 2004 remain so that the public can be informed about the nature of the agreement. We also agree that the parties have shown good cause to have the redacted portions of the substitute Exhibit 2004 remain under seal.

With respect to substitute Exhibit 2027, the parties have supplied a shortened version of Amkor's Reply Memorandum to "reduc[e] the amount of information kept under seal." Motion 6. The parties indicate that this shortened version should remain under seal as it is marked confidential and submitted under an International Chamber of Commerce (ICC) Protective Order in the parties' arbitration. *Id*. The cited portions appear to discuss the definition of royalty-bearing products, which is argued as being confidential and harmful to Tessera if made public. *See* Declaration of James J. MacDonald, ¶¶ 7-8. We agree

4

Cased IPR2013-00242
U.S. Patent 6,046,076

that the parties have shown good cause to maintain substitute Exhibit 2027 under seal in its entirety.

With respect to Exhibits 2002, 2007, 2009, 2014, 2017-2019, 2021-2024, 2040, and 2042, the parties argue that these documents should remain under seal because they contain confidential business information, details about the CLA, or trade-secret technical information of the parties. Motion 7-10. We have reviewed all of the exhibits and agree that they contain such information and should remain under seal, save one. Thus, we conclude that the parties have shown good cause for Exhibits 2002, 2009, 2014, 2017-2019, 2021-2024, 2040, and 2042 to remain under seal in this proceeding.

With respect to Exhibit 2007, however, we conclude that the Request for Arbitration, which forms that exhibit, is central to Tessera's arguments about Amkor's standing to petition for *inter partes* review. To maintain the entire document under seal would deny the public the opportunity to better understand that Request. While there may be data within the document that should be maintained as confidential and under seal, we conclude that such portions are minor and may be handled with proper redactions. As such, we require the parties to submit a substitute Exhibit 2007 with portions redacted to maintain their confidentiality and to remain under seal.

A motion to seal is required to include a proposed protective order and to state that the parties have stipulated to the default protective order, found at *Office Trial Practice Guide*, 77 *Fed. Reg.* 48756, 48771 (Aug. 14, 2012). Motion 10. We enter this default protective order and order that it shall govern the conduct of this proceeding.

Cased IPR2013-00242
U.S. Patent 6,046,076

ORDER

Accordingly, it is

**ORDERED** that original Exhibits 1029, 2004, and 2027 are hereby expunged from the record of this proceeding;

**FUTHER ORDERED** that newly submitted substitute Exhibits 1029, 2004, and 2027 are entered;

**FUTHER ORDERED** that Exhibits 2002, 2009, 2014, 2017-2019, 2021-2024, 2027 (substitute), 2040, and 2042 remain under seal in their entirety;

**FUTHER ORDERED** that, within one week of this Decision, the parties are required to submit a substitute Exhibit 2007 with portions redacted to maintain their confidentiality and to remain under seal;

**FURTHER ORDERED** that the default protective order at *Office Trial Practice Guide*, 77 *Fed. Reg.* 48756, 48771 (Aug. 14, 2012), agreed to by the parties, is hereby entered; and

**FURTHER ORDERED** that the protective order shall govern the conduct of the proceeding unless modification is authorized by the Board.

Cased IPR2013-00242
U.S. Patent 6,046,076

For PETITIONER:

Lissi Mojica
Kevin Greenleaf
SCHWEGMAN, LUNDBERG & WOESSNER, P.A.
Lmojica@slwip.com
Kgreenleaf@slwip.com
Request@slwip.com


For PATENT OWNER:

Jon E. Wright
Robert Greene Sterne
Jason D. Eisenberg
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.
jwright-PTAB@skgf.com
rsterne-PTAB@skgf.com

7

**A305**

Trial@uspto.gov                                             Paper 28
571-272-7822                                        Entered: 12 August 2013

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

ST. JUDE MEDICAL, CARDIOLOGY DIVISION, INC.
Petitioner

**v.**

VOLCANO CORPORATION
Patent Owner

————————————

Case IPR-2013-00258
Patent 7,134,994

————————————

Before JAMESON LEE, JOSIAH C. COCKS, and SCOTT E. KAMHOLZ,
*Administrative Patent Judges.*

LEE, *Administrative Patent Judge.*

**DECISION**
Revised Motion to Seal
*37 C.F.R. §§ 42.14 and 42.54*

Introduction

On April 30, 2013, Petitioner filed a Motion to Seal.  On May 20, 2013, the

Board authorized Petitioner to revise the motion, by refining the identify of the

exhibits sought to be sealed, based on a decision of the Board on Petitioner's

separate Motion for Non-Electronic Filing of certain exhibits.  On May 28, 2013,

Petitioner filed a Renewed Motion to Seal.  Paper 25.  The covered exhibits are:

Case IPR 2013-00258
Patent 7,134,994

Exhibits 1060, 1061, 1066, 1082, 1097, 1099, 1110, 1111, 1115, 1116, 1119, 1123, 1124, 1125, 1126, 1127, 1128, 1129, 1130, 1131, 1136, 1137, 1138, 1139, 1144, and 1145.

The Patent Owner filed no opposition. For reasons discussed below, Petitioner's Renewed Motion to Seal is *conditionally granted*.

Discussion

There is a strong public policy for making all information filed in a quasi-judicial administrative proceeding open to the public, especially in an *inter partes* review which determines the patentability of claims in a patent and therefore affects the rights of the public. Under 35 U.S.C. § 316(a)(1), the default rule is that all papers filed in an *inter partes* review are open and available for access by the public; and a party may file a concurrent motion to seal and the information at issue is sealed pending the outcome of the motion. Similarly, 37 C.F.R. § 42.14 provides:

> The record of a proceeding, including documents and things, shall be made available to the public, except as otherwise ordered. A party intending a document or thing to be sealed shall file a motion to seal concurrent with the filing of the document or thing to be sealed. The document or thing shall be provisionally sealed on receipt of the motion and remain so pending the outcome of the decision on the motion.

It is, however, only "confidential information" that is protected from disclosure. 35 U.S.C. § 316(a)(7)("The Director shall prescribe regulations -- . . . providing for protective orders governing the exchange and submission of

-2-

**A307**

Case IPR 2013-00258
Patent 7,134,994

confidential information"). In that regard, note the *Office Patent Trial Practice Guide*, 77 *Fed. Reg.* 48756, 48760 (Aug. 14, 2012), which provides:

> The rules aim to strike a balance between the public's interest in maintaining a complete and understandable file history and the parties' interest in protecting truly sensitive information.

> *            *            *

> *Confidential Information*: The rules identify confidential information in a manner consistent with Federal Rule of Civil Procedure 26(c)(1)(G), which provides for protective orders for trade secret or other confidential research, development, or commercial information. § 42.54.

The standard for granting a motion to seal is "for good cause." 37 C.F.R. § 42.54. Petitioner ("St. Jude") as the moving party has the burden of proof in showing entitlement to the requested relief. 37 C.F.R. § 42.20(c).

For reasons discussed below, we observe numerous deficiencies.

First, a motion to seal is required to include a certification that the moving party has in good faith conferred or attempted to confer with the opposing party in an effort to come to an agreement as to the scope of the proposed protective order for this *inter partes* review. 37 C.F.R. § 42.54. St. Jude's motion contains no such certification.

Secondly, the motion apparently acknowledges that certain relevant portions of each exhibit sought to be sealed are discussed openly, on the record, in St. Jude's Petition, and that the Patent Owner is invited to do the same. Paper 25, 6:20 to 7:2. That acknowledgment indicates that the Renewed Motion is excessive

-3-

**A308**

Case IPR 2013-00258
Patent 7,134,994

in scope, as it seeks to keep under seal portions of each exhibit, which are either not confidential information or no longer regarded as confidential information.

We reiterate that a party may seek to have sealed only confidential information. It is inconsistent with that principle to place any information under seal, which St. Jude already is discussing openly and has invited the Patent Owner to do the same. The effect of St. Jude's proposal is the creation of a confusing circumstance, in which it is unclear what parts of each exhibit may or may not be discussed openly. Every attempt should have been made to include non-confidential information in non-confidential exhibit(s). Whatever information St. Jude discusses in the open should not have been made a part of any exhibit the entirety of which is sought to be sealed, in the absence of any publically accessible exhibit containing the openly discussed information.

The renewed motion identifies twenty six (26) exhibits sought to be sealed: Exhibits 1060, 1061, 1066, 1082, 1097, 1099, 1110, 1111, 1115, 1116, 1119, 1123, 1124, 1125, 1126, 1127, 1128, 1129, 1130, 1131, 1136, 1137, 1138, 1139, 1144, and 1145. Paper 25, 2-4. According to St. Jude, Exhibits 1060 and 1061 contain source code or information about the structure of the source code for commercial products and are not available to the public. Paper 25, 5:10-12. Also according to St. Jude, Exhibits 1123-1131, 1137-1139, and 1145 contain confidential, non-source code, technical information about commercial products. Paper 25, 6:5-7. Further according to St. Jude, Exhibits 1082, 1097, 1099, 1110, 1111, 1115, 1116, 1119, 1136, and 1144 contain confidential business information.

St. Jude states that "these exhibits" are not available to the public but could be used for competitive purposes if they became public. Paper 25, 6:8-10. The

-4-

**A309**

Case IPR 2013-00258
Patent 7,134,994

statement has minimal value because whether the exhibits themselves as a document were available to the public is not the meaningful issue, but whether the information contained in the exhibits were available to the public. The party moving to seal documents should be sensitive to the distinction between the alleged confidential information contained in the documents and the documents themselves, because the burden of proof lies on the moving party.

In the motion, we can find no discussion of Exhibit 1066, listed as "README file for SMC EtherPower Ethernet ("Byrd Decl. Exhibit A")." Paper 25, 2. However, presumably this statement in the motion applies to all exhibits sought to be sealed: "The exhibits also constitute confidential technical and business information of third parties or the Petitioner." Paper 25, 5:4-5.

In *Garmin v. Cuozzo Speed Technologies, LLC*, IPR2012-00001 ( Paper 37, April 5, 2013), the Board denied a Renewed Motion to Seal as directed to Exhibits I and J, which the Patent Owner submitted to antedate prior art applied by the Petitioner. The Patent Owner in that case submitted the evidence to show pre-filing conception and diligence toward constructive reduction to practice. The Board stated at 10:3-5: "The public has an interest in knowing what information [Patent Owner] believes is important in determining substantive issues in the case." The Patent Owner there exercised its own choice in determining whether it was more important to antedate the prior art applied by the Petitioner or to maintain confidentiality of the information at its disposal.

The case here is equally as strong, if not stronger, against maintaining confidentiality. As Petitioner, St. Jude is seeking to cancel the claims of a patent. In its motion, St Jude acknowledges that its Petition relies on these exhibits as

-5-

**A310**

Case IPR 2013-00258
Patent 7,134,994

evidence of obviousness to establish unpatentability of the involved claims.  Paper 25, 4:23 to 5:1.  St. Jude is relying on such evidence offensively to cancel claims in an issued patent.  The Patent Owner is not requesting such information.  It is fundamentally unsupportable that a Petitioner should be allowed to attack the claims of an issued patent based on evidence it refuses to reveal to the public.

St. Jude argues that as evidence of obviousness, these exhibits are secondary to the prior art references which it has not sought to place under seal, and therefore not as important as those other evidence of obviousness.  Paper 25, 5:1-3.  The argument is misplaced.  If the evidence is sufficiently important for St. Jude to present in support of its substantive contentions on unpatentability, it is sufficiently important to be made accessible to the public, absent "good cause" to keep that evidence under seal.  That St. Jude believes there is other and more primary evidence of obviousness in the open record does not amount to such good cause.

St. Jude also states that the exhibits are evidence of "simultaneous invention."  Paper 25, 4:23 to 5:1.  That theory derives its origin from treating the evidence as establishing what was common or ordinary skill.  *Geo M. Martin Co. v. Alliance Machine Systems*, 618 F.3d 1294, 1305 (Fed. Cir. 2010); *Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1379 (Fed. Cir. 2000).  It is fundamentally odd, however, that St. Jude seeks to prove what was commonly known by relying on information that was not in the public domain but held in secret by the Petitioner and third parties.  That constitutes all the more reason why the public has a strong interest in knowing what information was relied on to prove what was commonly known.

-6-

**A311**

Case IPR 2013-00258
Patent 7,134,994

For the foregoing reasons, St. Jude has failed to show "good cause" to seal any of the exhibits it seeks to have sealed by the Renewed Motion to Seal. The Renewed Motion to Seal should be denied.

However, Patent Owner in its Preliminary Response has made a substantial argument that none of the exhibits sought to be sealed by St. Jude is proper for consideration in this proceeding. At this time, it is uncertain whether the Board even would consider any of those exhibits.

Considering the stated importance and sensitivity of these exhibits to St. Jude, rather than denying the Renewed Motion to Seal, which would make the exhibits immediately publically accessible, the Board conditionally grants the renewed motion for the duration of this proceeding. If the Board's final decision substantively relies on any information in any sealed exhibit, that exhibit will be unsealed by an Order of the Board; and if any sealed exhibit contains no information substantively relied on by the Board in the final decision, then that exhibit will be expunged from the record by an Order of the Board.

Conclusion

It is

**ORDERED** that St. Jude's Renewed Motion to Seal is *conditionally granted,* on the following *conditions*:

If this proceeding terminates without a final decision on the patentability of any of Patent Owner's claims, then the sealed exhibits will be expunged, without further input from either party;

If this proceeding proceeds to a final decision on the patentability of any of Patent Owner's claims, then if the Board's final

-7-

**A312**

Case IPR 2013-00258
Patent 7,134,994

decision substantively relies on any information in any one or more
sealed exhibits, then all such sealed exhibits in their entirety will be
unsealed by the Board, without further input from either party – *no
attempt will be made to parse out some information from other
information within the same exhibit*;

If this proceeding reaches the stage of a final decision on the
patentability of any of Patent Owner's claims, then if any one or more
sealed exhibits contain no information substantively relied on by the
Board in the final decision, then all such sealed exhibits will be
expunged from the record by the Board, without further input from
either party;

**FURTHER ORDERED** that if any Board decision other than the final
decision, such as the decision to institute or not to institute *inter partes* review,
refers to or relies on information in any one or more of the sealed exhibits, the
exhibit is considered unsealed to the extent it is revealed in the decision;

**FURTHER ORDERED** that within ten (10) days of the date of this
communication, if it desires not to risk the Board's substantively relying on any
sealed exhibit, which leads to unsealing of the exhibit, in part or in whole, St. Jude
may file a motion to expunge one or more of these sealed exhibits:  Exhibits 1060,
1061, 1066, 1082, 1097, 1099, 1110, 1111, 1115, 1116, 1119, 1123, 1124, 1125,
1126, 1127, 1128, 1129, 1130, 1131, 1136, 1137, 1138, 1139, 1144, and 1145; and

**FURTHER ORDERED** that the Protective Order submitted by St, Jude as
Exhibit 1147 is hereby entered, and applies to Exhibits 1060, 1061, 1066, 1082,
1097, 1099, 1110, 1111, 1115, 1116, 1119, 1123, 1124, 1125, 1126, 1127, 1128,

-8-

**A313**

Case IPR 2013-00258
Patent 7,134,994

1129, 1130, 1131, 1136, 1137, 1138, 1139, 1144, and 1145, subject to the

conditions specified above.

Case IPR 2013-00258
Patent 7,134,994

For PETITIONER

Matthew Smith
smith@turnerboyd.com

Glenn Law
glaw@foley.com

For PATENT OWNER

Stephen Schaefer
schaefer@fr.com

Dorothy Whelan
whelan@fr.com

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

_____

**DECLARATION OF MICHAEL ST. DENIS RE INVALIDITY OF 6,526,808**

Redline Detection, LLC
Petitioner

v.

Star Envirotech, Inc.
Patent Owner

Case IPR2013-00106
U.S. Patent No. 6,526,808

_____

I, Dr. Michael St. Denis, declare as follows:

1.    I have been retained by Redline Detection LLC ("Redline") to provide declaratory evidence in the above-captioned *inter partes* review proceeding regarding U.S. Patent No. 6,526,808 to Pieroni and others (hereinafter "the '808 patent") which, according to the front page of which, is assigned to Star EnviroTech, Inc. (hereinafter "Star").

REDLINE EXHIBIT 1039
Redline v. Star
Trial IPR2013-00106
p.1039-1

*Inter Partes* Review of U.S. Patent No. 6,526,808

2.    I have been retained to provide my technical review, analysis, insights, and opinions regarding the above-noted references that form the basis for the Grounds of rejections set forth in the Decision of July 1, 2013, granting I*nter Partes* Review of the '808 patent, and whether claims 9 and 10 are invalid.   I reserve the right to opine on additional or amended claims of the '808 patent that the patent owner may offer in this proceeding.  This declaration and materials cited in it sets forth my opinions on this topic.

3.    I am being compensated at a rate of $200 per hour, with reimbursement for actual expenses, for my work related to this Proceeding for *Inter Partes* Review.  My compensation is not dependent on and in no way reflects the substance of my statements in this Declaration.

**Professional Background**

4.    My professional background and technical qualifications are as described in my resume, a copy of which is attached as Exhibit 1040.  I have a Doctorate in Environmental Science and Engineering from UCLA, a Masters of Science degree in Physical Chemistry and a Bachelors of Science degree in Chemistry.

5.    In addition to what is listed on my resume, I have substantial experience related to the design and workings of automobile evaporative emissions control systems, federal and state regulations related to the

2

diagnostic testing of such evaporative emissions control systems, including the use of nitrogen for use in pressure testing such systems; and in promulgating guidelines for testing automobile evaporative emissions control systems for states such as California and New Jersey.

6.    In particular, I was substantially involved with the Environmental Protection Agency (EPA) and the state of New Jersey in devising standards for testing automobile evaporative emissions control systems well-prior to July 1999, including the implementation of guidelines to use nitrogen in pressure testing evaporative emissions control systems. I was also personally involved in establishment of the current evaporative system testing guidelines used in the state of California, and frequently lecture to state officials on how to properly conduct testing of automobile evaporative emissions control systems.    I have performed evaporative emissions control systems research for U.S. EPA, the state of Colorado, vehicle manufacturers and oil companies.

7.    In addition to the foregoing, I have been a guest lecturer at the University of Michigan, School of Engineering where I taught the subject of automobile emissions control in general, including evaporative emissions control systems, their design and function. Along those lines, I have substantial experience in the various diagnostic tests and devices used to

3

diagnose evaporative system leaks and have been involved in the design and development of leak detection systems. I also have experience in the operation of several diagnostic leak detection systems that are smoke-based, including those sold under the brand name Vacutec® which I understand is covered by the Gilliam patent (Ex. 1005) and further described in the Vacutec operation and instruction manual (Ex. 1006).

8.      From 1991 to 1993 I did my doctoral research on the operation of vehicle emissions control systems at Ford Motor Company. From 1993 to 1997 I worked for Parsons Corporation where my responsibilities included being the technical manager for the California Bureau of Automotive Repair ("BAR") Smog Check Referee Program. The Referee Program operated over 50 Referee Stations throughout California. Among other things, the Referee Program provided a second opinion after a recent smog test – usually because a vehicle failed to pass the smog check, or needed assistance in diagnosing the failures. The Referee Program also performed smog checks on out of state vehicles, cars imported by the owner from overseas, vehicles with engine changes, and gross polluters. As technical manager for the program, I dealt with the various Referee Stations and worked with numerous smog check stations in sorting out why vehicles had failed smog checks from smog check stations throughout California.

During my time at Parsons I also managed emissions research programs for BAR and personally conducted the studies which led to the development of the current smog check program. I was also involved in the development of the BAR Low Pressure Fuel Evaporative Tester (LPFET) currently in use throughout California.

9.     The questions referred to the Referee Program included requests to identify evaporative emissions control system leaks – usually because a vehicle failed a smog check. From my experience with the Referee Program, I know that the Vacutec smoke machine described in Exhibits 1005 and 1006 was widely used in California to identify leaks in evaporative emissions control systems, including fuel tanks. I have personally used the Vacutec device to identify leaks in fuel tanks using air, and I have watched others do so. During my work with the Referee Program, I had never heard of any safety problems with the use of the Vacutec device to test motor vehicles – even when using the device to check fuel tanks.

10.     From my involvement in devising standards and guidelines for the EPA and state of New Jersey I know that a year or two before July, 1999, the conservative view was to use nitrogen to pressure test fuel tanks. Based on my continued experience in the industry as shown in my resume,

including working on revisions of EPA guidelines and state emissions testing guidelines and further experience in the field, as of the mid-to-late 2000's, the dominant view was that that air was completely safe to use in pressure testing fuel tanks for smog compliance. This view results from experience with air and air-generated smoke being used in emissions compliance testing without any safety issues arising. The proven safety when using air for leak testing, coupled with the higher cost of using nitrogen and the additional complexity of supplying nitrogen gas, has resulted in the widespread use of air over nitrogen for smog check compliance applications after the mid-2000's, including pressure testing of evaporative emission control systems, including the fuel tank.

### Documents Reviewed

11.    I have reviewed and am familiar with the claims of the '808 patent filed July 7, 1999. I will cite to the specification using the following format:  Ex. ABCD, Col. X:y-z, which refers to Exhibit ABCD, column X, lines y through z and will cite to some of the other references using  the format of Ex. ABCD, Pg. X:y-z which refers to page X, lines y through z.

12.    I have also reviewed the prosecution history of application 09/348,320 which led to the issuance of the '808 patent and claim 9 (Ex. 1002).  Claim 9 was originally filed as prosecution claim 28, in an

amendment dated Aug. 16, 2002.  Ex. 1002-177 and 178-179.

13.    I have further reviewed and am familiar with the file history of the first reexamination of the '808 patent, Control No. 90/009,683 (Ex. 1003), including the references to Popkin, GB 1,039,729 (Ex. 2003) and Pieroni 5,922,944 (Ex. 1014) and EPA Publication IM240 & Evap Technical Guidance (contained in Ex. 1003) on which claims were rejected, and including the arguments, submissions and claim amendments made by the patentee that resulted in the issuance of the Reexamination Certificate 6,526,808C1.

14.    I have further reviewed the file history of the second reexamination of the '808 patent, Control No. 90/001,916 (Ex. 1004) including the references to Loblick RE38,686 (Ex. 2002), and Gilliam 5,107,698 (Ex. 1005) and Burton 3,683,675 (found in Ex. 1004) on which claims were rejected, and including the arguments and submissions made by the patentee that resulted in the issuance of the Reexamination Certificate 6,526,808C2.

15.    In preparation for this declaration I have also studied the following references: Exhibit 1015 Citgo MSDS for PAO 46, Exhibit 1008, Great Britain Patent No. 1,240,867 filed Aug. 28, 1968 and published July 28, 1971 ("Stoyle");  Exhibit 1010, Great Britain Patent No. 640,266 filed

June 4, 1947 and published July 19, 1950 ("Pauley"); Exhibit 1013, Webpages dated January 28, 1999 from the website www.smokemachines.com (the "1999 Website") from archive.org; and Exhibit 1014, U.S. Patent 5,922,944 to Pieroni and others ('944 patent) which was incorporated by reference into the '808 patent.

16.    I have also reviewed the July 1, 2013 the Patent Trial and Appeal Board decision in Redline Detect, LLC v. Star Envirotech, Inc., IPR2013-00106, which instituted *Inter Partes* Review of the '808 patent.

**Skill In The Art**

17.    My understanding is that a person of ordinary skill in the art is not a specific real individual, but rather a hypothetical individual having the qualities reflected by the following factors:  the educational level and years of experience of those developing the process that is the subject of this case but of others working in the same field of endeavor; the types of problems encountered in the art; the teaching of the prior art patents and publications of other persons and companies in the relevant art; the sophistication of the technology and the education level of workers in the field.

18.    I believe that the level of ordinary skill in the art would include persons who are familiar with the construction and operation of motor vehicle engines in motor vehicles, including the emissions control features

added to reduce pollution caused by operating the engines and the evaporation of fuel. Such a person would have acquired the familiarity through work experience, education, or both, with more education requiring less work experience. Relevant work experience would include automotive mechanics or diagnosing engine problems to ensure compliance with emissions control regulations, and it would include personnel creating vehicle emissions control regulations or designing engines, fueling system components or emissions controls used to comply with emissions control regulations. Relevant education would include at least a high school degree and experience in engine diagnosis and/or repair involving emissions control aspects of engines or fueling systems, or vocational training or college classes in such areas, including classes in one or more of the sciences relevant to analyzing or reducing pollution generation (e.g., chemistry, environmental engineering) or relevant to designing engines complying with emissions control requirements (e.g., automotive engineering).

19.    The above factors encompass a range of education and work experience. The persons using the smoke machines to perform the claimed method will usually have a high school degree and several years of additional education or work experience involving automobiles and automotive emission control systems. I will call these the persons with the

9

**A324**

lowest level of skill in the art. The persons designing the equipment and developing the methods for using the equipment will have at least this lowest level of skill, and in addition have a year or more of college education or several additional years of experience involving either product design or experience in diagnosing problems with automotive emission control systems. I will call these the persons with an ordinary level of skill in the art.

### Legal Requirements - Obviousness

20.    It is my understanding that a claimed invention is unpatentable if the differences between the claimed invention and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains. It is my understanding that "obviousness" is a question of law based on underlying factual issues including the content of the prior art and the level of the skill in the art. My understanding is that if the differences between the claim requirements and the prior art are identified, and if those differences are obvious to one of ordinary skill in the art, then the claimed combination may be invalid for obviousness.

21.    I understand that when considering the obviousness of a patent claim, one should consider whether a teaching, suggestion or motivation to

10

**A325**

combine the references exists (including common sense), so as to avoid impermissibly applying hindsight when considering the prior art. I understand that this motivation, suggestion etc. should not be applied rigidly, but that the test can be important to avoid such hindsight. I also understand that other factors that may affect the determination of obviousness may be considerations such as commercial success attributable to the claimed invention and a long felt need in the art when evidence of such things is presented.

22.    I further understand that a person of ordinary skill in the art is a person of ordinary creativity, not an automaton, that familiar items may have obvious uses beyond their primary purposes, and that a person of ordinary skill in the art often will be able to fit the teachings of multiple patents together like pieces of a puzzle.

**Meaning of Claim Terms**

23.    For the purposes of my opinion and this declaration I understand the claim terms are to be given their broadest reasonable meaning consistent with the use of the terms in the '808 patent as understood by one of ordinary skill in the art. I understand that the Patent Trial and Appeal Board has issued a ruling regarding the meaning of several claim terms in the '808 patent and I agree with those meanings and use them.

24.    Independent Claim 9 requires vaporizing a "flammable fluid." I thus understand that the definition of "'flammable fluid' is a fluid, including a liquid or gas (e.g., an oil), capable of catching fire and burning," as stated in the IPR Order of July 1, 2013, page 11.

25.    The smoke generating fluid of the '808 patent includes the preferred Citigo PAO 46 identified in the incorporated by reference application 09/00,841 that led to the patent 5,922,944 ('944 patent) of Exhibit 1014 Col. 2: 50-52.    That PAO 46 has a flash point of 468°F (242°C).    Exhibit 1015 (MSDS).    Since PAO 46 can burn at 468 °F it is a flammable fluid.    Glycerin  has a flash point of above 320°F (160°C)  and would also be a flammable fluid, as is the smoke generating hydraulic fluid of the Gilliam Patent (flash point of 425° F or 218° C per Exhibit 1005, Col. 6: 1-2).    All of those materials would be a "flammable fluid" since they would burn, per the definition used in the IPR Order of July 1, 2013 at page 11.

26.    Claim 9 defines a method including the steps of locating a heating element within the closed smoke producing chamber.    I understanding the meaning of "'locating' is to establish an element in a position, situation or locality" as defined in the IPR Order of July 1, 2013, page 12.    This is consistent with the use of "locating" in the '808 patent.

12

Claim 1 ("locating a heating element within said closed smoke producing chamber so as to extend in spaced alignment with said supply of fluid."); Col. 5: 16-23 ("Locating the pressure check valve 40 after the smoke producing apparatus 1, rather than prior to the air inlet tube 10 of chamber 6" to avoid early release of pressure.); Col. 5: 28-34 ("Locating the combination of pressure discharge accumulator 38 and pressure check valve 40 upstream from the smoke generating apparatus 1" to collect oil condensed from the smoke.); Col. 6: 9-12 ("located" used to refer to placing check valve 44 ahead of or upstream of flow meter 32).

27.    Claim 9 requires the flammable fluid "vaporize into smoke." I understand the term "'smoke' as a vapor or mist produced by blowing a flammable liquid against a heating element" as defined in the IPR Order of July 1, 2013, page 13.

28.    I understand that the claim term "'closed' is an adjective describing a chamber or other container the entrances, apertures, or gaps of which have been stopped or obstructed, e.g., sealed" as defined at pages 12-13 of the IPR Order of July 1, 2013.

29.    Claim 9 requires the step of "creating an inert environment within said chamber," and I understand that use of "'inert environment' as an environment formed within the closed smoke producing chamber and

comprising a non-combustible gas, such as carbon dioxide or nitrogen, in which a vapor or mist of flammable fluid is suspended, in such a manner that the flammable fluid *cannot* ignite or explode," as defined at page 14 of the IPR Order of July 1, 2013.

30.    The evaporative emissions control system of a motor vehicle carries the gasoline vapors in the vehicle's fuel tank to the engine directly and/or to a charcoal canister where the vapors are stored and later directed to the engine where they are burned, with the transporting air being vented from the canister into the atmosphere after the hydrocarbons in the vapors are adsorbed by the charcoal.  The evaporative emissions control systems is a ventilation system for fuel tanks and can be both positively and negatively pressurized (vacuum) during operation.  The opening on the bottom of the charcoal canister is referred to as the vent as it vents to the atmosphere.  I believe that one of ordinary skill in the art (or even one of the lowest skill in the art) would understand the evaporative emissions control systems as including the fuel cap, the fuel tank, the charcoal canister and the tubes that connect the canister to the engine and fuel tank, and sometimes these parts may also be connected to a pump, a solenoid valve and other components. Depending on the specific design of the vehicle and how it is operating, some of the system or all of the system may be under positive or negative

pressure.

### Field of Endeavor Or Problem

31.    I believe that the Gilliam patent is in the same field of endeavor as the '808 patent since it addresses leak testing of any closed system or vacuum system in a vehicle, which would include evaporative emissions control systems and associated fuel tanks.  It was also asserted by the patent examiner as a basis for rejecting claims 9-10 of the '808 patent in the first reexamination and that rejection was overcome only by removing the '944 Pieroni patent as a reference and not due to the previously made claim amendments and arguments.

32.    I believe that the Gilliam patent addresses the same problems as the '808 patent since it addresses leak testing of any closed system or vacuum system in a vehicle, which would include evaporative emissions control systems and associated fuel tanks, as well as other potentially explosive environments, and states that the use of smoke for finding leaks in vehicles "is well known in the art" (Ex. 1005, Col. 2: 40-41).  Indeed, I am personally aware that Gilliam's smoke machines sold under the Vacutec brand name were extensively used for testing for leaks in motor vehicles, including the motor vehicle evaporative emissions control system, well before July 1999, and personally used them before that date to pressure test

motor vehicle fuel tanks with air and to leak test motor vehicle fuel tanks with air-generated smoke before July 1999.

33.    I believe the Stoyle patent is in the same field of endeavor as the '808 patent since Stoyle says that one particular field of use is in the heating of mixtures of oil and carbon dioxide to produce a smoke or mist "useful, for example, for testing ventilation systems."   The evaporative emissions control system of a motor vehicle is a ventilation system for a fuel tank as it carries the vapors from a gasoline tank to a charcoal canister that is vented to the atmosphere.   In fact the opening on the bottom of the charcoal canister is commonly referred to as the "vent."   Moreover, Stoyle uses its carbon dioxide/oil generated smoke to test not only ventilation systems, but to test ducts or pressurized vessels (Ex. 1008, Pg. 1:16; Pg. 3:5-6). Evaporative emissions control systems, their connecting tubes and fuel tanks are pressurized systems (positive or negative pressure) during use in order to draw the fuel vapors from the charcoal canister into the engine or to push fuel vapors into the charcoal canister.   Thus, for several reasons the teachings of Stoyle are in the same field of endeavor as the '808 patent and the Gilliam patent.   At a minimum, Stoyle is reasonably pertinent to the use of smoke machines for testing such ventilation systems, ducts/tubing and pressure vessels/fuel tanks as are disclosed in the Stoyle, Gilliam and '808

patent.

34.    I also believe that Pauley is in the same field of endeavor as the Gilliam patent.  Gilliam is used for leak testing any vacuum system of a vehicle which would include the evaporative system and fuel tank of the '808 patent.  Gilliam says that its smoke generating aspect "is known in the prior art" (Ex. 1005, Col. 5: 61-62) and that suggests using other smoke generating machines such as Pauley (and Stoyle).  Gilliam goes on to identify some patents with smoke generators that can be used in Gilliam's leak testing device.  Ex. 1005, Col. 5: 61-65.  One identified patent to Swizatosz 4,303,397 (Ex. 1012) is to simulate smoke of a fire.  Ex. 1012, Abstract: 2-3; Col. 1:11-13.  The smoke simulating a fire may be used for the theatrical effects of Stoyle or Pauley, or the cinematographic uses of Pauley, and that suggests those smoke machines may be used interchangeably for such uses.  Further, Pauley also says it is useful for "other applications."  Ex. 1010, Pg. 1:13-14.

35.    For the above reasons, I thus believe that Pauley and Gilliam are in the same field of endeavor.  Gilliam is in the same field of endeavor as the '808 patent since they both test for leaks in vacuum systems, including evaporation emissions control systems and their fuel tanks.

**Overlapping Uses**

36.    Gilliam also identifies the smoke generator in U.S. Patent 3,250,723 to Fortney (Exhibit 1041) as usable in Gilliam's leak testing (Ex. 1005, Col. 5: 63) and that Fortney patent describes a smoke machine to lay down smoke screens and for other applications such as detecting leaks in pipes or conduits, such a sewer pipes, oil carrying conduits or pipes, etc.  Ex. 1041, Col. 8:8-18.  Gilliam also identifies the smoke generator in patent 3,432,439 to Dickman (Exhibit 1042) as usable in Gilliam Ex. 1005, Col. 5: 64-65) and that patent describes a smoke machine for use in simulating explosions as in a war zone and military exercises, for simulating air flow, in conduits of all types such as ducts, tunnels, vents and the like.  Ex. 1042, Col. 1: 21-41 & Col. 4: 65-69.  Copies of Patent Nos. 3,250,723 and 3,432,439 are attached hereto as Exhibits 1041 and 1042, respectively. Given these various uses for smoke machines I believe that a person of ordinary skill in the art would recognize that the smoke from a smoke machine can be used in a wide variety of applications and is not limited to the specific application for which a smoke machine is promoted or sold. The disclosures are sufficiently clear and overlapping that I believe this would be apparent to even one of the lowest level of skill in the art.

37.    Pauley teaches that it can be used for theatrical work, in

cinematographic pictures and "in other applications" (Ex. 1010, Pg. 1: 13-14).  Stoyle suggests various uses by giving "examples," including "for example, for testing ventilation systems or for theatrical effects."  Ex. 1008, Pg. 1: 15-17.

38.    The 1999 Website printout (Ex. 1013) also suggests that smoke machines may be used for various purposes, including the theatrical uses of Stoyle and Pauly and the leak testing of vehicles of Gilliam.  Ex. 1013 at 2. Likewise, the 1999 Website printout (Ex. 1013) also suggests that smoke machines may be used for simulating fires, for military training and for air flow studies as in the smoke generator patents Gilliam identifies (Ex. 1005, Col. 5:61-65) as well as being used in theatrical effects (as in Pauley & Stoyle) and leak testing of pipes, conduits and vehicles (as in Gilliam & Stoyle).

39.    The wide variety of uses for these smoke machines, the directly overlapping uses with the theatrical effect aspect of the smoke machines of Pauley and Stoyle, the overlapping uses of theater with the ventilation systems, ducts and pressure vessels of Stoyle and the overlapping uses of theatrical work, cinematographic pictures and "other applications" of Pauley, suggest interchangeability of the smoke generators for these various uses of smoke machines, including leak testing as in Gilliam.  This reaffirms

*Inter Partes* Review of U.S. Patent No. 6,526,808

my conclusion that one of ordinary skill in the art would look to the Gilliam, Stoyle and Pauley patents, as discussed in more detail later in this declaration. The disclosures are sufficiently clear and overlapping that I believe this interchangeability would be apparent to even one of the lowest level of skill in the art.

### Address Same Problem

40.    I believe that Pauley, Stoyle, Gilliam and the '808 patent address the same problem of igniting oil as it is vaporized into smoke. The '808 patent uses non-combustible gas in the smoke generating chamber to prevent ignition of the fluid as it is heated to generate smoke; it also creates an inert environment at the test location. Ex. 1010, Claim 9, Pg. 2:51-58, Pg. 6:54-67. The Pauley patent addresses the problem of igniting the oil used to generate smoke by using nitrogen or carbon dioxide, saying that "its presence reduces to a minimum any tendency to ignition of the vapour should the liquid employed be of an inflammable nature." Ex. 1010, Pg. 2: 113-16. The Gilliam patent notes this problem regarding the risk of sparks or flame from vaporizing a flammable smoke generating fluid (Ex. 1005, Col. 7:55-59) and the Pauley patent addresses that same problem by using nitrogen gas or carbon dioxide gas (Ex. 1010, Pg. 2:  99-100). As these patents address the same problem (ignition of oil as it is vaporized into

20

**A335**

smoke), I believe that they would be relied on by one of ordinary skill in the art addressing that problem. The disclosures are sufficiently clear that I believe even one of the lowest level of skill in the art would rely on them in addressing the problem of avoiding the ignition of oil as it is vaporized into smoke.

41.    I believe that the Stoyle patent addresses the same problem as the '808 patent: the problem of possible ignition of the oil as it is vaporized into smoke. Stoyle uses carbon dioxide which is known to avoid that problem as expressly recognized by Pauley as discussed above, and the Popkin patent. The Popkin patent (Ex. 2003, filed in 1965) uses carbon dioxide to generate smoke in a smoke machine, as do both Stoyle and Pauley. The Popkin smoke machine is for testing ventilation systems (as in Stoyle), wind tunnel testing, air flow visualization and training fire and armed services. Ex. 2003, Pg. 1: 13-15. Popkin and Pauley thus confirm that Stoyle addresses the same problem as the '808 patent and prevents ignition of oil as it is vaporized by using carbon dioxide.

42.    Pauley uses glycerin, oil and other suitable liquid with nitrogen or carbon dioxide to make a fog or mist. Ex. 1010, Pg. 1: 25-34. The 1999 Website (Ex. 1013) refers to water based smoke and oil based smoke (Ex. 1013 at 3). Pauley expressly notes that the use of these inert gases prevents

ignition when it says the "presence reduces to a minimum any tendency to ignition of the vapour should the liquid employed be of an inflammable nature". Ex. 1010, Pg. 2:103-115.

43.    Each of these patents addresses the problem of igniting the flammable smoke generating fluid when the fluid is heated to make smoke. Because Pauley propels the smoke using inert carbon dioxide or nitrogen gas it also addresses the problem of an inert environment at the location where the gas is used. Ex. 1010, Pg. 1: 30-32 & 53-56; Pg. 2: 34-36 & 40-14, 104; Pg. 3: 72-77.  Pauley addresses the problem of creating an inert environment where the smoke is conveyed or propelled by the inert gas and Stoyle implicitly does the same by its use of inert carbon dioxide which will not support combustion where it is present.

44.    The references also address the broader problem of making smoke.  Stoyle says it can mix oil and water and heat the mixture in carbon dioxide to make smoke, mist or fog.  Ex. 1008, Pg. 1: 11-15.  Pauley uses glycerin, oil and other suitable liquid with nitrogen or carbon dioxide to make a fog or mist.  Ex. 1010, Pg. 1: 25-34.  The 1999 Website refers to oil based smoke and water based smoke.  Ex. 1013 at 3.  Stoyle, Pauley, Gilliam and the 1999 Website show the use of various fluids to make smoke. Whether called fog, mist or smoke, they all contain small particles of fluid

vaporized and carried by the gas present during vaporization, be it air, nitrogen or carbon dioxide. They produce a vapor or mist by blowing a flammable liquid against a heating element for various uses or purposes which overlap. See 1999 Website and Paragraph 36 above. The references thus address the common problem of making smoke for various overlapping applications.

### Brief Description Of The Gilliam Patent (Ex. 1005)

45.    Detailed portions of Gilliam are cited in the claim chart. But briefly, the Gilliam Patent discloses a smoke generator for detecting leaks in an internal combustion engine used in automobiles and trucks "and <u>any</u> closed vacuum system"  (Ex. 1005, Col. 1: 10), involving other systems including carburation or fuel injection systems.

46.    Gilliam has a smoke-generating assembly 35, which includes pump 15, switch 1 and ceramic heating element 11 located inside a smoke generating chamber 20 (the cylindrical canister). The smoke-producing fluid is poured into the chamber 20 through filler port 6 and preferably covers about half of the heating element 11 located inside the chamber 20.

*Inter Partes* Review of U.S. Patent No. 6,526,808

47.    In use, heating element 11 vaporizes the smoke-generating fluid that contacts the heating element.  Pump 15 pumps air into the chamber 20 through air inlet 7 to mix the air with the oil and cause the oil to circulate about heating element 11, by causing air to bubble up through the smoke producing liquid and be vaporized into smoke.  To test a system for leaks, the smoke generated within the chamber 20 passes through chamber outlet and conduit 22 (See Fig. 3) to the system to be tested. By observing smoke exiting from any of the plurality of hoses, flanges, gaskets, etc. in the vacuum system, any and all leaks may be located.

### Brief Description Of The Stoyle Patent (Ex. 1008)

48.    Detailed portions of Stoyle patent (Ex. 1008) are cited in the claim chart.  But briefly, the Stoyle Patent was filed in 1968.  It forces a mixture of carbon dioxide and oil into an annular gap between a heated plug 11 and a larger bore 2 to generate smoke, with the smoke going directly into "ducts or pressurized vessels" (Ex. 1008, Pg. 3: 5-7) and may also be used for "testing ventilation systems and theatrical effects." Ex. 1008, Pg. 1: 11-17.  The carbon dioxide and oil is forced through fitting 14 (Figs.1 & 2) and hole 13 (Fig. 3).  Temperature regulating means and a thermostat to set the temperature are provided. Ex. 1008, Pg. 2:

24

40-48 & 126-130.  Pipes may be attached to carry the smoke to the desired location.  Ex. 1008, Pg. 2:49-52. Outlet tubes are "particularly suitable to inject oil smokes or mists directly into ducts or pressurized vessels."  Ex. 1008, Pg. 3: 4-6.

49.    I believe that the oil and carbon dioxide and oil mixture vaporizes into smoke within the heater block.  Nothing in the Stoyle patent says it does not or cannot vaporize into smoke in the annular, heated space and vaporization is what I would normally expect to occur when oil and carbon dioxide contact a hot surface that is heated to a temperature selected to generate smoke.  This vaporization is what Pauley describes as discussed below.  Stoyle says the mixture of oil and carbon dioxide "eventually reaches the outlet means 10, where it emerges in the form of mist or smoke." Ex. 1008, Pg. 2:104-108.  Just because it emerges as the desired mist or smoke at the nozzle 10 does not mean it is something else in the bore 2 along the length of the heated plug.

50.    Moreover, whether or not Stoyle vaporizes inside the bore, Stoyle still teaches the use of heating carbon dioxide and oil in a chamber to generate smoke and when that is used in Gilliam's chamber I believe that it will generate the same inert smoke as in Stoyle.

51.    I believe that one of ordinary skill in the art would recognize

25

that Stoyle's use of carbon dioxide and oil to make smoke would result in a smoke that is non-flammable since it consists of an inert gas. The disclosures are sufficiently clear that I believe even one of the lowest level of skill in the art would do this. Carbon dioxide is well known to prevent ignition – as reflected by its widespread and well known use in fire extinguishers. Further, using such carbon dioxide-borne smoke would create an inert environment in the containers filled with the smoke and I believe that one skilled in the art (of lowest skill or ordinary skill) would recognize this, especially given the knowledge that carbon dioxide is used in fire extinguishers to suppress fire.

### Brief Description Of The Pauley Patent (Ex. 1010)

52. Detailed portions of the Pauley patent are cited in the claim chart. But briefly, The Pauley patent was published in 1950 and makes smoke by spraying glycerin, oil or  "other suitable liquid" (Ex. 1010, Pg. 1:25-26) along with either nitrogen or carbon dioxide that "reduces to a minimum any tendency to ignition" (Ex. 1010, Pg. 2: 108-116) of the flammable fluid as it is sprayed "on to a surface" that is heated to cause



"immediate vaporization" into smoke.  Ex. 1010, Pg. 1: 50-53.  Pauley creates an artificial fog, mist, or smoke.  Ex. 1010: 1:8-10.

53.    Pauley has gas from nozzle "c" that hits oil from oil spray nozzle "b3" to hit cylindrical walls "d" heated by heating coil "e" in closed vessel a.  Ex. 1010: 2:63-83.  The surface may be "such as the wall of a cylinder" but need not be such.  Ex. 1010, Pg. 1:50-51.  Pauley says the "illustrated example" uses a heater in the form of internal walls of a tubular member d.  Ex. 1010, Pg. 2: 117-120

An overview of Pauley is provided by its claim 1, which reads:

> An improved method of forming an artificial fog or mist according to which glycerine or a hydrocarbon oil is sprayed in atomized form by means of carbon dioxide or nitrogen gas under pressure on to a surface heated sufficiently to cause immediate vaporization, and the vapour so created is propelled along and in addition so cooled by the expanding gas, with or without other aids, as to forma heavy fog or mist which by means of the presence of the gas used is relatively proof against fire or explosion." [Ex. 1010, Pg. 3:65-77].

54.    I believe that Pauley vaporizes the sprayed or atomized mixture of carbon dioxide and oil or nitrogen, within Pauley's heating chamber.

Pauley says that the mixture of various fluids and inert gases is immediately vaporized into smoke even in the presence of either carbon dioxide or inert gas.

55.    Moreover, whether or not Pauley vaporizes the fluid into smoke inside the chamber so the chamber may be physically exchanged for the chamber 20 of Gilliam, Pauley still teaches the use of heating carbon dioxide and oil (or nitrogen and oil) in a chamber to generate smoke and when that is used in Gilliam's chamber I believe that it will generate the same inert smoke as in Pauley and that Pauley's inert nitrogen or carbon dioxide gases will still "reduce to a minimum any tendency to ignition" of the flammable fluid that is vaporized into smoke.

56.    I believe that one of ordinary skill in the art would recognize that Pauley discloses or at least strongly suggests the inert nitrogen or carbon dioxide gases create an inert environment in the combustion chamber, and in the location to which the resulting smoke is "propelled" by that inert gas. The disclosures are sufficiently clear that I believe even one of the lowest level of skill in the art would recognize this. I realize that at some locations in Pauley it says the presence of the inert gases "greatly reduces" any tendency to ignition.  Ex. 1010, Pg. 1: 36-44.  I don't view "greatly reduces" any tendency to ignition as saying a non-inert or combustible environment is

28

**A343**

created, in part because it is still enough to greatly reduce "any tendency to ignition."  Moreover, even the '808 patent says its use of nitrogen and carbon dioxide only produce a "relatively safe," non-explosive environment rather than a 100.0000% perfect inert environment.  *See* Ex. 1001, Col. 2: 54-57 & Col. 6: 54-60.  In fact, when I conduct a word search for "inert" in the '808 patent and look at the file history, it seems that the only use of "inert" in the patent application as originally filed is that the carbon dioxide or nitrogen gases can be used because of their "non-flammable and inert characteristics" and that those characteristics create a "relatively safe" environment.  Ex. 1001, Col. 6: 54-58. Since the same inert gases are used in Pauley to vaporize oil into smoke and propel the smoke downstream, I believe one skilled in the art would know an inert environment would be created by the inert gas and smoke, or at a minimum, could be created.  I believe even one of the lowest level of skill in the art would know this given the use of carbon dioxide fire extinguishers, and the availability of nitrogen as an inert gas.

### Brief Description Of The 1999 Website (Ex.1013)

57.   The 1999 Website (Ex. 1013) describes numerous applications for smoke generators, including various entertainment uses such as "all types of theaters" and TV studios, military applications, air flow visualization, and

leak testing in a broad range of systems, including "vehicles." Ex. 1013 at 2.

It refers to water based smoke and oil based smoke (Ex. 1013 at 3) and one

machine (Colt) that weighs only 12 pounds. Ex. 1013 at 4. Because the

1999 Website discusses vaporizing fluid including oil, creating a thermal fog

and layering, it is clear the smoke is generated by vaporizing a fluid.

### IPR Order Ground 1 –Gilliam & Stoyle:

58.    I understand that the First Ground of invalidity is the Gilliam

patent of Exhibit 1005 in view of the Great Britten Stoyle Patent of Exhibit

1008.  I believe that the Gilliam patent discloses all of the limitations of

Claim 9 except for those flowing from the use of a non-combustible gas to

generate smoke.  The Stoyle patent uses carbon dioxide, a non-combustible

gas, to generate smoke. The following table shows the location of text where

Gilliam describes each claim limitation.  Stoyle also discloses many of the

same claim limitations and some of those disclosures are also identified in

the following table.

| '808 Patent Claims | Gilliam (Exhibit 1005) & Stoyle (Exhibit 1008) |
|---|---|
| **Amended Claim 9:** A method for generating smoke for use at a volatile, potentially explosive environment, said method comprising the steps of: | **Ground 1: Gilliam's** smoke machine checks "any and all leaks" in vehicles, including evaporative emission control systems. Ex. 1005, Col. 1: 6-11; Col. 3: 3-6 & 48-52.  Gilliam cautions against explosions.  Col. 7: 54-59.<br>  **Stoyle** generates smoke by heating carbon dioxide and oil to produce smoke for "testing |

| | |
|---|---|
| | ventilation systems or for theatrical effects" (Ex. 1008, Pg. 1:11-17) and the smoke is "particularly suitable for injecting oil smokes or mists directly into ducts or pressurized vessels." Pg. 3:4-6. It also has "connecting means" for injecting smoke "directly into ducts or pressurized vessels." Pg. 3: 4-7 |
| locating a heating element within a closed smoke producing chamber, said smoke producing chamber having a gas inlet and a smoke outlet; . . . | **Ground 1:   Gilliam** has air inlet 7 to smoke producing chamber 20 containing heating element 11 and outlet conduit 22. Fig. 3; Claims 1 & 17 (chamber means, heating means, conduit means). Ball valve 4 on inlet 7 regulates pressure in the chamber 20. Ex. 1005, Col. 5:34-49. Ball valve 12 can close outlet 22.<br><br>   **Stoyle** has a cylindrical bore 2 within which is placed a heated plug 11 so the gas and oil are heated in the gap between the plug and the bore. Ex. 1008, Fig. 3, Pg. 2:24-30. It has passage 13 fitted with fluid inlet means 14 (Pg. 2: 91-93) and smoke outlet means 10. Pg. 2:107-08; Figs. 1, 3. |
| delivering a flammable fluid to said heating element within the closed smoke producing chamber; | **Ground 1: Gilliam's** oil from inlet 7 is heated in chamber 20 to make smoke. Ex. 1005, Claims 1 & 17 (fluid vaporized).<br><br>   **Stoyle** forces oil and carbon dioxide through inlet 14 to the heated plug 13 and the gap 7 between the plug and bore 2. Ex. 1008, Pg. 1:13-14 (oil and carbon dioxide to make smoke) & 45-48 (oil and carbon dioxide to make smoke); Pg. 2: 60-63 (same) & 101-108 (same); Figs 1 & 3. |
| energizing said heating element for vaporizing into smoke within the closed smoke producing chamber the flammable fluid that is delivered thereto; [and] | **Ground 1:   Gilliam's** switch 1 activates heating element 11. Ex. 1005, Col. 6: 3-7. The fluid is "vaporized." Gilliam Claims 1, Col. 8: 64 to Col. 9: 2. *See*, Claim 17, Col 10: 36-39; Col. 3: 65 to Col. 4: 1; Col. 4: 41-44 (vaporizing said smoke-generating fluid into smoke"); Col. 6: 34-36. Closed chamber 20 with inlet 7, outlet 22 and valves 4 & 12. |

31

**A346**

*Inter Partes* Review of U.S. Patent No. 6,526,808

| | |
|---|---|
| | **Stoyle** uses a temperature controlled, electrical heating element for plug 11 so the oil-carbon dioxide mixture is vaporized to make smoke. Ex. 1008, Pg. 1:15 (heating to produce smoke), 2:24-32 (electrical heating element) & 60-63 (heating) & 97 (electrical heating elements) & 104-08 (emerges as smoke); Pg. 3:3-6 (outlet can inject smoke directly into ducts or pressure vessels). |
| …blowing a supply of non-combustible gas under pressure into the closed smoke producing chamber by way of said gas inlet thereof | **Ground 1: Gilliam** blows air in inlet 7 using bellows pump 15, with the air also circulating smoke in the chamber 20. Ex. 1005, Col. 6: 57-63<br><br>**Stoyle** says the "oil/gas mixture is *forced* into the space" between the plug 11 and bore 2 through inlet 14. Ex. 1008, Pg. 2: 99-108. The gas is carbon dioxide which is a non-combustible gases and which does not support combustion. Pg. 1:10-13 & 20-26; Pg. 2:62 & 103, P3:73. |
| For (1) creating an inert environment within said chamber so as to prevent ignition and thereby avoid the possibility of an explosion when said flammable fluid is vaporized into smoke by said heating element and | **Ground 1: Gilliam** uses air and warns against sparks or flames being generated and entering a vehicle's engine. Ex. 1005, Col. 7: 54-59.<br><br>**Stoyle** forces only oil, carbon dioxide and optionally water into the small gap/chamber between the plug 11 and bore 2 so the environment is inert. Ex. 1008, Pg. 2, 99-108; Claims 9-10.<br><br>Using Stoyle's carbon dioxide and oil in Gilliam meets this limitation. |
| (2) for carrying the smoke to the volatile potentially explosive environment by way of the closed smoke outlet of the closed smoke producing chamber, said volatile potentially explosive | **Ground 1:** Particles of smoke fluid vaporized and suspended in a gas will be carried to any closed system to which the smoke chamber outlet is connected.<br><br>**Gilliam** uses air for the claimed functions as it carries smoke to closed systems involving carburation, fuel injection and emission control (Col. 1: 24-26) and provides "means for |

| | |
|---|---|
| environment being a closed system undergoing testing for leaks; and | determining the location of *any and all leaks* in an internal combustion engine." Ex. 1005, Col. 3: 3-6 & 48-52; Col. 1: 6-11.<br><br>    **Gilliam** also cautions against sparks causing an explosion. Ex. 1005, Col. 7: 55-59.<br><br>  Using **Stoyle's** carbon dioxide to generate smoke for use in Gilliam results in non-flammable smoke that meets these limitations. Stoyle says the smoke is injected "directly into ducts or *pressure vessels*" (Pg. 3: 4-6) and for "testing ventilation systems." Ex. 1008, Pg. 1:14-17. |
| …connecting the smoke outlet of said closed smoke producing chamber to the closed system undergoing testing, | **Ground 1:** **Gilliam's** smoke chamber outlet conduit 22 is connected to the system being leak tested. Ex. 1005, Abstract (smoke "sealably communicated through conduit means to the intake manifold of a vacuum system"); Col. 9: 18-21 ("interconnected with conduit 22"); Claims 1 & 17 (conduit means).<br><br>  **Stoyle** has "pipes and junctions for attaching it to fluid delivery or receiving means such as smoke generating or dispersal means," (Pg. 2:49-52) and has "connecting means" on the outlet. Ex. 1008, Pg. 3: 6-8. |
| said supply of non-combustible gas for creating an inert environment within the closed system to which the smoke is carried, said inert environment with the closed system preventing ignition within the closed system during the testing thereof; |   **Stoyle** uses oil and carbon dioxide and may further use water so the smoke is inert and would create an inert environment in the ventilation system, duct or pressure vessel tested. Ex. 1008, Pg. 1:11-17; Pg. 3:5-6; Cl. 9-10.<br>Using **Stoyle's** carbon dioxide to generate smoke for use in Gilliam meets these limitations. |
| wherein the closed | **Ground 1: Gilliam's** closed evaporative system |

*Inter Partes* Review of U.S. Patent No. 6,526,808

| | |
|---|---|
| system to be tested for leaks at the volatile, potentially explosive environment is the evaporative system of a motor vehicle including a fuel tank, further comprising delivering smoke from the smoke outlet of said smoke producing chamber to the fuel tank. | includes the fuel tank and Gilliam tests for leaks in "any and all leaks" in vehicles, including evaporative emission control systems. Ex. 1005, Col. 1: 6-11; Col. 3: 3-6 & 48-52.<br><br>**Stoyle** uses smoke for leak testing ventilation (Pg. 1: 15-17), ducts and pressure vessels (Ex. 1008, Pg. 3: 5-6).  An evaporative emissions control systems is a ventilation system for fuel tanks and can be both positively and negatively pressurized (vacuum) system during operation.<br><br>Using **Stoyle's** carbon dioxide to generate smoke for use in Gilliam meets these limitations. |

### Gilliam & Stoyle Meet All Claim Limitations

59.    Gilliam has all of the steps of claim 9 except it uses air instead of nitrogen as an inert gas and the use of Stoyle's carbon dioxide as an inert gas with Gilliam meets all limitations of claim 9.

60.    Stoyle shows that it was known in July, 1999 to use carbon dioxide to vaporize oil into smoke.  In fact, when Stoyle was filed in 1969, 30 years prior to the '808 patent, it said that a method was already "known for a number of years" to heat carbon dioxide and oil to make smoke (Ex. 1008, Pg. 1:17-25).  Gilliam shows that it was known at that same time to use air to vaporize oil into smoke for leak testing "any and all leaks" in a vehicle's vacuum system, as noted in the above table.  *See* Ex. 1005, Col. 3:3-6 & 48-52.  Using Stoyle's carbon dioxide with Gilliam's leak testing process combines prior art elements according to known methods to yield

predictable results. Those results include an inert environment wherever the inert carbon dioxide smoke is used (per Stoyle) and using that inert smoke to identify leaks in vacuum systems (per Gilliam) as the smoke exits the leaks.

61. **Substituting Known Elements:** Using Stoyle's carbon dioxide to make smoke in Gilliam's leak testing machine and process, simply substitutes one known element used before 1999 for another to obtain predictable results. Gilliam shows it was known to vaporize oil into smoke for leak testing all part of a vacuum system, including those required by claim 9. That Stoyle's carbon dioxide smoke was inert was known, especially given what I believe is a common awareness that carbon dioxide fire extinguishers smother fires caused by flammable fluids such as oils or gasoline. Using Stoyle's carbon dioxide in Gilliam's leak testing is thus substituting carbon dioxide in the generation of smoke, known to be inert, for Gilliam's air-generated smoke. The results are very predictable. Stoyle says that using carbon dioxide to vaporize oil into smoke was "known for a number of years" (Ex. 1008, Pg. 1: 17-12) and that was in 1969 – 30 years before the filing of the '808 patent application. Smoke generated in and carried by carbon dioxide is inert as carbon dioxide is well recognized as preventing combustion, which is why it is widely used in fire extinguishers. Thus, using carbon dioxide to make smoke would predictably prevent

ignition as the oil is vaporized into smoke and was known to do so, and since the carbon dioxide makes the resulting smoke inert the systems to which the smoke is carried also become inert as the carbon dioxide smoke displaces the air.

62.    **Stoyle Suggestion 1:** Stoyle also provides a suggestion to combine its carbon dioxide smoke with Gilliam's leak testing.  Stoyle says that one "particular field of use" for its smoke generated by vaporizing oil in carbon dioxide is "for testing ventilation systems."  Ex. 1008, Pg. 1:11-16. A vehicle's evaporative emissions control systems is accurately characterized as a ventilation system that, through various connecting tubes, ventilates the gasoline vapors in the vehicle's fuel tank to the engine directly and/or to a charcoal canister where the vapors are stored and later directed to the engine where they are burned.  I see nothing in Stoyle to exclude Gilliam's vehicle fuel tank ventilation system from the particular field of use (ventilation systems) for which Stoyle's carbon dioxide smoke is useful. Thus, I believe that one of ordinary skill in the art would be motivated to use Stoyle's inert carbon dioxide smoke in Gilliam's leak testing (as would one of even the lowest level of skill in the art), and there would be much more than a reasonable likelihood of success in doing so.  Using carbon dioxide to vaporize oil into smoke was well known and the resulting carbon dioxide-

borne smoke would be inert – as would the locations filled with enough of the non-flammable smoke so the smoke passed out of even small leaks for testing.

63.    **Stoyle Suggestion 2:** A similar motivation to combine arises because Stoyle uses its carbon dioxide/oil generated smoke to test not only ventilation systems, but to test ducts or pressurized vessels (Ex. 1008, Pg. 1:16; Pg. 3:5-6).   Evaporative emissions control systems use ventilation tubes to connect a charcoal canister to both the engine and the fuel tank, and these parts undergo a positive pressure, negative pressure, or both in order to transport the fuel vapors to either the engine or the charcoal canister.   Thus, one of ordinary skill in the art (or even one of the lowest level of skill in the art) would be motivated to use Stoyle's carbon dioxide and oil to generate smoke and use that inert carbon dioxide smoke in Gilliam's leak testing applications as of July, 1999 because of the common use of the references to test ducts/vacuum tubes or to test pressurized vessels such as the evaporative emissions control systems connecting tubes or fuel tank.   Using carbon dioxide in the suggested application had much more than a reasonable chance of success since vaporizing oil into smoke in a carbon dioxide environment was well known (per Stoyle) and the resulting carbon dioxide borne smoke would be inert – as would the locations filled with enough of

*Inter Partes* Review of U.S. Patent No. 6,526,808

the non-flammable smoke so the smoke passed out of even small leaks – as in Gilliam.

64.    **Safety Motivation:** There is also a strong, common sense suggestion to combine Stoyle's carbon dioxide smoke with Gilliam's vehicle leak testing because of safety concerns.   It is common knowledge that gasoline vapors are explosive.  For example, "No Smoking" signs are posted at filling stations because gas vapors which are released from vehicle fuel tanks while refilling are flammable and vehicle filling stations sometimes have carbon dioxide fire extinguishers.   I believe that is known to anyone who works on motor vehicles or their evaporative emissions control systems, as well being known just by common sense, that fuel tanks have explosive vapors because they contain fuel.  Sparks from a smoke generating chamber must not ignite those vapors during leak testing of fuel tanks or other parts of the vehicle.   Gilliam recognizes this concern when he says "[f]lames could be generated, for example, if a flammable fluid mixture was inadvertently created in chamber 20." Ex. 1005, Col. 7: 57-59.  Chamber 20 (Figs. 1-2 and 4-6) is Gilliam's smoke generating chamber.

65.    Stoyle addresses Gilliam's problem and provides a motivation for one of ordinary skill in the art to use Stoyle's carbon dioxide smoke in Gilliam's leak testing.  The motivation is sufficiently clear that I believe

even one of the lowest level of skill in the art would be motivated to use Stoyle's carbon dioxide smoke in Gilliam's leak testing. First, Stoyle uses carbon dioxide when vaporizing oil into smoke thus addressing Gilliam's concern about generating flames in the smoke generating chamber. Second, carbon dioxide is inert and remains inert when it passes through Gilliam's "conduit 22" to "any and all" parts of the vacuum system tested by Gilliam, including the evaporative emissions control systems and its fuel tank, thus creating an inert environment as the air in the system is displaced by the carbon dioxide smoke. Using carbon dioxide for safety reasons had much more than a reasonable chance of success since vaporizing oil into smoke in a carbon dioxide environment was well known (per Stoyle) and the resulting carbon dioxide-borne smoke would be inert – as would the locations filled with enough of the non-flammable smoke so the smoke passed out of even small leaks for testing – as in Gilliam.

66. **Substituting Known Elements:** Another way of viewing the above safety use of Stoyle's carbon dioxide smoke is that it substitutes a known fire suppressant (carbon dioxide) for Gilliam's known spark arrestor 3, to achieve a predictable result (avoiding ignition). Whatever way you look at it, I believe the motivation to combine Stoyle's carbon dioxide smoke with Gilliam's leak testing is so apparent that even one of the lowest

39

skill in the art would recognize the safety benefits of using carbon dioxide/smoke in Gilliam's leak testing system, as would one of ordinary skill in the art.  It just makes common sense to vaporize oil using the known fire suppressant carbon dioxide and to use the resulting inert smoke in leak testing of potentially explosive ventilation systems like Gilliam's evaporative emissions control systems and its fuel tank.

67.    **Same Field of Endeavor:**  Since Stoyle, Gilliam and the '808 patent are all in the same field of endeavor as discussed above, or at least reasonably pertinent to the testing of ventilation systems, connecting tubes and pressurized containers found in evaporative emissions control systems and the associated fuel tanks, I believe that a person of ordinary skill in the art in July, 1999 would know that smoke machines can be used to generate smoke with inert gas such as carbon dioxide, and would be motivated to use that carbon dioxide smoke in Gilliam's leak testing.  The disclosures are sufficiently clear that I believe even one of the lowest level of skill in the art would know this.  Using smoke machines to heat oil in an inert-gas-filled chamber to make smoke has much more than a reasonable chance of success since vaporizing oil into smoke in a carbon dioxide environment was well known (per Stoyle) and the resulting carbon dioxide borne smoke would be inert – as would the locations filled with enough of the non-flammable

*Inter Partes* Review of U.S. Patent No. 6,526,808

smoke so the smoke passed out of even small leaks for testing – as in Gilliam.

68.    In view of each of the above motivations or suggestions to combine, I believe the steps required by claim 9 are obvious to one of ordinary skill in the art in view of Gilliam's leak testing patent and Stoyle's use of carbon dioxide and oil to generate smoke.  I believe the various motivations and reasons for combining Stoyle and Gilliam are so strong that the steps of claim 9 would be obvious to even a person of the lowest skill in the art.

### IPR Order Ground 1, Claim 10 – Gilliam & Stoyle:

69.    Gilliam discloses all of the extra limitations added by Claim 10. The following table shows the location of text where Gilliam describes each claim limitation.

| ʻ808 Patent Claims | Gilliam (Exhibit 1005) & Stoyle (Exhibit 1008) |
|---|---|
| **Claim 10:** The method of generating smoke recited by Claim 9, comprising | As in Claim 9. |
| the additional step of regulating the pressure at which the smoke is carried by said non-combustible gas from said closed smoke producing chamber to the | **Ground 1:  Gilliam** Ex. 1005, Col. 5: 34-49 ("The flow of smoke-generating fluid is controlled by pressure adjustment knob 4 and drain 14. . . Of course, knob 4 could be marked or calibrated to indicate specific pressure levels which would be useful for applying prescribed pressures to particular automotive systems."); |

41

**A356**

*Inter Partes* Review of U.S. Patent No. 6,526,808

| | |
|---|---|
| closed system undergoing testing | Claims 3 (flow regulating means). |

**Gilliam Expressly Discloses The Further Step of Claim 10:**

70.    Gilliam shows it was common before July, 1999 to regulate the pressure (via adjustment knob 4) at which smoke is carried to the system being tested and Gilliam tests any system in a motor vehicle.  Ex. 1005, Col. 3:3-6 & 48-52.  Gilliam shows that adding this pressure regulation was known in the art.  Doing so is no more than using a known element from Gilliam to achieve a predictable result.  One of ordinary skill in the art would find it obvious to regulate the pressure as taught in Gilliam. The disclosures are sufficiently clear that I believe even one of the lowest level of skill in the art would find it obvious to regulate the pressure as taught in Gilliam.

71.    **Common Sense:**  Also, the '808 patent says it was known to pressure test evaporative emissions control systems to see if they leaked. Ex. 1001 at Col. 1: 28-36.  Over-pressurizing a fuel tank or other parts of an evaporative emissions control systems could have several bad consequences, from creating leaks to rupturing parts.  Indeed, from my participation in generating EPA evaporative testing guidelines and state emissions testing standards I know that there were concerns that too much pressure could

damage the components of evaporative emissions control systems and that the amount of pressure a vehicle could accommodate safely varied with the manufacturer of the vehicle. I participated in detailed discussions about this issue with governmental regulatory agencies prior to July, 1999, and even discussed creating a table correlating permitted upper pressures to specific vehicle makes and models. Thus, there are safety motivations and environmental motivations to prevent vehicle damage in regulating the pressure used to identify leaks and Gilliam provides this capability. I believe that it is common sense for one of ordinary skill in the art to regulate the pressure and Gilliam does this by using known elements to address these known safety and damage concerns.

72.     Given the above knowledge as of July, 1999, I believe the steps required by claim 10 are obvious to one of ordinary skill in the art in view of Gilliam's use of pressure regulator valve 4 to regulate pressure of smoke being carried to a system for leak testing. I believe that even a person of less than ordinary skill in the art would have enough common sense to regulate the pressure as in Claim 10.

### Ground 2 of the IPR Order - Claim 9 – Gilliam & Pauley & 1999 Website

73.     I understand the second ground of invalidity is the *Gilliam*

*Inter Partes* Review of U.S. Patent No. 6,526,808

Patent of Exhibit 1005 in view of Great Britten Pauley Patent of Exhibit 1010 and further in view of the 1999 Website of Exhibit 1013.  I believe that Gilliam discloses all of the limitations of Claim 9 except for using a non-combustible gas.  Pauley uses carbon dioxide or nitrogen for the express purpose of preventing ignition of oil or glycerin as it is sprayed onto a heater surface and vaporized in a smoke machine.  The following table shows the location of relevant text in the various references.

| '808 Patent Claims | Gilliam (Ex. 1005), 1999 Corona Website (Ex. 1013), Pauley (Ex. 1010 |
|---|---|
| **Amended Claim 9:** A method for generating smoke for use at a volatile, potentially explosive environment, said method comprising the steps of: | **Ground 2: Gilliam's** smoke machine checks "any and all leaks" in vehicles, including evaporative emission control systems. Ex. 1005, Col. 1: 6-11; Col. 3: 3-6 & 48-52.  Gilliam cautions against explosions. Col. 7: 54-59<br> **Pauley** generates smoke from oil, using inert gas to minimize potential ignition, for use in theatrical work, movies, and "other applications." Ex. 1010 at 1: 8-14 (uses).<br> **The 1999 Website** discloses smoke machines for leak testing of "vehicles," for theatrical work, and movies and other things. Ex. 1013 at 2, end. |
| locating a heating element within a closed smoke producing chamber, said smoke producing chamber having a gas inlet and a smoke outlet; . . . | **Ground 2:  Gilliam** has air inlet 7 to smoke producing chamber 20 containing heating element 11 and outlet conduit 22. Ex. 1005, Fig. 3; Claims 1 & 17 (chamber means, heating means, conduit means).  Ball valve 4 on inlet 7 regulates pressure in the chamber 20.  Col. 5:34-49.  Ball valve 12 can close outlet 22.<br> **Pauley** sprays oil or glycerin using a "jet of carbon dioxide or nitrogen under pressure *onto a* |

| | |
|---|---|
| | *surface*." Ex. 1010, Pg. 1: 25-81 (emphasis added) & 47-50 (same); Pg. 2: 48-53 (same) & 100-103 & 116-120; Claims 1 & 3 (spray onto a surface). The "preferred" embodiment has the surface as the walls, but it need not be so and the surface could be separate from the walls. |
| delivering a flammable fluid to said heating element within the closed smoke producing chamber; | **Ground 2: Gilliam's** oil is heated in chamber 20 to make smoke. Ex. 1005, Claims 1 & 17 (fluid vaporized).<br><br>   **Pauley** says "a hydrocarbon oil is sprayed in atomized form by means of a jet of carbon dioxide or nitrogen under pressure on to a surface sufficiently heated as to cause an immediate vaporization of the liquid." Ex. 1010, Pg. 2: 29-34. *See,* Ex. 1010, Pg. 2: 96-103 (Oil sprays out atomizing nozzle b$^3$); Claim 1, Pg. 3:67-71 |
| energizing said heating element for vaporizing into smoke within the closed smoke producing chamber the flammable fluid that is delivered thereto; [and] | **Ground 2: Gilliam's** switch 1 activates heating element 11. Ex. 1005, Col. 6: 3-7. The fluid is "vaporized." Gilliam Claims 1, Col. 8: 64 to Col. 9: 2. *See,* Claim 17, Col 10: 36-39; Col. 3: 65 to Col. 4: 1; Col. 4: 41-44 (vaporizing said smoke-generating fluid into smoke"); Col. 6: 34-36. Closed chamber 20 with inlet 7, outlet 22 and valves 4 & 12.<br><br>   **Pauley**: "a hydrocarbon oil is sprayed in atomized form by means of a jet of carbon dioxide or nitrogen under pressure on to a surface sufficiently heated as to cause an immediate vaporization of the liquid." Pauley: Ex. 1010, Pg. 2: 29-34; Pg. 1: 30-31 ("immediate vaporization") & 52-53 (same); Pg. 2: 66 ("vaporized") & 100-103 ("immediate vaporization") & 118 (vaporize); Claims 1 & 3 (spray "onto a surface heated sufficiently to cause immediate vaporization"); Fig. 3. |
| …blowing a supply of | **Ground 2: Gilliam** blows air in inlet 7 using air |

45

**A360**

| | |
|---|---|
| non-combustible gas under pressure into the closed smoke producing chamber by way of said gas inlet thereof | pump 15, with the air also circulating smoke fluid in the chamber 20. Ex. 1005, Col. 6: 57-63.<br>**Pauley** Ex. 1010, Pg. 1: 25 – 31, 47-49; Pg. 2: 30-33, 38-41 & 108-111 ("the use of the *carbon dioxide* or *nitrogen gas* under pressure as a medium for atomizing and propelling the fog forming liquid is advantageous."). Fig. 3. Neither carbon dioxide nor nitrogen gas support combustion and both are non-combustible gases. |
| For (1) creating an inert environment within said chamber so as to prevent ignition and thereby avoid the possibility of an explosion when said flammable fluid is vaporized into smoke by said heating element and | **Ground 2: Gilliam** uses air and warns against sparks and combustion in the engine. Ex. 1010, Col. 7: 54-59.<br>**Pauley:** Pauley states: "The use of the carbon dioxide or nitrogen gas under pressure as a medium for atomizing an propelling the fog forming liquid is advantageous not merely because of its cooling effects but because *its presence reduces to a minimum any tendency to ignition of the vapour* should the liquid employed be of an inflammable nature." Pauley Ex. 1010, Pg. 1: 36-44. *See* Pg. 2: 38-47 (same) & Pg. 2: 108-116 (same).<br>Neither carbon dioxide nor nitrogen gas support combustion. Using Pauley's carbon dioxide and oil/glycerin or nitrogen and oil/glycerin in Gilliam meets this limitation. |
| (2) for carrying the smoke to the volatile potentially explosive environment by way of the smoke outlet of the closed smoke producing chamber, said volatile potentially explosive environment being a closed system undergoing testing for | **Ground 2:** Particles of smoke fluid vaporized and suspended in a gas will be carried to any closed system to which the smoke chamber outlet is connected.<br>**Gilliam** uses air for the claimed functions as it carries smoke to closed systems involving carburation, fuel injection and emission control (Col. 1: 24-26) and provides "means for determining the location of *any and all leaks* in an internal combustion engine." Ex. 1005, Col. 3: 3-6 & 48-52; Col. 1: 6-11. Gilliam cautions |

46

**A361**

| | |
|---|---|
| leaks; and" | against explosions. Ex. 1005, Col. 7:54-59.<br>**Pauley:** Using Pauley's carbon dioxide or nitrogen to generate smoke for use in Gilliam results in non-flammable smoke that meets these limitations. Pauley also uses the inert gases to "propel" the vaporized smoke fluid. Ex. 1010, Pg. 1: 30-32 & 54-56 ("conveying the mist"). *See* Ex. 1010, Pg. 1: 53-54; Pg. 2: 34-36 & 40-14 (propelling); Pg. 2: 104; Pg. 3: 72-77. |
| …connecting the smoke outlet of said closed smoke producing chamber to the closed system undergoing testing. | **Ground 2:  Gilliam's** smoke chamber outlet conduit 22 is connected to the system being leak tested.   Ex. 1005, Abstract (smoke "sealably communicated through conduit means to the intake manifold of a vacuum system"); Col. 8: 18-21 ("interconnected with conduit 22"); Claims 1 & 17 (conduit means).<br>**Pauley's** smoke machine requires the claimed connections in order to get smoke where it is needed for theatrical effects and movies and "other applications." Ex. 1010, Pg. 1: 13-14.   It is common sense to provide smoke carrying connections. |
| said supply of non-combustible gas for creating an inert environment within the closed system to which the smoke is carried, said inert environment with the closed system preventing ignition within the closed system during the testing thereof; | **Ground 2:**   Using **Pauley's** carbon dioxide or nitrogen to generate smoke for use in Gilliam meets these limitations.<br>**Pauley** Ex. 1010, Pg. 2: 109-116 (mere presence reduces any tendency to ignition); Pg. 1: 36-44 (minimizes and greatly reduces any tendency for ignition); Pg. 2: 38-47 (same text);. |
| wherein the closed system to be tested for leaks at the volatile, | **Ground 2: Gilliam's** closed evaporative system includes the fuel tank and Gilliam tests for leaks in "any and all leaks" in vehicles, including |

47

**A362**

*Inter Partes* Review of U.S. Patent No. 6,526,808

| | |
|---|---|
| potentially explosive environment is the evaporative system of a motor vehicle including a fuel tank, further comprising delivering smoke from the smoke outlet of said smoke producing chamber to the fuel tank. | evaporative emission control systems. Ex. 1005, Col. 1: 6-11; Col. 3: 3-6 & 48-52. Gilliam cautions against explosions. Col. 7:54-59.<br>**Pauley** produces inert gas-borne smoke using a heated mixture of inert gas with oil for entertainment, cinematographic pictures, theatrical work, and "other applications." Pauley, Ex. 1010, Pg. 1:12-13; Pg. 2:14-16. Using Pauley's carbon dioxide or nitrogen generates a non-flammable, inert smoke and using that smoke in Gilliam meets these limitations. |

**Gilliam & Pauley & 1999 Website Meets All Claim Limitations**

74.    Gilliam has all of the steps of claim 9 except it uses air instead of nitrogen as an inert gas and the use of Pauley's carbon dioxide or nitrogen as an inert gas with Gilliam meets all limitations of claim 9, while the 1999 Website (Ex. 1013) provides any needed motivation to combine the two references. Pauley shows that it was known in 1948 (well before July, 1999) to use carbon dioxide or nitrogen to vaporize oil into smoke and that those inert gases were used to reduce to a minimum any tendency to ignition of the vapor if the vaporized fluid was flammable.  Ex. 1010, Pg. 2: 108-116. Gilliam uses vaporized oil to generate smoke for testing any and all closed systems of a motor vehicle.  *See* Ex. 1005, Col. 3:3-6 & 48-52.  Thus, the use of Pauley's carbon dioxide or nitrogen to vaporize oil into smoke in Gilliam, meets all the claim limitations.

75.    Moreover, the results of using Pauley's carbon dioxide or nitrogen with Gilliam's leak testing process combines prior art elements according to known methods to yield predictable results. Those results include an inert environment wherever the inert carbon dioxide smoke is used (per Stoyle) and using that inert smoke to identify leaks in vacuum systems (per Gilliam) as the smoke exits the leaks.

76.    **Pauley Suggestion 1:** Pauley suggests the use of its carbon dioxide or nitrogen to generate smoke for Gilliam's leak testing.  Pauley teaches using carbon dioxide and oil/glycerin or nitrogen gas and oil/glycerin which "*reduces to a minimum any tendency to ignition of the vapour*" when making smoke.  Ex. 1010, Pg. 2: 108-116.  Given such clear statements of how to suppress ignition, one of even the lowest skill in the art would recognize that carbon dioxide or nitrogen would prevent ignition or combustion in the smoke generating chamber and that would avoid Gilliam's concern for sparks or flames coming from the smoke chamber (Ex. 1005, Col. 7:54-59) as of July, 1999.  There is more than a reasonable expectation of success if Pauley's carbon dioxide or nitrogen gas to vaporize flammable fluid in Gilliam's smoke machine for Gilliam's leak testing since Pauley says the inert gases "any tendency" to combustion to a minimum.

77.    Further, the same nitrogen and carbon dioxide gases "propel"

the inert smoke along to its destination.  Ex. 1010, Pg. 2:108-111 ("the use of the *carbon dioxide* or *nitrogen gas* under pressure as a medium for atomizing and propelling the fog forming liquid is advantageous."); Ex. 1010, Pg. 3: 72-77 ("the vapour so created is propelled along"); Ex. 1010, Pg. 2: 34-36.  Pauly thus teaches or at least suggests the inert smoke/fog is carried to its use location by the inert nitrogen and carbon dioxide gases that generate the smoke.  Since the inert nitrogen and carbon dioxide gases are acknowledged as preventing ignition during vaporization, it is apparent they would prevent ignition at the location of use when carried through Gilliam's conduit 22, shown in Figs. 1-4.  Thus, there is more than a reasonable expectation of success if Pauley's carbon dioxide or nitrogen gas to vaporize flammable fluid in Gilliam's smoke machine for Gilliam's leak testing.

78.    **Popkin Confirmation:** The 1965 Popkin patent shows that the use of inert gas to suppress ignition during vaporization was commonly known for many years.  Ex. 2003, Pg. 3: 31-46; Pg. 2:114 to Pg. 3: 4 ("There is no risk whatsoever of the oil being ignited within the portion of the tube R wound around the heating element because the foam contains carbon dioxide and no oxygen is present."). Popkin thus clarifies and reaffirms the teachings of Pauley and the conclusion that one of ordinary skill in the art would know carbon dioxide and nitrogen gas prevent ignition and combustion when oil is

vaporized into smoke in the smoke generating chamber of a smoke machine and that those inert gases could be used to carry the smoke to the location of use for the same purpose. I thus believe that one of ordinary skill in the art would be motivated to use Pauley's carbon dioxide and nitrogen and oil to generate smoke in Gilliam's leak testing machine as of July, 1999. The disclosures in Pauley (especially as reaffirmed by Popkin) are sufficiently clear that I believe even one of the lowest level of skill in the art would be motivated to use Pauley's carbon dioxide and nitrogen and oil to generate smoke in Gilliam's leak testing machine as of July, 1999.

79.   There is more than a reasonable chance of success in using Pauley's inert gas to vaporize oil into smoke for Gilliam's leak testing. The nitrogen and carbon dioxide would displace the oxygen in the air and make the smoke chamber and tested systems safe from combustion. The smoke made using nitrogen and carbon dioxide and oil would be recognized as non-combustible due to the inert gas as noted by Pauley's use of these inert gases to prevent ignition. Popkin confirms that this use of inert gas to prevent ignition was well known for many years prior to July, 1999. Ex. 2003, Pg. 2:118 to Pg. 3: 4 ("There is no risk whatsoever of the oil being ignited within the portion of the tube R wound around the heating element because the foam contains carbon dioxide and no oxygen is present."). As the

51

nitrogen and carbon dioxide propels the inert smoke through Gilliam's conduit 22, the inert smoke and gas would displace the oxygen in the air and a conduit and tested system filled with inert smoke would also prevent ignition. This would include any vacuum system in a vehicle (Gilliam Ex. 1005, Col. 3:3-6 & 48-52) and that would include its evaporative emission control system and associated tubes, charcoal canister and fuel tank.

80.    **Pauley's Suggestion 2:** The use of Pauley's inert gas to generate smoke is also suggested by Pauley's disclosure that its smoke can be used not just for theatrical works and cinematography, but can also be used "*in other applications.*" Ex. 1010, Pg. 1: 10-14. Gilliam's leak testing would be one such other application. Using Pauley in another application such as Gilliam would have more than a reasonable chance of success, especially given Pauley's disclosure that carbon dioxide or nitrogen reduce any tendency of a flammable smoke fluid to ignite when vaporized and especially given the recognition that both carbon dioxide and nitrogen are inert gases that don't support combustion. One skilled in the art would have reason to apply the teachings regarding a smoke used for one purpose to those of a machine for another purpose. The 1999 Website strengthens the ability of one skilled in the art to recognize that one "other application" for Pauley's smoke could include leak testing of vehicles as described in the

1999 Website and that Gilliam is one such vehicle leak testing application.

81.   **Safety Motivation:**   One of ordinary skill in the art would recognize the added safety benefits of using Pauley's nitrogen/smoke or carbon dioxide/smoke in Gilliam's leak testing system, especially given Gilliam's caution against sparks and flames coming from the smoke generating chamber and Pauley's disclosure that its use of nitrogen or carbon dioxide avoids ignition that could produce such sparks or flames. This is confirmed by the 1999 Website (Ex. 1013) which suggests that smoke machines can be used for theatrical effects (as in Pauley) as well as leak testing of vehicles (as in Gilliam).   The disclosures in Pauley about minimizing any tendency to ignition are so sufficiently clear that I believe even one of the lowest level of skill in the art would be motivated to use Pauley's inert gas in Gilliam's smoke generating chamber to make smoke and propel it downstream for leak testing.

82.   The use would have more than a reasonable likelihood of improving safety given Pauley's teaching that carbon dioxide and oil or nitrogen and oil reduce to a minimum any tendency to ignition, and the recognition that the resulting smoke carried on the inert generating gas (carbon dioxide or nitrogen) would be inert and would render inert any location filled with the inert smoke.

53

**A368**

*Inter Partes* Review of U.S. Patent No. 6,526,808

83.    **1999 Website Motivation:** The 1999 Website (Ex. 1013) also directly suggests using Pauley's inert smoke in Gilliam's leak testing system, and shows that one of Pauley's "other applications" can be Gilliam's leak testing of any vacuum system in a vehicle.  The 1999 Website suggests the use of smoke machines for entertainment, including "theaters, TV studios, exhibitions, nightclubs, etc."  (Ex. 1013, Pg. 2) as in Pauley and it also suggests that smoke machines can be used "to detect leaks in a broad range of systems, including  . . . vehicles . . .." Ex. 1013, Pg. 2.  The 1999 Website discloses or at least suggests the use of smoke generating machines for the same applications used by both Pauley and Gilliam, and that teaches or at least suggests using Pauley's nitrogen/carbon dioxide, oil-based smoke in Gilliam's vehicle leak testing.  Thus, one of ordinary skill in the art would be motivated to use Pauley's carbon dioxide and oil or nitrogen and oil to generate inert smoke for use in Gilliam's leak testing applications as of July, 1999.  The suggestion to use smoke machines for so many interchangeable uses is sufficiently strong that I believe even one of the lowest level of skill in the art would be motivated to use Pauley's carbon dioxide and oil or nitrogen and oil to generate inert smoke for use in Gilliam's leak testing applications as of July, 1999.

84.    The use would have more than a reasonable likelihood of

success given Pauley's teaching that carbon dioxide and oil or nitrogen and oil reduce to a minimum any tendency to ignition and the recognition that the resulting smoke would be inert and also reduce to a minimum any site filled with the inert smoke for testing.

85. **Substituting Known Elements:**  Substituting Pauley's inert gas smoke for Gilliam's leak testing smoke substitutes one known element for another to yield predictable results.  Pauley shows that it was known to vaporize oil and nitrogen into smoke, or to vaporize oil and carbon dioxide into smoke.  Ex. 1010, Pg. 2:118; Pg. 3:68-78.  Substituting Pauley's carbon dioxide/oil smoke or nitrogen/oil smoke for Gilliam's air/oil smoke is the substitution of a "known" inert smoke for another known air-based smoke for the predictable results of reducing to a minimum any tendency to ignition as taught by Pauley.  This is especially so since Pauley says the mere presence of nitrogen and carbon dioxide greatly reduces any tendency to ignition (Ex. 1010, Pg. 2: 44-47) and Popkin removes doubt that it is eliminated as stated in Pauley.  Popkin Ex. 2003, Pg. 2:118 to Pg. 3: 4 ("There is no risk whatsoever of the oil being ignited within the portion of the tube R wound around the heating element because the foam contains carbon dioxide and no oxygen is present.").  The carbon dioxide/oil smoke or nitrogen/oil smoke displaces the air and prevents combustion.

55

86.    **Combining Prior Art Elements:**  Combining Pauley's inert gas smoke with Gilliam's leak testing combines prior elements according to known methods to yield predictable results.  Pauley shows that it was known to vaporize oil into smoke using carbon dioxide or nitrogen in order to prevent ignition and to use that same inert gas to propel the smoke to its location of use.  Combining those elements with Gilliam's leak testing method results the predictable result of avoiding ignition as oil is vaporized into smoke - as expressly stated by Pauley.  Combining those elements also results in the same inert gas propelling the smoke through Gilliam's conduit 22 (Ex. 1005, Figs. 1-4) to any vacuum system being leak tested.  Since carbon dioxide or nitrogen gas are recognized as preventing ignition during vaporization of oil, they would also prevent ignition in the system being tested – including the evaporative emissions control systems and its charcoal canister and fuel tank.  The results would be predictable given Pauley's teaching that carbon dioxide or nitrogen reduce to a minimum any tendency to ignite the oil as it is vaporized into smoke, and given the recognition that the same inert gases and same ignition reduction apply to any site filled with the inert smoke – as when Gilliam fills a tank with smoke until the smoke exits a leak.

87.    In view of each of the above motivations, I believe the steps

*Inter Partes* Review of U.S. Patent No. 6,526,808

required by claim 9 are obvious to one of ordinary skill in the art in view of Gilliam's leak testing patent in further view of Pauley's use of carbon dioxide and oil to generate smoke (or nitrogen and oil to generate smoke), and further in view of the 1999 Website suggestion to combine those references. Given Pauley's teaching that the mere presence of nitrogen and carbon dioxide reduces to a minimum any tendency to ignite, and given Gilliam's concerns over sparks/flame causing ignition, and given the 1999 Website suggestion that smoke machines can be used for the applications of both Pauley and Gilliam, even one of the lowest skill in the art would find it obvious to combine Pauley's nitrogen and carbon dioxide smoke with Gilliam's leak testing to achieve the combination of Claim 9 as of July, 1999.

88.    I believe the various suggestions to combine are sufficiently clear that even one of the lowest level of skill in the art would find it obvious as a matter of common sense to combine Pauley and Gilliam in light of the 1999 Website (Ex. 1013) and achieve the combination of claim 9.

**IPR Order Claim 10 – Ground 2 – Gilliam & Pauley & 1999 Website:**

89.    Gilliam discloses all of the extra limitations added by Claim 10, as does Pauley. The following table shows the location of text where

57

**A372**

Gilliam describe each added claim limitation.

| '808 Patent Claims | Gilliam (Exhibit 1005) & Pauley (Exhibit 1011) |
|---|---|
| **Claim 10:** The method of generating smoke recited by Claim 9, comprising | As in Claim 9. |
| the additional step of regulating the pressure at which the smoke is carried by said non-combustible gas from said closed smoke producing chamber to the closed system undergoing testing | **Ground 2: Gilliam** Ex. 1005, Col. 5: 35-49 ("The flow of smoke-generating fluid is controlled by pressure adjustment knob 4 and drain 14. . . . Of course, knob 4 could be marked or calibrated to indicate specific pressure levels which would be useful for applying prescribed pressures to particular automotive systems."); Claims 3 (flow regulating means).<br><br>  **Pauley** uses a valve to start and stop the flow of smoke. Ex. 1010, Pg. 2: 77-82. Turning smoke on and off regulates the pressure at which smoke is supplied and carried by the gas that "propels" the smoke. Pg. 1: 30-32 ("the vapour so created being . . . *propelled* along ...."). *See* Ex. 1010, Pg. 1: 53-54; Pg. 3: 72-77 ("the vapour so created is propelled along"); Pg. 2: 34-36; Pg. 2: 104; Pg. 3: 72 (same). |

**The Further Step of Claim 10 Is Disclosed in Gilliam:**

90.    Gilliam shows it was common before July, 1999 to regulate the pressure (via adjustment knob 4) at which smoke is carried to the system being tested and Gilliam tests any system in a motor vehicle. Col. 3:3-6 & 48-52. Gilliam shows that adding this pressure regulation was known in the art. Doing so is no more than using a known feature from Gilliam, for a predictable result, with no change in the function. One of ordinary skill in

the art would find it obvious to regulate the pressure as taught in Gilliam as of July, 1999.   The known use for predictable results is sufficiently strong that I believe even one of the lowest level of skill in the art would find it obvious to regulate the pressure as taught by Gilliam as of July, 1999.

91.   **Disclosed in Pauley:**   Likewise, Pauley shows it was common before July, 1999 to regulate the pressure (Ex. 1010, Pg. 2: 77-82) especially as turning the smoke on and off regulates the pressure at which smoke is supplied and carried by the gas that "propels" the smoke.   Ex. 1010, Pg. 1: 30-32 ("the vapour so created being . . . *propelled* along ....").   *See* Ex. 1010, Pg. 1: 53-54; Pg. 3: 72-77 ("the vapour so created is propelled along"); Ex. 1010, Pg. 2: 34-36; Pg. 2: 104; Pg. 3: 72 (same).   The motivation for combining Pauley and Gilliam is as in Claim 9.

92.   **Common Sense:**   Also, the '808 patent says it was known to pressure test evaporative emissions control systems to see if they leaked. Ex. 1001 at Col. 1: 28-36.   Over-pressurizing a fuel tank or any part of an evaporative emissions control systems could have several bad consequences, from creating leaks to rupturing parts.   Indeed, from my participation in generating EPA and state standards I know that there were concerns that too much pressure could damage the components of engines or associated evaporative emissions control systems and that the amount of pressure a

vehicle could accommodate safely varied with the manufacturer. I participated in detailed discussions about this issue with governmental regulatory agencies prior to July, 1999, and even discussed creating a table of allowed upper pressures for testing correlated to vehicle makes and models. Thus, there are safety and damage motivations in regulating the pressure used to identify leaks and Gilliam provides this capability. I believe that it is common sense for a person of ordinary skill in the art to regulate the pressure and Gilliam and Pauley both do this using known elements to address these known safety and reliability concerns. I believe that even a person of lowest skill in the art would have enough common sense to regulate the pressure as in Claim 10.

93. **Obvious:** Given the above knowledge as of July, 1999, I believe the steps required by claim 10 are obvious to one of ordinary skill in the art in view of Gilliam's use of pressure regulator valve 4 to regulate pressure of smoke being carried to a system for leak testing. I believe that even a person of less than ordinary skill in the art would have enough common sense to regulate the pressure as in Claim 10.

The undersigned, being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. 1001,

*Inter Partes* Review of U.S. Patent No. 6,526,808

and that such willful false statements and the like may jeopardize the validity of the application or document or any registration resulting therefrom, declares that all statements made of his/her own knowledge are true; and all statements made on information and belief are believed to be true, and that this Declaration is being executed on July 26, 2013 at Rocklin, California.


Dr. Michael St. Denis

REVECORP INC.
Research and Consulting Services
5732 Lonetree Blvd, Rocklin, CA 95765 USA 916.786.1006

## Resume
## Michael J. St. Denis, D. Env.

### *Background*

Dr. St. Denis is a recognized expert in vehicle inspection and maintenance (I/M) programs with over 15 years of industry experience. He was a Managing Partner with Sierra Research, a nationally-known air quality consulting firm and then formed Revecorp to continue vehicle emissions research. Currently responsible for managing I/M-related projects, he has provided assistance to numerous states in developing I/M program specifications, evaluating program benefits, program auditing and quality assurance, and analysis of vehicle emissions test data. He is regarded as a foremost expert in I/M emissions test equipment design, operation, auditing and acceptance testing. Dr. St. Denis has developed novel emissions testing technology and assists states and contractors with the implementation of innovative vehicle inspection program test equipment and data systems.

### *Education*

**D. Env., Environmental Science and Engineering** - UCLA, Los Angeles, CA 1993
**M.S., Physical Chemistry** - University of the Pacific, Stockton, CA, 1989
**B.S., Chemistry** - University of the Pacific, Stockton, CA, 1985

### *Professional Experience*

| | |
|---|---|
| **2007 to Present** | **Principal** |
| | **Revecorp, Inc., Roseville, CA** |

• Management responsibilities include: business development activities; proposal preparation and submittal; project planning, logistics, management and scheduling; project implementation and operations activities; personnel and resource allocation; development of project budgets; project-level financial monitoring and reporting (both internally and to clients); report preparation; contract negotiation; and client liaison.

• Focus of work related to vehicle inspection program design, vehicle emissions testing equipment, planning, and implementation.  Performing analysis of vehicle inspection data for program effectiveness and fraud through the use of triggers. Expert in the development of acceptance testing for vehicle emissions inspection test equipment (OBDII, BAR97 type analyzers, IM240 type systems, dynamometers and gas cap/pressure testing equipment).

• Significant work providing legal support related to emissions testing equipment failures to perform and vehicle emissions testing program fraud.

REDLINE EXHIBIT 1040
Redline v. Star
Trial IPR2013-00106
p.1040-1

REVECORP INC.

- Specific technical I/M project activities and responsibilities have included:
  - ✓ Member of the US EPA Remote OBDII Protocol Technical Subgroup.
  - ✓ US EPA High Evaporative Emission Vehicle Identification Pilot Project (CRC E-77-3) developing field test procedures and jointly operating the test program.
  - ✓ Project Manager for the District of Columbia Department of Motor Vehicles on the implementation of IM240 testing.  Developed specifications for equipment and performed equipment acceptance testing.
  - ✓ OBDII testing program assistance to the Louisiana Department of the Environment.
  - ✓ Developed equipment audit procedures for the District of Columbia Department of the Environment.
  - ✓ Assistance to legal counsel in resolution of dispute related to potential clean-piping.
  - ✓ Assistance to the Texas Commission on Environmental Quality, through Gordon-Darby for conversion of the vehicle information database from operation by Verizon Business to operation by Gordon-Darby.
  - ✓ Assistance to legal counsel in evaluation of test equipment for compliance with BAR97 certification requirements.

**2006 to        President**
**Present       St. Denis Innovations, LLC., Roseville, CA**

- Responsible for new product development, intellectual property management, and technology licensing.  Developed two products protected by U.S. Patents.  Products relate to vehicle testing equipment, aviation and remote tracking technology. Product currently being marketed nationally (www.Ready-or-Not.us).

**1998 to        Managing Partner, Senior Engineer**
**2007          Sierra Research, Inc., Sacramento, CA**

- As a Managing Partner and shareholder at Sierra Research, involved in oversight of corporate business practices and marketing efforts. Responsibilities included: project, personnel and resource planning and management; participation in corporate marketing and strategic planning discussions and efforts; identifying and pursuing new business opportunities and strategic partnerships; ensuring on-time completion of projects and transmittal of deliverables to clients; client liaison; and contract, budget and schedule monitoring and reporting to clients.

- Frequent speaker and session chair at the Annual Mobile Sources/Clean Air Conferences in Colorado, as well as providing assistance to conference organizers in setting agendas for the annual sessions, and identifying and inviting speakers. Attendance and presentations at annual Coordinating Research Council (CRC), Society of Automotive Engineers (SAE), and other air quality and vehicle emissions technical conferences as well. Past guest lecturer on emissions control technologies and standards at University of Michigan short course on motor vehicle emissions.

- Managed Sierra's I/M-related projects. Technical I/M project activities and responsibilities have included:

REVECORP INC.

- ✓ Assistance to states in development of I/M program specifications, evaluation of I/M vehicle programs, analysis of vehicle emissions testing data, I/M program auditing and quality assurance, and technical support.
- ✓ I/M program assistance to states and others in developing test program protocols, equipment specifications, contractor RFP and other procurement-related documents, and audit plans and procedures.
- ✓ Extensive work in acceptance testing of centralized and decentralized I/M program test equipment (gas analyzers, dynamometers and OBDII test systems), and end-to-end testing of electronic transmission systems and vehicle information databases (VIDs).
- ✓ Auditing all aspects of I/M programs from equipment auditing to overall program auditing for compliance with federal guidelines. Also provided hands-on training to perform OBDII and other emissions test equipment audits to US EPA and state program staff.
- ✓ For the US EPA, worked on projects under a technical support contract to evaluate new test program designs, propose changes to current technical guidance, draft new guidance, and evaluate improvements in US EPA support to states on I/M programs.
- ✓ Evaluation of emissions reductions through the use of various emissions testing regimes and various types of emissions analysis equipment (including particulate emissions from Diesels).
- ✓ Development of and working with state clients on all aspects necessary to implement OBDII testing programs including development of specifications, equipment testing, and development of an OBDII master reference lookup table.
- ✓ Development of annual reports on the status of all United States I/M programs, which involved contacting all the I/M programs to determine any program changes or other developments since publication of the previous annual report as well as any planned future program changes
- ✓ Developing/updating Sierra's master I/M and OBDII lookup tables, and program specific vehicle reference tables (VRTs) that incorporate the contents of the master lookup tables for a number of I/M programs or their contractors including Georgia, California, New York, Washington State, New Jersey, Massachusetts, Texas, Virginia, Alaska, Connecticut, Oregon, New Mexico, ESP, Applus and Testcom.

- Provided technical assistance to the following clients and I/M programs:
  - ✓ U.S. Environmental Protection Agency
  - ✓ California Air Resources Board
  - ✓ California Bureau of Automotive Repair
  - ✓ Georgia Environmental Protection Division
  - ✓ New Jersey Clean Air Program
  - ✓ Massachusetts Department of Environmental Protection
  - ✓ Connecticut Department of Motor Vehicles
  - ✓ Gordon-Darby and their customers, the New Hampshire Department of Motor Vehicles, Arizona Department of Environmental Quality, Texas Commission on Environmental Quality
  - ✓ Vermont Department of Environmental Conservation, Air Pollution Control Division
  - ✓ District of Columbia Department of Motor Vehicles and Department of the Environment
  - ✓ Alaska Department of Environmental Conservation

REVECORP INC.

✓ Municipality of Anchorage Alaska
✓ Missouri Department of Natural Resources
✓ Borough of Fairbanks Alaska
✓ Colorado Department of Public Health and the Environment
✓ Pacific Vehicle Testing Technologies, Ltd. (for the AirCare program, British Columbia)
✓ Louisiana Department of Environmental Quality
✓ Virginia Department of Environmental Quality
✓ New South Wales (Australia) Roads and Traffic Authority
✓ Envirotest – Environmental System Products Inc
✓ Worldwide Environmental Products
✓ SGS Corporation
✓ Coordinating Research Council
✓ Environmental Testing Corporation
✓ Dah Chong Hong Motor Service Center Ltd., (Hong Kong, China)
✓ Sidley Austin LLP
✓ Quinn Emanuel Urquhart Oliver & Hedges LLP
✓ Fraser Milner Casgrain LLP

• Co-developed and patented a tester for verifying proper dynamometer performance that multiple state I/M programs are currently using to conduct test system acceptance testing and audits.  The tester allows for evaluation of either steady state or transient dynamometers.  Developed an enhanced version of the dynamometer tester for EPA to test two- and four-wheel drive 48-inch roll certification dynamometers.


**1997 to         Project Manager, Diesel Emissions Testing Program**
**1998            Clayton Industries, Inc. - City of Industry, CA**

• Responsible for development of loaded-mode Diesel vehicle test systems.
• Additional responsibility for international business development for vehicle emissions test systems and for providing international technical support on new product development.
• Worked with government agencies in Hong Kong, China, Korea, Australia, Philippines, Canada, England, Germany, and California to develop vehicle emissions test systems.
• Worked with partners including Snap-On International, SPX Corporation, and Dah Chong Hong on joint development of vehicle emissions testing solutions in Asia.


**1993 to         Manager and Senior Engineer**
**1997            Parsons, Inc. - Pasadena, CA**

• Served as Project Manager for projects involving vehicle emissions testing and emissions modeling analyses.
• Responsibilities in the area of vehicle testing included design and installation of computerized IM240 and ASM test lanes for testing light-duty motor vehicles, evaluation and selection of testing equipment, development of automation software, vehicle procurement, management of test center and staff, transient loaded mode vehicle emissions testing, and data analysis.

REVECORP INC.

- Conducted studies evaluating the cost-effectiveness of accelerated vehicle retirement (scrap programs) for light duty vehicles, catalytic converter replacement, and I/M waiver criteria.
- Modeling responsibilities included review of vehicle emissions simulation modeling of heavy-duty Diesel vehicles and related modeling assumptions, development of a vehicle emissions reduction credit model for analysis of heavy-duty Diesel vehicle scrap programs, and evaluation and critique of heavy-duty Diesel vehicle emissions modeling performed by the US EPA.
- Project Technical Advisor to the Bureau of Automotive Repair (BAR) referee program. Developed and managed a research test center for BAR in which the first studies in California were conducted to evaluate the IM240 for use in centralized testing and to evaluate the current test procedure (ASM).
- Served as Technical Manager for the Alternative Fuel Vehicle Feasibility Study conducted for the U.S. Air Force at Hill AFB in Ogden, Utah, evaluating the air quality benefits and cost-effectiveness of seven different systems for converting Diesel vehicles to operate on compressed natural gas.

**1991 to          Contractor**
**1993          South Coast Air Quality Management District - Los Angeles, CA**

- Conducted research for project jointly sponsored by the South Coast Air Quality Management District, Ford Motor Company, and the Coordinating Research Council. Managed a test and simulation research project on computerized vehicle emissions control systems to determine if vehicle emissions control systems are calibrated to have lower emissions during certification than on road.
- Instrumented an experimental vehicle using air/fuel ratio sensors, thermocouples in the exhaust stream, interface to on-board electronic engine controller, and other sensors. Collected vehicle operating parameter data on urban and freeway routes in Los Angeles.
- Developed new dynamometer driving cycles that were to be representative of actual driving patterns in Los Angeles and used these cycles to conduct transient loaded mode vehicle emissions tests at Ford's test facilities.
- Wrote two vehicle emissions computer models used to simulate driving in the Los Angeles area to aid in determining the causes of high emissions rate events.

**1990 to          Staff Research Associate**
**1993          UCLA School of Public Health, Los Angeles, CA**

- For the US EPA, developed a compact and portable differential optical absorption spectrometer (DOAS) to measure the indoor air pollutants formaldehyde, nitric acid (HONO), and NO2. Designed the optical system and components, and tested and evaluated a new diode array electronic detection system for the spectrometer.
- For the South Coast Air Quality Management District, modified the Regional Human Exposure Model (REHEX) to allow for modeling of human exposure to benzene and formaldehyde in the South Coast air basin.

## Large Project Experience

California Bureau of Automotive Repair, Smog Check Referee Program, 1993 to 1997. Technical manager for vehicle inspection station network of 57 facilities

REVECORP INC.

throughout state of CA with over 100 staff.  Responsible for budgeting and resource allocation.  Total program value over $40 million.

California Bureau of Automotive Repair, Program Test Options Evaluation, 1994 to 1996.  Designed, equipped and operated three test facilities, managed 20 staff.  Total program value $1.5 million.

New Jersey Motor Vehicle Commission, Motor Vehicle Emission Program Replacement Planning and Oversight, 2011 - 2014.  Provide evaluation, planning and oversight for implementation of a revised vehicle inspection program.  Work includes complete review of the current program, modeling of emissions impacts and financial impacts of various alternative inspection delivery methods, development of a Request for Proposals for the State to retain a vendor to implement the developed plan and then oversight of the new vendor.  Contract value $3.3 million, Revecorp working as a sub-contractor to ERG, Revecorp portion $900,000.  New vendor contract expected to be valued at $30 to $60 million.

New Jersey Department of Motor Vehicles, Vehicle Inspection Program Privatization Oversight, 1999- 2005.  Provided oversight of contractor retrofitting 37 inspection stations throughout the entire state of NJ for operation by private contractor.  Performed review of facility plans, equipment and software specifications, database and communications specifications, and staff training and management plans.  Provided acceptance testing and approval of installations before being allowed to become operational.  Retrofit cost over $60 million.

Massachusetts Department of Environmental Protection, Vehicle Inspection Program Privatization Oversight, 2000-2005.   Provided oversight of contractor equipping 1800 private inspection stations, installing new data system, and establishing program operations.  Performed final acceptance testing, specification reviews, data system reviews, and program option analyses.  Total program value $250 million.

Louisiana Department of Environmental Quality, Program Implementation Oversight, 2003 to present.  Providing contractor oversight for implementation of new test equipment and data system developed by contractor.  Total program value several million dollars.

Washington DC Department of Motor Vehicles, Test Facility Retrofit, 2005 to 2007.  Project manager and overall design engineer for complete facility equipment and data system upgrades.  Selected subcontractors for equipment and data system development and managed three phases of retrofit.  Retrofit cost $2 million.

Performed audits of state-wide inspection programs for Colorado, Connecticut, Alaska, Missouri.  Evaluated programs versus vendor contractual requirements, federal and state regulations, and best engineering practices.

## *Professional Organizations*

• Member US EPA Federal Advisory Committee Act (FACA) Remote OBDII Protocol Technical Subgroup
• Member the Society of Automotive Engineers
• Member of the American Chemical Society

REVECORP INC.

## Other Experience

- Provided expert witness services related to vehicle inspection program project failures, emissions testing equipment product defect cases and related to emissions testing fraud.
- "A Device and Method for Verifying the Operation of a Chassis Dynamometer," U.S. Patent No. 6,601,441 B1, issued August 5, 2003. Inventors: G. Torgerson and M. St. Denis, Assignee: Sierra Research Inc.
- "OBDII Readiness Status Notification Device," U.S. Patent 7,012,512 B2 issued March 14, 2006. Inventor: M. St. Denis, Assignee: St. Denis Innovations LLC.
- Guest lecturer during period 1999-2002 at University of Michigan summer courses in automotive emissions control.

## Publications and Presentations

"Evaporative Emissions Durability Testing", CRC Project E-91, Prepared for the Coordinating Research Council, August 6, 2012 (Co-Authors Joe Roeschen, Revecorp; Keith Vertin, Gerard Glinsky, Jan Mickelsen, SGS Environmental Testing Corporation; Craig Morgan, Chrysler Corporation Chelsea Proving Grounds)

"Evaporative Emissions Reductions Using Remote Sensing," presented at I/M Solutions Conference, Sacramento, California, May 20-24, 2012.

"Changes to the Delivery of I/M Programs as OBDII Matures" Presented at the 22nd CRC Real World Vehicle Emissions Workshop, San Diego, California, March 25-28, 2012.

"Evaporative Emissions Reductions Using Remote Sensing," Presented at the 22nd CRC Real World Vehicle Emissions Workshop, San Diego, California, March 25-28, 2012.

"New Jersey Interim Report: Review of Current I/M Program and NGcontract Options", Draft Report, New Jersey Motor Vehicle Commission, December 1, 2011.

"Mentoring for Potential New I/M Non-attainment Areas" Presented at the 26th Clean Air Conference, Estes Park, Colorado, September 27, 2010 (co-author Jim Lindner, ERG).

"Evaluation of the District of Columbia Vehicle Inspection Program Options," prepared for the District of Columbia Department of the Environment, December 2008.

"Survey Results: What States Think About Future OBD", presented by Richard Joy at the 24th Annual Mobile Sources/Clean Air Conference, Breckenridge, Colorado, September 22-25, 2008 (performed study, analysis and generated results).

"Review of: Evaluation of the 2003 – 2004 Phoenix I/M Program Using Random Sample Data, Draft Report to the Arizona Department of Environmental Quality, July

REVECORP INC.

2007", prepared in conjunction with Gordon-Darby Inc. for the Arizona Department of Environmental Quality, November 2007.

"District of Columbia South West Vehicle Inspection Station Vehicle Emissions Test Equipment Audit Procedures," prepared for the District of Columbia Department of the Environment, September 2007.

"Manager's Perspective on the DC Vehicle Inspection Program Improvements," presented at the 23rd Annual Mobile Sources/Clean Air Conference, Breckenridge, Colorado, September 24-27, 2007.

Series of user training videos for the use of the Gordon-Darby TIMSPlus vehicle information management system by the state of Texas program staff.  Prepared for Gordon-Darby, September 2007.

"SEM-04-007 (Quebec Automobiles), Data for the Factual Record," Sierra Research Report No. SR2007-02-02, prepared for the Commission for Environmental Cooperation of North America, February 28, 2007.

"Municipality of Anchorage I/M Program Evaluation Study," Sierra Research Report No. SR2007-01-01, prepared for the Municipality of Anchorage, January 2007.

"Municipality of Anchorage Cold Weather Program Evaluation Study," presented at the 22nd Annual Mobile Sources/Clean Air Conference, Keystone, Colorado, September 25-28, 2006.

"Evaluation of Clayton TEC1500 Chassis Dynamometers," Sierra Research Report No. SR2006-06-02, June 20, 2006 for Sidley Austin LLP.

"United States Motor Vehicle Inspection and Maintenance Programs," Sierra Research Report No. SR2005-12-03, December 2005.

"OBD Support Issues: Tools Available for Improvement in I/M Programs and Recent Developments," presented at the 21st Annual Mobile Sources/Clean Air Conference, Keystone, Colorado, September 26-29, 2005.

"Municipality of Anchorage I/M Program Evaluation Design," Sierra Research Report No. SR2005-07-05, prepared for the Municipality of Anchorage, July 2005.

"Comparison of New Jersey OBDII I/M Results to Other States," Sierra Research Report No. SR2005-04-01, prepared for New Jersey Motor Vehicle Services, April 20, 2005.

"Audit of ESP Missouri's Performance in the Gateway Clean Air Program," Sierra Research Report No. SR2005-01-02, prepared for Environmental Systems Products Holdings, Inc., January 27, 2005.

"Review of Light-Duty Diesel and Heavy-Duty Diesel/Gasoline Inspection Programs," Journal of the Air and Waste Management Association, Volume 55, December 2005, pages 1876-1884.

REVECORP INC.

"Analysis and Comparison of OBDII Data From Five IM Programs," presented at the 20th Annual Mobile Sources/Clean Air Conference, Copper Mountain, Colorado, October 5-8, 2004.

"Development of the IM147: An Alternative Inspection/Maintenance Mass-Emission Transient Test to Address Vehicle Preconditioning Concerns," Journal of the Air and Waste Management Association, Volume 54, March 2004, pages 269-285.

"Draft Audit Report on Connecticut Vehicle Emissions Testing Programs," Prepared by Sierra Research in conjunction with Gordon Darby for Connecticut Department of Motor Vehicles, May 20, 2004.

"2002 Alaska I/M Program Audit," Sierra Research Report No. 02-09-01, prepared for Alaska Department of Environmental Conservation, September 11, 2002.

"Diesel Emissions Overview," presented at the 18th Annual Mobile Sources/Clean Air Conference, Breckenridge, Colorado, September 10-13, 2002.

"Report on Equipment Testing for CDPHE of the Colorado Centralized Test Lanes," Sierra Research Report No. SR02-09-05, prepared for the Colorado Department of Public Health and the Environment," September 2002.

"Hands-On Audit Training for Mass- and Concentration-Based IM Programs," Sierra Research Report No. SR02-02-02, prepared for U.S. Environmental Protection Agency Certification and Compliance Division, February 2002.

"New Jersey Enhanced I/M Program Audit Procedures Manual," prepared for New Jersey Department of Environmental Protection, February 15, 2002.

"Technical Evaluation of IM Program Dynamometer Specifications and Guidance," Sierra Research Report No. SR01-12-01, prepared for the U.S. Environmental Protection Agency, December 2001.

"Status of Vehicle Inspection Programs for Light-Duty Diesel Vehicles and Heavy-Duty Gasoline and Diesel Vehicles," Sierra Research Report No. SR01-11-01, prepared for U.S. Environmental Protection Agency, Certification and Compliance Division, November 6, 2001.

"QA/QC Procedures Based on Program Data and Statistical Process Control Methods for I/M Programs," Sierra Research Report No. SR01-10-02, prepared for U.S. Environmental Protection Agency, Certification and Compliance Division under Contract No. 68-C7-0051, Work Assignment No. 3-03, October 30, 2001.

"CT2001-D Analyzer System Specifications for Vehicle Emission Test Equipment to Be Used in Decentralized Test-Only and Test-and-Repair Inspection Facilities," Draft Version 1.0, prepared for Connecticut Department of Motor Vehicles, October 29, 2001.

"Technical and Functional Specification for a Light-Duty Vehicle Emissions Measuring System," Revised Draft, prepared for New South Wales Roads and Traffic Authority, May 2001.

REVECORP INC.

"Reductions in Human Benzene Exposure in the California South Coast Air Basin," Atmospheric Environment, 35 (2001) pages 1069-1077.  (Co-Authors S.A. Fruin, A.M. Winer (UCLA), S.D. Colome, F.W. Lurmann (Sonoma Technology)).

"Acceptance Testing of the Vancouver B.C. AirCare II IM240 Emissions Inspection System," prepared for Pacific Vehicle Testing Technologies, Ltd., February 2001.

"Massachusetts Enhanced Safety and Emission Inspection Program, Covert Vehicle and Visual Auditing Program Operations Manual," Sierra Research Report No. 00-11-01, prepared for Keating Technologies, Inc., November 2000.

"I/M Acceptance Testing and Auditing," presented at the 16th Annual Mobile Sources/Clean Air Conference, Snowmass, Colorado, September 19-22, 2000.

"QA/QC for Transient Mass Emissions testing in I/M Programs," presented at the 16th Annual Mobile Sources/Clean Air Conference, Snowmass, Colorado, September 19-22, 2000.

"U.S. EPA Steady State and Transient Testing Equipment Audit Guidance," prepared for U.S. Environmental Protection Agency under Contract No. 68-C7-0051, Work Assignment No. 2-05, September 15, 2000, available at: http://www.epa.gov/otaq/regs/im/auditgd.pdf and http://www.epa.gov/otaq/regs/im/auditfrm.pdf.

"Detailed Comments on Revised Documentation for Vehicle Emission Program," prepared for New South Wales Roads and Traffic Authority, May 2000.

"New Jersey Enhanced I/M program Audit Procedures Manual," Sierra Research Report No. SR00-04-02, prepared for Parsons Brinckerhoff - FG, Inc., April 2000.

"New Jersey Enhanced I/M Program PIF and CIF Audit Plan," Sierra Research Report No. SR00-04-01, prepared for Parsons Brinckerhoff - FG, Inc., April 2000.

"Establishment, Operation And Management of a Motor Vehicle Emission Testing Network: Test Specifications," Revised Draft, prepared for New South Wales Roads and Traffic Authority, March 2000.

 "Determination of the Emissions Credit and Average Test Times for IM147 Testing," Sierra Research Report No. SR99-10-02, prepared for the U.S. Environmental Protection Agency, Office of Mobile Sources, October 11, 1999.

"I/M of the Future," 15th Annual Mobile Sources/Clean Air Conference, Snowmass, Colorado, September 14-17, 1999.

"Measures to Improve the Reliability and Accuracy of Vehicle Inspection and Maintenance (I/M) Test Program Results," Ninth CRC On-Road Vehicle Emissions Workshop, April 19-21, 1999.

"VIN-Based Lookup Table Pilot Study," Sierra Research Report No. SR98-11-01, prepared for the U.S. Environmental Protection Agency, November 1998.

"Relative Effectiveness of Remote Sensing, Low Emitter Profiling and Model Year Exemptions for I&M Clean Screening," presented at the 14th Annual Mobile Sources/Clean Air Conference, Breckenridge, Colorado, September 15-18, 1998.

"Conceptual Overview of Air Pollution Control," presented at the Automotive Seminar on Emission Management and Service Technology, ITE Ang Mo Kio, Singapore, September 16, 1997.

"Report on Vehicle Emissions Reduction Technologies," presented at the Tri-Lateral Workshop on Diesel Vehicle Emission Control conducted by the Environmental Protection Department, Hong Kong, China, September 8-9, 1997.

"Cost Effectiveness of Various Mobile Source Emission Reduction Control Programs," presented at the China International Automotive Technology and Vehicle Emission Control Exhibition & Symposium, Beijing, China, May 2-4, 1997 (co-author Joe Doty).

"Politics Versus Science:  The California Smog Check Program as a Case Study," invited seminar, UCLA School of Public Health, April 24, 1997.

"Comparison of Vehicle Emissions Rates in Centralized and Decentralized Emissions Testing Programs," Presented at the Seventh CRC-APRAC On-Road Vehicle Emissions Workshop, April 9-11, 1997.

"Modeling of Heavy Duty Diesel Vehicle Replacement Programs," Paper No. 96-RA108A.03, Presented at the 89th Annual Meeting of the Air and Waste Management Association, Nashville, Tennessee, June 23-28, 1996.

"Modeling of a Heavy Duty Vehicle Replacement Program:  Modeling Issues and Program Effectiveness," Presented at the Sixth CRC-APRAC On-Road Vehicle Emissions Workshop, March 18-20, 1996.

"Evaluation of Heavy Duty Diesel Emissions Modeling in the California FIP," Paper No. 95-FA154.03, Presented at the 88th Annual Meeting of the Air and Waste Management Association, San Antonio, Texas, June 18-23, 1995.

"Review of the Heavy Duty Diesel Vehicle Replacement Program in the California SIP and Vehicle Replacement Program Emissions Reduction Analysis," Final report to the California Trucking Association, American Trucking Association Foundation, and the Western Highway Institute, May 10, 1995.

"Catalytic Converter Replacement:  Screening Criteria and Cost Effectiveness," Presented at the Fifth CRC-APRAC Vehicle Emissions Modeling Workshop, April 3-5, 1995.

"The Federal and State Implementation Plans for California and Modeling of Alternative Emissions Reduction Measures," Presented to the American Trucking Association, Alternative Fuels Task Force, at the American Trucking Association Annual Meeting, October 16, 1994.

"Review of Heavy Duty Diesel Vehicle Emissions Modeling in the USEPA Federal Implementation Plan (FIP) for California and Modeling of Alternative Emission

REVECORP INC.

Reduction Strategies," Final report to the California Trucking Association, American Trucking Association Foundation, and the Western Highway Institute, also submitted to the USEPA Air Docket No. A-94-09, August 1994.

"Vehicle Emission Reduction Studies, Part 3:  Catalytic Converter Testing and Replacement," Final report to the Bureau of Automotive Repair, report number R844-F, December 1994 (co-author Antoine Assioun).

"Vehicle Emission Reduction Studies, Part 2:  Purchasing and Scrapping High Emitters (Phase One)," Final report to the Bureau of Automotive Repair, report number R843-F, December 1994 (co-author Antoine Assioun).

"Vehicle Emission Reduction Studies, Part 1:  Waivered Vehicles" Report to the Bureau of Automotive Repair, report number R842, July 1994 (co-author Antoine Assioun).

"Evaluation of Two New Vehicle Emissions Models and Prediction of On-Road Emissions in the SoCAB," presented at the CRC-APRAC Vehicle Emissions Modeling Workshop, March 16-18, 1994.

"Emissions Reduction from Old Vehicle Scrapping:  Modeling Versus Screening and Scrapping," Presented at the CRC-APRAC Vehicle Emissions Modeling Workshop, March 16-18, 1994 (co-authors Antoine Assioun, Tom Peters).

"Effects of In-Use Driving Conditions and Vehicle/Engine Operating Parameters on 'Off-Cycle' Emissions:  Comparison with Federal Test Procedure Conditions," Journal of the Air and Waste Management Association, January 1994.

"Comparison of Driving Conditions and the Frequency of Rich Open Loop Operation for the South Coast Air Basin and The Federal Test Procedure with a 1991 FFV Ford Taurus:  Implications for Mobile Source Emissions Models," Doctoral dissertation, University of California Los Angeles, December 1993.

"On-Board Vehicle Operating Parameter Measurements and Vehicle Emissions Modeling," Final report, South Coast Air Quality Management District, Contract number S-C92101 and S-C92029, November 1993 (co-authors Arthur M. Winer, Pablo Cicero-Fernandez).

"Prediction of On-Road Emissions and Comparison of Modeled On-Road Emissions to Federal Test Procedure Emissions," Presented at the International Conference on The Emission Inventory: Perceptions and Reality, October 1993.

 "On-Road Analysis of Potential Open Loop Operation with Current On-Board Computer Technology," Presented at the CRC-APRAC Vehicle Emissions Modeling Workshop, December 1-3, 1992.

"Human Exposure Assessment Modeling of Benzene and Formaldehyde in California's South Coast air Basin using the REHEX Model," Invited seminar presented to the Department of Chemistry, University of the Pacific, March 10, 1992.

"On-Board Emissions Measurements," Presented at the CRC-APRAC Vehicle Emissions Modeling Workshop, September 16-18, 1991 (co-authors Jim Butler, Gerry Jesion, Arthur Winer).

"Development of a Compact and Portable Differential Optical Absorption Spectrometer for In-Situ Measurement of Indoor Air Pollutants," Environmental Science and Engineering Program Technical Report #91-09, Submitted to the U.S. EPA, December 1991.

"Modeling Benzene and Formaldehyde Population Exposure in California's South Coast Air Basin," Presented at the Workshop on Measuring, Understanding and Predicting Exposures in the 21st Century, November 18-21, 1992 (co-authors Fred Lurmann, Arthur M. Winer, Steve Colome).

"REHEX Model Estimates of Population Exposure to Benzene in California's South Coast Air Basin," Presented at the Workshop on General Population Exposures to Gasoline, December 12-14, 1990 (co-authors Fred Lurmann, Arthur M. Winer, Steve Colome).

"Products of Low Energy Electron Impact Induced Excited State Reactions of Carbon Monoxide and of Nitric Oxide Adsorbed on a Gold Surface," Masters thesis, University of the Pacific, June 1989.

May 10, 1966                B. C. FORTNEY                3,250,723
SMOKE GENERATED METHOD AND MEANS

Filed Sept. 6, 1962                            3 Sheets—Sheet 1



FIG. I

FIG. 2

FIG. 3

INVENTOR.
BLAND C. FORTNEY
BY
*John K. Widdowson*
ATTORNEY

REDLINE EXHIBIT 1041
Redline v. Star
Trial IPR2013-00106
p.1041-1

May 10, 1966                 B. C. FORTNEY                    3,250,723
                        SMOKE GENERATED METHOD AND MEANS

Filed Sept. 6, 1962                                  3 Sheets—Sheet 2



FIG. 4

FIG. 5

FIG. 6

FIG. 7

FIG. 8

FIG. 9

INVENTOR.
BLAND C. FORTNEY
BY
*John H. Widdowson*
ATTORNEY

May 10, 1966                    B. C. FORTNEY                    3,250,723

SMOKE GENERATED METHOD AND MEANS

Filed Sept. 6, 1962                                        3 Sheets—Sheet 3



**FIG. 10**

INVENTOR.
BLAND C. FORTNEY

BY
*John H. Widdowson*
ATTORNEY

# United States Patent Office

**3,250,723**
Patented May 10, 1966

1

**3,250,723**
**SMOKE GENERATED METHOD AND MEANS**
Bland C. Fortney, 715 Ruth, Rte. 5, Wichita, Kans.
Filed Sept. 6, 1962, Ser. No. 221,854
11 Claims. (Cl. 252—305)

This invention relates to smoke generating method and means. In a more specific aspect the invention relates to method and means for converting a fuel to smoke. In a still further aspect the invention relates to new method and means for converting a fuel to smoke and for directing the produced smoke to a sign or the like. In another aspect, the invention relates to a new portable construction for smoke generating means having means for producing smoke and directing same to the desired location.

Various methods and means for producing smoke are known to the art. In many instances the prior art methods and means can be utilized only in fixed locations which materially limits utilization of the apparatus. Also, some of the prior art methods and apparatus are quite complicated and difficult to practice or operate and are quite expensive and therefore have not gained wide acceptance by the art.

The method and means of producing smoke of the invention overcomes the many disadvantages of the prior art constructions and is relatively simple structurally and functionally. The new portable method and means of producing smoke of the invention are easily installed and removed, making relatively frequent changes from location to location feasible. The means for converting a fuel to smoke includes a fuel receiving member for combustion of fuel thereon and heating means which are operatively positioned relative to the fuel receiving member and are operable to heat the fuel receiving member. In use the fuel is received by the fuel receiving member and heated to convert the fuel to smoke.

The means for generating smoke of the invention includes spray means having means operatively connected thereto to provide a gas under pressure thereto. Fuel storage means are operatively connected to the spray means to provide smoke producing fuel thereto. Converter means are positioned at the outlet of the spray means to receive a fuel and gas mixture therefrom. The converter means has heating means operatively positioned relative thereto and operable to burn the fuel and produce smoke. Smoke accumulator means are desirably provided and positioned to receive smoke from the converter means, the accumulator means having outlet means therewith to discharge smoke therefrom. Blower means are mounted relative to the converter means to force smoke from the converter means through the accumulator means and in to the outlet means.

The method of producing smoke of the invention includes the steps of heating a converter element or member to a temperature sufficient to cause a fuel to produce smoke and spraying a smoke-producing fuel onto the converter. A stream of air is directed by the converter to cause movement of the smoke from the converter and delivery of same to the desired location.

Accordingly, it is an object of the invention to provide a new method and means for converting a fuel to smoke.

Another object of the invention is to provide new method and means for converting a smoke-producing fuel into smoke and for transferring the smoke to the desired location.

Another object of the invention is to provide new portable smoke generating means.

A further object of the invention is to provide new smoke generating method and means wherein the smoke-producing fuel is siphoned from fuel storage means to means to convert the fuel to smoke.

2

Another object of the invention is to provide new smoke producing method and means wherein the fuel is siphoned from storage means and discharged onto means to convert the fuel to a smoke.

A still further object of the invention is to provide new and relatively inexpensive smoke-producing method and means.

A further object of the invention is to provide a relatively simple and light-weight portable smoke-producing apparatus for use on signs and the like.

Various other objects, advantages and features of the invention will become apparent to those skilled in the art from the following description taken in connection with the accompanying drawings, in which:

FIG. 1 is a longitudinal vertical cross section view of a preferred specific embodiment of the smoke generator means of the invention taken along the line 1—1 of FIG. 2.

FIG. 2 is a longitudinal cross section view taken through the embodiment of the invention shown in FIG. 1 and taken along the line 2—2 of FIG. 1.

FIG. 3 is a longitudinal cross section view through a preferred specific embodiment of a converter for use with the apparatus of FIGS. 1 and 2.

FIG. 4 is a transverse cross section view taken along the line 4—4 of FIGS. 1 and 2.

FIG. 5 is a partial longitudinal cross section view taken along the line 5—5 of FIG. 2.

FIG. 6 is a partial cross section view illustrating another preferred specific embodiment of the smoke generating means of the invention.

FIG. 7 is an enlarged partial cross section view illustrating the preferred mounting of the top of the housing for the smoke generator of the invention.

FIG. 8 is a top plan view illustrating another preferred specific embodiment of the converter for the apparatus of the invention.

FIG. 9 is an end view of the converter means of FIG. 8.

FIG. 10 is a schematic wiring diagram with legends showing connected the various electrical elements of the smoke generator of the drawings.

The following is a discussion and description of preferred specific embodiments of the new method and means for generating smoke of the invention, such being made with reference to the drawings whereon the same reference numerals are used to indicate the same or similar parts and/or structure. It is to be understood that such discussion and the description are not to unduly limit the the scope of the invention.

Referring now to the drawings in detail and to FIGS. 1–5 and 7 in particular, a preferred specific embodiment of the portable smoke generator of the invention is shown generally at 10 and desirably includes an elongated cabinet having a bottom 12, two sides 14 and 16, two ends 18 and 20 and a top 22 removably mounted on the sides. Preferably the top 22 is mounted on side 14 of the cabinet by a piano hinge 24 in the manner illustrated in FIG. 7 of the drawings. For this purpose the top 22 can be provided with depending flanges 26, as shown in FIG. 1, which extend entirely around the top 22 and snugly engage the sides 14 and 16 and the ends 18 and 20 of the cabinet. The cabinet can be made of suitable metal, plastics, wood, etc. Bottom 12 is preferably made of wood or mounted on shock absorbing means to eliminate vibration of the cabinet.

In the preferred specific embodiment illustrated in the drawings the device is electrically operated and suitable electric inlet means, such as a socket 30, is connected to the end 18 of the cabinet and is connectible in any suitable manner to a source of electric current. A common timing switch 32 is mounted on the side 14 of the cabinet and is desirably positioned adjacent the end 18 thereof near

3,250,723

the electrical inlet means 30. A conduit 34 receives the electrical wiring (not shown) from the electrical inlet means 30 leading to the timing switch 32.

Suitable fan or blower means are provided to move air through the cabinet. For this purpose a squirrel cage type blower fan 36 is preferably provided and mounted on the side 16 of the cabinet as shown in FIGS. 4 and 5. The blower fan 36 has an air inlet 38 which projects through side 16 of the housing or cabinet to receive air from the atmosphere and an outlet 40 which is directed toward the end 20 of the cabinet. The blower fan 36 has an electric motor 42 which powers the blower. A blower fan switch 44 is mounted on the end 18 of the cabinet and preferably has a switch operator 46 which is operable to regulate the speed of operation of the blower fan at more than one speed. Movement of 50 to 200 cubic feet per minute of air through the blower has been found satisfactory. Electrical conductors 48 are connected in one end portion to the timing switch 32 and connected in the other end portion to a fuse or fusestat 50. Electrical conductors 52 connects the fuse or fuses at 50 to the blower switch 44 and conductors 54 connect the fuse or fusestat 50 and blower switch 44 to the motor 42 of the blower 36.

A source of gas under pressure is provided, preferably electrically operated air compressor 60 which is mounted on the bottom 12 of the cabinet and desirably positioned adjacent the end 18 thereof as shown in FIGS. 2 and 4. Conductors 62 connect the fuse or fusestat 50 to the fuse of fusestat 64 and conductors 66 connect the fuse 64 to a socket 68 mounted on the side 16 of the cabinet. The motor 70 of the compressor 60 is connected by a cord 72 to the socket 68 to thereby electrically connect the compressor to the switch 32. An air storage tank 74 is mounted on the bottom 12 of the cabinet and a compressor conduit 76 (FIG. 2) is operatively connected in the end portion to the outlet of the compressor 60 and to the tank 74 so that operation of compressor 60 supplies air under pressure to the tank 74. Preferably the conduit 76 (FIG. 1) is connected to one opening of a T-shaped coupling 78 which in turn is secured to the tank 74 and in fluid communication therewith through another opening of the conduit. An air gauge 80 is desirably mounted on the other opening of the coupling 78 to indicate air pressure therein as shown in FIG. 1.

A wall 82 is preferably positioned within the cabinet and extends between and is secured to the sides 14 and 16 and extends from the top 22 when closed to the lower portion of the cabinet and desirably terminates in spaced relation to the bottom 12 of the cabinet. A plate 84 is provided and is connected in one edge to the lower edge of the wall 82 and has the opposite edge positioned on the bottom 12 of the cabinet at the end 20 thereof and the plate 84 preferably extends across the cabinet from one side 14 to the other side 16 thereof. The wall 82 is positioned at an intermediate portion of the cabinet and defines with the end 20, the walls 14 and 16, top 22 and plate 84 a smoke accumulator compartment.

As shown in FIGS. 1 and 2, the wall 82 preferably has a centrally located opening 86 therethrough and a hood 88 is positioned within the accumulator compartment and has one end portion 89 thereof mounted on the center portion of the wall 82 in communication with the opening 86 therein. The other end portion 90 of the hood 88 desirably faces downwardly toward the plate 84 and is positioned in spaced relation thereto. The lower end portion 90 of the hood 88 is desirably relatively large in size in comparison with the end portion 89 to facilitate flow of smoke therethrough.

Suitable support means, such as the angle iron 92, is provided and is secured in its end portions to the sides 14 and 16 of the cabinet and is desirably positioned adjacent the wall 82 and between the wall 82 and the end 18 of the cabinet. Gun support means are provided and in the preferred embodiment illustrated in FIGS. 1 and 2

such is a piece of strap iron 94 having end portions bolted or otherwise suitably secured to the angle iron 92 at an intermediate portion thereof and having the center portion thereof projecting toward the end 18 of the cabinet. A common spray gun 96 is mounted on the gun support or strap iron 94 with the nozzle or spray end portion 98 of the spray gun pointed at the hood 88 through the opening 86 in the wall 82. The spray gun 96 is desirably a common type adapted to receive a gas such as air under pressure, in one portion thereof and pass same through the gun with fuel being received by another portion of the gun and siphoned thereto as a result of passage of air therethrough. Spray guns of this type are known to the art and any suitable type or construction can be used.

An air hose 100, as illustrated in FIG. 2, is connected in its end portions to an air inlet in the handle of the spray gun 96 and to the air storage tank 74. Preferably a pressure relief valve 102 is located at the outlet of the tank 74 in the hose 100 and is operable to open at a preset pressure of air in the storage tank to provide compressed air therefrom to the spray gun at a substantially constant pressure. A pressure of approximately 20–25 pounds per square inch has been found satisfactory.

A fuel storage tank 104, FIG. 1, is provided and is desirably positioned beneath the spray gun 96 and preferably is provided with removable cap 105 on the fuel inlet. An immersible electric heater element 106 is preferably provided and connected by cord 108 to a source of electric power, such as socket 68. The heater 106 is desirable for outdoor installations and operates to maintain the temperature of the fuel in tank 104 above the freezing temperature of the fuel. A hose or conduit 110 connects the fuel storage tank 104 to a forward portion of the spray gun 96 to transfer fuel 107 from the storage tank to the spray gun.

A relatively short and preferably channel-shaped converter mounting bracket 112 is desirably provided and connected to the intermediate portion of the angle iron 92 in any suitable manner, such as by welding, and is desirably positioned adjacent the opening 86 in the wall 82.

Means are provided adjacent the outlet end 98 of the spray gun 96 to convert a smoke-producing fuel to smoke. For this purpose, a fuel converter 120 is, as shown in detail in FIG. 3, provided and preferably is cylindrical in shape and includes a tubular or cylindrical metallic outer housing 124 and a tubular inner metallic core 126, the core 126 preferaby being longer than the outer housing 124 and projecting from both ends thereof as best illustrated in FIGS. 1 and 3. The core 126 is also substantially smaller in diameter than the outer housing 124 and is in spaced relation to the outer housing and substantially coaxial therewith. The fuel converter 120 includes a body portion 128 which is preferably cast in place and is positioned between and extends between the housing 124 and the core 126. Body portion 128 is preferably made of aluminum or an aluminum compound due to the desirable heat properties of aluminum.

Heating means are operatively positioned relative to the core or fuel-receiving portion of the converter to heat same. Preferably two elongated, bar-shaped electrical heating elements 130 are provided and positioned in spaced relation within the body portion 128 of the converter 120 and desirably extend substantially the entire length thereof. The electrical heating elements or bars 130 are connected by electrical conductors 132 to a suitable source of current, e.g. socket 68, to heat the converter core to a relatively high temperature, preferably in excess of 400° F. Suitable plugs 134 can be provided to close the end portion of the housing at the ends of the heating elements 130.

Preferably one end portion of the core 126 of the converter 120 is positioned beneath the converter mounting bracket 112 and in closely spaced relation to the spray end 98 of the spray gun 96 to receive an air-fuel mixture

3,250,723

therefrom. A U-bolt 136 is positioned around the core 126 of the converter 120 and has the end portions thereof projecting through the center portion of the converter mounting bracket 112 and receives nuts 138 to secure the converter in position. Preferably the end portion 89 of the hood 88 in the opening 86 in the wall 82 is larger in size than the diameter of the converter and the converter is positioned substantially within the hood 88 with an end portion thereof projecting toward the spray gun as best illustrated in FIG. 1 of the drawings. Thus, an air passage is provided around the converter 120 between same and the hood 88 and by spacing the end portion of the core 126 from the spray end 98 of the spray gun 96 an air passage is provided therethrough and another thereacross whereby in use operation of the squirrel cage fan or blower 36 forces air through the core 126 and around the converter 120 and through the hood 88.

Desirably suitable means are provided to determine the temperature of the converter 120. For this purpose a common heat sensing element 140, FIG. 1, is mounted in the body portion 128 of the converter and is connected by a conductor 142 to a heat gauge 144 (FIGS. 2 and 5). The gauge 144 is desirably mounted on the wall 82 adjacent the side 16 of the cabinet to be readily visible when top 22 is open.

A common percentage input control mechanism 150 (FIGS. 1 and 2) is mounted on the side 14 of the cabinet adjacent the timer switch 32 and is electrically connected to the timing switch by a conduit 152 to receive electric current therefrom. Preferably the percentage input control mechanism 150 is adjustable to provide electric current to the converter 120 at rates variable from 1 to 100 percent of the operating cycle to provide a suitable average converter operating temperature. The input control mechanism 150 in use alternately completes and breaks the electrical circuit supplying power to the heater elements in converter 120 to produce a suitable average temperature. For example, if the percentage input control mechanism is set at 50 percent, electrical current will be supplied to the converter heater 50 percent of the time while the generator is in operation. The input time is broken up into suitable intervals. The mechanism 150 is connected by an electrical conductor in conduit 154 to a fusestat or fuse box 156 which in turn is electrically connected to a socket 158 by a conduit 160 and the wires 132 leading to the heating elements 130 and the converter 120 are connected to a wall plug which is inserted into the socket 158. Fuse box 156 and socket 158 can be mounted on side 14 of the cabinet.

Smoke produced by the converter 120 is discharged from the lower or right-hand end portion of the converter as shown in FIG. 1 into the hood 88 and is transferred by passage of air from blower fan 36 through the lower end 90 of the hood 88 into the smoke accumulator compartment. Means are provided to receive and transfer the smoke from the accumulator compartment to the desired location. For this purpose two smoke outlet pipes 170 and 172 (FIG. 2) are provided and mounted on end 20 of the cabinet and each have one end portion thereof in communication with an upper portion of the smoke accumulator compartment of the cabinet and the other end portions thereof are connectible to signs, etc. (not shown).

If no combustion or burning of the fuel takes place within the converter or if such is incomplete a portion of the liquid fuel discharged into the converter by the spray gun 96 drains into the smoke accumulator compartment and onto the plate 84. Also, some condensation of fuel may take place within the smoke accumulator compartment or the hood 88 and the resulting condensation is discharged onto the plate 84. In order to prevent accumulation of this smoke producing fuel in the smoke accumulator compartment a conduit 174 is connected in one end portion to the upper portion of the fuel storage tank 104 and in the other end portion to a drain 176 on plate 84 in the smoke accumulator compartment (FIG. 1) and

the liquid or fuel received by the smoke accumulator compartment flows along the inclined surface of plate 84 to the drain 176 and through tube or conduit 174 back to the fuel storage tank 104 for further use.

Use of the apparatus described hereinbefore and when practicing the method of the invention, the converter 120 is preheated to a temperature sufficient to cause burning, combustion or conversion of the smoke-producing fuel 107 and preferably the converter 120 is heated to a temperature of approximately 400° to 500° F. This temperature is sufficient to heat most smoke-producing fuels and preferably a fuel produced by the Texaco Company and sold as No. 537 fuel is used, such having a relatively small residue product and being desirable for this purpose. Other suitable fuels can, of course, be used including fuel designed and constructed to produce colored smokes other than a black or gray color. The converter is preferably heated prior to starting the other apparatus. The timing switch 32 closes to provide current to conductors 48 a predetermined time interval after providing current to the converter heating elements such as five minutes. The air compressor 60 then commences operation and provides compressed air through the hose or conduit 76 to the air storage tank 74. The valve 102 is preferably regulated to permit passage of air therefrom through hose 100 to the spray gun 96 at approximately 22 pounds per square inch pressure.

Air under pressure passes through the spray gun 96 and is discharged through the nozzle or spray end portion 98 thereof and passage of air through the spray gun siphons fuel from tank 104 through conduit or tube 110 to the spray gun 96 for mixing therein with the air under pressure and a mixture of air and fuel is discharged from the spray gun onto a heated surface of the converter, preferably the inner surface of the tube or core 126, and passage of the fuel thereacross causes heating of the fuel and conversion of same into smoke. The blower fan 36 is started at the same time as the compressor and continuously provides from 80 to 160 cubic feet per minute of air from the atmosphere through the cabinet and through the converter and around same and in the passageway between the converter and the hood 88. This passage of air causes continuous transfer of smoke from the converter 120 into the hood 88 and from same into the smoke accumulator compartment and from the accumulator compartment through the outlet means 170 and 172 to a sign or the like. If desired, suitable interrupting means (not shown) can be connected to the smoke outlet means 170 and 172 to provide surges of smoke therethrough for discharge of smoke at the outlet end thereof.

By siphoning fuel 107 from fuel storage tank 104 rather than providing same under pressure to the spray gun it has been found that proper conversion of the fuel to a smoke occurs instead of a flash ignition of the fuel which would result in imperfect production of smoke and inefficient utilization of the fuel. A slow burning or smolder effect is obtained as a result of the method and structure of the invention. The siphoning of the fuel can be referred to as reversed carburetion.

Another preferred specific embodiment of the converter means of the invention is illustrated in FIGS. 8 and 9 of the drawings and this embodiment is quite desirable for production of large volumes of smoke with a minimum increase in equipment required. In this embodiment, the converter is shown generally at 200 and includes an elongated outer metallic housing 202 and a body portion 204 which is preferably a cast aluminum material. A plurality of cores or tubular members 206 are provided in the body portion 204 and are preferably of sufficient length to project from both end portions thereof as best illustrated in FIG. 8 of the drawings. Desirably the axes of the cores 206 are substantially parallel to each other and the cores are in spaced relation as illustrated in FIG. 9. One end portion of the cores 206

7

is desirably located adjacent to and in spaced relation to a plurality of spray guns 208 and receive a spray of fuel and compressed air in the manner described hereinbefore in connection with the spray gun 96.

A plurality of heating elements 210 are mounted in the body portion 204 of the converter 200 and are connected by electrical conductors 212 to a source of electric power to thereby heat the converter and cause conversion of the fuel to smoke when received by the cores 206. The heating elements 210 are desirably positioned in spaced relation to each other and to cores 206.

In use the converter 200 is mounted in a hood or the like similar to that shown at 88 and receives a fuel-air mixture from the spray guns 208 and converts the fuel to smoke. Operation of a blower or the like similar to that shown at 36 transfers the generated smoke to the desired location.

Another preferred specific embodiment of the invention is illustrated in FIG. 6 of the drawings. In this embodiment of the invention a smoke accumulator compartment is defined by a side wall 220, an end wall 222, an intermediate wall 224, a plate 226 mounted on the end 222 and the bottom 228 of the cabinet and another wall (not shown) opposite from the wall 220. The smoke accumulator compartment of FIG. 6 is the same or similar in construction to that of FIGS. 1–5 of the drawings. In this embodiment a support, such as the angle iron 230 is mounted on the cabinet within the smoke accumulator compartment, such as by connecting same to the side wall 220 and the wall opposite therefrom. A gun support 232 is mounted on the angle iron 230 in any suitable manner, such as by bolts 234. Gun support 232 can be the same or similar in construction to that shown at 94 and described hereinabove.

The spray gun 236 is connected to the gun support 232 and supported thereby with the spray end or nozzle 238 thereof directed toward the end 222 of the housing.

A hose 240 connects the handle portion of the gun 236 to a source of air or gas under pressure and a hose or conduit 242 connects the gun 236 to a fuel storage means, such preferably being positioned beneath the gun 236 to be siphoned thereinto by passage of the compressed air or gas therethrough.

A converter mounting bracket 250 is preferably provided and desirably has a relatively flat center portion 252 and inclined edge or leg portions 254 and 256 which are connected to the plate 236 and end 222, respectively, in any suitable manner, such as by welding, bolt means, etc. The center portion 252 of the converter support is preferably inclined relative to the end 222 and bottom 228 of the housing or cabinet.

A relatively flat and generally plate-shaped converter 260 is provided and has the lower surface secured to the center portion 252 of the converter support 250 and can be mounted thereon by bolt means, welding, or other suitable means. The flat upper surface 262 of the converter 260 is positioned adjacent the spray end or nozzle 238 of the spray gun 236 to receive smoke producing fuel therefrom.

The converter 260 preferably has a plurality of rod or bar-type electrical heating elements 264 positioned therein in spaced relation and operatively connectible to a source of electric current and the like such as in the manner described hereinbefore. A condensation conduit 266 is desirably connected to a drain 267 on the plate 226 and to the fuel storage tank to return fuel condensed in the smoke accumulator compartment or not consumed on the converter surface 262 to the storage tank. In FIG. 6, as in FIGS. 8 and 9, the means for compressing the air, moving air to the converter end through the smoke accumulator compartment, and for transferring the produced smoke to a sign or the like are the same or similar in construction to that illustrated in detail in FIGS. 1, 2, 4 and 5 of the drawings and have not been shown in

8

detail here. Also, the manner of operation is the same as that described hereinbefore for FIGS. 1–5.

The smoke generating method and means of the invention have been found quite desirable in use for supplying relatively large quantities of smoke over a long period of time to signs and in other uses where smoke is required. By mounting the apparatus in a cabinet as indicated in the drawings, the apparatus is easily portable and need only be connected to a source of electric current and have the smoke outlet means 170 and 172 connected to the sign or other means to receive the smoke and the apparatus is ready for use. The apparatus can be used for portable installations, such as on trucks, vans or the like for moving signs, to lay down smoke screens, etc. The apparatus can also be used in applications other than for signs. For example, the device can be used to detect leaks in pipes or conduits, such as in sewer pipes, oil carrying conduits or pipes, etc.

While the invention has been described in connection with preferred specific embodiments thereof, it will be understood that such is intended to illustrate and not to limit the scope of the invention which is defined in the claims.

I claim:

1. A portable smoke generator comprising, in combination, an elongated cabinet having a bottom, two sides, two ends and a hingedly mounted top secured to one of said sides, electrical inlet means connected to one end of said cabinet and electrically connectible to a source of electric current, a timing switch mounted on said one side of said cabinet adjacent said one end of said cabinet and electrically connected to said electrical inlet means, a blower fan positioned within said cabinet and mounted on the opposite side of said cabinet, a blower fan switch electrically connected to said blower fan and said timing switch, said blower fan switch being operable to regulate the speed of said blower fan, an electrically operated air compressor mounted on said bottom of said cabinet adjacent said one end thereof and electrically connected to said timing switch, an air storage tank mounted on said bottom of said cabinet adjacent said one end thereof, a compressor conduit connected at its end portions to said compressor and to said air storage tank to supply air under pressure to said air storage tank, an air pressure gauge operatively connected to said air storage tank to indicate pressure of air therein, a wall in said cabinet extending between and secured to said sides thereof and extending from said top when closed to the lower portion of said cabinet and terminating in spaced relation to said bottom of said cabinet, a plate connected in one edge to the lower edge of said wall and having the opposite edge positioned on said bottom of said cabinet at said other end of said cabinet and extending across said cabinet from said one side to said other side, said wall being positioned at the intermediate portion of said cabinet and defining with the other end thereof, said sides, said top and said plate, a smoke accumulator compartment, a centrally located opening in said wall, a hood mounted on the center portion of said wall with one end portion thereof in communication with said opening, said hood being positioned within said accumulator compartment and having its other end portion opening toward said plate, and in spaced relation thereto, an angle iron secured in its end portions to said sides of said cabinet and positioned adjacent said wall between said wall and said one end of said cabinet, a gun support connected to an intermediate portion of said angle iron and projecting therefrom toward said one end of said cabinet, a spray gun mounted on said gun support with the spray end thereof pointed at said hood through said opening in said wall, an air hose connected in its end portions to said spray gun and to said air storage tank, a pressure relief valve in said hose operable to open at a preset pressure of air in said air storage tank to provide compressed air therefrom to said spray gun, a fuel storage tank positioned

3,250,723

9

beneath said spray gun and below said accumulator compartment, an immersible electric heater in said fuel storage tank, a fuel conduit connected in one end portion to said spray gun and having the other end portion positioned in said fuel storage tank, a short channel-shaped converter mounting bracket connected to said angle iron adjacent said opening in said wall, a cylindrical fuel converter having a metallic tubular body portion positioned in said hood and having a plurality of spaced electrical heating elements mounted therein in spaced relation to the radially inner and outer surfaces of said body, said hood being larger in size than said body portion of said converter to provide an air passage therearound, a heat sensing element positioned in said body portion of said converter, a heat gauge mounted on said wall and operatively connected to said heat sensing element to indicate the temperature of said body portion of said converter, said converter having a tubular center core mounted in and coaxial with said body portion and projecting from the ends of said body portion, one end of said tubular core of said converter being positioned beneath said converter mounting bracket and in closely spaced relation to said nozzle of said spray gun to receive fuel therefrom, a U-bolt removably connecting said one end portion of said core of said converter to said converter mounting bracket, a percentage input control mounted on said one side of said cabinet within said cabinet and electrically connected to said timing switch and to each of said heating elements in said converter and operable to supply electric current to said heating elements in said converter from one to one hundred per cent of the operating cycle in suitable time intervals to provide a constant temperature in the converter, two smoke outlet pipes connected to the upper portion of said other end of said cabinet and communicating with the interior of said accumulator compartment of said cabinet, and a condensation conduit connected in its end portions to said accumdlator compartment and to said fuel storage tank to return fuel consensed in said accumulator compartment to said fuel storage tank, said smoke generator being constructed and adapted so that operation of said compressor provides air under pressure to said air storage tank and to said spray gun with passage of air through said spray gun siphoning fuel from said fuel storage tank to said spray gun for discharge therefrom into said one end portion of said converter core for burning therein as a result of heating therein to result in discharge of smoke from the other end of said converter into said hood, said blower fan forcing air through said air passage around said converter and forcing smoke from said hood through said accumulator compartment into said smoke outlet pipes, said timing switch constructed and adapted to in operation initially operate to provide current from said source of electric current to said heating elements followed by providing at a time interval from said source to said compressor and blower fan, thereby providing for producing and delivering smoke.

2. A portable smoke generator comprising, in combination, an elongated cabinet having a bottom, two sides, two ends and a hingedly mounted top secured to one of said sides, a blower fan positioned within said cabinet and operable to vary the speed of same in operation, an air compressor mounted in said cabinet at said one end portion thereof, an air storage tank positioned in said cabinet adjacent said air compressor, conduit means connecting said air compressor to said air storage tank, a wall in said cabinet extending between said sides and positioned in an intermediate portion thereof and defining with the other end portion of said cabinet a smoke accumulator compartment, said wall having an opening therein, hood means mounted on said wall and having one end portion thereof in fluid communication with said opening in said

10

wall, said hood means being positioned within said accumulator compartment and having its other end portion thereof opening downwardly toward said bottom of said cabinet, spray gun support means operatively connected to said cabinet and positioned in said one end portion thereof, a spray gun mounted on said gun support means and having the spray end portion thereof positioned to direct a spray toward said hood through said opening in said wall, conduit means connecting said spray gun to said air storage tank, a fuel storage tank positioned beneath said spray gun and below said accumulator compartment, conduit means connecting said fuel storage tank to said spray gun with said gun being operable upon passage of compressed air therethrough to siphon fuel from said fuel storage tank and mix same with said air therein for discharge through said spray end thereof, a fuel converter operatively mounted in said cabinet and supported thereby and having the inlet end thereof positioned adjacent said spray end of said spray gun to receive smoke-producing fuel therefrom, said fuel converter having heating means connected thereto to heat said fuel therein and convert same to smoke, the outlet end of said fuel converter being positioned within said hood to discharge smoke thereinto, said converter being positioned relative to said hood to provide a passage for air from said blower fan into said hood, and smoke outlet means in said accumulator compartment positioned to receive and discharge smoke therefrom, said smoke generator being constructed and adapted in operation to provide a smoke-producing fuel from said fuel storage tank to said spray gun for mixing therein with compressed air from said air storage tank and discharging therefrom into said fuel converter for production of smoke therein, the resulting smoke being discharged into said hood and moved by air from said blower fan through said smoke accumulator compartment to said smoke outlet means for delivery to a sign or the like, said switch means being connected to said compressor and to said heating means in said fuel converter and constructed and adapted to in operation initially operate said heating means followed by operating at a time interval said blower fan and compressor.

3. A portable smoke generator comprising, in combination, an elongated cabinet having a bottom, two sides, two ends and a hingedly mounted top secured to one of said sides, electrical inlet means connected to one end of said cabinet and electrically connectible to a source of electric current, a timing switch to selectively initiate or terminate operation of said generator mounted on said one side of said cabinet adjacent said one end of said cabinet and electrically connected to said electrical inlet means, a blower fan positioned within said cabinet and mounted on the other side thereof, a blower fan switch electrically connected to said blower fan and said timing switch, said blower fan switch being operable to regulate the speed of operation of said blower fan, an electrically operated air compressor mounted on said bottom of said cabinet adjacent said one end thereof and electrically connected to said timer switch, an air storage tank mounted on said bottom of said cabinet adjacent said one end thereof, a compressor conduit connected in the end portions to said compressor and to said air storage tank to supply air under pressure to said air storage tank, an air pressure gauge operatively connected to said air storage tank to indicate pressure of air therein, a wall in said cabinet extending between and secured to said sides thereof and extending from said top when closed to the lower portion of said cabinet and terminating in spaced relation to said bottom of said cabinet, a plate connected in one edge to the lower edge of said wall and having the opposite edge positioned on said bottom of said cabinet at said other end of said cabinet and extending across said cabinet from said one side to said other side, said wall being positioned at the intermediate portion of said cabinet and defining with the other end thereof, said side

3,250,723

11

walls, said top when closed and said plate a smoke accu-
mulator compartment, a centrally located opening in said
wall, a hood mounted on the center portion of said wall
with one end portion thereof in communication with said
opening, said hood being positioned within said accumu-
lator compartment and having the other end portion there-
of opening toward said plate and in spaced relation there-
to, an angle iron secured in its end portions to said sides
of said cabinet and positioned adjacent said wall between
said wall and said one end of said cabinet, a plurality of
spray guns operatively connected to and supported by
said angle iron with the spray end portions thereof posi-
tioned to direct a spray toward said hood through said
opening in said wall, each of said spray guns being op-
eratively connected to said air storage tank to receive air
under pressure therefrom, fuel storage means positioned
beneath said spray guns and accumulator compartment
and operatively connected thereto to provide a smoke-
producing fuel thereto, an elongated fuel converter oper-
atively mounted in said cabinet, said fuel converter hav-
ing an elongated metallic body portion positioned in said
hood and having a plurality of tubular cores mounted
therein in spaced relation with said cores projecting from
the ends of said body portion, the axes of said cores being
substantially parallel to each other and one end of said
cores being positioned adjacent said spray end portions of
said spray guns to receive a fuel and air mixture from said
spray guns, a plurality of heating elements mounted in
said body portion of said converter in spaced relation to
the outer surface thereof and to said cores to heat the
fuel passing through said cores and convert same to
smoke, the other end of each of said converter cores be-
ing positioned to deliver smoke to said hood, electrical
input control means mounted in said cabinet and elec-
trically connected to said timing switch and to said heat-
ing elements in said converter and operable to supply elec-
tric current to said heating elements, said converter be-
ing positioned relative to said hood to define therewith an
air passage, two smoke outlet pipes connected to the up-
per portion of said other end of said cabinet and com-
municating with the interior of said accumulator com-
partment of said cabinet, a condensation conduit con-
nected in the end portions to said accumulator compart-
ment and to said fuel storage means to return fuel con-
densed in said accumulator compartment to said fuel stor-
age means, said smoke generator being constructed and
adapted so that operation of said compressor provides air
under pressure to said air storage tank and to said spray
guns with passage of air through said spray guns siphon-
ing fuel from said fuel storage means to said spray guns
for discharge therefrom into said converter cores for pro-
duction of smoke therein as a result of heating therein to
result in discharge of smoke from said other end of said
converter cores into said hood, said blower fan forcing air
through said passage defined by said converter and said
hood and forcing smoke from said hood through said ac-
cumulator compartment into said smoke outlet pipes, said
timing switch constructed and adapted to in operation
initially operate to provide current from said source of
electric current to said heating elements followed by pro-
viding at a time interval thereafter current from said
source to said compressor and blower fan, thereby pro-
viding for producing and delivering smoke.

4. A portable smoke generator comprising, in combi-
nation, an elongated cabinet having a bottom, two sides,
two ends and a hingedly mounted top secured to one of
said sides, electrical inlet means connected to one end of
said cabinet and electrically connectible to a source of
electric current, a timing switch to selectively initiate or
terminate operation of said generator mounted on said
one side of said cabinet adjacent said one end of said
cabinet and electrically connected to said electrical inlet
means, a blower fan positioned within said cabinet and
mounted on the other side thereof, a blower fan switch
electrically connected to said blower fan and said timing
switch, said blower fan switch being operable to regulate

12

the speed of operation of said blower fan, an electrically
operated air compressor mounted on said bottom of said
cabinet adjacent said one end thereof and electrically con-
nected to said timer switch, an air storage tank mounted
on said bottom of said cabinet adjacent said one end there-
of, a compressor conduit connected in its end portions to
said compressor and to said air storage tank to supply air
under pressure to said air storage tank, an air pressure
gauge operatively connected to said air storage tank to
indicate pressure therein, a wall in said cabinet extending
between and secured to said sides thereof and extending
from said top thereof when closed to the bottom thereof,
a plate connected in one portion to the lower edge of said
wall and having the opposite edge thereof connected to
said other end of said cabinet adjacent said bottom of said
cabinet and extending across said cabinet from said one
side to said other side thereof, said wall being positioned
at the intermediate portion of said cabinet and defining
with the other end thereof, said sides, said top when closed
and said plate a smoke accumulator compartment, a cen-
trally located opening in said wall, an angle iron secured
in its end portions to said sides of said cabinet and posi-
tioned within said accumulator compartment, a gun sup-
port connected to an intermediate portion of said angle
iron and projecting therefrom toward said wall, a spray
gun mounted on said gun support, an air hose connected
in its end portions to said spray gun and to said air stor-
age tank, a pressure relief valve in said hose operable to
open at a preset pressure of air in said air storage tank to
provide compressed air therefrom to said spray gun, a
fuel storage tank positioned in said cabinet beneath said
spray gun and said accumulator compartment, a fuel con-
duit connected in one end portion to said spray gun and
having the other end portion positioned in said fuel stor-
age tank, a converter mounting bracket having a flat cen-
ter portion and inclined edge portions, said edge portions
being secured to said plate and said other end of said
housing with said center portion being inclined relative
to said plate and said other end of said cabinet, a flat
fuel converter having a plurality of electrical heating ele-
ments positioned therein in spaced relation to the upper
and lower surfaces thereof, said fuel converter having the
lower surface thereof connected to said converter mount-
ing bracket and having the upper surface thereof posi-
tioned adjacent and in spaced relation to the spray end
portion of said spray gun, electrical control means oper-
atively connected to said electric heating elements in said
converter and to said timing switch and operable to sup-
ply electric current to said heating elements to heat said
converter, smoke outlet means connected to said accumu-
lator compartment of said cabinet to receive smoke there-
from and direct same to a sign or the like, and a conden-
sation conduit connected in the end portions to said ac-
cumulator compartment and to said fuel storage tank to
return fuel condensed in said accumulator compartment
to said fuel storage tank, said smoke generator being con-
structed and adapted so that operation of said compres-
sor provides air under pressure to said air storage tank
and to said spray gun with passage of air through said
spray gun siphoning fuel from said fuel storage tank to
said spray gun for discharge therefrom onto said upper
surface of said converter for production of smoke as a
result of heating of the fuel thereon, said blower fan forc-
ing air through said opening in said wall into said accu-
mulator compartment for mixing with smoke therein and
discharging same through said smoke outlet means to a
sign or the like, said timing switch constructed and adapted
to in operation initially operate to provide current from
said source of electric current to said heating elements
followed by providing at a time interval thereafter cur-
rent from said source to said compressor and fan, there-
by providing for producing and delivering smoke.

5. Portable smoke generator means comprising, in com-
bination, a cabinet, a timing switch to selectively initiate
or terminate operation of said generator mounted in said
cabinet and operatively connected to a source of electric

p.1041-9

**A398**

3,250,723

13

power, a blower fan positioned in said cabinet to drive air therein, and electrically connected to said timing switch, a compressor mounted in said cabinet and electrically connected to said timing switch, an air storage tank positioned within said cabinet and operatively connected to said compressor to receive compressed air therefrom, spray gun support means connected to said cabinet, spray gun means mounted on said gun support means, fuel storage means positioned beneath said spray gun means, conduit means connecting said fuel storage means and said air storage tank to said spray gun means to supply air under pressure and fuel to said spray means, converter means mounted in said cabinet and positioned adjacent said spray gun means to receive an air-fuel mixture from said spray gun means, said converter having heating means therewith operable to heat said converter to cause conversion of said fuel to smoke upon contact with said converter means, said cabinet having smoke outlet means therewith operable to receive and pass smoke from said cabinet, said smoke generator means being constructed and adapted so that operation of said compressor provides air under pressure to said air storage tank and to said spray gun with passage of air through said spray gun means siphoning fuel from said fuel storage means to said spray gun means for discharge therefrom to said converter to result in the production of smoke, said blower fan forcing air through said cabinet into said smoke outlet means, said timing switch constructed and adapted to in operation initially operate to provide current from said source of electric current to said heating means of said converter followed by providing at a time interval thereafter current from said source to said compressor and blower fan, thereby providing for delivering smoke.

6. Means for generating smoke comprising, in combination, spray means, means operatively connected to said spray means to provide a gas under pressure thereto, fuel storage means operatively connected to said spray means to provide a smoke-producing fuel thereto, converter means positioned at the outlet of said spray means to receive a fuel and gas mixture therefrom, said converter means having heating means operatively positioned relative thereto and adapted to burn said fuel and produce smoke, smoke accumulator means positioned to receive smoke from said converter means, said accumulator means having outlet means to discharge smoke therefrom, and blower means mounted and operable to force smoke from said converter means through said accumulator means and into said outlet means.

7. The method of producing smoke comprising, the steps of, preheating a smoke converter to a temperature of approximately 400° F., subsequently commencing operation of an air compressor and transferring compressed air from the compressor to an air storage tank, passing air at approximately 22 pounds per square inch pressure from the air storage tank to a spray gun, operatively connecting the spray gun to a supply of smoke-producing fuel and passing the air under pressure through the spray gun and discharging same from a spray nozzle so that passage of air through the gun causes siphoning of fuel from the fuel storage tank to the spray gun, mixing the fuel and air under pressure in the spray gun and discharging a spray mixture of air and fuel from the spray gun, directing the fuel-air mixture from the spray gun onto a heated surface of the converter to cause heating of the fuel and conversion of same into smoke, continuously

14

passing approximately 85 cubic feet per minute of air around the converter to cause movement of smoke therefrom and mixing of the smoke with the air, and transferring the smoke generated in the converter to a sign or the like.

8. A method of producing smoke comprising the steps of, preheating a converter to a temperature sufficient to convert a fuel to smoke, starting an air compressor after heating of said converter and operating the compressor continuously to provide a continuous supply of air under pressure to an air storage tank, transferring a portion of the air under pressure from the air storage tank to a spray gun and passing same therethrough, siphoning fuel from a fuel storage tank to the spray gun, mixing the fuel and air in the spray gun and directing the fuel-air mixture therefrom to the converter, heating the fuel-air mixture at the converter to cause conversion of the fuel to smoke and discharging the resulting smoke from the converter, continuously passing a stream of air past the converter to the smoke from the converter and mix same with the stream of air, and transferring the resulting smoke and air mixture through a restricted opening to a sign or the like.

9. A method of producing smoke comprising the steps of, compressing a supply of air, transferring a portion of the compressed air to spray gun means, passing the compressed air through the spray gun to result in siphoning of a smoke-producing fuel from a fuel tank, mixing the fuel with the air in the spray gun and discharging same therefrom in a spray to a fuel converter, heating the converter, placing the fuel in contact with the converter to heat the fuel to thereby produce smoke, passing a stream of air around the converter to move the smoke therefrom and mix the smoke with the air, and transferring the smoke and air mixture to a sign or the like.

10. A method of producing smoke comprising the steps of, siphoning fuel from storage means into spray means, mixing said fuel therein with a compressed gas and forcing the resulting mixture from said spray means to converter means, heating the converter and thus the resulting mixture of fuel and gas to produce smoke and forcing same from the converter, blowing the resulting smoke into discharge means for delivery to a sign or the like.

11. A method of producing smoke comprising the steps of, heating a converter element to a temperature sufficient to cause a fuel to produce smoke, spraying a smoke-producing fuel onto the converter, directing a stream of air by the converter to cause movement of the smoke from the converter and delivery of same to the desired location.

References Cited by the Examiner

UNITED STATES PATENTS

| | | | |
|---|---|---|---|
| 2,422,024 | 6/1947 | Levey et al. | 252—359.1 |
| 2,686,944 | 8/1954 | Gubelin | 239—70 X |
| 2,736,987 | 3/1956 | Tomasovich | 219—273 |
| 2,742,562 | 4/1956 | Frantz et al. | 219—38 |
| 2,882,240 | 4/1959 | Charwat | 252—359.1 |
| 2,926,855 | 3/1960 | Durr et al. | 252—359.1 |
| 3,044,276 | 7/1962 | Kauten | 239—70 X |
| 3,081,313 | 3/1963 | Wohl | 219—38 |

NORMAN YUDKOFF, Primary Examiner.

GEORGE D. MITCHELL, Examiner.

March 11, 1969          J. J. DICKMAN                3,432,439
                    SMOKE GENERATING APPARATUS

Filed Jan. 9, 1967                        Sheet __1__ of 2



FIG. I

INVENTOR,
*JOHN J. DICKMAN*

BY: *Ralph K. Koisch*

ATTORNEY

REDLINE EXHIBIT 1042
Redline v. Star
Trial IPR2013-00106
p.1042-1

March 11, 1969          J. J. DICKMAN          3,432,439

SMOKE GENERATING APPARATUS

Filed Jan. 9, 1967                    Sheet _2_ of 2



FIG. 2



FIG. 3

FIG. 4

INVENTOR,

*JOHN J. DICKMAN*

BY:

**ATTORNEY**

p.1042-2

**A401**

# United States Patent Office

**3,432,439**
**Patented Mar. 11, 1969**

---

1

3,432,439
**SMOKE GENERATING APPARATUS**
John J. Dickman, Lemay, Mo., assignor to Missouri Research Laboratories, Inc., St. Louis, Mo., a corporation of Missouri
Filed Jan. 9, 1967, Ser. No. 608,106
U.S. Cl. 252—359                  6 Claims
Int. Cl. B01f 3/04; A63j 5/00

## ABSTRACT OF THE DISCLOSURE

An apparatus for producing smoke by subjecting a liquid fuel to an electrically heated resistance coil; there being means for delivering predetermined quantities of the liquid fuel to the coil under preselected pressure for controlling the characteristics of the emitted smoke.

## Background of the invention

This invention relates to apparatus for generating smoke for visual detection purposes. Heretofore in the use of dioramas for military exercise purposes, there has been the need for causing a readily detectable, realistic signal to be presented upon the incidence of an explosion-producing event. Various types of electrical indicators have been used but not with the desired effectiveness. Thus, the present invention brings about the emission of a cloud of smoke at or near the point of the simulated explosion so as to lend a strong sense of reality to the exercise, as well as to provide the participants with an experience closely associated with that which might be encountered in an actual war zone. Furthermore, there has been difficulty heretofore in developing agents for effecting facile study of air flow in conduits of all types such as ducts, tunnels, vents and the like. With the present invention, a body of smoke may be cheaply and easily discharged into the path of air flow so as to allow viewers to watch the effects thereon and thereby gain a rapid insight as to the nature of the currents.

## Summary of the invention

It is an object of the present invention to provide apparatus for producing smoke for visible detection purposes such as, for instance, in air flow studies, in duct and vent systems, as well as in air tunnel experiments.

It is another object of the present invention to provide an apparatus of the character stated which can be effectively used in training devices, such as for military purposes for simulating explosions as in dioramas designed to represent battle areas.

It is a further object of the present invention to provide an apparatus of the character stated which may be most economically produced, having a marked simplicity of parts; which may be readily installed in operative position; which may be utilized in multiple units; which is reliable and efficient in operation; and which may be easily installed in operative condition.

## Brief description of the drawings

FIGURE 1 is a perspective view of the smoke generating apparatus constructed in accordance with and embodying the present invention, illustrating same in operative position with respect to a terrain board for diorama purposes and with the main support bracket omitted.

FIGURE 2 is an elevational view, partly in section, of the smoke generating apparatus.

FIGURE 3 is an exploded perspective view of the smoke discharging unit and the associated elements.

FIGURE 4 is a circuit diagram of the electrical system of the smoke generating apparatus.

2

## Description of the preferred embodiment

Referring now by reference characters to the drawings which illustrate the preferred embodiment of the present invention, A generally designates a smoke generating apparatus which, for purposes of illustration, is shown as used for diorama purposes being disposed on the underside of a terrain board or table 1, the upper surface of which may be suitably treated for simulating a battle area. Board 1 is provided with an aperture 2 for each smoke generating apparatus A through which aperture the generated smoke will escape, as indicated at S in FIGURE 1, simulative of an explosion, as by a shell or the like, as more fully described hereinbelow. Apparatus A comprises a support structure which includes an angle bracket 3, having its horizontal flange 4 secured to the under face of board 1 as by screws 5 and with its other or vertical flange 6 depending downwardly; said latter flange being tapered in its lower margin, as at 6' and having a transversely extending arcuate slot 7 for receiving a pin 8 which is engaged to a vertically disposed support bar 9 which progresses downwardly with its lower end located spacedly below bracket 3. The upper end of bar 9 is fixed to flange 6 of bracket 3 or the like 10. Thus, bar 9 may be disposed in any preselected rotatively swung relation to bracket 3 by reason of slot 7 so as to allow for facile installation of apparatus A. Progressing upwardly from the lower end of bar 9 is an elongated longitudinally extending opening 11, the sides of which are designed to securely embrace bolts 12 extending through said opening 11 for securing same to the vertical wall 13 of a mounting bracket 14. Opening 11 accordingly permits of selected vertical disposition of mounting bracket 14 with respect to support bar 9. Vertical wall 13 is provided with a cut-out as indicated at 15 for receiving a terminal plug 16. Mounting bracket 14 integrally incorporates a lower horizontal plate 17 which extends from the lower end of vertical wall 13 in a direction rearwardly, as viewed in FIGURE 2, for supported disposition thereon of a transformer 18. Also received upon plate 17 between transformer 18 and vertical wall 13 are the discharge conduits 19 of an atomizer, indicated generally at 20, and being disposed immediately laterally outwardly of the adjacent side edge of plate 17.

Atomizer 20 comprises a liquid receptacle 21 and a removable cap 22, which latter carries a restricted fluid passage or venturi 23, the discharge end of which is suitably connected by customary fittings to conduit 19; the inlet end of said latter being engaged, as by a fitting denoted 24, to a fluid supply tube 25. The throat of venturi 23 is connected to a tube 26 which extends downwardly within receptacle 21 for drawing the contents thereof upwardly into venturi 23 upon the development of reduced pressure therein as will be described more fully hereinbelow. Cap 22 is also provided with an aperture 27 for extension therethrough of a conduit 28 terminating at one end at a location preferably in alignment with the utilized for the purpose of recharging the receptacle with the smoke producing fluid.

Fluid supply tube 25 is engaged at its other end to a solenoid valve 29 suitably secured to the under surface of plate 17 and being connected by tubing 30 to a conveniently located source of pressure gas 31 which, if desired, may be air.

Vertical wall 13 of mounting bracket 14 on its side remote from that adjacent atomizer 20 is provided with a vertical flange 32 being suitably apertured (not shown) for engagement as by rivets, screws, or like attaching means, to a chimney 33 being of tubular form and being preferably formed of material adapted to resist deterioration through exposure to heat and also being preferably dielectric, such as from fibreglass-impregnated phenolics.

3,432,439

<table>
<tr><td>3</td><td>4</td></tr>
</table>

Chimney 33 is received at its upper end within the lower portion of table aperture 2 and at its lower end may terminate in substantial alignment with the bottom of atomizer receptacle 21 thereby conducive to the compactness of apparatus A. Flange 32 of mounting bracket 14 terminates above plate 17 for accommodating a fitting 34 which connects the nozzle forming ends of discharge conduits 19 as indicated at 35 to the inlet passage 36 of the glass housing 37 of a heating element indicated generally at H. Said glass housing 37 is of general bulb form with inlet passage 36 projecting laterally from the upper side wall thereof through a suitable opening 38 in the side wall of chimney 33; said opening 38 extending to the bottom of chimney 33 so as to facilitate removal of elements H from, and installation of such elements in, chimney 33. Glass housing 37 is of such outside diameter as to be readily received within chimney 33. Heating element H comprises a resistance coil 39 which is of spiral formation and disposed within housing 37. Coil 39 may be made of any suitable material, however, 22 gage Nichrome wire has been found to be a material of preference with the same being wound into a ¼ inch diameter coil. By reason of the relatively thick character of the selected wire, high durability is assured, as well as providing a relatively low resistance.

At its upper end glass housing 37 is provided with an upwardly projecting vertical extension 40 constituting an outlet passage. Extension 40 mounts a tubular sleeve 41, as of suitable flexible material, which provides a continuation of extension 40; the upper end of said sleeve 41 terminating spacedly below the upper end of chimney 33.

There is also provided in the upper end of chimney 33 an incandescent lamp 42 engaged within a socket 43 carried upon a mounting clip 44 having outwardly biased arms 45, 45' for engaging the inner wall of chimney 33; said clip 44 carrying bosses 46, 46' for suitable connection by leads (not shown) to a source of electricity. Lamp 42 projects into aperture 2 and at its upper end is located slightly below the upper surface of board 1; there being a mesh member 47 extending across aperture 2 so as to inhibit foreign particles from descending into chimney 33. With reference to FIGURE 2 it will be seen that sleeve 41 will be disposed in adjacency to lamp socket 43.

With reference to the wiring diagram being shown in FIGURE 4, it will be seen that heating element H is in circuit with transformer 18 whereby the latter may step down the voltage applied to said element H in view of its relatively low-resistance characteristics. For purposes of diorama usage, transformer 18 may be of such capacity so as to furnish 17¼ watts to heating element H which will be maintained in energized condition throughout the period of use of apparatus A. Transformer 18 thus may step down the customary line voltage of 115 volts to 12.6 volts for energizing purposes. But it is understood that the foregoing is merely exemplary since it is obvious that the electrical requirements will differ depending upon the application of the unit.

In operation, receptacle 21 of atomizer 20 will be supplied with a quantity of a liquid fuel, of non-toxic character, which is adapted at a predetermined temperature to be converted through combustion to smoke. Thus, upon provision of pressurized gas to atomizer 20, a predetermined quantity of the liquid fuel will be entrained by the vehicle-forming gas for transmission through discharge conduits 19, nozzle 35, and inlet 36 for subjection to the energized coil 39 within housing 37 whereby through combustion of the fuel, smoke will be emitted through extension 40 and sleeve 41 and thence outwardly through aperture 2 to create a visible mass, as shown at S in FIGURE 1. Although it does not form part of the present invention, apparatus A may be provided with a circuit for illumination of lamp 42 in timed relation to emission of smoke through aperture 2 so as to provide

simulation of a flash thereby completing the illusion of an explosion.

From the foregoing it will thus be seen that by the circuitry provided, upon each actuation, solenoid valve 29 will operate for a predetermined time increment so as to allow a correlative quantity of pressurized gas to pass therethrough for carrying the liquid fuel to heater element H. The duration of operation of solenoid valve 29 may be easily predetermined with reference to the particular smoke characteristic sought, taking into account the pressure of the gas. It is recognized that such pressure may be preselected to achieve desired smoke flow. Thus, it has been found that gas pressure at 3 p.s.i. will cause the smoke to drift upwardly as from a slow burning fire, while at 60 p.s.i. the smoke will be rapidly dissipated. Gas at a pressure of 10 pounds per square inch has been found in practice to produce a very realistic smoke cloud having desired body and travel rate. The constituency of the liquid fuel may be a matter of choice and with the same determining the temperature of the heating element H in energized state so as to bring about the requisite combustion. For purposes of dioramas, as used for military instructional and educational purposes, a fuel having the following ingredients has been found highly effective, namely:

|  | Parts |
|---|---|
| Kerosene | 80 |
| Methyl salicylate | 20 |
| Glycerine | 1 |

Fuel so constituted will be converted to a smoke in a non-pyrotechnic manner at a temperature of approximately 400° F. so that element H will be maintained at such temperature during operation of apparatus A. The particular fuel utilized is not a part of the present invention but the foregoing will serve as an example of the type of preparation having properties desirable for use with the present invention.

From the foregoing the operation of apparatus A should be quite apparent; it being recognized that the same may be readily adapted for the particular conditions desired with appropriate selection of the pressure operating upon the gas vehicle; the interval of operation of solenoid valve 29 for permitting a preselected volume of gas to be delivered to atomizer 20, as well as choice of fuel and with commensurate temperature maintenance of element H.

FIGURE 4 demonstrates a simple wiring diagram for the system and with the same being connected to terminal plug 16 by appropriate leads for ultimate connection to a convenient source of electricity. FIGURE 4 sets forth the circuit utilized in the smoke generating apparatus of the present invention.

FIGURE 1 shows a plurality of apparatuses A spacedly mounted upon the under surface of a terrain board 1 so as to bring about the emission of smoke clouds at various locations throughout the table surface which, as indicated above, is decorated to represent an embattled zone. It is apparent that a single remotely located control device could be used for causing discharge of smoke at selected points throughout terrain table 1 in accordance with the requirements and developments of a particular military exercise.

It will also be seen that apparatus A is extremely versatile in usage since the same provides an efficient, reliable and easily operated system for providing visible smoke which can be used in airflow studies, such as in vents, ducts, air tunnels, and the like.

It should be understood that changes and modifications in the formation, construction, arrangement, and combination of the several parts of the smoke generating apparatus may be made and substituted for these herein shown and described without departing from the nature and principle of my invention.

3,432,439

**5**

Having thus described my invention, what I claim and desire to obtain by Letters Patent is:

1. An apparatus for generating smoke comprising a source of liquid fuel capable, upon combustion, of producing smoke, a source of a combustion supporting gas under preselected pressure, conduit means connecting said source of fuel and said source of gas, said connecting means comprising a venturi tube for entrainment of said liquid fuel via the venturi throat into said gas, a heating element, means defining a housing surrounding said heating element, said housing being of general glass bulb form having an inlet passage and an outlet passage, means for maintaining said heating element at a temperature for combustion of said gas and liquid fuel mixture, conduit forming means connected to said inlet passage for delivering the gas-carried fuel into direct contact with said heating element for smoke generation and then through said outlet passage.

2. An apparatus for generating smoke as defined in claim 1 and further characterized by the axis of said inlet passage being in normal relationship to the axis of said outlet passage.

3. An apparatus for generating smoke as defined in claim 1 and further characterized by chimney defining means surrounding said housing and progressing upwardly of said outlet passage thereof, said chimney being formed of dielectric material and having an opening in the sidewall thereof for receiving said conduit-forming means.

4. An apparatus for generating smoke as defined in claim 1 and further characterized by said outlet passage comprising an upwardly projecting vertical extension formed integral with said housing, said extension being of reduced diametrical dimension, the axis of said extension being normal to the axis of said inlet passage.

5. An apparatus as defined in claim 1 and further characterized by said heating element being of low resistance wire and being spirally formed, said heating element being disposed in said housing in axially normal relationship to said inlet passage and in axially aligned relationship with said outlet passage.

6. In combination with a diorama terrain board having a plurality of apertures therein, a plurality of smoke generating apparatus mounted on the underface of said board

**6**

adjacent each of said apertures, each said smoke generating apparatus comprising means defining a receptacle, a liquid fuel, capable upon combustion with a combustion supporting gas of producing smoke, contained with in said receptacle, a venturi mounted within said receptacle having two inlets and an outlet, tube means connecting the throat inlet of said venturi with said liquid fuel, a source of gas under preselected pressure, first conduit means connecting said source of gas with the other inlet of said venturi, a solenoid valve disposed in said first conduit means for controlling the volume of gas delivered to said venturi other inlet to entrain said fuel, a glass bulb having an inlet and an outlet, a spiral heating element provided within said bulb, means for heating said heating element to a predetermined temperature for combustion of said gas and liquid fuel mixture, second conduit means connecting the venturi outlet to said bulb inlet, said bulb outlet being in axially perpendicular relationship to the axis of said bulb inlet and in axially aligned relationship with the axis of said heating element, chimney defining means mounted within each of said apertures and depending downwardly from said terrain board, said glass bulb being adapted to be received within said chimney defining means, a lamp mounted within said chimney upwardly of said bulb outlet and proximate a said aperture and means for illuminating said lamp.

### References Cited

UNITED STATES PATENTS

| | | | |
|---|---|---|---|
| 1,892,132 | 12/1932 | Berney | 244—136 |
| 3,160,980 | 12/1964 | Seuthe | 46—9 |
| 3,239,960 | 3/1966 | Stevens | 252—359 X |
| 3,250,723 | 5/1966 | Fortney | 252—359 X |
| 2,862,889 | 12/1958 | Mitchell | 252—359 |
| 2,611,992 | 9/1952 | Loy et al. | 252—359 X |

NORMAN YUDKOFF, *Primary Examiner.*

J. SOFER, *Assistant Examiner.*

U.S. Cl. X.R.

272—15

## <u>CERTIFICATE OF SERVICE</u>

𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
𝔣𝔬𝔯 𝔱𝔥𝔢 𝔉𝔢𝔡𝔢𝔯𝔞𝔩 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

Misc. No. _____

-------------------------------------------------------------)

In re Redline Detection, LLC,

                              *Petitioner.*

-------------------------------------------------------------)

I, John C. Kruesi, Jr., being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by STETINA BRUNDA GARRED & BRUCKER, Attorneys for Petitioner to print this document.  I am an employee of Counsel Press.

On the **17th Day of October, 2013**, I served the within **Petition for Writ of Mandamus** upon:

| | |
|---|---|
| Edward Schlatter | Sally C. Medley |
| Brenton Babcock | Jennifer S. Bisk |
| Knobbe Martens Olsen & Bear | James B. Arpin |
| 2040 Main Street, 14th Floor | US Patent and Trademark Office |
| Irvine, California 92614 | Patent Trial and Appeal Board |
| 949-760-0404 | Madison Building (East) |
| ed.schlatter@knobbe.com | 600 Dulany Street |
| brent.babcock@knobbe.com | Alexandria, Virginia 22313 |
| *(also served  via E-Mail)* | 571-272-7822 |
| | Trials@uspto.gov |

**via Express Mail,** by causing 2 true copies of each to be deposited, enclosed in a properly addressed wrapper, in an official depository of the U.S. Postal Service.

Unless otherwise noted, 4 copies and a pdf copy on disk, along with the required filing fee, have been hand-delivered to the Court on the same date as above.

October 17, 2013

John C. Kruesi, Jr.
Counsel Press

RECEIPT FOR PAYMENT

# United States Court of Appeals
# For The Federal Circuit

OFFICE OF THE CLERK

Received
From _____ _In re Redline_____

_____
(NAME)

_____
(ADDRESS)                          10/17/13

_____
(CASE NO.)          (SHORT TITLE)            (DATE)

| ACCOUNT | AMOUNT | |
|---|---|---|
| Clerk's Fee for docketing case  Writ | 450 | 00 |
| Certificate of membership | | |
| Certified copy of | | |
| | | |
| | | |
| | | |
| Copy of opinion | | |
| Copy of documents | | |
| Reimbursement fees | | |
| | | |
| Deputy Clerk  _____ | TOTAL  450 | 00 |

Credit Card ☐   Cash ☐   Check ☑   MONEY ORDER ☐